# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

MERCK SERONO S.A.,

*Appellant,*

*v.*

HOPEWELL PHARMA VENTURES, INC.,

*Appellee.*

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2023-00480 and IPR2023-00481.

## CONFIDENTIAL BRIEF FOR APPELLANT MERCK SERONO S.A.

EMILY R. WHELAN
MARK C. FLEMING
JAMES M. LYONS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

JENNIFER L. GRABER
GARY M. FOX
NORA N. XU
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, DC 20037
(202) 663-6000

March 7, 2025

DAVID B. BASSETT
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

HELENA RACHAEL MILLION-PEREZ
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, CO 80202
(720) 274-3135

*Attorneys for Appellant
Merck Serono S.A.*

## REPRESENTATIVE PATENT CLAIMS AT ISSUE

Appellee Hopewell Pharma Ventures, Inc. ("Hopewell") challenges U.S. Patent No. 7,713,947 (the "'947 patent"), which claims:

36.     A method of treating multiple sclerosis comprising the oral administration of a formulation comprising cladribine following the sequential steps below:

> (i) an induction period lasting from about 2 months to about 4 months wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

> (ii) a cladribine-free period lasting from about 8 months to about 10 months, wherein no cladribine is administered;

> (iii) a maintenance period lasting from about 2 months to about 4 months, wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg;

> (iv) a cladribine-free period wherein no cladribine is administered.

…

39.     The method according to claim 36, wherein the total dose of cladribine reached at the end of the induction period is about 1.7 mg/kg.

Appx201(19:13-29, 20:5-7).

Hopewell also challenges U.S. Patent No. 8,377,903 (the "'903 patent," and with the '947 patent, the "patents-at-issue"), which recites:

17.     A method of treating relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis comprising the oral administration of a formulation comprising cladribine to an individual having relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis following the sequential steps below:

> (i) an induction period lasting from about 2 months to about 4 months wherein said formulation is orally administered and

wherein the total dose of cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) a cladribine-free period lasting from about 8 months to about 10 months, wherein no cladribine is administered;

(iii) a maintenance period lasting from about 2 months to about 4 months, wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg; and

(iv) a cladribine-free period wherein no cladribine is administered.

…

20.    The method according to claim 17, wherein the total dose of cladribine reached at the end of the induction period is about 1.7 mg/kg.

Appx213(18:7-26, 18:30-32).

# CERTIFICATE OF INTEREST

Counsel for Appellant Merck Serono S.A. certifies the following:

**1.** **Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

Merck Serono S.A.

**2.** **Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

Merck KGaA, Ares Trading S.A.

**3.** **Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3).  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Merck KGaA

**4.** **Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

WILMER CUTLER PICKERING HALE AND DORR LLP:  Vinita Ferrera, Deric Geng, Cindy Kan, Asher S. McGuffin, David Mlaver (former), Mary Pheng

**5.     Related Cases**.   Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

[X] Yes (file separate notice; see below)     [ ] No     [ ] N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  Please do not duplicate information.  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

Already filed.

**6.     Organizational Victims and Bankruptcy Cases**.   Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None.

Dated:  March 7, 2025                    /s/ David B. Bassett
                                         DAVID B. BASSETT
                                         WILMER CUTLER PICKERING
                                           HALE AND DORR LLP
                                         7 World Trade Center
                                         250 Greenwich Street
                                         New York, NY  10007
                                         (212) 230-8800

# TABLE OF CONTENTS

Page

REPRESENTATIVE PATENT CLAIMS AT ISSUE

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES .....................................................................vi

STATEMENT OF RELATED CASES ........................................................1

INTRODUCTION ......................................................................................2

JURISDICTIONAL STATEMENT ............................................................5

STATEMENT OF ISSUES ON APPEAL ..................................................6

STATEMENT OF THE CASE....................................................................6

    A.    The Patents-At-Issue ..................................................................6

    B.    Conception Of The Claimed Dosing Regimen ..................9

    C.    Hopewell's Asserted References........................................12

        1.    Bodor.......................................................................12

        2.    Stelmasiak ...............................................................14

    D.    Board Decisions ...............................................................15

        1.    Procedural history ...................................................15

        2.    Status of Bodor as prior art .....................................17

        3.    Merits of the obviousness challenge ........................19

SUMMARY OF THE ARGUMENT ....................................................21

STANDARD OF REVIEW ..................................................................25

ARGUMENT ......................................................................................26

I.    THE BOARD LEGALLY ERRED IN TREATING BODOR AS A DISCLOSURE "BY ANOTHER".........................................................26

A.    The Board Legally Erred By Imposing An Unprecedented Bright-Line Rule That An Earlier Disclosure Is "By Another" Whenever The Inventors Of The Earlier Subject Matter Add A Collaborator To A Later-Filed Patent ........................................................................26

B.    The Board Violated The APA By Refusing To Follow The MPEP And Depriving Merck Of A Fair Opportunity To Respond.........................................................................33

C.    The Board Legally Erred In Its Determination That Dr. De Luca Was Not Proven To Be Part Of The Common Inventive Entity ...................................................................37

D.    The Board Separately Erred In Concluding That Drs. Bodor and Dandiker Were Co-Inventors Of The Dosing Regimen Disclosed In Bodor ...............................................43

II.   THE BOARD ERRED IN DETERMINING THAT IT WOULD HAVE BEEN OBVIOUS TO RE-TREAT A PATIENT ACCORDING TO THE CLAIMED MAINTENANCE PERIOD WITH A REASONABLE EXPECTATION OF SUCCESS ..........................................................48

A.    Neither Bodor Nor Stelmasiak Discloses Re-Treatment As Claimed .......................................................................49

B.    The Board Erred In Determining That A Skilled Artisan Would Have Been Motivated To Modify Bodor With A Reasonable Expectation Of Success ...................................53

III.  THE BOARD ERRED IN INTERPRETING THE CLAIMS TO COVER NON-WEIGHT-BASED DOSING .........................................................59

CONCLUSION ........................................................................................63

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted from pages Appx32, Appx39, Appx126, and Appx133 of the addendum contains Merck's proprietary technology information.

# TABLE OF AUTHORITIES

## CASES

Page(s)

*A.C. Aukerman Co. v. R.L. Chaides Construction Co.*,
  960 F.2d 1020 (Fed. Cir. 1992) ........................................................42

*Allergan, Inc. v. Apotex Inc.*,
  754 F.3d 952 (Fed. Cir. 2014) ...............................................25, 26, 32

*Applied Materials Inc. v. Gemini Research Corp.*,
  835 F.2d 279 (Fed. Cir. 1988) ...............................................29, 31, 32

*Belden Inc. v. Berk-Tek LLC*,
  805 F.3d 1064 (Fed. Cir. 2015) ........................................................54

*Dell Inc. v. Acceleron, LLC*,
  818 F.3d 1293 (Fed. Cir. 2016) ........................................................33

*Dionex Softron GmbH v. Agilent Technologies, Inc.*,
  56 F.4th 1353 (Fed. Cir. 2023) ........................................................25

*Duncan Parking Technologies, Inc. v. IPS Group, Inc.*,
  914 F.3d 1347 (Fed. Cir. 2019) ..................................................*passim*

*Dynamic Drinkware, LLC v. National Graphics, Inc.*,
  800 F.3d 1375 (Fed. Cir. 2015) ........................................................42

*Ethicon LLC v. Intuitive Surgical, Inc.*,
  847 F. App'x 901 (Fed. Cir. 2021) (nonprecedential) .................................. 44-45

*Ex parte Krahnstoever*,
  No. 2017-011796, 2019 Pat. App. LEXIS 2586 (P.T.A.B. Apr. 8, 2019) .........34

*Fleming v. Escort Inc.*,
  774 F.3d 1371 (Fed. Cir. 2014) ........................................................39

*Google LLC v. IPA Technologies Inc.*,
  34 F.4th 1081 (Fed. Cir. 2022) ...................................................41, 46

*Graham v. John Deere Co. of Kansas City*,
  383 U.S. 1 (1966)........................................................................55

*Hobbs v. United States Atomic Energy Commission*,
  451 F.2d 849 (5th Cir. 1971) ...............................................................29

*Hyatt v. Dudas*,
  492 F.3d 1365 (Fed. Cir. 2007) .........................................................36

*Illinois Tool Works, Inc. v. Solo Cup Co.*,
  461 F.2d 265 (7th Cir. 1972) .............................................................27

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule
  Patent Litigation*,
  676 F.3d 1063 (Fed. Cir. 2012) .........................................................49

*In re DeBaun*,
  687 F.2d 459 (C.C.P.A. 1982) ...............................................26, 27, 45

*In re Facius*,
  408 F.2d 1396 (C.C.P.A. 1969) .........................................................28

*In re Kaghan*,
  387 F.2d 398 (C.C.P.A. 1967) ...........................................................36

*In re Kaplan*,
  789 F.2d 1574 (Fed. Cir. 1986) .........................................................30

*In re Katz*,
  687 F.2d 450 (C.C.P.A. 1982) .....................................................27, 28

*In re Land*,
  368 F.2d 866 (C.C.P.A. 1966) .....................................................28, 29

*In re Magnum Oil Tools International, Ltd.*,
  829 F.3d 1364 (Fed. Cir. 2016) .........................................................42

*In re Mathews*,
  408 F.2d 1393 (C.C.P.A. 1969) .........................................................46

*In re Schweickert*,
  676 F. App'x 988 (Fed. Cir. 2017) (nonprecedential)........................55

*In re Skvorecz*,
  580 F.3d 1262 (Fed. Cir. 2009) .........................................................36

*In re Wertheim*,
   646 F.2d 527 (C.C.P.A. 1981) ...................................................................26

*Innovative Scuba Concepts, Inc. v. Feder Industries, Inc.*,
   26 F.3d 1112 (Fed. Cir. 1994) .................................................................42

*Lebron v. National Railroad Passenger Corp.*,
   513 U.S. 374 (1995)....................................................................................60

*LSI Corp. v. Regents of University of Minnesota*,
   43 F.4th 1349 (Fed. Cir. 2022) ..............................................................44

*NFC Technology, LLC v. Matal*,
   871 F.3d 1367 (Fed. Cir. 2017) ........................................................39, 40

*Pannu v. Iolab Corp.*,
   155 F.3d 1344 (Fed. Cir. 1998) ..............................................................28

*Personalized Media Communications, LLC v. Apple Inc.*,
   952 F.3d 1336 (Fed. Cir. 2020) ..............................................................25

*Pfizer, Inc. v. Genentech, Inc.*,
   IPR2018-00373, Paper 12 (P.T.A.B. Aug. 2, 2018)...........................35

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................60, 61

*Price v. Symsek*,
   988 F.2d 1187 (Fed. Cir. 1993) ..............................................................39

*Provisur Technologies, Inc. v. Weber, Inc.*,
   Nos. 2021-1851, -1852, -1892, -1893, 2022 WL 17688071 (Fed.
   Cir. Dec. 15, 2022) (nonprecedential) .................................................52

*Rambus Inc. v. Infineon Technologies Ag*,
   318 F.3d 1081 (Fed. Cir. 2003) ..............................................................62

*Regents of University of California v. Broad Institute, Inc.*,
   903 F.3d 1286 (Fed. Cir. 2018) ..............................................................25

*Sanofi-Aventis U.S. LLC v. Immunex Corp.*,
   IPR2017-01879, 2019 WL 643024 (P.T.A.B. Feb. 14, 2019) ...........44

*TQ Delta, LLC v. Cisco Systems, Inc.*,
    942 F.3d 1352 (Fed. Cir. 2019) ........................................................57

**CONSTITUTIONAL PROVISIONS, STATUTES, AND REGULATIONS**

U.S. Const. art. I, § 8 ............................................................................28

5 U.S.C.
    § 554(b)-(c) .....................................................................................33
    § 556(d) ...........................................................................................33
    § 706 ................................................................................................25

28 U.S.C. § 1295(a)(4)(A) .......................................................................5

35 U.S.C.
    § 102(a), (e) (pre-AIA) ...........................................................3, 6, 26, 24
    § 141(c) ..............................................................................................5
    § 319 ..................................................................................................5
    § 321 ..................................................................................................5

37 C.F.R. § 1.53(b) ................................................................................31

**OTHER AUTHORITIES**

Manual of Patent Examining Procedure ("MPEP")
    § 715.01(c) .......................................................................................34
    § 716.10 ............................................................................................34
    § 2132.01 .....................................................................................22, 34
    § 2136.05(b) .................................................................................22, 34

*TWi Pharmaceuticals Inc. v. Merck Serono SA*,
    IPR2023-00049, Petition for Inter Partes Review, Paper No. 1
    (P.T.A.B. Oct. 14, 2022).....................................................................15

*TWi Pharmaceuticals Inc. v. Merck Serono SA*,
    IPR2023-00049, Decision Denying Institution of Inter Partes
    Review, Paper No. 10 (P.T.A.B. Mar. 28, 2023) ...............................16

*TWi Pharmaceuticals Inc. v. Merck Serono SA*,
    IPR2023-00049, Decision Granting Petitioner's Request for
    Rehearing and Granting Institution of Inter Partes Review, Paper
    No. 15 (P.T.A.B. Dec. 20, 2023) .......................................................16

**STATEMENT OF RELATED CASES**

The following cases may directly affect or be directly affected by this Court's decision in the pending appeal: *Merck KGaA v. Accord Healthcare, Inc.*, No. 1:22-cv-00974 (D. Del.); *Merck KGaA v. Hopewell Pharma Ventures, Inc.*, No. 1:22-cv-01365 (D. Del); *Merck KGaA v. Aurobindo Pharma USA, Inc.*, No. 1:23-cv-00039 (D. Del.); *Merck KGaA v. Apotex Inc.*, No. 1:23-cv-00655 (D. Del.); *Merck KGaA v. TWi Pharmaceuticals, Inc.*, No. 1:24-cv-00700 (D. Del.); *TWi Pharmaceuticals, Inc. v. Merck Serono SA*, IPR2023-00049 (P.T.A.B.); *TWi Pharmaceuticals, Inc. v. Merck Serono SA*, IPR2023-00050 (P.T.A.B.); *Merck Serono S.A. v. TWi Pharmaceuticals, Inc.*, No. 2025-1463 (Fed. Cir.); *Merck Serono S.A. v. TWi Pharmaceuticals, Inc.*, No. 2025-1464 (Fed. Cir.).

Appellant Merck Serono S.A. ("Merck")[1] knows of no appeal in or from these proceedings that was previously before this Court or any other appellate court.

---

[1] Merck Serono S.A. and Ares Trading S.A. are subsidiaries of Merck KGaA, Darmstadt, Germany.

**INTRODUCTION**

Merck's patents claim a unique and groundbreaking dosing regimen to treat multiple sclerosis ("MS") using an oral cladribine formulation with specific periods of treatment and no treatment, and dosing that depends on the patient's weight. The claimed dosing regimen was invented by four scientists at Merck's predecessor, Serono: Drs. Giampiero De Luca, Arnaud Ythier, Alain Munafo, and Maria Lopez-Bresnahan.[2] In preparation for clinical trials, Serono partnered with Drs. Nicholas Bodor and Yogesh Dandiker at generic manufacturer IVAX Corporation, who made cladribine tablets according to the criteria Serono provided. The claimed dosing regimen improved convenience for patients, enhanced patient compliance, and produced remarkable long-term treatment benefits. The FDA subsequently approved Mavenclad®, Merck's cladribine product for MS, which is administered according to the patented regimen.

Hopewell, a generic manufacturer, filed IPRs attacking Merck's claims as obvious, relying on a one-sentence disclosure in a patent application filed by IVAX describing an incomplete excerpt of a dosing regimen designed by Merck's ***own*** inventors. Although Merck explained that disclosure of its inventors' earlier work was not prior art to their own patents, the Board erroneously concluded that the

---

[2] "Serono" refers to Serono S.A. and its affiliates, and the distinctions among them are immaterial. Merck acquired Serono in 2006. Appx7577(¶15).

disclosure was "by another" under 35 U.S.C. § 102(a), (e) (pre-AIA) because the patents name Dr. De Luca, who the Board (erroneously) concluded had not been shown to have contributed to the earlier one-sentence disclosure. But no authority holds that one additional co-inventor's contribution to a later-filed patent turns the inventors' earlier disclosure into prior art. Indeed, Section 102 and this Court's precedents mandate the contrary. Nonetheless, the Board—without notice to Merck—adopted a novel, bright-line rule that *any* earlier disclosure qualifies as prior art *unless* it was invented by the ***exact same*** inventors as the later-filed patent. The Board's unprecedented requirement is not—and should not be—the law, and would have a chilling effect on collaboration between original inventors and additional inventors during the one-year grace period. The Board also violated the Administrative Procedure Act ("APA") by depriving Merck of a fair opportunity to respond to the Board's deviation from the Patent Office's guidance in its Manual of Patent Examining Procedure ("MPEP") that a declaration can be submitted from just one joint inventor to show the disclosure was not "by another."

The Board also legally erred by holding that Merck had not shown that Dr. De Luca contributed to the relevant portion of the earlier disclosure. In fact, Dr. Munafo attested that Dr. De Luca contributed to the disclosed dosing regimen, and documents and other witness testimony corroborate Dr. Munafo's sworn testimony, thus satisfying even the Board's novel, unsupported rule. Instead of looking at all

evidence under the rule of reason to determine whether Dr. Munafo's general account was credible, however, the Board erroneously required Merck to provide evidence of Dr. De Luca's "specific contribution" to the earlier one-sentence disclosure. The Board also demanded a higher degree of corroboration than legally necessary. And the Board improperly shifted the burden of persuasion, which should have remained with Hopewell.

The Board further erred in alternatively concluding that the IVAX scientists, Drs. Bodor and Dandiker, supposedly made a contribution to the dosing regimen described in the one-sentence disclosure. The Board reached this conclusion by looking at portions of the earlier disclosure that Hopewell did ***not*** invoke as disclosing the relevant claim limitations. That was legal error. The appropriate inquiry is whether "another" made a significant contribution "to render him a joint inventor of the ***applied portions*** of the reference patent." *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1358 (Fed. Cir. 2019).[3] The Board also focused erroneously on those individuals' contribution to ***making*** the disclosed tablets, rather than the fact that a dosing regimen with those tablets "w[as] ***conceived***" by Serono's inventors. *See id.*

---

[3]     Emphases added unless otherwise noted.

The Board's decisions cannot stand for two additional, independent reasons. First, on the merits of Hopewell's obviousness challenge, the Board erred in concluding that a skilled artisan would have been motivated to re-treat an MS patient by administering cladribine according to the claimed dosing regimen following a period of no treatment with a reasonable expectation of success. Hopewell's primary reference does not disclose subsequent therapy, and Hopewell's secondary reference discloses subsequent therapy with much smaller doses of cladribine after short periods of no treatment, but they disclose neither re-treating with the claimed maintenance dose of cladribine nor re-treating after about eight to ten months. Second, although the Board initially recognized in related proceedings that the claims require weight-based dosing (*i.e.*, the cladribine dose ***must*** be selected based on patient weight), the Board legally erred here in broadening the scope of the claims to encompass regimens in which all patients receive the same amount of cladribine regardless of weight. The Board's decision should be reversed, or at least vacated.

## JURISDICTIONAL STATEMENT

The Board had jurisdiction under 35 U.S.C. §§ 321 *et seq.* The Board issued its final written decisions on September 18, 2024. Appx1-94; Appx95-189. Merck timely appealed on November 19, 2024. Appx11916-11919; Appx13917-13921. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c), 319.

# STATEMENT OF ISSUES ON APPEAL

1.     Whether the Board legally erred in treating a one-sentence disclosure derived from Merck's inventors and published less than a year before the filing date as prior art "by another" under pre-AIA 35 U.S.C. § 102(a), (e).

2.     Whether the Board erred in determining that a skilled artisan would have been motivated to re-treat a patient with the claimed cladribine dose in the claimed manner with a reasonable expectation of success.

3.     Whether the Board legally erred in interpreting the claims to encompass non-weight-based dosing.

# STATEMENT OF THE CASE

## A.     The Patents-At-Issue

The patents-at-issue claim priority to December 2004, are assigned to Merck, and name Drs. De Luca, Ythier, Munafo, and Lopez-Bresnahan as inventors. Appx190.[4]

Merck's inventors conceived of and developed a groundbreaking cladribine dosing regimen to treat MS. MS is a "multi-phasic" disease, with periods of attacks, remissions, and relapses. Appx192(1:43-45). In MS, the body's immune system

---

[4]     The patents-at-issue share a specification; this brief generally cites only the '947 patent. Likewise, the two IPR records are substantially similar; this brief generally cites only the record in IPR2023-00480.

attacks the central nervous system, leading to damage of the nerves. Appx7223(¶40).

The prior art described widespread and significant concerns regarding treating MS with cladribine. Skilled artisans, including Hopewell's expert, Dr. Aaron Miller, discouraged the use of cladribine to treat MS and concluded that cladribine was "found not to be of benefit." Appx6081. Even researchers considering cladribine to treat MS largely investigated it only as an injectable product and specifically "excluded the oral route," because they "questioned" its therapeutic efficacy. Appx192-193(2:28-3:30). Medical scientists were also concerned about the safety of treating a chronic disease like MS with cladribine, because "[r]epeated treatment raises long-term toxicity issues." Appx2310-2311; *see also* Appx6695 ("We remain to be convinced that cladribine is useful, and do not recommend its use in the management of patients with multiple sclerosis.").

Merck's inventors bucked the conventional wisdom by conceiving of a unique dosing regimen that—for the first time—safely and effectively treated MS using oral cladribine. Moreover, the claimed regimen of only four treatment weeks over two years improved convenience for patients, thereby enhancing patient compliance and providing sustained long-term benefits for a median time of over 10 years after treatment. Appx6949.

The patents-at-issue claim treating MS in four sequential steps, as recited in claim 36 of the '947 patent and claim 17 of the '903 patent.

1.      During a first "***induction period***," cladribine is orally administered to a patient for about 2-4 months in a total dose of about 1.7-3.5mg/kg. Appx201(19:17-21). As "mg/kg" indicates, the amount of cladribine to be administered (measured in milligrams) is determined based on patient weight (measured in kilograms). *See* Appx199(tbl.3) (number of pills administered varies with patient weight). This "weight-based" dosing differs from a "flat-dosing" regimen, in which all patients receive the same dose regardless of weight.

2.      In a post-induction "***cladribine-free period***," the patient receives no cladribine for about 8-10 months. Appx201(19:22-23).

3.      Then, during a "***maintenance period***" of about 2-4 months, the patient is re-treated with a total cladribine dose of about 1.7mg/kg, which can be equal to or less than the total amount during the induction period. Appx201(19:24-28). Re-treatment occurs regardless of whether the patient's disease has or has not progressed since the induction period. As during the induction period, the cladribine dose during this maintenance period is determined based on the patient's weight.

4.      Another "***cladribine-free period***" follows the maintenance period. Appx201(19:29-30).

Claim 39 of the '947 patent and claim 20 of the '903 patent more specifically require "the total dose of cladribine reached at the end of the induction period" to be "about 1.7 mg/kg." Appx201(19:13-29, 20:5-7). Thus, for those dependent claims, the induction and maintenance doses are the same.

## B. Conception Of The Claimed Dosing Regimen

In 2002, Serono partnered with IVAX to develop oral cladribine for treating MS. Appx7580(¶23). At that time, Serono was equipped to handle "drug development from concept phase in discovery through late-stage clinical development." Appx7576(¶11). IVAX, by contrast, was "a generic manufacturer" that "did not have the capability to conduct" clinical trials. Appx7763(¶9); *see* Appx7765(¶14).

Serono and IVAX executed a joint research agreement under which Serono would "'conduct clinical trials' to determine 'the dose, safety, and/or efficacy'" of cladribine oral tablets, and IVAX would "develop an oral dosage formulation of [cladribine] in tablet or capsule form suitable for use in clinical trials and commercial sale." Appx7581(¶¶24-25); Appx7101-7102; Appx7117-7119. The Serono scientists involved were Drs. Munafo, Lopez-Bresnahan, Ythier, and De Luca. Appx7579(¶18). Those scientists "developed a dosing regimen for treating MS," and IVAX manufactured the tablets to be used in Serono's designed dosing regimen and clinical trials. Appx7581-7582(¶26).

Serono and IVAX "met or corresponded regularly" and confidentially exchanged substantial information about their work. Appx7582(¶¶27-28); Appx7612(¶28); Appx7765-7766(¶15). For example, at a meeting in Amsterdam in August 2003 (*see* Appx7197-7204 ("Amsterdam Minutes")), members from IVAX explained that they planned to make a 3mg tablet. Appx7199-7200; Appx7766(¶17). Serono's inventors instead described a proposed clinical-trial design using a dosing regimen of 10mg cladribine oral tablets administered for 5 consecutive days per month for 2 months—a regimen Serono designed based on specific formulation criteria Serono had set for IVAX. Appx7200; Appx7117-7118(§4.1); Appx4919(129:3-10); *see* Appx7586-7588(¶¶35-38); Appx7771-7772(¶26).

On December 17, 2003, Serono emailed IVAX a "Briefing Document" containing a clinical-trial design invented by Serono, which included the following oral dosing regimen: (1) 10mg cladribine tablets administered for 5 consecutive days in each of 2 months, (2) placebos for 4 months, and (3) no pills at all for 6 months. Appx7184-7185; *see* Appx7590-7592(¶¶43-46). Serono recognized that the study design was "in a draft stage" and explained—at meetings IVAX attended—that "certain parameters in the study protocol, such as the number of days of cladribine dosing each month, might need minor adjustment, e.g., to 6 or 7 days per month." Appx7592-7593(¶47).

Serono's inventors went on to design the dosing regimen claimed in the patents-at-issue. Appx7580(¶¶20-22). Importantly, Dr. De Luca's "discussions with various team members during the development of cladribine for treating MS contributed to [Serono's] development of a proposed dosing regimen." Appx7580(¶21).

Serono subsequently conducted a study demonstrating that the claimed regimen "provides a safe and effective method for treating MS." Appx7243(¶81); Appx6909. In 2019, the FDA approved Merck's cladribine product for MS, Mavenclad®, administered according to that regimen. Appx7243-7244(¶81). Similar to the dosing table in the patents' specification, the FDA-approved label shows that patients receive different cladribine doses by taking a different number of tablets depending on their weight:

Table 1    Dose of MAVENCLAD per Cycle by Patient Weight in Each Treatment Course

| Weight Range | Dose in mg (Number of 10 mg Tablets) per Cycle | |
|---|---|---|
| kg | First Cycle | Second Cycle |
| 40* to less than 50 | 40 mg (4 tablets) | 40 mg (4 tablets) |
| 50 to less than 60 | 50 mg (5 tablets) | 50 mg (5 tablets) |
| 60 to less than 70 | 60 mg (6 tablets) | 60 mg (6 tablets) |
| 70 to less than 80 | 70 mg (7 tablets) | 70 mg (7 tablets) |
| 80 to less than 90 | 80 mg (8 tablets) | 70 mg (7 tablets) |
| 90 to less than 100 | 90 mg (9 tablets) | 80 mg (8 tablets) |
| 100 to less than 110 | 100 mg (10 tablets) | 90 mg (9 tablets) |
| 110 and above | 100 mg (10 tablets) | 100 mg (10 tablets) |

*The use of MAVENCLAD in patients weighing less than 40 kg has not been investigated.

Appx6005.  A recent study with a median follow-up period of 10.9 years surprisingly

demonstrated that the claimed regimen—involving oral administration of cladribine

for only four weeks over two years—results in "sustained long-term mobility and

disability benefits."  Appx6949; *see* Appx7245(¶83).

### C.     Hopewell's Asserted References

#### 1.     Bodor

International Patent Application WO2004/087101A2 ("Bodor") published on

October 14, 2004—approximately two months before the priority date of Merck's

patents.    Appx1915.    Bodor names Drs. Bodor[5] and Dandiker as inventors.

Appx1915.  Bodor relates to a "cladribine-cyclodextrin complex formulated into a

solid oral dosage form."  Appx1917(1:4-6).  One sentence in Bodor's 53 pages

describes the following dosing regimen for treating MS:

> At the present time, it is envisioned that, for the treatment of multiple
> sclerosis, 10 mg of cladribine in the instant complex cladribine-
> cyclodextrin complex in the instant solid dosage form would be
> administered once per day for a period of five to seven days in the first
> month, repeated for another period of five to seven days in the second
> month, followed by ten months of no treatment.

Appx1939(23:15-20).[6]  This dosing regimen is very similar to the regimen described

by Serono in the Amsterdam Minutes and Briefing Document.  *See* Appx7200;

---

[5]     This brief refers to the individual as "Dr. Bodor" and the reference as "Bodor."

[6]     The parties have called this sentence "the 6-line disclosure" or "the one-
sentence disclosure."

Appx7184-7185. Bodor's sentence also resembles the dosing regimen explained at length in the patents-at-issue in certain respects, but differs in two critical ways. First, Bodor articulates a flat-dosing regimen in which every patient receives the same cladribine dose regardless of their weight. Appx1956-1969(40:1-53:18). Second, Bodor says nothing about re-treatment with cladribine after the ten-month no-treatment period, let alone the dose or duration of any possible cladribine re-treatment or what would happen after re-treatment. Bodor thus describes an incomplete excerpt of the claimed dosing regimen. None of Bodor's 98 claims recites the disclosed regimen. Appx1956-1969(40:1-53:18).

In fact, both Drs. Bodor and Dandiker disclaimed inventing the dosing regimen and swore that Serono did. Appx7612(¶26) (Dr. Bodor: "Neither myself nor my team, including Dr. Dandiker, developed, researched, or invented the above dosing regimen. Indeed, no one on my team at IVAX developed, researched, or invented any cladribine dosing regimen for treating MS. I do not consider this regimen to be my invention[.]"); Appx7612(¶27) (Dr. Bodor: "Serono was responsible for any research and development regarding proposed dosing regimens."); Appx7607(¶18) (Dr. Bodor: "Serono would develop a potential dose and dosing regimen"); Appx7770(¶23) (Dr. Dandiker: "I did not invent the dosing regimen disclosed … [n]or, to the best of my knowledge, did anyone else on my team at IVAX."); Appx7770(¶23) (Dr. Dandiker: "[N]o one on my team at IVAX

developed, researched, or invented any cladribine dosing regimen for treating MS. … I am not aware of anyone at IVAX who was working on developing or researching a cladribine dosing regimen for treating MS … [or] of any cladribine dosing regimen invented by any member of the IVAX team."); Appx7770(¶24) (Dr. Dandiker: "Serono was responsible for any research and development regarding proposed dosing regimens."); Appx7765(¶14) (Dr. Dandiker: "Serono's role was to design and develop a dosing regimen for treating MS with cladribine."); Appx7771(¶24) (Dr. Dandiker: "Serono was the only group developing a dosing regimen for cladribine between 2002 and 2004.").

Dr. Dandiker explained that "Serono communicated the dosing regimen" disclosed in Bodor to himself and others at IVAX and that he "attend[ed] the August 2003 meeting and receiv[ed] the December 2003 Briefing Document." Appx7771-7772(¶¶25-26). Dr. Bodor also stated that "it is highly likely that, prior to February 4, 2004, Serono communicated the above dosing regimen" to IVAX. Appx7612-7613(¶28).

### 2. Stelmasiak

Stelmasiak[7] discloses another dosing regimen for treating MS with cladribine:

Six cladribine courses were given at monthly intervals, and two additional courses were given at 9 and 12 or 15 months. Each course

---

[7] Stelmasiak, *A Pilot Trial of Cladribine (2-chlorodeoxyadenosine) in Remitting-Relapsing Multiple Sclerosis*, 4 Med. Sci. Monit. 1, 4 (1998); Appx1848-1852.

consisted of five doses of the drug taken once daily on consecutive
days.  Cladribine was given either subcutaneously (dose 5 mg per day,
six patients) or orally (dose 10 mg per day, four patients).

Appx1849.  Like Bodor, Stelmasiak involves flat dosing, as the four patients who

took cladribine orally all received the same amount regardless of their weight.

Stelmasiak disparages weight-based dosing, reporting that "[t]here was no indication

that a 'good response' is related to the actual cladribine dose per body weight."

Appx1851.  Stelmasiak discloses administering cladribine to patients after short no-

treatment periods of only two months in most instances, and no longer than five

months.  Appx1849.  Patients that received subsequent therapy following the oral

route took only one-sixth of the total dose they initially took.  Appx1849.

### D.    Board Decisions

#### 1.    Procedural history

In October 2022, before Hopewell filed these IPRs, another generic filer (TWi

Pharmaceuticals, Inc.) petitioned for IPR of the same claims Hopewell challenged

(plus several more), arguing anticipation by Bodor as well as obviousness over

Bodor and either the knowledge of a skilled artisan or another study ("Rice").[8] *TWi*

*Pharms. Inc. v. Merck Serono SA*, IPR2023-00049, Paper No. 1 at 24-25 (P.T.A.B.).

In March 2023, the Board denied institution of TWi's petitions because Bodor

---

[8]    Rice et al., *Cladribine and Progressive MS*, 54 Neurology 1145 (2000);
Appx1887-1897.

discloses non-weight-based dosing (IPR2023-00049, Paper No. 10 at 12), and an obviousness theory modifying Bodor to switch to weight-based dosing "relies improperly on hindsight" (*id.* at 19-20, 24). The Board also explained that the relied-upon disclosures in Bodor do not support the "assertion that a subsequent round of Bodor's therapy … would necessarily be at the same dosage administered in the first round." *Id.* at 13.

In December 2023, the Board reversed course and instituted review on rehearing, concluding without significant analysis that "it would be reasonable to infer from Bodor's teachings in conjunction with the knowledge of the ordinary artisan that the cladribine dosing protocol in Bodor is repeated." IPR2023-00049, Paper No. 15 at 5. The Board made no mention of its previous understanding that the claims required weight-based dosing, focusing instead on a supposed "overlap" between Bodor and the claims of the patents-at-issue. *Id*. at 6.

In January 2023, Hopewell also petitioned for IPR of claims 36, 38, 39, and 41-46 of the '947 patent, Appx11047, and claims 17, 19, 20, and 22-27 of the '903 patent, Appx13047. The sole ground presented was obviousness over Bodor and Stelmasiak. Appx11047.[9] The Board instituted review of all challenged claims, Appx11186-11246, and ultimately found all challenged claims obvious, Appx1-94.

---

[9]     Given the priority date of the patents-at-issue, the pre-AIA statute applies.

## 2. Status of Bodor as prior art

The Board treated Bodor's one sentence as a disclosure "by another" and therefore as prior art on two separate, erroneous bases.

First, even though the Board did not deny that at least three inventors of the patents-at-issue—Drs. Munafo, Lopez-Bresnahan, and Ythier—provided inventive contributions to the dosing regimen described in Bodor, Appx24-26, the Board believed that the dosing-regimen disclosure in Bodor still qualified as "by another" unless it "reflect[ed] the invention of *all* the [patents-at-issue]'s listed inventors," including Dr. De Luca. Appx30 (emphasis in original); *see also* Appx34 ("[T]he inventive entities must be *identical*."); Appx37 (Bodor disclosure was prior art "unless that disclosure was invented by the *same* 'inventive entity'" as the patent claims (emphasis in original)).

Having imposed its erroneous requirement of identical inventorship, the Board found that Merck did not prove that Dr. De Luca specifically "provided an inventive contribution" to Bodor's single-sentence dosing-regimen disclosure. Appx30-37. Despite Dr. Munafo's declaration that Dr. De Luca "was part of the team that developed the regimen" and personally "helped design the subject dosing regimen," the Board faulted Merck for supposedly not showing independent evidence of Dr. De Luca's specific contributions (Appx32-34), though the Board acknowledged that the Amsterdam Minutes mentioned Dr. De Luca. Appx32 n.17.

Additionally, the Board acknowledged the testimony of Drs. Bodor and Dandiker that Serono invented the dosing regimen mentioned in Bodor, Appx27, but faulted their testimony for not explaining how Dr. De Luca specifically contributed to it, Appx31.

Second, the Board treated the dosing-regimen disclosure in Bodor as "by another" based on Drs. Bodor's and Dandiker's supposed "contribution to the dosing regimen," even though both specifically testified that they did *not* invent or contribute to it. Appx37-40 (alterations omitted). The Board purported to follow the steps set forth in *Duncan Parking*, 914 F.3d at 1357, but erred in its application of those steps.

At *Duncan Parking*'s first step, which asks "what portions of the reference patent were relied on as prior art to anticipate the claim limitations at issue," 914 F.3d at 1358, the Board considered "additional Bodor disclosures" *outside* the material Hopewell cited as disclosing the claimed limitations, despite acknowledging that the ultimate question is Drs. "Bodor's and Dandiker's contribution to the 'dosing regimen,'" Appx37-38 (alterations omitted). The Board did so because it believed that "at least some of these additional disclosures" somehow "count[]" toward the disclosure-by-another analysis. Appx37-38. Neither Hopewell nor the Board cited authority holding that inventorship of material cited only as background or for a purported motivation to combine was pertinent to

whether a different portion—the one sentence that allegedly disclosed claim limitations—was "by another." Appx37-38. Additionally, the Board's analysis wrongly focused on Drs. Bodor's and Dandiker's contributions to a cladribine-cyclodextrin complex tablet formulation, even though the patents-at-issue do not claim a cladribine-cyclodextrin complex or a tablet form or specific formulation (only an "oral" "formulation comprising cladribine"). Appx37-40; Appx199-200(16:54-17:4).

At *Duncan Parking*'s second step, which requires the Board to "evaluate the degree to which [the cited] portions were conceived 'by another,'" 914 F.3d at 1358, the Board ignored the fact that Serono conceived of the dosing regimen with 10mg cladribine tablets (*see* Appx7184-7185; Appx7200), and attributed the "invention" of the tablets to Drs. Bodor and Dandiker, relying on evidence showing simply that IVAX ***made*** the 10mg tablets at Serono's direction. Appx38.

The Board erroneously concluded that Drs. Bodor and Dandiker were thus co-inventors of all applied portions of Bodor, and thus that those portions were disclosure "by another." Appx40.

### 3. Merits of the obviousness challenge

On the merits, the Board interpreted Merck's claims as not limited to weight-based dosing, but as encompassing flat dosing, despite acknowledging that the specification shows how "patients receive a different number of tablets depending

on their weight" and recognizing that the Mavenclad® label's dosing table, like the specification's Table 3, identifies different doses based on different patient weights. Appx47. Moreover, despite Hopewell's expert previously calling the weight-based dosing of Mavenclad® "rather unique," Appx6132-6133(4:17-5:1), the Board accepted yet another about-face from him after Hopewell retained him as a paid expert, Appx51.

Regarding motivation to modify Hopewell's references with a reasonable expectation of success, the Board determined that "it would have been obvious to follow Bodor's 2-month induction period and 10-month cladribine-free period with a retreatment or maintenance phase" (Appx53), even though Bodor does not disclose any re-treatment with cladribine. The Board instead credited Dr. Miller's unsupported testimony that Bodor's mere recitation of specific durations for the drug-free periods "logically suggests a retreatment period." Appx53. In a footnote, the Board acknowledged Merck's explanation that the no-treatment period in Bodor is "required for safety," but asserted that this explanation "reinforce[s] [Hopewell]'s point that, by specifying the number of months of the cladribine-free period, Bodor is suggesting [that] one could safely retreat the patient as needed when that specified period elapsed—or at least the POSA would consider doing so." Appx53 n.26. The Board cited nothing to support this assertion.

Beyond Bodor, although the Board acknowledged that Stelmasiak's subsequent treatments "are not the same as what is claimed" in the patents-at-issue and recognized differences between the claim limitations and the specifics of Stelmasiak's oral dosing regimen, the Board concluded that those differences were overcome simply because Hopewell's "challenge is obviousness," not anticipation. Appx58.

The Board also concluded that MS's chronic nature would lead a skilled artisan to re-treat at least some patients right after the no-treatment period. *E.g.*, Appx53-54; Appx64; Appx69. Although subsequent treatment in the prior art was typically administered only when other conditions were met, such as "worsening of the patient's disease" along with "hematological criteria" for safety, the Board "fail[ed] to see how this undermines [Hopewell]'s theory." Appx58-59. The Board thus failed to grapple with the challenged claims' requirement of re-treatment after the no-treatment period, even absent any evidence of disease progression.

## SUMMARY OF THE ARGUMENT

I.    The Board erred in treating Bodor as prior art to Merck's patents, because Bodor's relevant disclosure is the work of Merck's inventors, not work "by another."

First, the Board erroneously imposed a bright-line rule that a reference is invariably prior art "by another" unless the inventive entities behind the reference's

applied disclosure and the patent-at-issue are "identical."  The Board misread this Court's precedent, which explained that adding a later inventor to a patent does ***not necessarily*** make a reference prior art against the patent—an approach reflecting the important policy of allowing disclosure by inventors, followed by further development, including through collaboration with other inventors.  The Board's new rule, by contrast, serves no legitimate policy and needlessly punishes any later inventor collaboration.

Second, even under the Board's unprecedented and unsupported rule, the Board's unexpected departure from MPEP §§ 2132.01, 2136.05 violated the APA by depriving Merck of any opportunity to provide additional evidence of Dr. De Luca's contribution to the dosing regimen described in Bodor.  The case should at a minimum be remanded to allow Merck to develop the record to address the Board's new rule.

Third, even under the Board's new rule, the Board legally erred in deciding that Dr. De Luca was not part of the "common inventive entity" of the relevant Bodor disclosure.  Dr. Munafo gave detailed testimony, supported by documentary evidence and other testimony, that ***each*** named inventor—including Dr. De Luca— contributed to the dosing regimen disclosed in Bodor.  Instead of considering the credibility of Dr. Munafo's general account in view of all pertinent evidence under the rule of reason, the Board demanded evidence corroborating Dr. De Luca's

*specific* contribution to the dosing regimen. And the Board further erred by rejecting circumstantial evidence of Dr. De Luca's contributions. The Board's requirement that Merck prove Dr. De Luca's contributions also improperly shifted the burden of persuasion, which should have remained with Hopewell.

Lastly, the Board erred in concluding that Drs. Bodor and Dandiker were somehow part of the relevant "inventive entity," despite their express disavowal of any role in inventing either Bodor's disclosed dosing regimen or Merck's patented dosing regimen. The Board reached this conclusion by erroneously considering other passages in Bodor that Hopewell did not map onto the claim limitations. The Board compounded that error by focusing not on who **conceived** of those (unclaimed) concepts, but on who **manufactured** an embodiment. When this Court's *Duncan Parking* decision is correctly applied, the dosing regimen disclosed in Bodor was not the work of Dr. Bodor or Dr. Dandiker, as they themselves testified.

II.     Regarding the merits, the Board wrongly concluded that Bodor and Stelmasiak rendered obvious the re-treatment of an MS patient with the claimed maintenance dose of cladribine after an induction dose and a period of no treatment. Bodor does not teach or imply re-treatment, and Stelmasiak discloses subsequent therapy with cladribine doses that were one-sixth the size of the initial dose and at significantly different intervals.

Furthermore, in finding a motivation to modify the prior art, the Board wrongly relied on a hypothetical motivation for a subset of patients whose disease theoretically progressed during the no-treatment period, even though Merck's patents-at-issue (unlike the prior art) require re-treatment following the first no-treatment period, even absent any disease progression. The Board improperly credited Hopewell's expert's conclusory testimony, which was the opposite of his opinion before he was hired as Hopewell's expert in this proceeding. Moreover, the Board incoherently endorsed Hopewell's theory of optimizing prior cladribine dosing regimens based on levels of lymphocytes (a type of white blood cell), even though both sides' experts agreed that lymphocyte level is not an efficacy measure, and the Board recognized that there is no target level to guide optimization. The Board's obviousness determination was thus unacceptably driven by hindsight and unsupported by evidence.

III. Finally, the Board legally erred in interpreting the claims to cover non-weight-based dosing. The claims expressly require doses in "mg/kg," meaning milligrams of drug per kilogram of *patient weight*. The specification confirms that the dose of cladribine varies depending on patient weight. The FDA-approved label for Merck's drug Mavenclad® embodies the claims, and the dosing of Mavenclad® likewise varies depending on patient weight. The Board wrongly dismissed this evidence because it mistakenly believed that Merck's interpretation would read a

limitation into the claims, but that interpretation simply gives the claims their plain meaning.  The Board fared no better by asserting that a flat dose could be converted to a weight-based dose, as weight-based dosing requires selecting the dose based on patient weight at the time of dosing.  Because neither Bodor nor Stelmasiak teaches weight-based dosing, the Board's final written decisions should be reversed.

## STANDARD OF REVIEW

Under the APA, the Court "hold[s] unlawful and set[s] aside agency action" that is "not in accordance with law" or is taken "without observance of procedure required by law."  5 U.S.C. § 706.  "[W]hether a reference is a work of others" is a question of law reviewed de novo.  *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 969 (Fed. Cir. 2014).  Legal conclusions concerning conception are reviewed de novo. *Dionex Softron GmbH v. Agilent Techs., Inc.*, 56 F.4th 1353, 1358 (Fed. Cir. 2023).

"Obviousness is a question of law based on underlying facts."  *Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018).  This Court "review[s] the Board's ultimate conclusion of obviousness de novo, and the underlying factual findings for substantial evidence."  *Id.*

This Court "review[s] de novo the Board's ultimate claim constructions and any supporting determinations based on intrinsic evidence."  *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1339 (Fed. Cir. 2020).

# ARGUMENT

## I. THE BOARD LEGALLY ERRED IN TREATING BODOR AS A DISCLOSURE "BY ANOTHER"

### A. The Board Legally Erred By Imposing An Unprecedented Bright-Line Rule That An Earlier Disclosure Is "By Another" Whenever The Inventors Of The Earlier Subject Matter Add A Collaborator To A Later-Filed Patent

Pre-AIA 35 U.S.C. § 102(e) states:

> A person shall be entitled to a patent *unless*—
>
> …
>
> (e) the invention was described in—
>
>> (1) an application for patent, published under [35 U.S.C. §] 122(b), *by another* filed in the United States before the invention by the applicant for patent.

Section 102(a) similarly provides that an inventor is entitled to a patent unless the reference is known or used "by others," and Section 102(b) protects disclosure of one's own work unless it was described "more than one year prior to the date of the application for patent." Section 102(e) "may be applied to determine what is 'prior art' under the [Section] 103 requirement." *In re Wertheim*, 646 F.2d 527, 532 (C.C.P.A. 1981).

Section 102 ensures that inventors' "own work … may not be used against" them, unless it was published over a year before their application. *In re DeBaun*, 687 F.2d 459, 462 (C.C.P.A. 1982); *see Allergan*, 754 F.3d at 968. The "by another"

inquiry asks "who invented the subject matter disclosed by (the reference) which was relied on to support the [challenge]." *DeBaun*, 687 F.2d at 462.

In this case, the Board ruled that a reference is invariably "by another" unless "the inventive entities behind the reference's applied disclosure and the patent [are] ***identical***." Appx35. The Board's newly announced bright-line rule is antithetical to the iterative inventive process protected by Section 102's one-year grace period and incompatible with this Court's recognition that a difference in inventive entity does not necessarily make a reference prior art.

Innovation does not always occur in a flash of genius. Transforming an idea into a completed invention can involve many iterative steps and extensive collaboration. Section 102(b) provides a one-year grace period during which an inventor is "allowed to perfect, develop and apply for a patent on his invention and publish descriptions of it if he wishes." *In re Katz*, 687 F.2d 450, 454 (C.C.P.A. 1982).[10]

---

[10]     "Undoubtedly, a majority of inventions are made in stages. Modifications and improvements of the original idea are common. … The balancing process between the encouragement of technological advancement by the granting of legal monopolies and permitting a one-year grace period for application, and the interest of the public in having new advances readily accessible, has been considered by Congress in Section 102(b)." *Illinois Tool Works, Inc. v. Solo Cup Co.*, 461 F.2d 265, 270 (7th Cir. 1972).

In perfecting and further developing an invention before applying for a patent, an inventor may collaborate with others, who might consequently become co-inventors of the applied-for patent, even though they did not conceive of the original invention. The patent system encourages such collaboration and joint innovation "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8.

It is bedrock principle that "*one's own invention*, whatever the form of disclosure to the public, may not be prior art against oneself." *In re Facius*, 408 F.2d 1396, 1406 (C.C.P.A. 1969) (emphasis in original). Section 102 also ensures that one co-inventor on a disclosed joint invention cannot later seek a patent to the exclusion of another co-inventor. Because "an invention made jointly by A & B cannot be the sole invention of A or B," an earlier disclosure by A & B is potentially a disclosure "by another" with respect to a subsequent patent application by A alone. *In re Land*, 368 F.2d 866, 879 (C.C.P.A. 1966). To avoid treating the earlier disclosure as prior art, A may need to show that the earlier disclosure was "his original work, and his alone." *Katz*, 687 F.2d at 455. This makes sense, otherwise A would be able to obtain a patent for himself on an invention conceived jointly with B. *See Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349 (Fed. Cir. 1998) ("[I]n the case of a patent which is a joint invention, a patent issued to one only [sic] of the inventors is void.").

However, as this Court has warned, the analysis is not a matter of asking "merely whether A or B, individually, is or is not 'another' to A & B jointly on a theory of 'different legal entities.'" *Land*, 368 F.2d at 879. Indeed, in other scenarios, a requirement of exact sameness among inventor groups is neither appropriate nor sensible. When A initially discloses an invention, and then *later* collaborates within the grace period with B, A's earlier disclosure is not necessarily prior art to a patent naming A and B as coinventors. Nor would there be any purpose in holding otherwise, as it would only punish A for collaborating with, and *sharing* credit with, B. *See Hobbs v. United States Atomic Energy Comm'n*, 451 F.2d 849, 864 (5th Cir. 1971) ("[A]n inventor may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent.").

Thus, this Court held that a patent application by McNeilly and Benzing was not prior art to a continuation-in-part patent issued to McNeilly, Benzing, and Locke, even though they were "conceived by *different* inventive entities." *Applied Materials Inc. v. Gemini Research Corp.*, 835 F.2d 279, 281 (Fed. Cir. 1988). That is because Section 102's requirement that a disclosure be by another "is not necessarily satisfied" if the patent and the earlier disclosure "share *one or more* persons as joint inventors." *Id.* An earlier disclosure is thus not necessarily prior art to a patent later filed by the same inventor(s) within the one-year grace period when any new inventors are added to the later-filed patent.

The Board misunderstood *Applied Materials* to have employed a bright-line rule that "***require***[*s*] the inventive entities behind the reference's applied disclosure and the patent be ***identical***." Appx35. There is no support in *Applied Materials* for the Board's reading, which the Board appears to premise on the Court's quotation of *In re Kaplan*, 789 F.2d 1574, 1576 (Fed. Cir. 1986). In *Kaplan*, the Court held that a patent to Kaplan was not prior art to a later application by Kaplan and Walker because the earlier patent actually "was the joint invention of Kaplan and Walker." *Id.* at 1575. *Kaplan* went on to explain: "When the joint and sole inventions are related, as they are here, inventor A commonly discloses the invention of A & B in the course of describing his sole invention and when he so describes the *invention of A & B* he is not disclosing 'prior art' to the A & B invention, even if he has legal status as 'another.'" *Id.* at 1576 (emphasis in original).

This passage from *Kaplan* supports the outcome in *Applied Materials* and Merck's position here. The Board, however, appears mistakenly to have believed that, because *Applied Materials* quoted *Kaplan*, the ***facts*** in *Applied Materials* were somehow analogous to *Kaplan*'s, *i.e.*, "the McNeilly/Benzing reference had disclosed the invention of McNeilly/Benzing/Locke," and thus "the inventive entities must be identical." Appx34 & n.19. But the Court in *Applied Materials* cited *Kaplan* only to support its holding that "the fact that an application has named a different inventive entity than a patent ***does not necessarily make that patent prior***

*art*." 835 F.2d at 281. Nowhere in *Applied Materials* did the Court state or imply a finding that the McNeilly/Benzing patent application really disclosed the invention of McNeilly/Benzing/Locke, and there is no indication to that effect.

To the contrary, as the Court explained, the original application by McNeilly and Benzing was restricted into different applications, "each claiming a patentably distinct invention," including an application for a radiation heated reactor (the alleged prior disclosure) and an application for a chemical vapor deposition coating process (parent of the challenged patent). *Applied Materials*, 835 F.2d at 280. The coating-process application was followed by a continuation-in-part (the challenged patent) that "included *the addition of Locke* as an inventor." *Id.* The addition of Locke in the continuation-in-part presumes his later contribution to new matter added in that application. *See* 37 C.F.R. § 1.53(b) (pre-AIA) ("A continuation-in-part application … may disclose and claim subject matter not disclosed in the prior application" and allows "naming an inventor not named in the prior application."). Even though Locke was added to the coating-process patent, the Court held that the earlier application regarding the radiation heated reactor was not disclosure "by another," because McNeilly and Benzing were common to both applications. *Applied Materials*, 835 F.2d at 281. In other words, the addition of Locke as a co-inventor did not deprive McNeilly and Benzing of their right to patent what they invented.

Additionally, the Board's reasoning cannot be reconciled with the express recognition in *Applied Materials* that, even where "an application and a patent have been ***conceived*** by different inventive entities," that does not necessarily render the earlier disclosure "by another." 835 F.2d at 281. *Applied Materials* acknowledges that a reference is ***not*** necessarily prior art to a patent even if their inventive entities are not exactly the same. *Id*. Adding later collaborators thus does not, by itself, prevent earlier inventors from patenting an invention that they previously conceived and disclosed. Rather, the "relevant inquiry must be whether the [earlier] reference[]" was solely the work of at least ***one*** of the inventors named on the later patent, and not the work of others from the earlier reference who were not included on the later patent. *Allergan*, 754 F.3d at 969 (earlier reference was by another because it was not the work of VanDenburgh alone, but was also the work of Chen and Whitcup, where later patent named VanDenburgh and Woodward). Under that standard, the dosing regimen disclosed in Bodor is not "by another" because it was solely the work of inventors named on the patents-at-issue (at least Drs. Munafo, Lopez-Bresnahan, and Ythier).

Proper application of this Court's precedent—and indeed common sense—compels the conclusion that because at least Drs. Munafo, Lopez-Bresnahan, and Ythier conceived of the dosing regimen disclosed in Bodor, as the Board did not deny (*see* Appx24-26), and they are all inventors on the patents-at-issue, the nature

of Dr. De Luca's contributions to the Bodor disclosure is immaterial. The Board legally erred in treating Bodor's disclosed dosing regimen as prior art to the patents-at-issue because the disclosure supposedly does not "share a common inventive entity that includes De Luca." Appx30 (alterations omitted). Even if that were true (it is not, *see infra* pp. 37-43), it should have been enough that the dosing regimen described in Bodor's one sentence was attributable to inventors of the patents-at-issue.

**B.    The Board Violated The APA By Refusing To Follow The MPEP And Depriving Merck Of A Fair Opportunity To Respond**

In addition to being legally erroneous, the Board's ruling violated the APA because the Board changed its application of the MPEP without providing Merck notice or an opportunity to present evidence satisfying the Board's new requirement that ***all*** inventors of the patents-at-issue (including Dr. De Luca) be shown to have contributed to the earlier disclosure.

In a formal adjudication, including an IPR, the APA imposes particular procedural requirements on the Patent Office. *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1301 (Fed. Cir. 2016). The agency must timely inform the patent owner of "the matters of fact and law asserted," give all interested parties the opportunity to submit and consider facts and arguments, and allow a party "to submit rebuttal evidence … as may be required for a full and true disclosure of the facts." 5 U.S.C. §§ 554(b)-(c), 556(d). The Board violated the APA by deviating from the Patent

Office's stated interpretation of law and policy in the MPEP and failing to provide Merck with proper notice and a full and fair opportunity to present evidence that would satisfy its new legal standard, namely evidence of Dr. De Luca's specific contributions to the dosing regimen described in Bodor.

There is no question that the Board changed its application of the law in this case, without notice. As the Board itself recognized (Appx35), MPEP § 2132.01 states:

> An inventor's or ***at least one joint inventor's disclosure of his or her own work*** within the year before the application filing date cannot be used against the application as prior art.

*See also* MPEP § 2136.05(b) ("[E]ven if an inventor's or ***at least one joint inventor's work*** was publicly disclosed prior to the patent application, the inventor's or ***at least one joint inventor's own work*** may not be used against the application subject to pre-AIA 35 U.S.C. 102 unless there is a time bar under pre-AIA 35 U.S.C. 102(b)."); MPEP §§ 715.01(c), 716.10. Hopewell did not even mention, much less challenge, these MPEP provisions in its reply. Appx11518-11519. And the Board and the Patent Office's examiners have routinely interpreted this settled agency guidance to mean that earlier disclosure of the work of at least one joint inventor is not prior art against the later patent.[11]

---

[11]     *E.g.*, *Ex parte Krahnstoever*, No. 2017-011796, 2019 Pat. App. LEXIS 2586, at *30 (P.T.A.B. Apr. 8, 2019) (earlier reference by Chang (and others) was not prior

Merck relied on the agency's settled policy and interpretation reflected in the MPEP, and accordingly submitted a declaration from one joint inventor, Dr. Munafo. *See generally* Appx7574-7601. Among other things, Dr. Munafo testified that the work was at least his own—he was involved with "design[ing] and develop[ing] the regimen for treating MS which is disclosed in the Bodor [reference]," explaining, for example, that he partook in "refin[ing] the dosing

art to a patent adding two additional inventors (Tu and Ge), where Chang declared that "any common subject matter disclosed in the [earlier] reference and claimed in the present application was [Chang's] own invention, and not that of another" but did not address what, if any, contribution the other named inventors made to the earlier disclosure); *Pfizer, Inc. v. Genentech, Inc.*, IPR2018-00373, Paper 12 at 15 (P.T.A.B. Aug. 2, 2018) (Board declined to question examiner's consideration of declaration by one inventor (Novotny) that the earlier disclosure was solely the contribution of one or more of the inventors of the present application, even though the declaration did not detail any contribution by two additional co-inventors (Fyfe and Holmgren) not named on the earlier disclosure); Notice of Allowance, U.S. App. No. 10/167,572 (Jan. 22, 2004) (allowing application because "the invention disclosed but not claimed in the primary reference was derived from the inventor[s] of the instant application"; two inventors (Kanzaki and Kumada) submitted a declaration that the prior disclosure "that is common to the [later] patent application is [Kanzaki and Kumada's] invention," and did not claim any contribution of the third inventor named on the later patent application (Komiya), *see* Decl. under 37 C.F.R. § 1.132, U.S. App. No. 10/167,572 (Dec. 5, 2023)).

Numerous other examples exist. *E.g.*, Notice of Allowance, U.S. App. No. 16/572,053 (June 8, 2023); Notice of Allowance, U.S. App. No. 10/151,029 (Apr. 29, 2004); Notice of Allowance, U.S. App. No. 10/164,474 (Jan. 13, 2005); Notice of Allowance, U.S. App. No. 14/941,988 (June 6, 2017); Notice of Allowance, U.S. App. No. 14/388,139 (May 21, 2018). The file history materials cited in this footnote are available at "https://patentcenter.uspto.gov," by searching the application number, selecting "Documents & Transactions" on the left panel, navigating to the cited materials by locating the respective date and document, and selecting "Preview," or "PDF" to download.

regimens for the planned phase III trial to use 10 mg solid tablets and have a retreatment period 12 months after the first treatment period." Appx7586(¶33); Appx7588(¶39); *see* Appx7586-7593(¶¶33-49). He also testified that he and his team at Serono, and "***not*** anyone at IVAX, were the first and ***only*** people to design and develop the regimen for treating MS which is disclosed in … Bodor." Appx7586(¶33). Given the MPEP's recognition that disclosure from "at least one joint inventor" "of his or her own work" is not prior art, Merck did not suspect (and could not have suspected) that the Board would require anything further, and thus did not submit additional evidence.

The Board then arbitrarily decided that it would not follow the MPEP. Appx35. But the "express provisions of MPEP set forth an established Patent Office policy on which applicants for patents are entitled to rely in good faith in the orderly conduct of their business in the Patent Office." *In re Kaghan*, 387 F.2d 398, 401 (C.C.P.A. 1967); *see also Hyatt v. Dudas*, 492 F.3d 1365, 1369 n.2 (Fed. Cir. 2007) (the MPEP "is made available to the public and describes procedures on which the public can rely" (alterations omitted)); *In re Skvorecz*, 580 F.3d 1262, 1268 n.3 (Fed. Cir. 2009) (same). For example, in *Kaghan*, this Court reversed the Board's application of *res judicata* where "the sections of the MPEP relied upon by appellants clearly approve of the practice which was followed by appellants," 387 F.2d at 400-401. So too here, Merck was entitled to rely on the Patent Office's own

published procedures to show a reference was not "by another" in defending its patents in the IPRs.

Had Merck received notice of the agency's drastic change in its interpretation of the patentability standard, Merck could have proceeded differently—such as by providing more evidence of Dr. De Luca's specific contributions to the disclosure in Bodor, which Merck had no reason to believe was required (and should not be required).

Thus, if the Court does not reverse the Board's novel and erroneous legal rule (though it should), the Court should still reverse because Merck was entitled to rely on the MPEP. At a minimum, the case should be remanded so that Merck may develop a record responsive to the Board's new rule.

## C. The Board Legally Erred In Its Determination That Dr. De Luca Was Not Proven To Be Part Of The Common Inventive Entity

Besides adopting an unheralded and unsupported legal framework, the Board applied it in an erroneous manner in two ways. First, it required particularized proof of Dr. De Luca's "specific contribution" to the Bodor disclosure (Appx32), rather than looking at all the evidence under the rule of reason. Second, the Board placed an improper burden of persuasion on Merck to prove Dr. De Luca's contributions, when the burden should have remained on Hopewell.

First, the Board misapplied the rule of reason, rejecting as uncorroborated Dr. Munafo's testimony regarding Dr. De Luca's involvement in inventing the relevant

disclosure in Bodor.  Appx30-37.  Dr. Munafo declared that Dr. De Luca "contributed to our development of [the] proposed dosing regimen," Appx7580(¶21), and that, "before February 2004," Dr. Munafo and "Dr. Lopez-Bresnahan … with the support of Drs. Ythier and De Luca, designed a regimen for treating MS by administering oral cladribine 10 mg tablets daily for 5-7 days per month for 2 months followed by a 10-month cladribine free period." Appx7586(¶34).  Dr. Munafo explained that the contemporaneous documents (*e.g.*, the 2003 Amsterdam Minutes and the 2003 Briefing Document) included a description of a plan for treating MS with cladribine, which was "developed by the Serono team, including Drs. Ythier, Lopez-Bresnahan, De Luca, and" Dr. Munafo himself.  Appx7589(¶40).  And Dr. Munafo stated that the relevant portions of Bodor were attributable to the collective work and were the invention of the named inventors of the patents-at-issue.  Appx4872-4873(82:15-83:5).

There is no reason to doubt Dr. Munafo's testimony regarding his co-inventors, including Dr. De Luca: unlike a self-serving statement promoting his individual contribution, Dr. Munafo instead provided testimony regarding his co-inventors—even before the Board articulated that evidence of Dr. De Luca's contribution was required.  Dr. Munafo's testimony is also corroborated by the 2003 Amsterdam Minutes and the 2003 Briefing Document.

Yet the Board refused to credit Dr. Munafo's detailed account, supposedly because the record lacked independent evidence of the "***specific*** contribution made by [Dr.] De Luca." Appx32. That was error because "an inventor's conception can be corroborated even though 'no one piece of evidence in and of itself' establishes that fact." *NFC Tech., LLC v. Matal*, 871 F.3d 1367, 1372 (Fed. Cir. 2017) (quoting *Price v. Symsek*, 988 F.2d 1187, 1196 (Fed. Cir. 1993)); *see also Fleming v. Escort Inc.*, 774 F.3d 1371, 1377 (Fed. Cir. 2014) (corroboration only requires "evidence that, as a whole," makes the inventor testimony credible).

The Board should have considered more broadly whether the documentary evidence and other witness testimony aligned with Dr. Munafo's testimony such that it rendered his "general account" credible. *Fleming*, 774 F.3d at 1377; *see also NFC Tech.*, 871 F.3d at 1372 (rule-of-reason analysis involves "an evaluation of ***all*** pertinent evidence … so that a sound determination of the ***credibility of the inventor's story*** may be reached" (quotation marks omitted)). As Merck explained (Appx11324-11327), the documents reinforce the accuracy of Dr. Munafo's account: Serono partnered with IVAX to develop an oral formulation of cladribine in October 2002 (Appx7101; Appx7580-7581(¶¶23-25)), and by 2003, Serono's team designed doses and regimens for Phase III studies (Appx7200-7201; Appx7184-7188; Appx7582-7583(¶¶28-29)). The documents additionally reinforced Dr. Munafo's testimony that he and Drs. Lopez-Bresnahan and Ythier

were all involved (Appx7197; Appx7138-7140; Appx7142), a fact the Board did not deny (Appx25-26), further supporting the credibility of Dr. Munafo's account. And as Merck explained (Appx11327-11328), Drs. Bodor and Dandiker also confirmed Dr. Munafo's account. *See* Appx7580-7584(¶¶23-29); Appx7607-7612(¶¶18-27). The Board's failure to address the credibility of Dr. Munafo's general account based on all the evidence was erroneous.

Furthermore, even if the Board were correct to require corroboration of Dr. Munafo's testimony regarding Dr. De Luca's specific contribution to the relevant disclosure in Bodor, the Board erred in its evaluation of that evidence under the rule of reason. Appx36-37. The Board itself recognized that the 2003 Amsterdam Minutes, which laid out Serono's dosing-regimen plan at the time, named Dr. De Luca. Appx32 n.17; Appx7200.[12] *See NFC Tech.*, 871 F.3d at 1372 (circumstantial evidence can provide corroboration). Additionally, the Board wrongly rejected the testimonies of Drs. Bodor and Dandiker for being "silent" as to Dr. De Luca's specific contribution. Appx36. Instead, their respective testimonies that "***Serono*** was responsible for any research and development regarding proposed dosing regimens" (Appx7612(¶27); Appx7770(¶24)) should have been considered in

---

[12] The Board observed that Merck did not cite this mention of Dr. De Luca (Appx32 n.17), but that is because Merck had no notice that the Board would apply a new rule requiring evidence of Dr. De Luca's specific contribution. *See supra* pp. 33-37.

conjunction with Dr. Munafo's testimony that Dr. De Luca was part of that Serono team (Appx7580(¶21)). *See Google LLC v. IPA Techs. Inc.*, 34 F.4th 1081, 1088 (Fed. Cir. 2022) (a "high degree of corroboration" is not required to corroborate inventor testimony). Because this evidence was more than enough under the rule of reason to corroborate Dr. Munafo's testimony that Dr. De Luca contributed to the dosing regimen disclosed in Bodor, reversal is warranted.

The Board also wrongly relied on the mere fact that "Dr. Bodor did not 'know anybody from Serono' and 'had no connection with Serono,'" and that Dr. "Dandiker never communicated with [Dr.] De Luca and could not say what, if anything, he did in relation to the collaboration between Ivax and Serono." Appx31. But that is no surprise, as Drs. Bodor and Dandiker from IVAX were not involved in designing the Serono inventors' dosing regimen and thus could not be expected to know Dr. De Luca's specific contribution. If anything, the IVAX researchers' unawareness supports and reinforces the credibility of Dr. Munafo's testimony that "[t]he IVAX team did not contribute to the design or development of that dosing regimen or the unique weight-based regimen that we later claimed in the '947 patent and the '903 patent." Appx7586(¶33).

Notably, the Board's logic allows for an unfair and unjustifiable situation where a party could disclose an incomplete account of another's invention that had been disclosed to that party, leaving out the contribution of one co-inventor, and

thereby prevent the remaining co-inventors from later obtaining a patent on the completed invention. There is no reason to penalize co-inventors for the fact that *others* disclosed their invention incompletely and could not explain which co-inventors did or did not contribute to the incomplete disclosure.

Second, the Board separately erred by placing an improper burden of persuasion on Merck. The IPR petitioner *always* bears the burden of persuasion. *Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1379 (Fed. Cir. 2015). Even if Merck at one point had a burden of *production* on this issue, *see In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016), Merck easily carried it with Dr. Munafo's testimony that Dr. De Luca contributed to the dosing regimen (Appx7586(¶34)), documentation showing Dr. De Luca was on the Serono team that designed the dosing regimen (Appx7200), and other supporting testimony (Appx7612(¶27); Appx7770(¶24)). Hopewell offered *no* contrary evidence. It is "legal error" for the Board to effectively "place[] the ultimate burden of persuasion" on the patentee regarding conception of the invention. *Innovative Scuba Concepts, Inc. v. Feder Indus., Inc.*, 26 F.3d 1112, 1115 (Fed. Cir. 1994). For example, in *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, placing a burden on the patentee "of showing" the affirmative defense effectively "shifted the ultimate burden of persuasion to the patentee to negate the *prima facie* defense," which was "a greater burden than the patentee had to bear." 960 F.2d 1020, 1039 (Fed. Cir.

1992).  Here too, it was erroneous for the Board to effectively place the burden of persuasion on Merck to "show that [Dr.] De Luca must necessarily be a co-inventor of Bodor's 6-line disclosure."  Appx32-34.  Reversal is thus warranted because Hopewell, which should have borne the burden of persuasion, failed to carry it.  At the very least, remand is needed for the Board to evaluate the evidence under correctly allocated burdens of proof.

> ### D.  The Board Separately Erred In Concluding That Drs. Bodor and Dandiker Were Co-Inventors Of The Dosing Regimen Disclosed In Bodor

The Board separately concluded that Bodor could be considered "by another" because it found Drs. Bodor and Dandiker co-invented the dosing regimen disclosed in Bodor, despite their own testimony denying it.  But the Board could only reach that conclusion by misconstruing the analysis set forth in *Duncan Parking*, 914 F.3d at 1358.

First, the Board misapplied *Duncan Parking*'s first step, which asks "what portions of the reference patent were relied on as prior art to anticipate the claim limitations at issue," 914 F.3d at 1358.  Though the Board acknowledged that the ultimate question is Drs. "Bodor's and Dandiker's contribution to the 'dosing regimen,'" Appx37 (alterations omitted), the Board legally erred when it veered outside the dosing regimen in its search for their alleged contributions.  Specifically, the Board considered "additional disclosures"—including Bodor's teaching of lower

interpatient variation with solid tablets and disclosure about "fine tuning" the cladribine dose and length of treatment—none of which Hopewell asserted as disclosing claim limitations of the patents-at-issue. Appx37-38.

Hopewell's petition mapped the 6-line sentence in Bodor relating to the dosing regimen—and only that disclosure—to several limitations of the challenged claims. Appx11059-11061. The petition relied on other portions of Bodor for ***background*** teachings. Those background teachings are irrelevant at the first step of *Duncan Parking*. *LSI Corp. v. Regents of Univ. of Minn.*, 43 F.4th 1349, 1356 (Fed. Cir. 2022) (portions of reference relied on "for background and context" are "not relevant to the scope of the challenged claims" under *Duncan Parking*'s first step); *Sanofi-Aventis U.S. LLC v. Immunex Corp.*, IPR2017-01879, 2019 WL 643024, at *6 (P.T.A.B. Feb. 14, 2019) (other parts of reference in background not relied on for anticipation challenge not considered in determining disclosure "by another"). While the Board surmised that other portions of Bodor were "relevant to [Hopewell]'s obviousness challenge" for motivation to combine and reasonable expectation of success (Appx38), the Board's invocation of those portions at *Duncan Parking*'s first step was legal error and at a minimum requires remand; the Board should have focused its analysis on the "portions of the reference patent [that] were relied on as prior art to anticipate the claim limitations," not on other passages that were invoked only for other obviousness-based considerations. *See, e.g., Ethicon*

*LLC v. Intuitive Surgical, Inc.*, 847 F. App'x 901, 909 (Fed. Cir. 2021) (assessing the portions of the reference petitioner mapped onto the claim limitations at *Duncan Parking*'s first step).

Additionally, the Board erred by looking to Drs. Bodor's and Dandiker's contribution to inventing a particular solid dosage form—a "cladribine-cyclodextrin complex" (Appx38 (citing Appx3986-3987(25:13-26:2)))—a fact irrelevant here, as the claims of the patents-at-issue recite neither a solid dosage form nor a "cladribine-cyclodextrin complex." Again, the Board needed to "determine what portions of the reference patent were ***relied on*** as prior art to anticipate ***the claim limitations at issue***." *Duncan Parking*, 914 F.3d at 1358; *see also DeBaun*, 687 F.2d at 462 (the inquiry asks "who invented the subject matter disclosed by (the reference) which was ***relied on*** to support the" challenge to the claims). The only relevant portion of Bodor relied upon to challenge ***the claims***—*i.e.*, alleged to disclose limitations of the claimed dosing regimen—was the dosing regimen, which Dr. Bodor testified neither he nor his team, "including Dr. Dandiker, developed, researched, or invented," let alone "any cladribine dosing regimen for treating MS." Appx7611-7612(¶¶25-26). Indeed, where inventors communicate their ideas to another and one inventor publishes both his and the other's ideas, the publication cannot be "by another" against the other's patent application, even where they are complementary and can be used together. For example, where two coworkers, Mathews and Dewey,

told each other about their complementary work and each filed separate patent applications including descriptions of the other's invention, disclosure of Mathews' invention in Dewey's application was not prior art "by another" to Mathews' invention because it reflected Mathews' own work communicated to Dewey along with Dewey's related invention. *In re Mathews*, 408 F.2d 1393, 1394-1395 (C.C.P.A. 1969). So too here, Bodor's description of a cladribine-cyclodextrin complex solid formulation by IVAX that could be used in a Serono dosing regimen does not turn disclosure of that dosing regimen into prior art that can be used against the Serono inventors.

Nor can Hopewell point to the solid-dosage-form cladribine-cyclodextrin complex disclosure merely because it is mentioned in the relevant sentence. This would lead to absurd results, as patent challengers could "artificially alter the inventive entity for comparison by citing extraneous portions of a multi-inventor prior art reference, thereby making it 'by others' even if the portions of the reference necessary for establishing obviousness had the same inventive entity as the challenged patent." *Google*, 34 F.4th at 1086 n.3. Because the solid dosage form was irrelevant to the obviousness combination, the Board's analysis at *Duncan Parking*'s first step was legally flawed.

Moreover, even if the dosage form could have been properly considered a relevant part of the disclosure, the Board independently erred at *Duncan Parking*'s

second step, which requires "evaluat[ing] the degree to which those portions were *conceived* 'by another.'" 914 F.3d at 1358. The Board failed to properly evaluate *conception* of the 10mg cladribine tablets, instead citing evidence showing that Dr. Dandiker was planning to *manufacture* a 10mg tablet—not that he *conceived* of it. Appx38-39 (citing Appx4925(135:4-14) (Dr. Munafo's testimony that "it was a joint team agreement" was in response to question of "who proposed that Dr. Dandiker *make* a 10 mg tablet," not who conceived of the 10mg tablet)); Appx4186-4187(48:15-49:13) (Dr. Dandiker: "What we were trying to do was to *make* the first oral tablet … for cladribine"); Appx7200 (Dr. Dandiker "would *make* a 10 mg tablet").

Instead, the evidence showed that the Serono inventors, not Dr. Bodor or Dr. Dandiker, conceived of the dosing regimen with 10mg oral cladribine tablets—a regimen Serono designed based on specific formulation criteria *Serono* had set for IVAX's formulation in 2002. *E.g.*, Appx7200; Appx7180; Appx7586-7596(¶¶33-54) (Dr. Munafo testifying that Serono provided the Briefing Document to IVAX describing *Serono's* planned study to include treatments with 10mg oral cladribine tablets for 5 consecutive days in each of the first 2 months, followed by placebo in months 3-6, then no pills in months 7-12). Indeed, before Serono told IVAX about its plan to study a dosing regimen using 10mg cladribine tablets, IVAX was working on making a 3mg tablet. Appx7197. Hopewell never contended that Drs. Bodor

and/or Dandiker conceived of a 10mg cladribine tablet; Hopewell's position was that "[n]either [the 2003 Briefing Document] nor [the Amsterdam Minutes] identifies who suggested to create a 10 mg tablet." Appx11525. And Drs. Bodor and Dandiker admitted that they did not invent the regimen described in Bodor. Appx7612(¶26); Appx7770(¶23). The Board's analysis thus fails at *Duncan Parking*'s second step because there is no evidence that Drs. Bodor and Dandiker conceived of the dosing regimen disclosed in Bodor, even considering the unclaimed 10mg oral tablet.

Thus, the Board's determination that Bodor constitutes prior art "by another" should be reversed. And because Hopewell has no other reference allegedly disclosing limitations of the claimed dosing regimen, the Court should reverse the final written decisions. Reversal on that basis would mean that the Court need not address the remaining arguments in this brief.

## II. THE BOARD ERRED IN DETERMINING THAT IT WOULD HAVE BEEN OBVIOUS TO RE-TREAT A PATIENT ACCORDING TO THE CLAIMED MAINTENANCE PERIOD WITH A REASONABLE EXPECTATION OF SUCCESS

No substantial evidence supports the Board's conclusion that "it would have been obvious to follow Bodor's 2-month induction period and 10-month cladribine-free period with a retreatment or maintenance phase" as claimed. Appx53. Hopewell's references do not disclose or suggest re-treating patients with cladribine according to the claimed maintenance period after the claimed no-treatment period. Indeed, Hopewell identified ***no*** reference that teaches re-treatment using the ***same***

MS drug with the *same* dose as initially administered, as required by claim 39 of the '947 patent and claim 20 of the '903 patent. A skilled artisan seeking to administer subsequent therapy to MS patients could and would have had to consider and choose from numerous different MS drugs, different doses, and/or different dosing periods, the combination of which would have led to unlimited possible options, with no teachings or guidance regarding which combination would have been effective and safe. *See* Appx7265(¶118) ("[T]he art does not suggest that a [skilled artisan] would have re-treated with cladribine."); Appx7263(¶116) ("[T]here was no consensus in the art regarding when re-treatment with cladribine would occur, if at all."). Thus, a skilled artisan would not have been faced with a discrete number of predictable solutions, leaving Hopewell to "urge[] an obviousness finding by 'merely throwing metaphorical darts at a board' in hopes of arriving at a successful result." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1070-1071 (Fed. Cir. 2012) (brackets omitted). Any suggestion of re-treatment with cladribine according to the claimed maintenance period could only be driven by improper hindsight given previous failures and wariness in the art.

## A. Neither Bodor Nor Stelmasiak Discloses Re-Treatment As Claimed

The regimen disclosed in Bodor does not involve *any* subsequent therapy. Bodor describes only *one* treatment period with 10mg of cladribine administered daily for 5-7 days in two consecutive months. Appx1939(23:15-20). Bodor's

alternative regimen likewise discloses *one* treatment period, in which the patient is administered 10mg tablets for "five to seven days per month for a total of six months, followed by *eighteen months* of no treatment." Appx1939(23:20-24). Bodor does not teach or suggest any subsequent treatment at any point after the no-treatment period, let alone whether subsequent treatment should be with cladribine; what dose would be administered; how the drug would be administered (*e.g.*, orally or subcutaneously); how long the treatment would last; or whether a no-treatment period would follow. *See* Appx7252(¶98) ("Bodor does not state that re-treatment with cladribine should occur upon completion of the 10-month cladribine-free period (or otherwise).").

The Board did not find otherwise. Instead, it surmised that "Bodor's recitation of specific durations for the drug-free periods *logically suggests* a retreatment period." Appx53. The Board's conclusory statement is unsupported, and the evidence shows that a skilled artisan would *not* provide subsequent treatment with any therapy unless and until it was necessary and safe. Both sides' experts agreed that the art included a no-treatment period out of concern "for safety." Appx11870(62:15-17); *see* Appx7253(¶99); Appx1075-1076(¶103). A skilled artisan would have understood that, following a no-treatment period, a patient should not be treated with any therapy unless and until a need arises (such as disease progression) *and* it is safe. Appx7262(¶113) (Dr. Lublin: "any subsequent re-

treatment would have been based on a combination of factors, such as evidence of disease progression, time course of therapeutic effects, and safety considerations"). In fact, the prior art contemplated re-treatment *only* when certain criteria were met. Appx1888 (Rice study permitted re-treatment with cladribine only if: (1) "at least 12 months had elapsed since the last dose of cladribine," (2) "there was evidence of disease progression," *and* (3) "hematologic dosing criteria" were met).

Nothing in Bodor's disclosure of a no-treatment period suggested re-treating upon expiration of that period *even if* the disease did not worsen. By analogy, a dentist who orders an X-ray might caution the patient not to have another X-ray within three months, as X-rays can increase the risk of cancer. But expiration of the three-month "no-X-ray period" does not mean that the patient immediately undergoes another X-ray at that time. The patient would receive another X-ray *only* if it were safe and medically needed. Appx11870(62:18-22). It is only with the benefit of Merck's discovery that an MS patient is re-treated after the claimed no-treatment period, regardless of whether the disease progressed or not.

The Board erred by focusing incorrectly on the mere possibility of safe re-treatment, rather than on whether a skilled artisan would have been motivated not only to administer subsequent treatment, but specifically to re-treat *with cladribine* under *the same regimen* upon completion of Bodor's 10-month no-treatment period with a reasonable expectation of success. In a footnote, the Board interpreted Bodor

as "suggesting one could safely retreat the patient as needed when that specified period elapsed." Appx53 n.26. Even if a skilled artisan could infer from Bodor that one *could* safely re-treat with cladribine after the no-treatment period, the Board did not explain *why* a skilled artisan *would* consider re-treatment, particularly according to the claimed maintenance period, choosing cladribine again over any other MS therapies; oral over any parenteral route; and the exact duration and total dose as given previously. Of the virtually infinite number of potential subsequent-treatment regimens, the Board did not explain why a skilled artisan would have chosen the claimed regimen for re-treatment.

The Board's crediting of Dr. Miller's testimony fails for the same reason, as he merely suggested that re-treatment with cladribine was *possible*, not that a skilled artisan would have been *motivated* to re-treat with cladribine upon conclusion of the no-treatment period, let alone motivated to re-treat as claimed, with a reasonable expectation of success. Appx53-54 (citing Appx1059-1061(¶¶84-86); Appx5491(¶70)). The Board's further speculation that a skilled artisan "at least … would consider doing so" was conclusory and legally insufficient. Appx53 n.26. Even when a skilled artisan "would have … knowledge" about how to modify the prior art, "it does not necessarily follow that such an artisan would have any motivation" to modify the prior art. *Provisur Techs., Inc. v. Weber, Inc.*, 2022 WL 17688071, at *5 (Fed. Cir. Dec. 15, 2022) (emphasis omitted).

Stelmasiak does not remedy Bodor's deficiencies regarding re-treatment. Stelmasiak's oral dosing regimen is significantly different, administering doses of cladribine in three separate windows of time over the course of one treatment protocol. Appx1849 ("Six cladribine courses were given at monthly intervals, and two additional courses were given at 9 and 12 or 15 months. Each course consisted of five doses of the drug taken once daily on consecutive days."). The no-treatment periods in Stelmasiak lasted two or five months. Moreover, the patients receiving Stelmasiak's oral regimen took a total of 300mg of cladribine during the initial phase, and subsequently received oral doses totaling only 50mg each. Stelmasiak's subsequent oral doses were also given only during the first week of one month; they did not span two to four months, as the patents-at-issue claim. Thus, Stelmasiak does not disclose or suggest re-treatment with cladribine after 8-10 months with a maintenance period having doses and intervals as claimed. Indeed, ***nothing*** in Hopewell's references discloses or suggests re-treatment with cladribine at the claimed dose and frequency, approximately one year after the start of treatment.

**B.**      **The Board Erred In Determining That A Skilled Artisan Would Have Been Motivated To Modify Bodor With A Reasonable Expectation Of Success**

Although neither Bodor nor Stelmasiak teaches re-treatment with cladribine according to the claimed maintenance period following an 8-10 month no-treatment period, let alone re-treatment followed by a second no-treatment period, the Board

- 53 -

improperly concluded that a skilled artisan would have been motivated to modify Bodor to repeat the same dosing regimen following the no-treatment period and would have reasonably expected success. Appx53-60.

As discussed, a skilled artisan considering re-treatment would have taken account of multiple factors taught in prior-art studies like Rice and Romine,[13] such as disease progression, the drug's therapeutic profile, and safety criteria. *Supra* pp. 50-51. The Board brushed those factors aside because Hopewell's theory purportedly "did not presuppose 'automatic' retreatment" after the first no-treatment period. Appx59. That was legal error, because the ***claims*** in fact require re-treatment after the first no-treatment period of 8-10 months, regardless of whether the disease progressed or not. Hopewell had the burden of proving a motivation to modify the prior-art elements in that claimed manner. *See Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015). The Board thus erred in venturing that "at least some patients" might have worsened during Bodor's no-treatment period, leading a skilled artisan to re-treat those patients, let alone with the same dosing regimen of cladribine. Appx59; *see* Appx60-61; Appx64. Theorizing hypothetical results for an unknown subset of the population does not provide a motivation to

---

[13]     Romine et al., *A Double-Blind, Placebo-Controlled, Randomized Trial of Cladribine in Relapsing-Remitting Multiple Sclerosis*, 111 Proceedings of Ass'n of Am. Physicians 35 (1999); Appx2302-2311.

employ the unique regimen as claimed, which requires re-treatment in *every* case. Only in hindsight, with the benefit of the patented invention, would a skilled artisan have chosen that route. *See In re Schweickert*, 676 F. App'x 988, 996 (Fed. Cir. 2017) (Board's finding that references merely could be combined "suffer[ed] from hindsight bias").

In its reply before the Board (though not its petition), Hopewell generally pointed to prior-art studies as providing motivation for re-treatment, cross-referencing arguments involving Rice. Appx11548; *see* Appx77. But before considering any re-treatment, Rice requires: (1) waiting ***at least*** 12 months from the last cladribine dose, (2) progression of the patients' disease, ***and*** (3) satisfaction of hematological safety criteria. Appx1888. The Board acknowledged Rice's criteria but, as noted above, dismissed them as purportedly irrelevant because Hopewell's "theory … did not presuppose 'automatic' retreatment." Appx59. Again, the ***claims*** themselves require re-treatment upon conclusion of the first no-treatment period regardless of whether the disease progressed or not, and cannot be held obvious without evidence of a motivation to practice them as written with a reasonable expectation of success. Rice's details accordingly cannot be so easily disregarded, as they bear on the "differences between the prior art and the claims at issue." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966).

Additionally, the undisputed, contemporaneous evidence showed that, around 2004, there were significant concerns about cladribine's safety and efficacy for MS treatment. *E.g.*, Appx6695 ("We remain to be convinced that cladribine is useful, and do not recommend its use in the management of patients with multiple sclerosis."). As a result, a skilled artisan would not have been motivated to modify, or reasonably expected success in modifying, Bodor and Stelmasiak to arrive at the claimed dosing regimen.

Tellingly, Dr. Miller flip-flopped on this issue. In 2008, Dr. Miller stated that Rice and other studies regarding MS treatment with cladribine showed "an enigmatic dissociation between positive effects on MRI and unconvincing clinical benefit" for MS patients. Appx6059; *see also* Appx6059 ("[I]t seems prudent to await the results of a prospective, randomized, blinded trial of oral cladribine before recommending its use in patients with MS."); Appx6177(26:5-10). After being hired by Hopewell, however, Dr. Miller stated that Rice revealed cladribine as "a 'promising treatment'" for MS. Appx5478-5479(¶51) (brackets omitted). Thus, when the applications that resulted in the patents-at-issue were filed, Dr. Miller and other skilled artisans would not have been motivated to modify Bodor in the way that Dr. Miller now suggests as Hopewell's paid expert. Although Merck extensively quoted Dr. Miller's earlier disparagement of cladribine, Appx11351-11352, the Board erred by not addressing his about-face and instead offering its own view of Rice, Appx74.

After largely glossing over the details in Stelmasiak and Rice, the Board merely agreed with Dr. Miller that "'re-treatments were consistent with prior clinical studies where patients relapsed during or after cladribine therapy.'" Appx53-54 (quoting Appx5491(¶70)); *see also* Appx57-58 ("[R]etreatment was recommended given cladribine's temporary lymphocyte suppression and MS's chronic nature."); Appx60 (noting possibility of "breakthrough disease or relapse that would require additional, maintenance treatment"); Appx69 (accepting "Dr. Miller's testimony that it would be logical to retreat relapsing patients"). But the mere risk of relapse does not mean that a skilled artisan would have been motivated to re-treat patients with the same drug following a no-treatment period as claimed, let alone with oral cladribine at the claimed maintenance dose over the claimed duration and with a subsequent no-treatment period. The Board's only basis for that conclusion was Dr. Miller's hindsight testimony (contradicting his earlier stated views), and even looking backward, Dr. Miller could not offer a concrete reason ***why*** re-treatment would have occurred in the precise form of the claimed maintenance period. Such speculative, conclusory expert testimony "does not qualify as substantial evidence." *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019).

The Board also improperly concluded that a skilled artisan would have been motivated to "optimiz[e] Bodor's teachings to arrive at" the claims. Appx63. But a skilled artisan would not have been able to optimize re-treatment with cladribine in

the way Hopewell's petition argued, namely "by regularly measuring the patient's lymphocyte counts and evaluating the efficacy of a given dose based on the change[] in the count." Appx11056; *see* Appx11539. As Hopewell's expert conceded, "[l]ymphocyte suppression is ***not*** a measure of efficacy." Appx6272(121:17-18). The Board similarly recognized that a lower lymphocyte level does not mean that an MS patient will experience better outcomes. *See* Appx71. Rather, as a safety matter, a skilled artisan would not allow the lymphocyte level to drop precipitously. Appx7276-7279(¶¶136-142). The Board's statement that lymphocyte level is a "result-effective variable" (Appx73; Appx76) makes no sense. Patient ***safety*** is not a result that could allow one to optimize ***efficacy*** of an MS regimen, but rather a safety guardrail to be observed while treating the disease. There is thus no specific lymphocyte level to which a skilled artisan could optimize cladribine treatment. *See* Appx8212-8213(41:17-42:4) (Dr. Miller testifying that lymphocytes "don't necessarily need to be suppressed at all to treat" MS); Appx5505(¶90) (Dr. Miller admitting that his chosen lymphocyte level was "merely … exemplary"). The Board responded to this argument by pointing generally to lymphocyte tracking in the art, Appx74, but that only underscores the importance of lymphocyte tracking for safety; it does not explain how a skilled artisan would optimize cladribine dosage based on lymphocyte level without any target level. The Board's optimization rationale,

accordingly, does not support a motivation to pursue the claimed dosing regimen with a reasonable expectation of success.

## III. THE BOARD ERRED IN INTERPRETING THE CLAIMS TO COVER NON-WEIGHT-BASED DOSING

Exemplary claim 36 of the '947 patent requires that "the total dose of cladribine reached at the end of the induction period is from about 1.7 *mg/kg* to about 3.5 *mg/kg*." Appx201(19:19-21). Similarly, claim 36 requires that "the total dose of cladribine reached at the end of the maintenance period is about 1.7 *mg/kg*." Appx201(19:26-28). The claims thus require administering cladribine in a dose (measured in milligrams) determined based on the patient's weight (measured in kilograms) during the induction and maintenance periods. The Board acknowledged this when initially declining to institute TWi's IPR petitions, *supra* pp. 15-16, but later reversed course, holding that the claims encompass "flat" dosing whereby each patient, regardless of weight, receives the same amount of cladribine. Appx47. That was legal error.

As a preliminary matter, the Board incorrectly faulted Merck for "not propos[ing] any express 'weight-based' claim construction in its Patent Owner Response." Appx47. But Merck relied on the claims' plain language, arguing extensively in its patent owner response that neither Bodor nor Stelmasiak discloses weight-based dosing. Appx11330-11335. Merck carried its weight-based interpretation of the claims through its sur-reply. Appx11621-11623 (arguing that

Hopewell "*misconstrues* the claims"). Thus, the Board was on notice that Merck understood the claims' plain language as requiring weight-based dosing. And the Board passed upon the issue by concluding that the claims' scope extends beyond weight-based dosing. Appx46-53. That preserved the issue for review. *See Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995) (appellate practice "'permits review of an issue … so long as it has been passed upon'" (brackets omitted)).

Claim interpretation starts, and often ends, with the claims' plain language. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). The induction and maintenance doses are listed in milligrams of drug per kilograms of patient weight. Under the limitations in claim 36, a patient weighing 100kg (220 pounds) would be administered about 170mg of cladribine in total during the maintenance phase to attain the claimed dose.[14] A patient weighing only 50kg (110 pounds) would be administered only about 85mg of cladribine during the same period by taking about half as many tablets.[15] Hopewell never explained how one could or would select the proper dose of cladribine without knowing the patient's weight. Indeed, it is a logical impossibility.

---

[14]    1.7mg/kg x 100kg = 170mg.

[15]    1.7mg/kg x 50kg = 85mg.

The specification confirms that the claims require weight-based dosing. *See Phillips*, 415 F.3d at 1315 (the specification "'is the single best guide to the meaning of a disputed term'"). It provides examples of selecting the amount of cladribine based on patient weight. Appx198(14:41-44) (patient "receives … 1, 2 or 3 administration(s) a day depending on the patient's weight"); Appx198(14:63-66) ("administration schemes for the induction period depending on the patient's weight are given below"). Table 3 shows how many pills need to be administered to patients of various weights to reach a target dose by the end of the two-month induction period. Appx199. Accordingly, the patient's weight ***must*** be known for the proper dose of drug to be selected. *See* Appx4547-4548(144:20-145:3) (Dr. Lublin: one must "know a patient's weight before administering cladribine according to the methods claimed").

The FDA-approved label of Merck's drug Mavenclad®, which embodies the patented invention, reinforces the weight-based-dosing requirement. Like the specification, the Mavenclad® label includes a table showing how many cladribine tablets should be administered to patients based on their weight. Appx6005. As Dr. Miller recognized, that is precisely what makes Mavenclad® "unique": Mavenclad® "is the only MS medicine … that is not given in a fixed dose but rather the dose is determined by how much the individual weighs." Appx6132-6133(4:17-5:1). The Board downplayed Dr. Miller's statement by endorsing his made-for-litigation

testimony that he had previously been talking about only dosing regimens for FDA-approved MS treatments, not all dosing regimens in the prior art. Appx51 (citing Appx5489). That does not change the fact that, even today, Mavenclad® remains the only oral cladribine MS drug that patients take according to their weight.

The Board offered no contrary explanation of the intrinsic evidence. *See* Appx47-48. In a footnote, the Board dismissed one excerpt from the specification as a "non-specific disclosure," even though it states that the dose "'will vary depending on'" the patient's weight and other factors. Appx47 n.22. Otherwise, the Board stated that it was "declin[ing] to import into the claims any express ***patient-weighing step*** or to construe the claims to require ***preexisting knowledge*** of a patient's weight." Appx47. But Merck is not arguing for a "patient-weighing step," nor any claim requirement of "preexisting ***knowledge*** of the patient's weight." It is true that, to practice the claims as written, someone—typically a physician or the patient—will know the patient's weight and use it to determine the correct dosage. But that does not "import" a limitation of "preexisting knowledge"; it simply shows that practicing the claims will typically arise in particular circumstances. *Cf. Rambus Inc. v. Infineon Techs. Ag*, 318 F.3d 1081, 1093 (Fed. Cir. 2003) ("[T]he claims need not recite every component necessary to enable operation of a working device.").

The Board alternatively reasoned that it would be obvious to "convert[] … flat and weight-based expressions of the dose." Appx48. But after-the-fact conversion of a dose previously administered is not the same as selecting a dose based on the patient's weight when administering the drug. To be sure, dose per weight can typically be calculated, but a dose is not weight-based unless weight is factored in *at the time of dosing*.

The Board erred in expanding the claims to cover flat dosing when they require weight-based dosing. As Merck explained, both Bodor and Stelmasiak teach flat dosing; neither teaches weight-based dosing. Appx11330-11335; Appx11623. Indeed, Stelmasiak expressly discourages weight-based dosing, stating that there is "no indication that a 'good response' is related to the actual cladribine dose per body weight." Appx1851. Thus, the combined references do not teach the patented dosing regimen, and this Court should reverse the Board's obviousness determination. At minimum, the Court should vacate and remand for the Board to reconsider the nonobviousness of the claims under the proper claim construction.

## CONCLUSION

The Board's final written decisions should be reversed or, at minimum, vacated.

Respectfully submitted,

/s/ David B. Bassett

DAVID B. BASSETT
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

HELENA RACHAEL MILLION-PEREZ
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, CO  80202
(720) 274-3135

*Attorneys for Appellant*
*Merck Serono S.A.*

EMILY R. WHELAN
MARK C. FLEMING
JAMES M. LYONS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

JENNIFER L. GRABER
GARY M. FOX
NORA N. XU
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, DC  20037
(202) 663-6000

March 7, 2025

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

Final Written Decision, Paper No. 62 (Sep. 18, 2024)
[CONFIDENTIAL]................................................................................ Appx1-94

Final Written Decision, Paper No. 62 (Sep. 18, 2024)
[CONFIDENTIAL]............................................................................ Appx95-189

**PATENTS-IN-SUIT**

U.S. Patent No. 7,713,947 B2 (Exhibit 1001 from IPR2023-
00480) ............................................................................ Appx190-202

U.S. Patent No. 8,377,903 B2 (Exhibit 1001 from IPR2023-
00481) ............................................................................ Appx203-214

## CONFIDENTIAL MATERIAL OMITTED

The material omitted from pages Appx32, Appx39, Appx126, and Appx133 of the addendum contains Merck's proprietary technology information.

Trials@uspto.gov
571-272-7822

Paper 62
Date: September 18, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

HOPEWELL PHARMA VENTURES, INC.,
Petitioner,

v.

MERCK SERONO S.A.,
Patent Owner.

IPR2023-00480
Patent 7,713,947 B2

Before ZHENYU YANG, ROBERT A. POLLOCK, and
TIMOTHY G. MAJORS, *Administrative Patent Judges*.

MAJORS, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Granting Parties' Motions to Seal (Papers 19, 54, 55)
Denying without Prejudice Petitioner's Motion to Seal (Paper 42)
*37 C.F.R. § 42.14*

**Appx1**

## I.     INTRODUCTION

Hopewell Pharma Ventures, Inc. ("Petitioner" or "Hopewell") filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 36, 38, 39, and 41–46 of U.S. Patent No. 7,713,947 B2 (Ex. 1001, "the '947 patent"). Pet. 1, 33.

We instituted trial on September 22, 2023.  Paper 10 ("Inst. Dec."). During trial, Merck Serono S.A. ("Patent Owner" or "Merck") filed a Patent Owner Response.  Paper 20 ("PO Resp.").  Petitioner filed a Reply (Paper 41 ("Pet. Reply")) and Patent Owner filed a Sur-reply (Paper 51 ("PO Sur-reply")).  An oral hearing was held on June 25, 2024, and a transcript is of record.  Paper 61 ("Tr.").  With authorization, Petitioner and Patent Owner also filed post-hearing supplemental briefs providing further argument about the asserted prior-art status of a reference asserted herein.  Paper 59 (PO Suppl. Br.); Paper 60 (Pet. Suppl. Br.).

Unopposed motions to seal also remain pending (Papers 19, 42, 54, and 55).  We resolve those motions as set forth in Section IV below.

We have jurisdiction under 35 U.S.C. § 6(b).  After considering the full record developed through trial, we determine that Petitioner has proved by a preponderance of the evidence that the challenged claims are unpatentable.  *See* 35 U.S.C. § 316(e).  Our reasoning is explained below, and we issue this Final Written Decision under 35 U.S.C. § 318(a).

## II.     BACKGROUND

### A.     *Real Parties-in-Interest*

Petitioner identifies itself and the following entities as real parties-in-interest: Hopewell Pharma Ventures LLC; Levy SPV, LLC; GLS Capital Partners Fund I, LP; GLS Capital Partners GP, LLC; and GLS Capital, LLC.

Pet. 68–69.  Merck identifies itself along with Merck KGaA and Ares
Trading SA as the real parties-in-interest.  Paper 3, 1.

### B.    Related Matters

The parties identify the following lawsuits involving assertions of the
'947 patent: *Merck KGaA et al. v. Accord Healthcare, Inc. et al.*, 1-22-cv-
00974 (D. Del.); *Merck KGaA et al. v. Hopewell Pharma Ventures, Inc.*, 1-
22-cv-01365 (D. Del); *Merck KGaA et al v. Aurobindo Pharma USA, Inc. et
al.*, 1-23-cv-00039 (D. Del.).  Pet. 69; Paper 3, 1.

The parties also identify other related matters before the Board.
Pet. 69–70; Paper 3, 1–2.  We instituted trial in IPR2023-00481, which
matter was filed by Petitioner and challenges U.S. Patent No. 8,377,903
("the '903 patent"), and we enter a final written decision in IPR2023-00481
concurrent with this Decision.  Additionally, the parties identify IPR2023-
00049 and IPR2023-00050, which were filed by a different petitioner (TWi
Pharmaceuticals, Inc. ("TWi")), challenging the '947 and '903 patents.[1]  *Id.*

### C.    The '947 Patent & Technology Background

The '947 patent, titled "Cladribine Regimen for Treating Multiple
Sclerosis," issued on May 11, 2010.  Ex. 1001, codes (45), (54).  The
application that matured into the '947 patent was filed December 20, 2005,
and claims the priority benefit of a provisional patent application filed
December 22, 2004.  *Id.* at codes (22), (60).[2]

---

[1] The Board initially denied institution on the TWi-filed petitions, but
granted institution on rehearing.  IPR2023-00049, Papers 10 and 15;
IPR2023-00050, Papers 8 and 13.  Those proceedings remain pending.

[2] In this case, Petitioner assumes December 22, 2004, is the priority date.
Pet. 2–4, 7–8 n.3, 13–28.  Absent argument to the contrary, the Board
applies December 22, 2004, as the priority date for the challenged claims.

According to the '947 patent, the "present invention is related to the use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis . . . wherein the preparation is to be orally administered and wherein re-treatments are possible." *Id.* at Abstr.; *see also id.* at 1:17–20 ("The present invention relates to the use of multiple doses of Cladribine for the treatment of multiple sclerosis, especially relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis.").

Cladribine is a chlorinated purine analogue, 2-chloro-2′deoxyadenosine (also known as 2-CdA). *Id.* at 2:24–27. Cladribine was known in the prior art, as were oral, i.v., and subcutaneous formulations including it. *See, e.g.*, *id.* at 6:20–25 (noting formulations for oral administration described in, for example, US Patent No. 5,506,214[3]). The '947 patent notes that cladribine has also been suggested previously in the art as useful for treating multiple sclerosis. *Id.* at 2:24–3:21 (discussing prior studies on cladribine's use in patients with multiple sclerosis); *see also* Pet. 19–21; Ex. 1002 ¶¶ 33–52 (testimony of Dr. Aaron Miller on studies by Beutler, Stelmasiak, Rice, and others).

As described in the '947 patent, "[m]ultiple sclerosis (MS) is the most known chronic inflammatory demyelinating disease of the central nervous system in humans." Ex. 1001, 1:25–27. "Over time, MS may result in the accumulation of various neurological disabilities" and "[c]linical disability in MS is presumed to be a result of repeated inflammatory injury with subsequent loss of myelin and axons, leading to tissue atrophy." *Id.* at 1:30–34. The patent states that "MS is manifested in physical symptoms (relapses

---

[3] Beutler, U.S. Patent No. 5,506,214, issued April 9, 1996 (Ex. 1026).

and disability progression), Central Nervous System (CNS) inflammation, brain atrophy and cognitive impairment." *Id.* at 1:35–37; Ex. 2051 ¶ 39 (testimony of Patent Owner's declarant, Dr. Fred Lublin, explaining that "multiple sclerosis," meaning "many scars," is an autoimmune disease where the immune system attacks the CNS, particularly myelin, which is an insulating substance that surrounds and protects nerve fibers/axons).

By December 2004, it was known that lymphocytes (especially T cells), which cells are part of the body's acquired immune system, play a role in the pathophysiology of MS. Ex. 1002 ¶¶ 28–29; Ex. 2051 ¶ 40 (testifying that "by 2004, MS was thought to be a lymphocyte-dependent autoimmune disease" involving autoantigen-specific T lymphocytes). According to Petitioner's declarant, Dr. Miller, "[p]atients with MS 'harbor T cells that react with CNS autoantigens'" and, "[a]lthough these T cells (a type of lymphocyte) may 'remain dormant for decades, at some point they are activated in the periphery,'" allowing the cells to "migrate through the blood-brain barrier to the brain and spinal cord." Ex. 1002 ¶¶ 28–29 (citing Ex. 1044, 1–3; Ex. 1007, 131). "Once these T cells are reactivated in the CNS . . . they 'release pro-inflammatory Th1 cytokines and orchestrate the destruction of the myelin sheath by various types of immune cells.'" *Id.* (citing Ex. 1007, 131). As Dr. Miller further explains, inflammation and resulting demyelination creates "lesions" in the affected tissues that can be detected and monitored. *Id.* ¶¶ 15, 24, 27 (discussing detection of active/enhancing lesions with MRI); Ex. 2051 ¶ 39 (explaining "lesions" reflect accumulated dead nerve cells in the brain and spinal cord).

According to the '947 patent, MS is "considered to be a multi-phasic disease and periods of clinical quiescence (remissions) occur between exacerbations. Remissions vary in length and may last several years but are

infrequently permanent." Ex. 1001, 1:43–46. Moreover, the patent states, "[f]our courses of the disease are individualized: relapsing-remitting (RR), secondary progressive (SP), primary progressive (PP) and progressive relapsing (PR) multiple sclerosis." *Id.* at 1:47–50. "More than 80% of patients with MS will initially display a RR course with clinical exacerbation of neurological symptoms, followed by recovery that may or may not be complete." *Id.* at 1:51–56 (noting that disability arises from incomplete recovery from relapses). "Approximately, half of the patients with RRMS switch to a progressive course, called SPMS, 10 years after the disease[] onset." *Id.* at 1:56–62 (noting that worsening of disability in the progressive phase results from "accumulation of residual symptoms after exacerbation but also from insidious progression between exacerbations").

There is no known cure for MS. Ex. 1002 ¶ 22 (citing Ex. 1024). Because MS is a chronic disease, patients ordinarily require ongoing care and repeated treatments designed to alter or suppress the immune system. *Id.* ¶ 53 (citing Ex. 1008, 211–213). To illustrate, Dr. Miller identifies Figure 1 of Weiner (Ex. 1008), which is reproduced below.



Ex. 1008, 212, Fig. 1. Figure 1, above, is titled a "clinical course and treatment of multiple sclerosis" and shows a common MS disease course, with the horizontal axis representing time and the vertical axis the level of disability. *Id.* (capitalization omitted). The figure includes an early "attack" followed by multiple "relapses," shown by vertical bars of different heights on the left half of the figure; then, at the time represented by a vertical dashed line near the middle of the figure, the onset of a progressive phase of the disease with persistent disability steadily increasing as shown by the upwardly sloping line as one moves to the figure's right. *Id.* (including, below the horizontal axis, a treatment strategy (e.g., improve recovery from attack, etc.) for the disease stage). According to Dr. Miller, as reflected in the figure above, "different therapies are designed to treat acute attacks, prevent or decrease the number of relapses, and prevent onset of or halt the progressive phase." Ex. 1002 ¶ 53 (citing Ex. 1008, 212–213).

As Dr. Miller further explains, "[b]ecause of the role the immune system plays in the underlying pathophysiology of MS, [administering] immunosuppressive drugs was '[t]he most common therapeutic approach' for treating MS before December 2004." *Id.* ¶ 16 (citing Ex. 1013, 4; Ex. 1007, 131); *see also id.* ¶ 30 ("Because of the role autoantigen-specific T lymphocytes were known to play in MS, suppressing these lymphocytes was a target of [prior] MS therapies"); *but see* Ex. 2051 ¶¶ 49–52 (Dr. Lublin testifying MS therapies generally involved immunosuppressive and immunomodulatory therapies, and some, though not all, involved suppressing lymphocytes (citing, e.g., increased levels of white blood cells in natalizumab-treated patients (Ex. 2019, 2)).

"Because cladribine caused 'prolonged, profound suppression of lymphocyte counts,' researchers began studying it in MS." Ex. 1002 ¶ 16

(citing Ex. 1016, 420); Ex. 2051 ¶ 64 (testifying that cladribine, originally approved for treating hairy cell leukemia, "was known for its ability to selectively reduce lymphocyte count" and, by 2004, had been investigated in several MS clinical studies). Dr. Miller testifies that "[i]n early studies, cladribine was shown to 'modulat[e] autoimmune processes involving lymphocyte abnormalities such as MS' and 'impressively decrease[]' relapse rates" in MS patients. Ex. 1002 ¶ 16 (citing Ex. 1018, 1146; Ex. 1013, 5, 7). According to Dr. Miller, "[d]uring treatment, neurologists commonly assessed the therapeutic effect of cladribine by monitoring a patient's lymphocyte count, with a sustained reduction of lymphocytes, e.g., below 1000 [cells]/μL, being characteristic of a treatment response." *Id.* (citing Ex. 1018, 1146; Ex. 1013, 5; Ex. 1014, 1717).

The '947 patent describes, in an example, a treatment regimen for patients with MS. Ex. 1001, 14:19–16:23 (Example 1). In a study on sixty patients with relapsing forms of MS, the patients were sorted into three groups: for the first year, Group 1 patients received placebo for four months followed by 8 months of no treatment; Group 2 patients received daily oral administration of cladribine (10 mg tablets) for about 5 days a month for two months, followed by placebo for two months, and 8 months of no treatment ("total dose of about 1.75 mg/kg"); and Group 3 patients received daily oral administration of cladribine (10 mg tablets, as above) for about 5 days a month for 4 months followed by 8 months of no treatment ("total dose of about 3.5 mg/kg"). *Id.* In the second year (starting month 13), the patent discloses that all three groups received oral cladribine for about 5 days a month for 2 months at the lower dose (i.e., total of "about 1.75 mg/kg" over

the 2 months) followed by 10 months of no treatment.[4] *Id.* (disclosing, *inter alia*, that lymphocyte markers are monitored and that "[p]atients in Groups 2 and 3 have a decrease in brain lesions"); *see also id.* at 5:52–6:12 (disclosing that "[e]fficacy" of cladribine for MS treatment can be measured by, for example, relapse frequency, reduction of MRI-detectable lesions, or improvements in clinical assessments like the "Expanded Disability Status Scale (EDSS)" or "Scripps Neurologic Rating Scale (SNRS)" scores).

### D. Illustrative Claims

Claim 36, reproduced below, is the only independent claim challenged in this proceeding. It reads:

> 36. A method of treating multiple sclerosis comprising the oral administration of a formulation comprising cladribine following the sequential steps below:
>
> (i) an induction period lasting from about 2 months to about 4 months wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;
>
> (ii) a cladribine-free period lasting from about 8 months to about 10 months, wherein no cladribine is administered;
>
> (iii) a maintenance period lasting from about 2 months to about 4 months, wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg; [and]
>
> (iv) a cladribine-free period wherein no cladribine is administered.

Ex. 1001, 19:14–30. Illustrating some of the challenged dependent claims, claim 39 depends from claim 36 and adds "wherein the total dose of cladribine reached at the end of the induction period is about 1.7 mg/kg,"

---

[4] The '947 patent indicates that the course of treatment continues into a third year (starting at month 25) that essentially repeats the regimen given during the second year. Ex. 1001, 16:4–9.

claim 41 depends from claim 36 and adds "wherein the cladribine-free period (ii) lasts about 10 months," and claim 45 depends from claim 36 and adds "wherein the formulation is orally administered at a daily dose of 10 mg cladribine." *Id.* at 20:5–7, 20:11–12, 20:20–22.

E. <i>Asserted Prior Art and Ground</i>

Petitioner asserts that claims 36, 38, 39, and 41–46 are unpatentable based on the following ground:

| Claims Challenged | 35 U.S.C. §[5] | References/Basis |
|---|---|---|
| 36, 38, 39, 41–46 | 103 | Bodor,[6] Stelmasiak[7] |

Petitioner submits testimony from Aaron E. Miller, M.D. and Rodolfo Pinal, Ph.D. to support its challenge. Ex. 1002 (Miller Decl.); Ex. 1084 (Miller Rebuttal Decl.); Ex. 1080 (Pinal Decl.). Patent Owner responds with testimony from Fred D. Lublin, M.D. and Dr. Bernd Meibohm. Ex. 2051 (Lublin Decl.); Ex. 2052 (Meibohm Decl.). The deposition testimony of Drs. Miller, Pinal, Lublin, and Meibohm is also of record. Exs. 2009 and 2079 (Miller transcripts); Ex. 2080 (Pinal transcript); Ex. 1061 (Lublin transcript); Ex. 1062 (Meibohm transcript).

---

[5] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011), revised 35 U.S.C. §§ 102, 103 effective March 16, 2013. The '947 patent issued from an application filed before March 16, 2013, so pre-AIA §§ 102 and 103 apply. Ex. 1001, code (22).

[6] Bodor et al., WO 2004/087101 A2, published Oct. 14, 2004 ("Bodor" (Ex. 1022)).

[7] Zbigniew Stelmasiak, *A pilot trial of cladribine (2-chlorodeoxyadenosine) in remitting-relapsing multiple sclerosis*, 41:1 Med. Sci. Monit. (March 1, 1998) ("Stelmasiak" (Ex. 1013)).

In addition to the testimony from the parties' designated experts above, the record also includes testimony from three fact witnesses: Alain Munafo, Ph.D. (Ex. 2053 (Munafo Decl.); Ex. 1063 (Munafo transcript)); Nicholas Bodor, Ph.D. (Ex. 2054 (Bodor Decl.); Ex. 1059 (Bodor transcript)); and Yogesh Dandiker, Ph.D. (Ex. 2055 (Dandiker Decl.); Ex. 1060 (Dandiker transcript)).

### III.    ANALYSIS

#### A.    *Legal Standards*

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3)).

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the relevant art. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) secondary considerations of nonobviousness when presented. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

Moreover, "[a]n obviousness determination requires finding both that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so."

*CRFD Research, Inc. v. Matal*, 876 F.3d 1330, 1340 (Fed. Cir. 2017)
(internal quotation marks and citation omitted).

### B.     Level of Ordinary Skill in the Art

In determining the level of skill in the art, we consider the problems encountered in the art, the art's solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

Petitioner proposes that the person of ordinary skill in the art ("POSA") would have a "high" level of skill. Pet. 28. In more detail, Petitioner contends:

> A POSA here would have drawn upon the knowledge and experience of related disciplines of a multi-disciplinary team that might lie outside the POSA's primary training. . . . A POSA for the '947 patent would have knowledge of multiple disciplines, such as immunology, biochemistry, and human physiology and anatomy, and also typically [would] be a clinician with experience and/or training in neurology. . . . The POSA typically would be a medical doctor with a specialty in neurology, specifically in treating autoimmune disorders of the nervous system, such as multiple sclerosis, and typically at least 2 years of experience with administering treatments to patients and evaluating results of such treatments, as well as experience or knowledge in related research and development.

*Id.* at 28–29 (citing Ex. 1002 ¶¶ 20–21).

Patent Owner responds with its own definition, which Patent Owner argues is "more accurate." PO Resp. 8–9. According to Patent Owner:

> A POSA would have an M.D. with at least two years of experience treating neurological conditions, with a focus on autoimmune disorders including but not limited to multiple sclerosis, and prescribing immunotherapies to treat such neurological conditions. . . . A POSA would also be part of a

team including individuals with experience in investigation of the pharmacokinetics (PK) and pharmacodynamics (PD) of drugs, pharmaceutical drug development, and clinical trial design.

*Id.* (citing Ex. 2051 ¶ 29). Regardless, Patent Owner contends, the claims are nonobvious, and its declarant (Dr. Lublin) qualifies as a POSA, under either definition. *Id.* (citing Ex. 2051 ¶¶ 30–31).

Patent Owner's definition includes aspects of pharmacology that are not explicitly recited in Petitioner's definition. We find those added aspects are consistent with the art (e.g., Ex. 1022, 40–41 (analyzing PK parameters for cladribine formulations)). We apply Patent Owner's definition in this Decision as it is somewhat more specific. In any event, neither party's analysis hinges on whether their respective POSA definition is adopted and the ultimate result here would not change under either definition.

### C. Claim Construction

In an IPR, we construe claims using the same standard used to construe claims in a civil action before the courts under 35 U.S.C. § 282(b), including construing claims in accordance with the ordinary and customary meaning as understood by the POSA and the patent's prosecution history. 37 C.F.R. § 42.100(b). We need only construe terms that are in controversy and only as needed to resolve the matters in controversy. *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019).

Petitioner proposes constructions for the following terms: (a) "total dose of cladribine"; (b) "an induction period"; and (c) "maintenance period." Pet. 29–33. No dispute here turns on interpretation of a "total dose of cladribine," and, as noted by Petitioner, "total dose" is defined in the '947 patent. Ex. 1001, 4:19–26 (defining "total dose" as the "cumulative dose," i.e., "the total dose of Cladribine administered during the treatment,

i.e. the dose reached at the end of the treatment that is calculated by adding the daily doses"). We need not further construe this term.

Regarding the term "maintenance period," Petitioner argues the maintenance period dose should be construed as being "lower" than the induction period dose. Pet. 30–33; Pet. Reply 11. And, as a corollary, Petitioner argues the induction period dose is "higher" than the maintenance period dose. Pet. 29–30. The premise of Petitioner's argument is that, during prosecution, the applicant sought to distinguish the claims over the prior art, including the asserted Bodor reference, and therein limited the claims. *Id.* at 29–33. Patent Owner disagrees and argues that, although the claims encompass regimens where the maintenance period dose is lower than the induction period dose, they also encompass a regimen where the induction and maintenance period doses are the same. PO Resp. 9 (citing the Board's Institution Decision (Paper 10, 12–17)); Inst. Dec. 17 (explaining that, based on the intrinsic evidence as a whole, the maintenance and induction doses could be the same ("about 1.7 mg/kg")).

We need not further construe and limit the claims in the manner argued by Petitioner. As Petitioner states, Patent Owner's argument and the Board's preliminary claim construction (in the Institution Decision) "encompass" Petitioner's construction and Petitioner's "arguments apply under either." Pet. Reply 10; Tr. 24:1–9 (agreeing construction of the maintenance dose is "not an issue that [the Board] ha[s] to resolve because these claims would have been rendered obvious under either . . . our construction or Patent Owner['] s construction"). We need only construe

claim terms to the extent necessary to resolve the controversy at hand. *Realtime Data*, 912 F.3d at 1375.[8]

Any remaining dispute about the meaning or application of the claims will be addressed below, where we analyze the asserted obviousness. *See infra* Section III.D.4.

### D.      *Obviousness over Bodor and Stelmasiak*

Petitioner contends that claims 36, 38, 39, and 41–46 would have been obvious over the combined teachings of Bodor and Stelmasiak. Pet. 33–61.

Petitioner argues that Bodor is prior art under 35 U.S.C. § 102(a) and § 102(e). Pet. 22. The parties provide more extensive argument on the prior-art status of Bodor, which we address in Section III.D.3 below. PO Resp. 9–18 (arguing certain disclosure in Bodor is not "by another" and, thus, not prior art); PO Sur-reply 2–7 (same); Pet. Reply 3–10 (arguing Bodor's disclosure is prior art in full). Petitioner argues that Stelmasiak is prior art under § 102(b), which Patent Owner does not dispute. Pet. 24.

We summarize the asserted prior art below before turning to the parties' further arguments and our analysis.

### 1.      *Bodor (Ex. 1022)*

Bodor is an international patent application that was filed March 26, 2004, and published October 14, 2004. Ex. 1022, codes (22), (43). Bodor

---

[8] In the event Petitioner should contend that an express construction of "maintenance period" and "induction period" was necessary for this Final Written Decision, we maintain and adopt our prior analysis on the issue. Inst. Dec. 12–17 (agreeing with Patent Owner that the maintenance period dose of claim 36 could be lower than the induction period dose, but it could also be the same (i.e., about 1.7 mg/kg)).

relates to "compositions of cladribine and cyclodextrin which are especially suited for the oral administration of cladribine." *Id.* at Abstr.

Bodor teaches that "[o]ral delivery of drugs is often preferred to parenteral delivery for a variety of reasons." *Id.* at 2:9–10. "[F]oremost," among the reasons given by Bodor, is "patient compliance." *Id.* "Patient compliance is enhanced insofar as oral dosage forms alleviate repeated health care provider visits, or the discomfort of injections or prolonged infusion times associated with some active drugs." *Id.* at 2:11–13.

"However," Bodor teaches, "to date the oral delivery of cladribine has been plagued by low bioavailability . . . and suboptimal interpatient variation." *Id.* at 2:22–25. Bodor teaches that "[i]t has now been found that amorphous cyclodextrins can be combined to form a particularly advantageous product which can be incorporated into a solid oral dosage form." *Id.* at 5:2–4. "This product is a [] cladribine-cyclodextrin complex, and solid oral dosage form containing it improves oral bioavailability and/or achieves lower interpatient and/or intrapatient variation of the drug." *Id.* at 5:4–7; *see also id.* at 11:27–12:3 (describing a cladribine and cyclodextrin complex "associated with improved cladribine absorption, as reflected by higher bioavailability and/or lower interpatient variation").

Bodor teaches cladribine has "been used as an immunosuppressive agent and as a modality for the treatment of a variety of autoimmune conditions including . . . multiple sclerosis." *Id.* at 2:1–5. Bodor discloses that "an effective amount of the complex cladribine-cyclodextrin . . . is used (e.g., an amount affective for the treatment of multiple sclerosis[)]." *Id.* at 22:11–15. Bodor further teaches that "[t]herapeutically effective dosages described in the literature include those for . . . multiple sclerosis (from about 0.04 to about 1.0 mg/kg/day (see U.S. Patent No. 5,506,214))." *Id.* at

22:17–22 (defining "therapeutically effective amount"); *see also id.* at 22:27–23:6 (noting "various dosage amounts and dosing regimens have been reported in the literature for use in the treatment of multiple sclerosis," and listing references).[9]

Bodor discloses that, "[a]t the present time, it is envisioned that, for the treatment of multiple sclerosis, 10 mg of cladribine in the instant [] cladribine-cyclodextrin complex in the instant solid dosage form" would be given. *Id.* at 23:15–17. Further, Bodor teaches, this dosage form "would be administered once per day for a period of five to seven days in the first month, repeated for another period of five to seven days in the second month, followed by ten months of no treatment." *Id.* at 23:17–20; *see also id.* at 23:20–24 (disclosing an alternative regimen where 10 mg of cladribine is given once per day for five to seven days per month over six months, followed by eighteen months of no treatment).

Bodor teaches that the dosing regimen can be tailored to suit the needs of the patient. Specifically, Bodor teaches that "one of skill will appreciate that the therapeutically effective amount of cladribine administered herein may be lowered or increased by fine tuning and/or by administering cladribine . . . with another active ingredient." *Id.* at 24:1–6 ("The invention . . . provides a method to tailor the administration/treatment to the particular exigencies specific to a given mammal."). Furthermore, Bodor teaches that

---

[9] Many of the references identified and incorporated-by-reference in Bodor are of record, including U.S. Patent No. 5,506,214 ("Beutler patent" (Ex. 1026)), Rice (Ex. 1018), Romine (Ex. 1031), Selby (Ex. 1047), and Tortorella (Ex. 1015). *See* Ex. 1022, 7:7–10 (incorporating-by-reference the patents, applications, and scientific literature identified in Bodor), 22:27–23:6 (incorporating Rice, Romine, etc. by reference "in their entireties").

"[t]herapeutically effective amounts may be easily determined for example, empirically by starting at relatively low amounts and by step-wise increments with concurrent evaluation of beneficial effect." *Id.* at 24:6–9.

2. *Stelmasiak (Ex. 1013)*

Stelmasiak is an article about a pilot trial describing cladribine's use in patients with remitting-relapsing multiple sclerosis (RRMS), which paper published in 1998. Ex. 1013, 4–5 ("In the present study we tested clinical efficacy of cladribine in remitting-relapsing form of MS in a two-year open-label pilot clinical trial.").

In its Introduction, Stelmasiak teaches that "multiple sclerosis (MS) is an autoimmune disease in which abnormalities in immune regulation lead to the lymphocyte-dependent demyelination process in the central nervous system." *Id.* at 4. Stelmasiak teaches that "[c]ladribine . . . is a purine analog with potent and clinically useful activity against some indolent leukemias and lymphomas" and "[t]he drug displays a highly selective toxicity toward malignant lymphocytes, and normal lymphocytes are also subject to the cytotoxic effect of the drug." *Id.*

Stelmasiak teaches that, in its study, cladribine was used in a solution form for both oral and subcutaneous administrations. *Id.* at 5. "The drug was prepared as a sterile solution in isotonic saline, 1 mg/ml for oral use and 2.5 mg/ml . . . for subcutaneous injections." *Id.* Stelmasiak discloses that its study group comprised "10 patients (eight females and two males)" with "body weight 52-75 kg (median: 66 [kg])." *Id.*

According to Stelmasiak, "[s]ix cladribine courses were given at monthly intervals, and two additional courses were given at 9 and 12 or 15 months," where "[e]ach course consisted of five doses of the drug taken once daily on consecutive days." *Id.* Six of the patients received the

subcutaneous dosing (5 mg per day), and four patients received oral dosing (10 mg per day). *Id.* The patients were monitored for 24 months from the start of treatment. *Id.* at Abstr., 5–7.

Stelmasiak reports that compliance and tolerance to the therapy were "good" and "side effects were mild." *Id.* at 5. Stelmasiak teaches that, in patients with RRMS, "treatment with cladribine decreases lymphocyte counts in peripheral blood, to 1/3 of the initial values on average." *Id.* at 7. Stelmasiak teaches that the "therapy appeared to be effective in seven patients who reported very marked (almost five-fold on average) reduction in the relapse rate during the 2 years." *Id.*; *see also id.* ("The relapse rate in some (but not all) patients is impressively decreased."). Stelmasiak discloses that, among a "responders" sub-group, the seven patients had "reported a total of 29 relapses during the two preceding years . . . and a total of 6 relapses during the two-year study period." *Id.* at 6. Stelmasiak further discloses that responding patients "showed also a somewhat more pronounced improvement in their neurological status as measured by EDSS scores." *Id.* at 7; *see also id.* at 6 ("Analysis of the data for the whole group revealed that EDSS scores were significantly reduced during the treatment compared to initial values . . . and that decreases observed at the third to fifteenth month were significant."). Stelmasiak teaches that "[a]long with clinical evaluation in MS, the detailed pattern of cladribine-induced immunosuppression in clinical conditions deserves further study." *Id.* at 7.

The therapy given in Stelmasiak's study appeared effective in seven of the patients, but Stelmasiak reports that it "seemed ineffective in the remaining three" patients. *Id.* The Stelmasiak authors report that they "were unable to identify any factor which would differentiate between the 'responders' and the 'non-responders.'" *Id.* (reporting, for example, that

"[t]here was no indication that a 'good response' is related to the actual cladribine dose per body weight").

Further, with respect to lymphocyte counts, Stelmasiak includes Figure 1, reproduced below.



**Figure 1.** Average lymphocyte counts during and after treatment with cladribine.

*Id.* at 5. Figure 1, above, is a graph of average lymphocyte counts during the 2-year treatment course, with the number of lymphocytes (1/µl) plotted on the vertical axis versus time (months) on the horizonal axis. *Id.* Stelmasiak teaches that "[l]ymphocyte counts dropped from the initial count of 2336±595 per µl (mean±S.D.) to 968±229 per µl at 6 months, and remained at approximately 1000 per µl for the next 15 months." *Id.* at 5–6 ("A tendency toward normalization of lymphocyte count became evident only at the end of the 2-year observation period.").

### 3. Status of Bodor as Prior Art

#### a) Overview

Responding to the Petition's assertion that Bodor is prior art under § 102(a) or § 102(e), Patent Owner argues that a 6-line "dosing regimen" cited in Bodor against the challenged claims is the work of the '947 patent's inventors, not the named inventors on Bodor—Drs. Nicholas Bodor and Yogesh Dandiker. PO Resp. 9–18. Thus, according to Patent Owner, that "dosing regimen" of Bodor is not "by another" under § 102(e) and cannot be used against the '947 patent's claims as prior art.[10] *Id.*

In reply, Petitioner argues, *inter alia*, that Patent Owner has not met its burden of production to come forward with sufficient, corroborated evidence to support a determination that the "dosing regimen" from Bodor is the work of all four named inventors of the '947 patent—and their work alone. Pet. Reply 2–10. Moreover, even if the '947 patent's inventors were the source of Bodor's "dosing regimen," Petitioner argues that Patent Owner misapprehends the importance of the solid cladribine dosage form for oral administration, which was undisputedly the invention of Drs. Bodor and Dandiker. *Id.* at 4–5. Petitioner argues that, because that formulation is integral to the obviousness challenge and the cited "dosing regimen," Drs. Bodor and Dandiker should, at minimum, be deemed joint inventors of all applied portions of Bodor. *See, e.g., id.* at 4–6, 10 ("Bodor and

---

[10] Patent Owner notes, and we agree, that § 102(a)'s recitation of "by others" is equally addressed herein under the "by another" analysis. PO Resp. 10 n.5 (citing *In re Land*, 368 F.2d 866, 877–879 (CCPA 1966)). Assuming, on this record, that the priority date for the challenged claims is December 22, 2004, Bodor's publication on October 14, 2004, is not early enough to qualify Bodor as § 102(b) prior art.

Dandiker's tablets render them co-inventors of all relied-upon disclosures."). Hence, Petitioner contends Bodor's "dosing regimen" and the '947 patent do not share the same "inventive entity," so Bodor's disclosure is "by another" and prior art in full. *Id.* at 2–10; Pet. Suppl. Br. 1–2.

### b) Factual Background

There is no overlap in the listed inventors or owners of the '947 patent and the Bodor reference. The latter names Drs. Bodor and Dandiker the inventors, and Ivax Corporation ("Ivax) as assignee. Ex. 1022, codes (71), (75). Conversely, the '947 patent lists Merck Serono S.A. as assignee, and names the following four inventors: Giampiero De Luca, Arnaud Ythier, Alain Munafo, and Maria Lopez-Bresnahan. Ex. 1001, codes (73), (75). Moving forward, we may refer to these individuals by their last name and omit any titles, unless needed for clarity (e.g., we may refer to Dr. Bodor to distinguish from the "Bodor" reference).

Although Bodor and the '947 patent share no facial overlap in their inventors or assignees, the trial record shows that there was a prior contractual relationship between Ivax and an affiliate of Patent Owner. Patent Owner presents evidence that, in October 2002, Ivax entered into a confidential product development and license agreement (the "Agreement" (Ex. 2048)) with Ares Trading S.A ("Ares"). PO Resp. 13. Patent Owner identifies Ares as a real party-in-interest in this proceeding (Paper 3, 1), and uses the name "Serono" to refer to itself and its affiliate, Ares, in its papers. *See, e.g.*, PO Resp. 2 n.1.

According to Patent Owner, Serono and Ivax entered into the Agreement to jointly develop oral cladribine for treating MS. *Id.* at 13. Patent Owner states that, under the Agreement, "Ivax would 'develop an oral dosage formulation of [cladribine] in tablet or capsule form suitable for use

in clinical trials and commercial sale,'" and "Serono agreed to 'conduct clinical trials' to determine 'the dose, safety, and/or efficacy' of IVAX's oral tablets or capsules" in furtherance of pursuing regulatory approvals and marketing the product. *Id.* at 13–14 (citing Ex. 2048, 2, 17–19). Patent Owner cites testimony from Munafo and Dandiker about the Agreement and discussing the delegation of responsibilities under it. Ex. 2053 ¶¶ 23–26; Ex. 2055 ¶¶ 14–15.[11]

Patent Owner submits testimony about the Serono and Ivax "teams" working under the Agreement. Munafo testifies that Serono's team included Munafo, Lopez-Bresnahan, Ythier, and De Luca, "along with many others." Ex. 2053 ¶ 18; *see also id.* ¶ 22 (testifying Serono's work led to the development of the drug Mavenclad, and the '947 and '903 patents, "which claim dosing regimens for treating MS"). The Ivax team included Bodor, Dandiker, "Dr. Stephen Marcus, and other team members." Ex. 2054 ¶ 14; Ex. 2055 ¶ 12.

Incident to Ivax's and Serono's collaboration, at least some of the members from each company met and communicated with each other about their work. Munafo testifies that "[c]onfidential communication between the Serono team and the IVAX team took place both at meetings (both in person and by telephone), where formal presentations were made, and by e-mail." Ex. 2053 ¶ 27; Ex. 2055 ¶ 15 (Dandiker testifying "the IVAX and Serono teams communicated frequently and confidentially" and "I sometimes emailed directly with Dr. Munafo"); *but see* Ex. 1059 (Bodor Tr.), 31:9–10 (testifying he had not heard of Munafo), 130:2–11 (testifying he did not

---

[11] Patent Owner also cites testimony from Dr. Bodor (PO Resp. 13 (citing Ex. 2054 ¶ 18)), but he admitted that he was not aware of, or familiar with, the Agreement at the relevant time. Ex. 1059, 132:19–135:3.

know, or recall meeting or communicating with, anyone from Serono; "I had no connection with Serono").

Patent Owner submits two documents related to communications and/or meetings between Ivax and Serono. First, is a document titled "Oral Cladribine for MS Project," which purports to be "Draft minutes" from a meeting on August 27, 2003, in Amsterdam. Ex. 2050 (the "Amsterdam Minutes"). The Amsterdam Minutes identify thirteen participants from Ivax and Serono as indicated in the screenshot below.

**Serono Participants:**
I. Emery, G. Francis, D. Frank, M. Lopez-Bresnahan, A. Munafo, A. Ythier, A. Jaber, by phone: N. Ammoury, J. Hillier

**IVAX Participants:**
S. Marcus, Y. Dandiker, D. Weiner, by phone: D. Emma

Serono International S.A.

Ex. 2050, 1 (annotated). As highlighted above, the Amsterdam Minutes list Lopez-Bresnahan, Munafo, and Ythier as among the Serono participants; and Dandiker is listed among the Ivax participants. *Id.*

The second document includes a December 17, 2003, cover email from Isabelle Emery at Serono to several other people at Ivax and Serono, attaching a draft "Briefing Document" titled "Cladribine." Ex. 2049, 1–3 (email), 5–9 (briefing document) (collectively the "Briefing Document"). The Briefing Document identifies Lopez-Bresnahan, Munafo, and Dandiker, among several others, as recipients and reviewers. *Id.* at 1–3, 5 (listing, e.g., Dandiker and Serono's A. Jaber as reviewers of the "CMC [(Chemistry, Manufacturing, and Controls)] section," Munafo and Ivax's Dr. Marcus as reviewers of "PK and PD [(Pharmacokinetic and Pharmacodynamic)] human info" in the Clinical Studies section, and Lopez-Bresnahan, Dr. Marcus, and seven others as reviewers of "All" sections).

Munafo testifies that the two documents illustrate the cladribine dosing regimen that Serono shared with Ivax. Ex. 2053 ¶¶ 29, 39–48.

Munafo testifies that, as reflected in the Amsterdam Minutes, Lopez-Bresnahan presented a Phase III design including two MS treatment regimens (or "arms") using oral cladribine. *Id.* In one arm, patients would receive total cumulative doses approximating 0.7 mg/kg, and in the other arm, patients would receive about 2.1 mg/kg. *Id.* ¶¶ 35–38 (citing Ex. 2050, 4–5). According to Munafo, the 0.7 mg/kg cumulative dose would be administered over 5 days and 2 months. *Id.*; Ex. 2050, 4 ("0.7 mg/kg (.35 mg/kg x 5 days x 2 months)").[12] Because the duration of treatment is recited as "24 months," Munafo testifies this means a cladribine-free period of "22-months." Ex. 2053 ¶ 38 (citing Ex. 2050, 4). Munafo testifies the Briefing Document describes a planned study to include three treatment groups: low dose (0.7 mg/kg), high dose (2.1 mg/kg), and placebo. *Id.* ¶ 41 (citing Ex. 2049, 47–48). According to Munafo, the low-dose group would receive 10 mg oral cladribine tablets daily for 5 consecutive days in each of the first 2 months, followed by placebo in months 3–6, then no pills in months 7–12. *Id.* ¶¶ 43–46 (testifying administration of placebo and no pills in months 3–12 "would result in a 10-month 'cladribine-free' period").[13]

Dandiker testifies that he attended the meeting in Amsterdam and gave a presentation on oral cladribine formulations that Ivax had developed and were investigating. Ex. 2055 ¶ 17 (citing Ex. 2050, 3–4). Dandiker also

---

[12] According to Munafo, "this means 0.35 mg/kg per month for 2 months, delivered over 5 consecutive days each month." Ex. 2053 ¶ 37 n.4.

[13] Munafo explains that the administration of placebo in months 3–6 was required to maintain the "double-blind" protocol and, thus, conceal from the patients whether they were in the high, low, or placebo group. Ex. 2053 ¶¶ 42–44 (noting the high-dose (2.1 mg/kg) group received active drug in each of the first six months).

testifies that Lopez-Bresnahan presented on a Phase III study design consistent with the Amsterdam Minutes. *Id.* (citing Ex. 2050, 5–6). And, Dandiker recalls receiving a draft regulatory document in 2003, and believes the Briefing Document (Ex. 2049) is the document he received at that time. Ex. 2055 ¶ 18.

The asserted Bodor reference includes, *inter alia*, the following disclosure:

> At the present time, it is envisioned that, for the treatment of multiple sclerosis, 10 mg of cladribine in the instant complex cladribine-cyclodextrin complex in the instant solid dosage form would be administered once per day for a period of five to seven days in the first month, repeated for another period of five to seven days in the second month, followed by ten months of no treatment.

Ex. 1022, 23:15–20.[14] Unlike several other disclosures in Bodor related to treating MS with cladribine, Bodor does not attribute this 6-line disclosure to any third-party source. *See, e.g.*, *id.* at 22:17–22 (disclosing "[t]herapeutically effective dosages . . . for multiple sclerosis" in Beutler (Ex. 1026), and "various dosage amounts and dosing regimens . . . for use in the treatment of multiple sclerosis" in, e.g., Romine (Ex. 1031) and Rice (Ex. 1018)).

Bodor includes three provisional patent applications in its priority chain. The first two provisionals were filed in 2003, and the third was filed in early 2004. Ex. 2044 ("March 2003 Provisional"); Ex. 2045 ("July 2003 Provisional"); Ex. 2046 ("February 2004 Provisional"). The 6-line

---

[14] The parties as shorthand refer to this passage as the "6-line disclosure" or the "6-line regimen." PO Resp. 6–7; Pet. Reply 3; PO Sur-reply 3–4. We may do likewise for consistency.

disclosure quoted above does not appear in the March 2003 Provisional or the July 2003 Provisional. *See generally* Exs. 2044 and 2045. The 6-line disclosure does appear in substantial part in the February 2004 Provisional— the only difference is that the provisional uses the phrase "for one week" instead of "for a period of five to seven days." Ex. 2046, 20:6–10.

Patent Owner submits testimony from Drs. Bodor and Dandiker related to the 6-line disclosure in Bodor. Ex. 2054 ¶¶ 25–26; Ex. 2055 ¶¶ 22–23. For example, in Dr. Bodor's declaration, there is a paragraph quoting the 6-line disclosure, after which Dr. Bodor testifies:

> Neither myself nor my team, including Dr. Dandiker, developed, researched, or invented the above dosing regimen. Indeed, no one on my team at IVAX developed, researched, or invented any cladribine dosing regimen for treating MS. I do not consider this regimen to be my invention, and it was not claimed in the BODOR PCT or the corresponding U.S. patents, Nos. 8,888,328 and 8,785,415. Ex. 2069; Ex. 2029.

Ex. 2054 ¶¶ 25–26; *see also* Ex. 2055 ¶¶ 22–23 (materially the same testimony from Dandiker). Drs. Bodor and Dandiker then declare their belief that, because Serono was working on "dosing regimens" for Phase III clinical trials as part of the collaboration with Ivax, "Serono communicated the dosing regimen" described in Bodor to Ivax. Ex. 2055 ¶¶ 24–26; Ex. 2054 ¶¶ 27–28 (testifying "it is highly likely that . . . Serono communicated the above dosing regimen" to Ivax).[15]

---

[15] Other testimony from Dandiker and Bodor gives more context to what those witnesses mean by the phrase "dosing regimen." Dandiker testified that "dosing regimen" is "not my term," but he distinguishes a dosing regimen (how the formulation is clinically administered) from the formulation (how a dosage form is chemically designed to, e.g., give a desired release of drug). *See, e.g.*, Ex. 1060, 119:13–123:5. Dr. Bodor notes his studies used single doses of oral cladribine to compare pharmacokinetic

*c)*    *Analysis*

Under 35 U.S.C. §§ 102(a) or (e), an inventor's own work is not prior art that may be used against the inventor. *See Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 968 (Fed. Cir. 2014); *In re DeBaun*, 687 F.2d 459, 462 (CCPA 1982). Mere publication of an inventor's ideas in a reference patent or application of another person is not necessarily prior art "by another" against the inventor. *See In re Mathews*, 408 F.2d 1393, 1394–95 (CCPA 1969) (holding Dewey's publication of coworker Mathews's invention in Dewey patent (after Mathews had communicated that invention to Dewey) not usable as prior art against the Mathews patent).

In deciding whether a reference patent or published application is "by another" and qualifies as prior art under § 102(e), "[w]hat is significant is not merely the differences in the listed inventors, but whether the portions of the reference relied on as prior art, and the subject matter of the claims in question, represent the work of a common inventive entity." *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1356 (Fed. Cir. 2003). The "common inventive entity" inquiry, however, requires *identity* among the respective inventors. *Id.* Indeed, "a sole applicant or patentee and joint applicants or patentees are separate or different 'legal entities' and either is treated as 'another'" for purposes of determining whether a reference is prior art. *In re Land*, 368 F.2d at 878, 881 ("Land and Rogers individually [were] separate legal entities from Land and Rogers as joint inventors."). Thus, just

---

properties and bioavailability. Ex. 2054 ¶ 17. Because he "never treated a patient using multiple doses of cladribine," Dr. Bodor testifies "we never used or studied anything that could be described as a 'dosing regimen.'" *Id.*

as a reference's disclosure of the invention of A and B[16] is usable as prior art against the invention of X, Y, and Z, a reference's disclosure of the invention of X and Y is usable as prior art against the invention of X, Y, and Z. *See, e.g., MaxLinear Inc. v. Cresta Tech. Corp.*, IPR2015-00594, Paper 90 at 16–24 (PTAB Aug. 15, 2016) (reference to subset of inventors determined as § 102(e) art); *Dr. Reddy's Labs., Inc. v. Horizon Pharma. USA, Inc.*, IPR2018-00272, Paper 74 at 17 (PTAB Sept. 9, 2019) (same).

The three-part test set forth in *Duncan Parking* also guides the analysis here. *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1358 (Fed. Cir. 2019); PO Resp. 10–18; Pet. Reply 3–10. According to that test, the Board must:

> (1) determine what portions of the reference patent were relied on as prior art to anticipate the claim limitations at issue, (2) evaluate the degree to which those portions were conceived "by another," and (3) decide whether that other person's contribution is significant enough, when measured against the full anticipating disclosure, to render him a joint inventor of the applied portions of the reference patent.

*Duncan Parking*, 914 F.3d at 1358. In *Google*, the Federal Circuit addressed the *Duncan Parking* test in the context of an obviousness challenge and explained that, "[t]o be a joint inventor of the [applied] reference . . . , [(co-author Moran)] must have made an inventive contribution to the portions of the reference relied on and relevant to establishing obviousness." *Google, LLC v. IPA Tech. Inc.*, 34 F.4th 1081, 1086 (Fed. Cir. 2022) (analyzing whether a reference co-authored by Martin, Cheyer, and Moran was § 102(a) art to the Martin and Cheyer patent); *see*

---

[16] The letters used here represent different individuals and the respective groupings (e.g., "A and B") reflect that those individuals are joint inventors of the hypothetical invention.

*also id.* at 1086 n.3 ("The portions of the reference being considered must be relied upon *and* relevant to establishing obviousness.").

Based on the parties' arguments, we see the issues as twofold. *First*, whether the evidence of record is sufficient to support a determination that the cited 6-line disclosure in the Bodor reference is the joint invention of Munafo, Lopez-Bresnahan, Ythier, and De Luca. If, for example, Bodor's 6-line disclosure did not reflect the invention of *all* the '947 patent's listed inventors, then there is no "common inventive entity" and Bodor's 6-line disclosure would be legally "by another" irrespective of whether Drs. Bodor or Dandiker contributed to it. *Second*, considering all Bodor's relied-upon teachings that are relevant to establishing the alleged obviousness of the claims (including portions that reflect the work of Drs. Bodor and Dandiker and not the '947 patent's named inventors), whether the contributions of Bodor and Dandiker are significant enough that they should be considered joint inventors of all applied portions of the reference.

> (1) *Whether Bodor's "Dosing Regimen" and the '947 Patent Share a Common Inventive Entity that Includes De Luca*

Petitioner met its initial burden to show that Bodor is 102(a) and (e) art, "because nothing in Bodor facially 'represent[s] the work of a common inventive entity.'" Pet. Reply 2–3 (quoting *EmeraChem Holdings v. Volkswagen*, 859 F.3d 1341, 1345 (Fed. Cir. 2017)). As discussed above, there is no facial overlap in the named inventors or assignees of Bodor and the '947 patent. Nor could Petitioner have reasonably foreseen that Patent Owner would argue Bodor (or any portion of it) represented Patent Owner's own work. As Petitioner points out, "[n]either the patent nor its file history evince a joint research agreement." *Id.* at 3. Also, despite the Examiner

citing Bodor against the pending claims several times during prosecution of the '947 patent and related '903 patent (including reliance on the same 6-line disclosure discussed above), Patent Owner never argued that any of Bodor's teachings were disqualified as prior art. *See, e.g.*, Ex. 1004, 220–221 (Aug. 3, 2009, Office Action rejecting claims); Ex. 1025, 99–101 (Dec. 19, 2011, Office Action rejecting claims).

The burden thus shifted to Patent Owner to come forward with evidence sufficient to support the proposition that Bodor is not prior art. *Dr. Reddy's*, IPR2018-00272, Paper 74 at 14–19 (shifting burden to patentee to provide evidence the reference is not "by another"); *Google*, 34 F.4th at 1085–1086 (discussing shifting burdens of production in context of "by another" analysis). We agree with Patent Owner that the ultimate burden of persuasion in an IPR remains with Petitioner. PO Sur-reply 3. Yet missing from Patent Owner's produced documents and testimony is credible and corroborated evidence that named inventor De Luca provided an inventive contribution to the 6-line regimen that appears in Bodor. *Google*, 34 F.4th at 1087 (holding corroboration of alleged inventor testimony is required in the "by another" analysis).

The testimony of Drs. Bodor and Dandiker does not corroborate that De Luca made any inventive contribution to the 6-line disclosure. Dr. Bodor did not "know anybody from Serono" and "had no connection with Serono." Ex. 1059, 130:2–11. Dandiker never communicated with De Luca and could not say what, if anything, he did in relation to the collaboration between Ivax and Serono. Ex. 1060, 84:2–85:19 (Q: "Do you have an understanding of whether Dr. de Luca contributed to developing the dosing regimen for treating multiple sclerosis with oral cladribine," A: "I cannot say anything on that.").

None of the three documents produced by Patent Owner suggests that De Luca made any inventive contribution to the 6-line dosing regimen. Petitioner contends that "De Luca's name appears nowhere in" the Amsterdam Minutes or the Briefing Document, and Patent Owner provides no argument to the contrary.[17] Pet. Reply 6; PO Sur-reply 5 (citing, in response, only Munafo's uncorroborated testimony that De Luca was part of the team that developed the regimen).

Patent Owner produced no testimony from three of the four named inventors on the '947 patent. The only testifying inventor, Munafo, could not recall any specific contribution made by De Luca (Serono's chief IP attorney)—declaring generically that De Luca was one of several "team" members and, in some unspecified way, helped design the subject dosing regimen. Ex. 2053 ¶¶ 18, 21, 34, 40. When pressed at deposition on what De Luca "contribute[d] intellectually to the development of the cladribine regimen in Bodor," Munafo had nothing material to add. Quite the opposite, Munafo responded simply that De Luca had worked for Serono "for a very long time," but "in a department which was remote" to Munafo's, and so Munafo was "not aware of [De Luca's], how you call it, personal intellectual contribution." Ex. 1063, 94:4–95:8 ("I cannot give details on [(whether De Luca contributed to the cladribine regimen in Bodor)], besides the fact that [De Luca's] department was also represented in the project team.").

---

[17] ████████████████████████████

Munafo's vague, uninformative, and otherwise uncorroborated testimony about De Luca's contribution to the 6-line disclosure of Bodor does not help Patent Owner meet its production burden.

That essentially leaves us with the fact that De Luca is a listed inventor on the '947 patent. Here again, however, there is no evidence of record about what De Luca specifically contributed to any of the patent's claims (e.g., De Luca could be a joint inventor of all claimed subject matter, or perhaps only of certain subject matter appearing in a dependent claim). *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998) (explaining that a joint inventor "needs to perform only a part of the task which produces the invention" and "need not make a contribution to every claim of a patent"). And, although there are similarities between the claims compared to the 6-line disclosure of Bodor, there are also some differences. Claim 36, for example, comprises oral administration of cladribine, but it does not require use of 10 mg solid tablets comprising the cladribine-cyclodextrin complex like Bodor's disclosure. Bodor's 6-line disclosure also does not expressly describe a maintenance period dose and duration and secondary cladribine-free period as claimed.[18] Patent Owner does not

_____

[18] There also appear to be differences in the dosing regimen described in the Amsterdam Minutes and Briefing Document versus what is claimed. For example, the Amsterdam Minutes refer to low and high "cumulative dose[s]" of 0.7 mg/kg (delivered over 2 months) and 2.1 mg/kg (delivered over 6 months). Ex. 2050, 4. Claim 36, however, requires a total induction dose of between about 1.7 mg/kg to 3.5 mg/kg given over about 2–4 months. Patent Owner does not explain if, and how, these regimens correspond to each other in such a way that it might suggest De Luca is necessarily a co-inventor on what is described in the minutes (and assuming De Luca is a joint inventor of claim 36). Also, if the recitation in the minutes of, for example, 0.7 mg/kg reflects an assumed total "effective" dose (meaning the dose to be delivered after reduced by a bioavailability coefficient), this

produce evidence that would show that De Luca must necessarily be a co-inventor of Bodor's 6-line disclosure simply because De Luca is named as a joint inventor on the '947 patent.

Patent Owner raises two counterarguments. Both are unavailing. First, Patent Owner contends that a reference's disclosure of the work of a "subset" of named inventors is not prior art against the invention of all named inventors. PO Suppl. Br. 1–2. Patent Owner cites *Applied Materials Inc. v. Gemini Rsch. Corp.*, 835 F.2d 279, 281 (Fed. Cir. 1988). But that case does not support Patent Owner's position. In *Applied Materials*, the Federal Circuit reversed the district court's determination that a "reference" patent naming McNeilly and Benzing was prior art to a related patent by McNeilly, Benzing, and Locke, which determination rested on the fact that the reference and patent *named* different inventors. *Id.* at 281 (explaining, "that an application has named a different inventive entity than a patent does not necessarily make that patent prior art").[19] Properly framed, the issue was whether the McNeilly/Benzing reference had disclosed the invention of McNeilly/Benzing/Locke, which the Federal Circuit answered in the affirmative. *Id.* at 280–281 (notably the reference and patent arose from a

_____

would seem to implicate further the importance of Dr. Bodor's formulation work, and not that of any named inventor of the '947 patent. *See, e.g.*, Ex. 1059, 34:11–40:8 (discussing Bodor's work on bioavailability).

[19] As the court further explained, "[w]hen the joint and sole inventions are related . . ., inventor A commonly discloses the invention of A & B in the course of describing his sole invention and when he so describes the *invention* of A & B he is not disclosing 'prior art' to the A & B invention, even if he has legal status as 'another.'" *Applied Materials*, 835 F.2d at 881 (quoting *In re Kaplan*, 789 F.2d 1574, 1576 (Fed. Cir. 1986)). Consistent with *Applied Materials's* result, this indicates the inventive entities must be identical.

single application filed by McNeilly & Benzing, which split into multiple applications due to the PTO's restriction requirement). McNeilly and Benzing's reference disclosure of the McNeilly/Benzing/Locke invention could, therefore, not be used to invalidate that same invention in the McNeilly/Benzing/Locke patent. The court thus required the inventive entities behind the reference's applied disclosure and the patent be identical.

Patent Owner also points to *Allergan* and MPEP § 2132.01. PO Suppl. Br. 1–2 (citing *Allergan*, 754 F.3d at 966). As noted by Petitioner, *Allergan* is of no avail because the Federal Circuit held that appellant had failed to prove that the cited art "represent[s] the work of the inventors *themselves*." *Allergan*, 754 F.3d at 968–69 (emphasis added); Pet. Suppl. Br. 2. *Allergan* did *not* hold that the work of a subset of inventors was disqualified as prior art.[20] The MPEP provision cited by Patent Owner states that "[a]n inventor's or at least one joint inventor's disclosure of his or her own work within the year before the application filing date cannot be used against the application as prior art" under § 102(a). Manual of Patent Examining Procedure (MPEP) § 2132.01 (9th ed. 2022). The authority behind this MPEP provision, however, does not support a conclusion that the "common inventive entity" inquiry requires something less than identity. To the contrary, the MPEP relies on *In re Katz*, which explained that a paper authored by Katz, Chiorazzi, and Eshar would only be excluded as prior art

---

[20] Patent Owner reads too much into *Allergan*, which focused on one co-inventor's (VanDenburgh's) authorship and alleged contribution to an applied reference (finding that contribution insufficient). *Allergan*, 754 F.3d at 968–70. We are unpersuaded that *Allergan* stands for the proposition that appellant would have prevailed and excluded the asserted art irrespective to whether co-inventor (Woodward) contributed to it, which the court did not substantively discuss, much less decide.

against the Katz patent if Katz *alone* invented the relied-upon disclosures in the paper. *In re Katz*, 687 F.2d 450, 455 (CCPA 1982) (explaining "co-authors may not be presumed to be coinventors merely from the fact of co-authorship").

In short, Patent Owner cites no authority holding that a reference's disclosure of the invention of a *subset* of inventors is disqualified as prior art against the invention of *all* the inventors. Patent Owner cites no case where a reference was disqualified as §§ 102(a) or (e) prior art absent the reference (or its applied teachings) and the claims sharing the same "inventive entity."

Second, Patent Owner argues that, under a "rule of reason," its evidence is sufficiently corroborated. PO Sur-reply 5–6; PO Suppl. Br. 2. It is true that whether an inventor's testimony is corroborated is evaluated under a "rule of reason" analysis, and that "[c]orroborating evidence may take many forms." *Ethicon*, 135 F.3d at 1461. But, as it concerns De Luca's alleged contribution to the 6-line disclosure, the testimonies of Bodor and Dandiker and the few internal documents produced by Patent Owner are silent. Munafo's vague assertion that De Luca had "discussions" with "various team members" that helped to develop the proposed regimen (Ex. 2053 ¶ 21) are undermined by Munafo's concession that he was "not aware of" and "cannot give details" about any contribution from De Luca (Ex. 1063, 95:3–8). And, this record is especially wanting for independent corroboration about De Luca's role vis-à-vis the Bodor regimen because the events in question took place over twenty-years ago.[21] Even considering the

---

[21] As noted above, Patent Owner never sought to disqualify Bodor during prosecution of the '947 and '903 patents when rejections based on Bodor were raised much closer in time to Ivax's and Serono's collaboration.

'947 patent, there is no sufficient evidence here from which we can conclude that a specific contribution from De Luca to the claimed subject matter found its way into Bodor's 6-line disclosure.

Altogether, we conclude that Patent Owner cannot exclude Bodor's 6-line disclosure as prior art unless that disclosure was invented by the *same* "inventive entity" as the '947 patent's challenged claims. And, on this record, we determine that Patent Owner has not provided sufficient evidence to support the conclusion that De Luca is an inventor of the subject matter in Bodor being applied against the '947 patent. Bodor is, thus, "by another" and available as prior art.

### (2) *Bodor's and Dandiker's Contribution to the "Dosing Regimen"*

Even if the four named inventors of the '947 patent made an inventive contribution to Bodor's 6-line disclosure, Petitioner argues that those contributors were not alone and that Patent Owner is ignoring the importance of Bodor's and Dandiker's cladribine tablet formulation. Pet. Reply 3–10.

According to Petitioner, under *Duncan Parking* step 1, Petitioner relies on additional Bodor disclosures relevant to establishing obviousness. *Id.* at 3–4. Petitioner cites Bodor's stated benefits of its oral cladribine formulation (e.g., bioavailability), MS cladribine dosages achieving therapeutic results, fine-tuning cladribine's dose and treatment duration, and Bodor's examples (e.g., making of Bodor's 3 mg and 10 mg tablets, and testing of tablets in patients with MS). *Id.* (citing Ex. 1022, 2, 22:17–19, 24:1–9, Examples 1–4). Patent Owner neither argues nor presents evidence that the '947 patent's named inventors are responsible for these other disclosures in Bodor, and we agree with Petitioner that at least some of these

additional disclosures are highly relevant to Petitioner's obviousness challenge. For example, Petitioner's citation to Bodor's teaching of lower interpatient variation with Bodor's solid tablets provides a reason to use that dosage form (Pet. 33–34); and Petitioner's citation to Bodor's disclosure about "fine tuning" the cladribine dose and length of treatment is relevant to Petitioner's position that a POSA would have regarded those variables as "result-effective" and optimizable to arrive at an obvious maintenance period dose and duration (Pet. 40–41). Those disclosures are thus, under *Google*, both relied-upon by Petitioner and relevant to establishing the alleged obviousness of the claims. *Google*, 34 F.4th at 1086. Although we agree that Bodor's 6-line disclosure plays a central role in Petitioner's obviousness challenge, we disagree with Patent Owner's suggestion that it is the only disclosure that counts in the *Duncan Parking* analysis. PO Sur-reply 3–4.

Petitioner also argues, under *Duncan Parking* step 2, that Bodor and Dandiker undisputedly invented the solid cladribine dosage form that is described and used in the so-called 6-line regimen. Pet. Reply 4–5 (citing, e.g., Ex. 1059, 25:13–26:2 ("That's my invention and Dr. Dandiker's invention"), Ex. 1060, 48:15–49:13 ("What we were trying to do was to make the first oral tablet . . . for cladribine so that it would help people, it would help patients. Multiple Sclerosis is a devastating disease. . . . And oral, I think, is just better for the patient."). Petitioner argues Drs. Bodor and Dandiker recognized the tablets' importance to MS treatments, as they are the sole inventors of MS treatment methods using those tablets, as claimed in two patents with priority to Bodor. *Id.* (citing Ex. 1022, claims 22, 27, 28; Ex. 2029, claims 54, 56, 61, and 75). And, even as it pertains to the disclosure of "10 mg" tablets in Bodor's 6-line regimen, Munafo could not

say that the '947 patent's inventors alone were responsible for that dose. Ex. 1063, 135:4–14 (testifying "it was a joint team effort"). Indeed, evidence suggests they were not alone. Ex. 2050 (Amsterdam Minutes), 3–4

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████ The teaching of the 10 mg cladribine tablets in Bodor's 6-line disclosure is not only relevant to the obviousness challenge, it is key to Petitioner's showing about how the claimed induction period's total dose limitation is met. *See* Pet. 49 (Ex. 1002 ¶ 83 (calculating (10 mg x 14 days = 140 mg; 140 mg ÷ 70 kg (average-weight patient) = 2 mg/kg (within range of 1.7–3.5 mg/kg)).

Patent Owner argues that Petitioner does not explain how Bodor's and Dandiker's involvement in a formulation renders them co-inventors of the regimen. PO Sur-reply 6–7 (arguing, *inter alia*, that Bodor also describes using the formulation to treat diseases in addition to MS, and never claimed the regimen involving administration for a specific number of days/months). That, however, is not accurate. As Petitioner points out, Bodor and Dandiker testified that their tablets exhibited properties important to Bodor's regimen, including improved absorption, reduced interpatient variation, and increased patient convenience/compliance. Pet. Reply 5 (citing, e.g., Ex. 1059, 34:11–40:8; Ex. 1060, 121:21–123:7, 124:11–125:6). Patent Owner's clinical pharmacology expert, Dr. Meibohm, agrees that such properties would have been considered when developing a dosing regimen. Ex. 2052 ¶ 2; Ex. 1062, 42:1–47:16, 48:7–57:21 (testifying interpatient variability, dosage form/route, patient compliance/adherence, and stability

would "all have been considerations in developing a dosing regimen as of the 2004 time frame").

Even Munafo agreed that "the formulation is part of the elements that you consider in designing a dosing regimen . . . and it [(Ivax's formulation)] became an element that we were considering when designing this dosing regimen." Ex. 1063, 79:8–14. Patent Owner argues that Munafo was only referring to "hypothetical" effects a formulation could have on the regimen; and, according to Patent Owner, there is no evidence the regimen actually changed based on the formulation. PO Sur-reply 7 (citing Ex. 1063, 78:5–80:4). Thus, according to Patent Owner, the formulation bears only an "incidental relation" to the regimen. We disagree. If we somehow excised the recitation of "10 mg of cladribine in the instant complex cladribine-cyclodextrin complex in the instant solid dosage form" from the remainder of the 6-line disclosure, it is unclear what dosage form is used or even how much of the drug would be given. *See* Pet. Reply 4 (annotating Bodor's 6-line disclosure; green highlighting reflecting subject matter not attributable only to named inventors on the '947 patent). The disclosure is intertwined and, on this record, we find that the tablets bear more than an incidental relation to the frequency and duration of administering those tablets.

Accordingly, upon considering all Bodor's relied-upon disclosures as discussed above and the significance of those disclosures to the obviousness challenge presented here, along with the contributions of Drs. Bodor and Dandiker to the cladribine tablets underlying those disclosures, we conclude that *Duncan Parking* step 3 is met. On the record here, the 6-line disclosure is not solely the invention of the '947 patent's named inventors, Drs. Bodor and Dandiker are at least co-inventors of all applied portions, and the Bodor reference is "by another" and available in full as prior art.

### 4. Obviousness of Claim 36

#### a) Overview

Petitioner contends that claim 36 would have been obvious over the teachings of Bodor and Stelmasiak. Pet. 33–54; Ex. 1002 ¶¶ 77–119. Petitioner contends that Bodor and Stelmasiak teach methods of treating multiple sclerosis comprising administering oral formulations of cladribine and that both treatments include induction and cladribine-free periods. Pet. 45–50 (citing, e.g., Ex. 1022, Abstr., 23:15–20; Ex. 1013, Abstr.). Indeed, Petitioner contends the induction period dosing in Bodor overlaps with the claimed induction period dosing, and is followed by a 10-month, cladribine-free period. *Id.* at 49–50 (arguing, e.g., that an average-weight patient would receive about 1.4 mg/kg to about 2.0 mg/kg, overlapping with claim 36's range of about 1.7–3.5 mg/kg).

According to Petitioner, Bodor at least suggests a retreatment period after the cladribine-free period, especially in view of the fact that MS is a chronic disease and many MS patients do require retreatment. *Id.* at 50–52 (citing Ex. 1022, 23:15–24; Ex. 1002 ¶¶ 86–87; Ex. 1009, 263). Petitioner notes that Stelmasiak teaches a cyclical treatment regimen that includes cladribine retreatments and intermittent cladribine-free periods. *Id.* (citing Ex. 1013, Abstr., 5; Ex. 1002 ¶¶ 88–89). Further, Petitioner contends, it would have been routine to optimize the total dose and length of cladribine administration in a maintenance phase. *Id.* at 40–43 (citing, e.g., Ex. 1022, 2, 11–12, 23, 24:6–9 (teaching therapeutically effective amounts can be "easily determined [] empirically by starting at relatively low amounts and by step-wise increments with concurrent evaluation of benefits"), 53–54; Ex. 1002 ¶¶ 102–104 (testifying it would be logical and within the POSA's

ordinary skill to use Bodor's two-month treatment period as a starting point for optimization in a maintenance phase)).

Petitioner argues it would have been obvious to optimize the total dose and duration of Bodor's regimen as appropriate for treating MS. *Id.* at 40–42. Petitioner contends the POSA would have, as was standard practice in the field, regularly measured patients' lymphocyte counts while assessing therapeutic efficacy. *Id.* (citing, e.g., Exs. 1013, 5; Ex. 1014, 1717; Ex. 1018, 1146); *see also id.* at 36 (citing Ex. 1002 ¶¶ 103–104 (testifying that a POSA would have been motivated to intersperse drug-treatment periods with drug-free periods to manage hematological toxicity)). And, Petitioner contends, a POSA would have reasonably expected success in view of various clinical studies reporting on the efficacy of cladribine in MS patients. *Id.* at 43–44 (citing, e.g., Ex. 1014, 1719–1720; Ex. 1013, 7; Ex. 1023, Abstr.; Ex. 1002 ¶¶ 35–49).

In response, Patent Owner argues that claim 36 would not have been obvious for three principal reasons. *First*, Patent Owner contends that neither Bodor nor Stelmasiak teaches the claimed induction and maintenance period dosing. PO Resp. 19–33. According to Patent Owner, Bodor and Stelmasiak do not disclose "weight-based" dosing, and neither reference discloses the same maintenance period as claimed. *Id.* at 19–24. *Second*, Patent Owner contends there is no reason to combine Bodor's and Stelmasiak's teachings or reasonable expectation of success in doing so to arrive at the claimed method. *Id.* at 35–57 (arguing, *inter alia*, Petitioner's optimization arguments should fail because of alleged dissociation between suppressed lymphocyte counts and therapeutic efficacy). *Third*, Patent Owner argues that objective indicia support a conclusion of nonobviousness. *Id.* at 58–65 (asserting, e.g., alleged skepticism).

We address the parties' arguments and evidence in more detail below in the analysis that follows.

> b) *Whether the Prior Art Teaches or Suggests All Limitations, Including the Claimed Induction and Maintenance Periods*

According to Petitioner, Bodor teaches treating MS by orally administering cladribine as recited in claim 36's preamble. Pet. 45, 47 (citing, e.g., Ex. 1022, 23:15–20). Petitioner contends that Stelmasiak similarly teaches treating MS, specifically patients with RRMS, using an oral formulation of cladribine. *Id.* at 47–48 (citing Ex. 1013, Abstr.). For the reasons given by Petitioner, we find that Bodor and Stelmasiak disclose claim 36's preamble language, whether that language is limiting or not. Patent Owner provides no argument to the contrary.

Petitioner argues that Bodor and Stelmasiak teach induction periods, and that Bodor teaches an induction period dosage and duration that overlaps with claim 36's recitation in step (i) that the total cladribine dose reached at the end of the induction period is about 1.7 mg/kg to about 3.5 mg/kg. *Id.* at 48–49 (citing Ex. 1022, 23; Ex. 1013, Abstr., 5). Specifically, Petitioner contends, Bodor teaches an induction period spanning two months wherein 10 mg of cladribine is administered once daily for five to seven days in the first month and repeated for five to seven days in the second month. Ex. 1022, 23. As Dr. Miller explains, that regimen would provide a total cladribine dose of 100–140 mg (e.g., 7 days x 10 mg x 2 months = 140 mg) at the end of the induction period and, for a patient of average weight, mathematically corresponds to a range of about 1.4 mg/kg to 2 mg/kg (e.g., 140 mg ÷ 70 kg = 2 mg/kg). Pet. 49; Ex. 1002 ¶ 83 (citing Exhibit 1050 for an average adult weight and showing the respective calculations).

Petitioner contends that Bodor further teaches a cladribine-free period that satisfies claim 36's step (ii). Pet. 49–50. Petitioner cites Bodor's teaching that the induction period discussed above is "followed by ten months of no treatment." *Id.* (citing Ex. 1022, 23:15–20). According to Petitioner, Bodor's cladribine-free period is within the scope of the claimed "cladribine-free period lasting from about 8 months to about 10 months." *Id.*; Ex. 1002 ¶ 85.

Furthermore, Dr. Miller opines that a POSA would have understood that Bodor suggests a retreatment period after the cladribine-free period. Ex. 1002 ¶ 86 (discussing Bodor's alternative regimen with a 6-month induction period, and an 18-month cladribine-free period (Ex. 1022, 23:15–24) and testifying that a POSA would understand Bodor to suggest a subsequent retreatment phase "otherwise, the specified length of time of the cladribine-free period is meaningless"). Dr. Miller testifies that a POSA would have known that MS is a disease without a cure that typically needs ongoing treatment and, reading Bodor in that context, would have "thought to re-administer cladribine again after the specified cladribine-free period." *Id.* ¶ 87 (testifying that "MS patients typically receive more than one course of drug therapy to treat active relapses, prevent relapses, and/or prevent or slow further progression of the disease"); *see also id.* ¶¶ 53–59.

Accordingly, Petitioner contends that a POSA would have understood Bodor as teaching a cladribine dosing regimen for the treatment of MS as shown in the schematic below.



Pet. 49–51 (citing Ex. 1002 ¶ 84). The image above is a schematic/timeline that shows an induction period (months one and two), a subsequent "No treatment" period of ten months, and then a "Retreatment" or "Maintenance" phase starting in the thirteenth month. Ex. 1002 ¶ 84. The schematic also shows daily and monthly cladribine doses in each of the first two months (~ 0.7–1 mg/kg for each month based on the average-weight patient). *Id.*

Petitioner argues that Stelmasiak teaches a cyclical cladribine regimen with "induction" and retreatment or "maintenance" periods. Pet. 52–53. Petitioner contends that Stelmasiak teaches a regimen ("Regimen 2") involving administration of oral cladribine for the first six months, a no-treatment period in months seven and eight, a retreatment at month nine, followed by another no-treatment period between months ten to fourteen, then another cladribine retreatment at month fifteen, which is again followed by a no-treatment period that spans months sixteen to twenty-four. *Id.*; Ex. 1013, Abstr., 5. Dr. Miller's schematic illustrating this dosing regimen from Stelmasiak is reproduced below.

**Regimen 2**



* Based on an average body weight of 70 kg

Ex. 1002 ¶ 89.  The schematic above shows the periods in which cladribine is administered (with dosing amounts in green font) occurring in months one through six, and at months nine and fifteen; following each of the periods in which cladribine is administered are "No treatment" periods (red font) lasting a certain number of months.  Dr. Miller opines that a POSA would have understood the first six months as being an induction period and that the retreatments at month nine and fifteen would be understood as "Maintenance" treatments. *Id.* ¶¶ 88–89.

We find that Petitioner has shown by a preponderance of the evidence that Bodor teaches or suggests the induction period recited in claim 36's step (i) and subsequent cladribine-free period recited in claim 36's step (ii). We credit Dr. Miller's testimony, discussed above, explaining how those claim limitations would have been obvious from at least Bodor's teachings. Patent Owner's counterargument, discussed below, is unavailing.

Patent Owner contends that "flat and weight-based dosing are fundamentally different."  PO Resp. 19 (asserting "in flat dosing all patients, regardless of weight, receive the same amount of a drug") (citing Ex. 2051 ¶¶ 91–93; Ex. 2052 ¶ 35).  According to Patent Owner, Bodor considered "weight-based dosing in the art but still chose flat dosing" for its 2-months on, 10-months off regimen.  *Id.* at 20; *see also* PO Sur-reply 8–10 ("In

contrast to the challenged claims' weight-based dosing, Bodor and Stelmasiak only disclose *flat* dosing.").

Insofar as Patent Owner is urging that claim 36 should be interpreted to *exclude* administering so-called "flat" doses (i.e., 100–140 mg) to patients of average weight where the total cladribine dose would fall within claim 36's recited range of about 1.7 mg/kg to 3.5 mg/kg, we reject that interpretation. Patent Owner did not propose any express "weight-based" claim construction in its Patent Owner Response and, in its Sur-reply, the only support cited by Patent Owner for its apparent limiting interpretation is an example in the patent (where patients receive a different number of tablets depending on their weight), and the prescribing information/label for the approved drug MAVENCLAD (and testimony about that drug's label). PO Sur-reply 8–9 (citing Ex. 1001, 14:41–44, Tables 3 & 4 (disclosing, e.g., that patients weighing between 60–69.9 kg receive ten 10 mg pills over the first two months; patients weighing 70–89.9 kg receive twelve to fourteen 10 mg pills over the first two months); Ex. 2001, 5).[22]

We see no adequate basis for limiting the claims in the manner suggested by Patent Owner based on the cited example and the extrinsic evidence about MAVENCLAD. We decline to import into the claims any express patient-weighing step or to construe the claims to require preexisting knowledge of a patient's weight. As we noted at institution, the claims include no active steps of determining a patient's weight or performing *a*

---

[22] Patent Owner also cites the Specification's disclosure that dosage administered to an individual "will vary depending on a variety of factors," listing pharmacokinetic properties, patient sex, age, weight, health, symptoms, frequency of treatments, and effect desired, among other factors. Ex. 1001, 5:30–35. We do not agree that this non-specific disclosure justifies limiting the claims as written in the manner urged by Patent Owner.

*priori* calculations to arrive at any alleged "weight-based" dosing before cladribine is taken or administered. Inst. Dec. 35–36 n.17. Indeed, the total dose in claim 36 is only recited passively in a wherein clause—"wherein the total dose of cladribine *reached at* the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg." Ex. 1001, 19:17–21 (emphasis added). We, thus, agree with Petitioner; Patent Owner "does not identify any term justifying limiting the claims to weight-based dosing." Pet. Reply 12; Ex. 1084 ¶ 32 (testifying "none of [the] claims . . . require an active step of determining a patient's weight before administering cladribine," and "the claims do not recite administering specific amounts of cladribine to patients of a specific weight").

In any event, the evidence points to the obviousness of converting so-called flat and weight-based expressions of the dose. And, in this field, those expressions are often used interchangeably to describe cladribine doses for treating MS. Bodor, for example, describes a regimen using 10 mg tablets administered over 5–7 days per month for 2 months, which Patent Owner argues is "flat." Ex. 1022, 23:15–20. Elsewhere, however, Bodor defines the "therapeutically effective amount" for treating MS with cladribine in view of the technical literature's reporting of values between "about 0.04 to about 1.0 mg/kg/day." *Id.* at 22:17–22 (citing Beutler (Ex. 1026)). Consistent with Dr. Miller's calculations of the total amount of cladribine given (on a mg/kg basis) with Bodor's regimen using 10 mg tablets, that total amount is well within Bodor's broader definition of known therapeutic amounts. Ex. 1002 ¶ 83. Contrary to Patent Owner's argument, Bodor does not suggest it was going in any new or nonobvious direction by expressing "flat" dosages in its regimen. PO Resp. 20.

Even the '947 patent makes the obvious conversion between flat and by-weight dose expressions when describing the *background* prior art. The patent describes a study by "Grieb" wherein "Cladribine has been orally administered during 6 monthly courses of 5 days at a total dose of about 4–5.7 mg/kg (patients of about 52 and about 75 kilos, respectively)." Ex. 1001, 3:3–21 (describing Grieb and citing Stelmasiak). Nowhere, however, does Grieb explicitly report a total dosage of 4–5.7 mg/kg. *See generally* Ex. 1023. The patent simply makes the basic mathematical conversion from Grieb's express disclosure (much like Bodor's cited regimen) of giving a certain dosing (e.g., 10 mg/day) over a specified timeframe. Ex. 1023, 324. Patent Owner suggests this description of Grieb should be discounted because the patent's inventors were more prescient than the ordinarily skilled artisan. PO Resp. 24. Yet that argument is undermined because that description appears in the "Background of the Invention," where the patent was plainly summarizing what was already known in the prior art. Ex. 1001, 1:23–3:21 (describing prior studies by Beutler, Grieb, and others). Moreover, although the alleged differences between "flat" and "by-weight" dosing has been a focus of Patent Owner's argument throughout this proceeding, the patent itself never highlights such distinctions, much less suggests any criticality to them.[23]

---

[23] Patent Owner does not identify any prosecution history that would support the alleged distinction between "flat" and "by-weight" dosing. We are aware of none. Indeed, the Examiner cited Bodor's alleged "flat" dose against the claims, which claims included similar "mg/kg" recitations. *See, e.g.*, Ex. 1004, 3, 221. And the applicant did not argue the alleged distinction Patent Owner raises now. *Id.* at 246–255.

Patent Owner argues that Bodor's dosing does not vary depending on the patient's weight. PO Resp. 20–21. We credit, however, Dr. Miller's testimony that, if Bodor's recited regimen using 10 mg cladribine tablets were given to patients of average weight, there would be material overlap with the induction period's total dose as claimed. *See, e.g.*, Ex. 1002 ¶¶ 83, 107; Ex. 1084 ¶¶ 9–10 (opining that it would have been obvious to administer Bodor's tablets to a patient of average weight (e.g., 70 kg), and in doing so, a POSA would have arrived at the claimed induction dose" and noting "Dr. Lublin did not disagree . . . that treating a MS patient of average weight would have been obvious")). *E.I. du Pont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1008 (Fed. Cir. 2018) ("The point of our overlapping range cases is that, in the absence of evidence indicating that there is something special or critical about the claimed range, an overlap suffices to show that the claimed range was disclosed in—and therefore obvious in light of—the prior art.").

Patent Owner argues that Dr. Miller arrives at the overlap in doses only through hindsight because Bodor does not expressly disclose patient weights. PO Resp. 21–23; Ex. 2051 ¶¶ 89–90 (agreeing with Dr. Miller's calculations but asserting it is hindsight to choose "one very particular-weight patient"). But reading Bodor's disclosure such that the regimen would not apply to at least average-weight patients is unsupported and illogical. *Fleming v. Cirrus Design Corp.*, 28 F.4th 1214, 1223 (Fed. Cir. 2022) ("Since *KSR*, we have explained that it is appropriate to consider the knowledge, creativity, and common sense of a skilled artisan in an obviousness determination."). The overlap also exists well beyond giving Bodor's regimen to a single patient weighing precisely 70 kg/154 pounds. Giving 140 mg to any patient weighing between about 50–80 kg (110–176

pounds) would result in an induction dosage within the bounds of claim 36's range.[24]   And, as Petitioner points out, the art supports applying Bodor's dosing to average-weight patients.  Pet. Reply 19 (citing Stelmasiak's cohort of patients weighing 52–75 kg (Ex. 1013, 5)); *see also* Ex. 1084 ¶¶ 64–65 (testifying it would have been obvious to treat patients of average weight and providing mg/kg calculations (n.3) for patients of various weights to further illustrate the overlap with the claims).  Petitioner need not show that administering every dose to every hypothetical patient falls within the claim. *Hewlett-Packard Co. v. Mustek Sys.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003) (explaining that prior art that "sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention").

Patent Owner argues that we should disregard Dr. Miller's opinions about the obviousness of the claimed induction period dosing because, outside of this IPR, he described MAVENCLAD's "weight-based" dosing as "rather unique."  PO Resp. 21–22 (citing, e.g., 2007 (2019 video for National MS Society), 3:53–4:12; Ex. 2008 (transcript), 4:17–5:1).  We credit Dr. Miller's responsive testimony, however, which explains that his comments were "made in the context of [FDA] *approved* MS drugs, not *all* drugs or dosing regimens being investigated in the prior art."  Ex. 1084 ¶ 67. What may be "unique" in terms of FDA approval does not equate with being nonobvious over the relevant art.  Considering the prior art and preexisting clinical studies generally, it is clear that administering "weight-based"

---

[24] Notably, the '947 patent also treats such bounds rather loosely.  *See, e.g.*, Ex. 1001, 15 (Table 3 (target dose of "1.75 mg/kg"): suggesting, e.g., a patient receiving 14 tablets (each with 10 mg cladribine) and weighing between 85–89.9 kg would fit the criteria, which conversion produces a total dose range of about 1.56–1.65 mg/kg).

cladribine dosing is not unique. *See, e.g.*, Ex. 1018 (Rice), Abstr. (describing placebo-controlled clinical trials in MS patients receiving subcutaneous induction dose of 0.7 mg/kg (over 2 months) or 2.1 mg/kg (over 6 months)); Ex. 1002 ¶ 47 (discussing Rice's study).

Patent Owner argues that Stelmasiak does not remedy Bodor's deficiencies because it too allegedly teaches "flat" dosing, not "weight-based" dosing. PO Resp. 23. Also, Patent Owner contends, "Stelmasiak teaches away from" weight-based dosing. *Id.*; PO Sur-reply 10.

Bodor is not deficient for the reasons explained above. Pet. Reply 19 (noting Petitioner relies on Bodor's induction dosing, not Stelmasiak's). We also disagree that Stelmasiak teaches away from weight-based dosing.[25] Stelmasiak discloses that "there was no indication that a 'good response' is related to the actual cladribine dose per body weight." Ex. 1013, 6–7; Ex. 1084 ¶ 68 (testifying "a POSA would have understood that to simply mean that 'responders' in the study had different body weights"). This is not a teaching away. Stelmasiak sought to explain the variance in lymphocyte counts among its patients, and to identify "any factor" that might have differentiated between patients that were responders versus the non-responders. Ex. 1013, 6–7. Stelmasiak was "unable" to identify such a factor. But Stelmasiak nowhere teaches that expressing dosages in mg/kg and administering those dosages would result in an ineffective MS treatment. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) (explaining the art's disclosure of alternatives is not a teaching away where the

---

[25] Because Patent Owner admits that Stelmasiak and Grieb have substantially the same disclosures (PO Resp. 24), the '947 patent's concession about what was known from Grieb undercuts Patent Owner's argument that Stelmasiak also discloses only "flat" dosing.

disclosure does not "criticize, discredit, or otherwise discourage the solution claimed"). To the contrary, at most, Stelmasiak suggests doing so would not have changed its results. Ex. 1084 ¶ 68 (testifying "Dr. Lublin provides no evidence that weight-based cladribine dosing was superior or not 'equivalent' to flat, fixed dosing").

Considering the totality of the record, we also find that it would have been obvious to follow Bodor's 2-month induction period and 10-month cladribine-free period with a retreatment or maintenance phase. Bodor teaches two "alternative" regimens—one noted immediately above, and another where the drug is administered for six months (giving a higher overall dose) with a longer 18-month drug free period. Ex. 1022, 23:15–24. We find persuasive Dr. Miller's testimony that Bodor's recitation of specific durations for the drug-free periods logically suggests a retreatment period. *See, e.g.*, Ex. 1002 ¶¶ 84–86 ("otherwise, the specified length of time of the cladribine-free period is meaningless"); *see also* Ex. 1084 ¶ 70 (noting Patent Owner's declarant "Dr. Lublin does not provide another explanation of why Bodor specifies the length of time of the cladribine-free period").[26] Indeed, Dr. Miller testifies, "[t]he most logical reading of Bodor would have included a re-treatment period, especially because such re-treatments were consistent with prior clinical studies where patients relapsed during or after

---

[26] At the hearing, when asked about why Bodor would specify the length of the cladribine-free period, Patent Owner's counsel stated that "it's a period in which the person should not be treated with cladribine" and is required for safety. Tr. 62:11–63:22. But this seems to reinforce Petitioner's point that, by specifying the number of months of the cladribine-free period, Bodor is suggesting one could safely retreat the patient as needed when that specified period elapsed—or at least the POSA would consider doing so.

cladribine therapy." Ex. 1084 ¶ 70 (citing Ex. 1013, Abstr.; Ex. 1031, 43);

Pet. 36 (citing, e.g., Ex. 1002 ¶¶ 101–102; Ex. 1018, Abstr.).

We also find persuasive Petitioner's position and Dr. Miller's supporting testimony that it would have been logical and well within the POSA's skill to use Bodor's 2-month treatment period and cladribine dose as a "starting point" for optimization in a maintenance phase.[27] Pet. 40–42; Ex. 1002 ¶¶ 102–104; Ex. 1084 ¶ 88. Petitioner argues, it would have been routine and well within the ordinary capabilities of the POSA to "fine tune" the total dose and length of cladribine administration, including during a maintenance period. Pet. 42; Ex. 1002 ¶ 93. The prior art supports that POSAs regarded such variables as optimizable. Bodor teaches that:

> [O]ne of skill will appreciate that the therapeutically effective amount of cladribine administered here may be lowered or increased by fine-tuning and/or by administering cladribine according to the invention with another active ingredient. The invention therefore provides a method to tailor the administration/treatment to the particular exigencies specific to a given mammal. Therapeutically effective amounts may be easily determined, for example, empirically by starting at relatively low amounts and by step-wise increments with concurrent evaluation of beneficial effect.

Ex. 1022, 24:1–9; *see also* Ex. 1026, 5:20–25 (teaching that "one can tailor the dosage and duration" of cladribine administration "to the stage of the [MS] disease and the condition of the patient being treated").

---

[27] For the same reasons discussed above, if the POSA repeated Bodor's dosage of 100–140 mg over two months in a maintenance phase for an average-weight patient (range of about 1.4–2.0 mg/kg), the dose and duration would overlap with the recitations in claim 36's step (iii) (total dose of about 1.7 mg/kg in a period lasting about 2–4 months).

Petitioner's position that it would have been obvious to use Bodor's induction dose/duration as a logical "starting point" in a maintenance phase is also more consistent with a concession made by Patent Owner during prosecution of the related '903 patent. There, it was argued that, if Bodor were understood to "imply" a retreatment (as the Examiner had found), "the teachings of the reference would suggest that the *same dosing regimen* be applied to the patient (10 mg of cladribine administered for 5-7 days each month for two consecutive months followed by another 10 month period of time in which the patient receives no treatment)." Ex. 1025, 100, 151 (arguing "[t]his would have resulted in the *same* total dose of cladribine being administered to the patient in *both* the induction phase and the maintenance phase") (emphasis added).

Petitioner also argues, and we agree, it would have been obvious to include a cladribine-free period after delivering treatment during a maintenance period. Pet. 54. As Dr. Miller explains, this is shown expressly in Stelmasiak, which followed the initial treatment and each retreatment period with cladribine-free periods. *Id.* (citing Ex. 1002 ¶¶ 94–95). Moreover, we credit Dr. Miller's testimony that a POSA would have incorporated cladribine-free periods to help control potential drug toxicity and side effects. *Id.* at 36–37 (citing Ex. 1002 ¶¶ 103–105 ("[A] POSA would have known that suppressing a patient's immune system would put them at increased risk of infection."); Ex. 1013, 5 (teaching "hematological toxicity of the drug (bone marrow suppression) raised some concern"); Ex. 1084 ¶ 87 (testifying "a POSA would have had the skill to monitor a patient's lymphocyte count and side effects associated with lymphocyte and myelosuppression and optimize the length of time of the second cladribine-

free period to mitigate side effects while maximizing lymphocyte suppression").

Patent Owner argues that Bodor and Stelmasiak do not disclose the maintenance period as claimed. PO Resp. 24–34 (citing, e.g., Ex. 2051 ¶¶ 98–122). Patent Owner contends that "safety concerns" stemming from prolonged immunosuppression would have suggested against retreating with cladribine. *Id.* at 25–27. Patent Owner contends that dosing of other FDA-approved MS disease-modifying agents (DMAs) were dosed continuously, not cyclically. *Id.* at 27–30 (arguing that Dr. Miller's citation to drugs like corticosteroids as evidence of cyclical retreatment is uninformative). And, Patent Owner contends, "most MS clinical trials studying cladribine" used only a single course of drug administration without any retreatment. *Id.* at 30–33. We address these arguments in turn below.

Because cladribine was known to be a strong immunosuppressive agent, there were some safety concerns with its use reflected in the art. *See, e.g.*, Ex. 1015, 1752 ("The primary toxicity caused by the drug is myelosuppression, which is a dose-limiting factor."); Ex. 1016, 430 ("[C]aution is recommended when the drug is administered before, after or with other drugs that may cause myelosuppression or immunosuppression.").

On the whole, however, the evidence shows that POSAs continued to use cladribine to treat MS patients in human clinical studies and considered cladribine to have an acceptable safety profile for such uses—especially balanced against the drug's promise. Stelmasiak reported no "clinically significant hematological side effects," and only "mild" side effects over its two-year study, even with an induction dose higher than Bodor's 2-month total dosing and giving multiple cladribine retreatments. Ex. 1013, 7.

Romine reported a mild infection in a few cladribine patients and one placebo patient but "[o]therwise, there were no side effects or adverse events." Ex. 1031, 35; *see also* Ex. 1018, 1153 (Rice reporting "no serious adverse events could be attributed to cladribine in this study."); Ex. 1047, Abstr. (Selby noting cladribine "was remarkably well tolerated"). Although Romine states that "[r]epeated treatment raises long-term toxicity issues . . . known to occur with *other* long-term immunosuppressive treatments," Romine, nevertheless, describes *retreating* twenty-four patients with cladribine. Ex. 1031, 43–44 (noting those patients were retreated for disease worsening, and reporting "no instances of marrow suppression or thrombocytopenia" but some increase (4% to 25%) in infection frequency versus the initial phase) (emphasis added); *see, e.g.*, Ex. 1084 ¶¶ 51–57 (reviewing cladribine's efficacy and safety profile as reported in the literature and testifying, "a POSA would have understood that cladribine continued to be administered to MS patients before 2004, despite the 'safety concerns' Dr. Lublin claims existed"). On balance, we disagree that a POSA would have considered a cladribine retreatment unacceptably unsafe following Bodor's 10-month cladribine-free period.

Patent Owner's argument about other FDA-approved MS drugs being dosed continuously without interruption fares no better in rebutting Petitioner's challenge. PO Resp. 27–30; Ex. 2051 ¶¶ 54–59, 102–103. The art's teachings are not limited to FDA-approved drugs. The prior art here *specific to cladribine* expressly teaches MS-treatment regimens that include cladribine-free periods and suggests retreating patients with cladribine as needed. Ex. 1022, 23:15–24; Ex. 1013, Abstr.; Ex. 1018, 1146; Ex. 1031, 43–44; Ex. 1002 ¶¶ 38–49; Ex. 1084 ¶¶ 69–70, 75. As persuasively argued by Petitioner, "[r]etreatment was recommended given cladribine's temporary

lymphocyte suppression and MS's chronic nature." Pet. Reply 21–22 (citing e.g., Ex. 1084 ¶¶ 71–73, 95–96). We credit Dr. Miller's literature-backed testimony that a POSA would have understood that, "[b]ecause lymphocytes rebound, the art recognized that the 'lengthy but impermanent duration of effect of cladribine means that retreatment will be necessary if cladribine is to become a practical long-term therapy for MS.'" Ex. 1084 ¶ 71 (quoting Ex. 1031, 43).

Patent Owner's argument that "most" clinical trials did not retreat with cladribine is equally unavailing. PO Resp. 30–33. The fact is, some studies did expressly retreat with cladribine—including at least Stelmasiak (retreatment at, e.g., months 9 and 15), Romine (retreatment if recurrence of disease worsening), and Rice (retreatment 12-months after last dose if evidence of disease progression). Ex. 1013, Abstr., 5; Ex. 1018, 1146; Ex. 1031, 43.

Patent Owner argues that the specific timing and dosing of Stelmasiak's retreatments are not the same as what is claimed. PO Resp. 33–34. That is true but inapposite because the challenge is obviousness based on the art's combined teachings. *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1050 (Fed. Cir. 2019) ("A finding of obviousness . . . cannot be overcome by attacking references individually where the rejection is based upon the teachings of a combination of references.") (internal quotation marks omitted). We find retreatment (and routine optimization thereof as necessary) at the end of Bodor's 10-month cladribine-free period would have resulted in the claimed maintenance period and dose. Patent Owner also dismisses the retreatments described in Rice and Romine because they were not "automatic" but depended on conditions like worsening of the

patient's disease or hematological criteria.[28]  PO Resp. 31–32.  But we fail to see how this undermines Petitioner's theory, which did not presuppose "automatic" retreatment either.  *See, e.g.*, Ex. 1002 ¶¶ 100–101 (testifying that at least some patients would be expected to exhibit signs of disease relapse during or after Bodor's initial treatment, motivating retreatment for the relapsing patient after the 10-month cladribine-free period).

Patent Owner's arguments about a lack of "consensus" around *when* retreatment should occur and the possibility that drugs other than cladribine might be used in a retreatment phase are unpersuasive.  PO Resp. 32–33.  As discussed above, Stelmasiak teaches retreatment at about two and eight months after the 6-month induction dosing period ended; according to Dr. Miller, Bodor logically suggests a retreatment after a 10-month cladribine-free period lapses; and Rice and Romine teach a retreatment as needed by the patient and at twelve months after the initial treatment ended. Even if there was no "consensus" to give a maintenance dose after expiry of a cladribine-free period lasting about 8–10 months as claimed, where, as here, retreatment with cladribine following a drug-free period was well-known in the art, it is not inventive to discover optimum or workable ranges by routine experimentation.  *In re Aller*, 220 F.2d 454, 456 (CCPA 1955). Moreover, that some clinicians may have considered switching drugs in retreatment does not mean that a POSA would not have considered continuing treatment with cladribine.  Ex. 1084 ¶ 73.  Both scenarios could

---

[28] Rice, for example, teaches that the hematologic criteria were based on patient's complete blood count (CBC).  Ex. 1018, 1146, 1154 (listing criteria including platelet, neutrophil, and hemoglobin counts above a threshold).

be true and, based on the record here, we find retreatments with cladribine were known and would have been considered.

For the above reasons, we are persuaded that claim 36's recited maintenance period and secondary cladribine-free period (in steps (iii) and (iv)) would have been obvious over the asserted art. We further address the parties' arguments about routine optimization of result-effective variables (e.g., cladribine dose and duration) in Section III.D.4.(c) below. *See, e.g.*, Pet. 40–43; PO Resp. 37–47 (addressing routine optimization in relation to argument about motivation and reasonable expectation of success).

<em>c)    Motivation to Combine and Reasonable<br>Expectation of Success</em>

According to Petitioner, a POSA would have been motivated to use Bodor's oral cladribine solid dosage form to treat MS. Pet. 33–34 (citing preference for oral drug delivery, increased bioavailability, and lowered interpatient variation with Bodor's oral dosage form as reasons to use Bodor's tablets to treat MS). *Id.* (citing, e.g., Ex. 1022, 2, 12, 23; Ex. 1002 ¶¶ 79, 97, 99). Further, Petitioner contends, a POSA would have expected at least some patients treated with Bodor's "two months on/ten months off" cycle to experience breakthrough disease or relapse that would require additional, maintenance treatment. *Id.* at 35 (citing Ex. 1002 ¶ 100 (testifying, with citation to supporting literature, that cladribine treatment is disease modifying but not permanent and that it was recognized that retreatment would be important)). As explained by Petitioner with Dr. Miller's supporting testimony, signs or symptoms of relapse may include, e.g., worsening neurologic function on physical examination of the patient or inflammatory demyelination (i.e., new lesion formation) on MRI scan. *Id.* (citing Ex. 1002 ¶ 100; Ex. 1016, 420; Ex. 1013, 6–7).

Because a POSA would have expected signs of relapse in at least some patients, Petitioner contends a POSA had reasons to retreat with cladribine, such as taught in Stelmasiak. *Id.* at 35–36 (citing Stelmasiak's reporting of a reduction in relapse rate, and improvements in patient EDSS scores). As discussed above, Petitioner contends that Bodor suggests retreatment too and that it would have been logical to use Bodor's induction dosing protocol in a retreatment phase. *Id.* at 42, 50; Ex. 1002 ¶¶ 86, 102. Petitioner contends a POSA, thus, would have had reasons to continue treating patients with cladribine after the induction and cladribine-free periods of Bodor. Pet. 36; Ex. 1002 ¶ 101. Indeed, Petitioner contends, retreatment, including with cladribine, was seen in various MS therapies described in the art. *Id.* (citing Ex. 1026, 11:5–7, Ex. 1022, 23; Ex. 1013, Abstr.; Ex. 1018, Abstr.; Ex. 1002 ¶¶ 101–102). Petitioner also contends a POSA had reasons to consider using lower maintenance-period doses or the same induction-period dose in the maintenance phase. *Id.* at 37–39; *id.* at 37 n.9; Ex. 1002 ¶¶ 89, 118.

Petitioner argues the claimed dose of cladribine reached at the end of the induction and maintenance periods would have been prima facie obvious over the prior art's teachings. Pet. 39–43. Petitioner cites an overlapping range with Bodor's 1.4 mg/kg to 2.0 mg/kg induction dosing compared to the range of "about 1.7 mg/kg to about 3.5 mg/kg" as claimed. *Id.* at 39 (citing Ex. 1002 ¶ 107). Petitioner contends that duration of treatment and dosage amount were known variables subject to routine optimization. *Id.* at 40–41 (citing Ex. 1002 ¶¶ 91–92, 99, 109–110; Ex. 1022, 2, 11–12, 23); *see also id.* (citing Bodor's definition (Ex. 1022, 22) for "therapeutically effective amount"). Petitioner cites the art's teaching that "one of skill will appreciate that the therapeutically effective amount of cladribine

administered . . . may be *lowered or increased* by fine tuning" and that "one can *tailor the dosage and duration* for which [cladribine] is administered to the stage of the disease and the condition of the patient being treated." *Id.* (quoting Ex. 1022, 24:1–3; Ex. 1026, 5:22–25) (emphasis added by Petitioner). Thus, Petitioner argues, cladribine's dose and length of administration are result-effective variables that can be modified to achieve a recognizable result (e.g., change in a patient's lymphocyte count). *Id.* at 41 ("Rice uses two different cladribine doses, 0.7 mg/kg and 2.1 mg/kg, with the higher dose having a higher suppression of lymphocyte counts.") (citing Ex. 1018, Fig. 4).

Accordingly, Petitioner argues, it would have been routine and within the POSA's capabilities to "fine tune" the total dose and length of cladribine administration. *Id.* at 42; Ex. 1002 ¶ 93. Dr. Miller opines that "it would have been logical for a POSA to have used Bodor's 2-month treatment period as a starting point, knowing that it could be routinely optimized." Ex. 1002 ¶ 102. Petitioner cites Bodor's teaching that "[t]herapeutically effective amounts may be easily determined, for example, empirically by starting at relatively low amounts and by step-wise increments with concurrent evaluation of beneficial effect." Ex. 1022, 24:6–9; Pet. 42. And, Petitioner contends, a POSA would have arrived at suitable doses and durations of cladribine administration by routinely measuring the patients' lymphocyte counts and monitoring for therapeutic efficacy. Pet. 42 (arguing "[t]his was standard practice in the field, as demonstrated by at least Stelmasiak, Rice, and Beutler") (citing Ex. 1013, 5, Ex. 1014, 1717; Ex. 1018, 1146; Ex. 1002 ¶¶ 16, 34, 102, 104)); *see also id.* at 42–43 (arguing no evidence of "criticality" to the dosage/duration for the maintenance period of claim 36).

Petitioner contends a POSA would have followed a retreatment period with another cladribine-free period. Pet. 36. According to Petitioner, a POSA would have been motivated to do so to manage possible adverse effects (e.g., hematological toxicity). *Id.*; Ex. 1013, 5; Ex. 1002 ¶¶ 103–105 (testifying the drug-free periods would have been seen as a desirable aspect of the regimen to mitigate toxicity and infections arising from the immuno-suppressive effects of cladribine).

Lastly, Petitioner contends a POSA would have had a reasonable expectation of success in arriving at the subject matter of claim 36. Pet. 43–45 (citing Ex. 1002 ¶¶ 111–119). Petitioner contends the POSA would have "followed the instructions in Bodor to orally administer the dosage forms following the dosage regimen" disclosed as suitable for treatment of MS. *Id.* at 44. Petitioner contends a POSA would have predictably included a maintenance and secondary cladribine-free period "because it was standard practice in the field to retreat MS patients over the course of the disease," and optimized the duration and dosing of such maintenance period as appropriate. *Id.* (citing Ex. 1013, Abstr.; Ex. 1002 ¶ 114). And, Petitioner contends, a POSA would have reasonably expected that the claimed cladribine regimen would be effective because it was known that cladribine can cause a "prolonged, profound suppression of lymphocyte counts," and "researchers published several clinical studies reporting on the efficacy of cladribine in MS patients." *Id.* at 44–45 (citing Ex. 1016, 420–421; Ex. 1013, 4, 7; Ex. 1022, 1–2, 23; Ex. 1014, 1719–20; Ex. 1023, Abstr.; Ex. 1002 ¶¶ 35–49, 115–116).

We find the POSA would have had sufficient motivation for modifying and optimizing Bodor's teachings to arrive at the subject matter of claim 36, and have had a reasonable expectation of success in doing so.

We explain our findings below and then turn to Patent Owner's arguments to explain why they are unavailing.

We find that Petitioner has proved by a preponderance of the evidence that a POSA would be motivated to use Bodor's solid oral 10 mg tablets and the recited 2-months on/10-months off regimen for treating MS patients. This requires little more than the POSA following Bodor's express guidance, and Bodor states that its dosage formulation has advantages (e.g., patient compliance with oral delivery; lower interpatient variability). Ex. 1022, 2, 12, 23; *see also* Ex. 1080 ¶ 16 (testimony of Dr. Pinal about the general preference for oral tablets and remarking on other attributes of Bodor's tablets making them desirable to use in an MS treatment regimen). Using Bodor's tablets and following the above-noted regimen would result in overlap with claim 36's induction period in step (i), as well as overlap with the claim's cladribine-free period recited in step (ii) as discussed above.

We find persuasive Dr. Miller's testimony that a POSA would have been motivated to retreat with cladribine at least those patients who showed signs of relapse—and done so after Bodor's 10-month cladribine-free period expires. Ex. 1002 ¶¶ 100–102 (citing, e.g., Ex. 1016, 420; Ex. 1013, 6–7; Ex. 1037, 908). We also agree that it would have been logical to use Bodor's initial treatment dose/duration as a starting point for optimization in a retreatment (maintenance) phase. *Id.* The prior art supports our finding that a POSA would have understood that cladribine dose and duration were known optimizable variables. *See, e.g.*, Ex. 1022, 24:1–9; Ex. 1026, 5:20–22; Ex. 1002 ¶¶ 18, 117–118 (testifying patient-specific dose optimization is a common practice in the clinic). Moreover, the known correlation between cladribine dose/duration (variables) and level of lymphocyte suppression (a result) supports our determination that the variables are "result-effective."

*See, e.g.*, Ex. 1002 ¶¶ 91–92 (testifying "[i]t was also general knowledge in the art that a direct correlation exists between the dose and length of administration of cladribine and level of lymphocyte suppression"), 117–118; Ex. 1018 (Rice), 1152, Fig. 4 (describing "dose-dependent decreases" in lymphocyte levels at 0.7 mg/kg and 2.1 mg/kg); *see also id.* at 1151 (reporting a "small, dose-dependent, median percent decrease in T2 lesion volume"); Ex. 1047 (Selby), 297 (describing less rapid decrease and faster rebound in lymphocyte levels with cladribine at lower versus higher doses (2.1 mg/kg and 2.8 mg/kg)). Thus, we find that a POSA would have optimized Bodor's cladribine dose/duration in a maintenance phase as appropriate for the relapsing patient, and also included a secondary cladribine-free period (for safety and to mitigate toxicity) and, in doing so, would have predictably arrived at claim 36's steps (iii) and (iv).

We also find that a POSA would have reasonably expected success in arriving at the claimed subject matter. In addressing this issue, we conclude that "the claims are not limited to any efficacy degree or metric." Pet. Reply 10 (citing Ex. 1061 (Lublin Tr.), 136:3–8 (Q: "Do the claims . . . require any particular degree of efficacy in its methods of treating multiple sclerosis?" A. "No, not that I see")).[29] *C.f. Janssen Pharm., Inc. v. Teva Pharm. USA, Inc.*, 97 F.4th 915, 928–929 (Fed. Cir. 2024) (holding that, "[w]hatever role safety and efficacy data may play in assessing the strength of a motivation or lack of motivation to combine, . . . [the absence of safety and efficacy data in

---

[29] The patent also indicates that the "beneficial effect" of the invention, including any attenuation, decrease, reduction, or diminishing of pathological development of disease may be seen at *any stage* of the treatment course (e.g., after the induction treatment, during a cladribine-free period, etc.). Ex. 1001, 5:19–24.

certain art] cannot justify simply discarding that prior art particularly where, as here, the claims do not have any safety and efficacy requirement.").

But even if the claims did require a specific treatment "efficacy," the patent's definition of the term is broad. It indicates that efficacy can be measured by, for example, "frequency of relapses" or "presence or absence of new lesions" as detected by MRI. Ex. 1001, 5:52–6:9 (describing reduction in MRI $T_1$ lesions as a "primary efficacy variable" and "secondary efficacy variables" as including, for example, lesion volume, frequency of exacerbations, and EDSS or SNRS scores); *see also id.* at 16:10–52 (example, using MRI-detected lesions as the efficacy metric; remarking that the treatment is "efficient in decreasing brain lesions and no severe adverse effect is observed").

With that context about what the claims require (or rather, don't) as to specific therapeutic efficacy, we consider the preexisting technical literature about cladribine's positive effects when treating MS patients, which Petitioner has identified. *See, e.g.*, Pet. 19–21 (summarizing studies by Beutler, Stelmasiak, Romine, and Rice, which we highlight below in order of their publication (from roughly 1996 through 2000)).

> Beutler: in a 2-year, placebo-controlled, double-blind, crossover study, noted improvement in EDSS and SNRS scores in patients receiving cladribine, and "highly statistically significant changes" in brain lesions. Ex. 1014, 1717–1719 ("Our studies clearly show that cladribine retards the progression of neurologic impairment of patients with chronic progressive MS" and "[i]n our studies we observed marked improvement in the appearance and disappearance of lesions" in patients receiving both the high and low doses (2.8 mg/kg and 1.4 mg/kg).); *see also id.* at 1716 ("Analysis of the results revealed a favorable influence on neurological performance scores . . . and on MRI findings on patients treated with cladribine.").

Stelmasiak: in a 2-year pilot study of cladribine's use in RRMS patients, reported "EDSS scores were significantly reduced [(a positive outcome)] during the treatment compared to the initial values" and the "number of relapses . . . was markedly reduced (almost five times on average)" in seven of the ten patients. Ex. 1013, 4, 6–7 ("The relapse rate in some (but not all) patients is impressively decreased" while side effects are "mild").

Romine: in an 18-month, placebo-controlled, double-blind study on patients with RRMS, reported "significant favorable effect of cladribine on the joint frequency and severity of relapses" and "MRI-enhancing lesions were completely suppressed in the cladribine patients." Ex. 1031, 35 (subcutaneous injection of total 2.1 mg/kg over six months). Romine, thus, "conclude[d] that cladribine shows promise as a treatment for relapsing-remitting multiple sclerosis." Id. (noting, with the exception of "mild" infection in a few patients, "there were no side effects or adverse events").

Rice: in a multi-year, placebo-controlled clinical trial[30] of progressive MS patients, concluded that, although "[n]o significant treatment effects were found for cladribine in terms of changes in EDSS or SNRS scores[,] [b]oth doses [(0.7 mg/kg and 2.1 mg/kg)] of cladribine produced and sustained significant reductions in the presence, number, and volume of gadolinium-enhanced T1 brain lesions on MRI." Ex. 1018, 1145 (describing the drug as "generally safe and well tolerated"), 1153 ("MRI findings . . . were more compelling" (compared to the results for clinical efficacy as measured by EDSS/SNRS scores), noting "T1 lesions represent areas of breakdown of the blood-brain barrier and are generally believed to be sites of new inflammation that probably precede symptoms and other MRI signs in MS," and those "lesions were virtually eliminated by treatment with cladribine").

---

[30] Rice included a 12-month double-blind phase, which was followed by a long-term extension phase for some patients. Ex. 1018, 1146.

These preexisting studies reasonably demonstrate cladribine's safety and efficacy—at least comparable to what is reported in the '947 patent and encompassed by the patent's definition of "efficacy." The expectation of success need be only reasonable, not absolute. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). Moreover, the test for obviousness does not require "actual success" in the prior art. *See Endo Pharm. Inc. v. Actavis LLC*, 922 F.3d 1365, 1379 (Fed. Cir. 2019) (Stoll, J., dissenting) (citing *PAR Pharm. Inc. v. TWi Pharm., Inc.*, 773 F.3d 1186, 1198 (Fed. Cir. 2014)). But here, the art does report actually significant and positive results in the treatment of MS as discussed above, including fewer lesions and a reduction in relapses. *See* Pet. 44–45 (citing studies); Pet. Reply 13–14 (citing studies); Ex. 1084 ¶ 89 (testifying a POSA would have reasonably expected Bodor's oral cladribine tablets and regimen of administering them "to effectively suppress lymphocytes and treat MS by reducing relapse rates and/or brain lesions as detected by MRI"). Bodor fully incorporates-by-reference many preexisting MS cladribine studies, including those from Romine and Rice (summarized above) immediately before disclosing its 2-months on, 10-months off regimen. Ex. 1022, 22:27–23:6. Even if Bodor did not itself report clinical results of that regimen, we find a POSA would have reasonably expected success in treating MS patients with it (optimized to include a suitable maintenance dose and secondary cladribine-free period, as discussed above).

Patent Owner argues that Petitioner fails to establish a motivation for changing Bodor's "flat" cladribine-dosing method to a "weight-based" method. PO Resp. 35–36 (arguing no overlap between Bodor's "flat" dosing and the claims), 48–49 (citing Ex. 2051 ¶¶ 85–97, 132, 164–166). Patent Owner presumes that the claims exclude giving allegedly "flat" dosing of

between 100–140 mg to a range of patients (including those of average weight, e.g., 70 kg) that would otherwise result in mg/kg dose expression that overlaps with the claims. We reject this argument for reasons already explained above. *See supra* Section III.D.4.(b). Bodor's method need not be *changed* in the manner urged by Patent Owner.

Patent Owner argues that a POSA would not have been motivated to retreat MS patients after Bodor's 10-month cladribine-free period, or done so with a reasonable expectation of success. PO Resp. 53–55. According to Patent Owner, there was no general, cyclical immunosuppression framework and FDA-approved MS drugs were dosed continuously. *Id.* at 53–54. Patent Owner contends Petitioner is citing Stelmasiak's cyclical regimen in hindsight because, even with its retreatments, EDSS scores eventually returned to baseline. *Id.* at 54–55. And, PO argues, if retreatment was needed, a POSA could have looked at other available MS drugs. *Id.* at 55.

We reject this argument for reasons already explained above, including our crediting of Dr. Miller's testimony that it would be logical to retreat relapsing patients following Bodor's 10-month cladribine-free period, and in view of multiple studies that did retreat with cladribine (e.g., Rice, Romine, and Stelmasiak). Patent Owner contends that, as to Rice and Romine, the art did not teach repeated treatment absent a pharmacological rationale and patient need. *Id.* at 54 (citing Ex. 2051 ¶¶ 180–181). This does not undermine Petitioner's showing because, as already explained, Dr. Miller testifies that retreatment would have been considered appropriate for patients showing signs of continued need (e.g., disease worsening, relapses during or after the cladribine-free period). Ex. 1002 ¶¶ 51, 52, 91, 99–102. Petitioner's theory also does not suggest that retreatment would have occurred without concomitant considerations of safety (e.g.,

lymphocyte counts). Ex. 1084 ¶¶ 11, 69–72 (noting, e.g., mean lymphocyte counts in Rice had rebounded to a level above $1.0 \times 10^9$/L by the tenth month following the last cladribine dose). Regarding Stelmasiak, it at least *maintained* EDSS scores during its full two-year study—a positive result showing the disease did not worsen. *Id.* ¶¶ 52 ("EDSS scores at 24 months were the same as they were at baseline indicates a lack of overall disability worsening."), 94–95; Ex. 1061 (Lublin Tr.), 57:3–4 (admitting "[t]here also could be decreased worsening of the EDSS," and "if your agent slows that worsening, then that's a therapeutic effect").

Patent Owner argues that a POSA would not have been motivated to combine Bodor and Stelmasiak to arrive at the claimed induction or maintenance doses. PO Resp. 49–53, 55–57. According to Patent Owner, the bioavailability of Stelmasiak's oral cladribine/saline solution is higher than Bodor's tablets, so a POSA would not have been motivated to "start" with Bodor over Stelmasiak. *Id.* at 50–53 (arguing "Bodor lacks efficacy data for its dosing regimen"). Patent Owner also contends a POSA would have expected Bodor's lower induction dose (total dose (140 mg) with less bioavailability) would have been less effective than Stelmasiak's induction dose (300 mg) and unable to suppress lymphocytes to the same degree as Stelmasiak. *Id.*; *see also id.* at 55–57 (arguing that Stelmasiak's lower maintenance doses are given earlier (after a 2- or 5-month drug-free period), following Stelmasiak's higher induction dose compared to Bodor, and thus provide no reason to lower a maintenance dose in Bodor or wait ten months to give it).

We disagree with Patent Owner's argument. Even assuming Stelmasiak's formulation has a higher bioavailability (allegedly 50% versus about 39% in Bodor), there are other reasons for the POSA to have selected

Bodor's regimen. Ex. 2009, 61:13–18 (Miller agreeing the reported bioavailability for Bodor's 10 mg tablets is 39.1–39.4%). Bodor describes other desirable features with its tablets, including lower interpatient variability and patient convenience. Pet. 33–34; Ex. 1022, 2, 11–12. The premise of Patent Owner's argument—that the POSA needs to have chosen to start with Bodor over Stelmasiak—is also flawed. The law "does not require that a particular combination must be the preferred, or the most desirable." *Novartis Pharma. Corp. v. West-Ward Pharma Int'l Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019); *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. 2021) ("[It is] not necessary to show that a combination is the best option, only that it be a suitable option.") (internal quotation marks omitted). Bodor's induction dosing and duration need not be modified by Stelmasiak to arrive at the induction period as claimed. And adding a maintenance phase to Bodor is a logical extension of its disclosures, which would have been further obvious in view of cladribine retreatments already known in the art and routine optimization. Pet. Reply 22 (noting Petitioner cited Stelmasiak for suggesting a cyclical regimen, but "did not argue modifying Bodor's method to incorporate *Stelmasiak's* cladribine-free period and lower-dose maintenance periods").

Insofar as it concerns an expectation of efficacy with Bodor's regimen and Petitioner's reliance on Stelmasiak, we agree with Petitioner, "there is no fixed lymphocyte-reduction 'bright-line threshold'" that guarantees efficacy. Pet. Reply 22 (citing, e.g., Ex. 1084 ¶ 14 (testifying "lymphocytes do not need to be suppressed to below 1000 cells/µL to achieve a therapeutic effect—1000 cells/µL is merely exemplary")). Stelmasiak, for example, discloses that a "significant" improvement (i.e., reduction) in EDSS scores was seen within three months of the start of treatment when lymphocyte

counts were well above 1000/µL. Ex. 1013, 6; PO Resp. 52 (annotation to Stelmasiak's Figure 1 where, at three months, lymphocyte count was ~ 1350 cells/µL, and only about "150 mg" of cladribine was given at that stage).[31]

Moreover, the reasonable expectation of success is shown by the record as a whole (see discussion of Rice, Romine, Beutler, and Stelmasiak above); *see, e.g.*, Pet. Reply 26 ("Rice reported that cladribine doses similar to Bodor's suppressed lymphocytes to ≤ about 1000 cells/µL" and "reported lowered brain lesions and volumes")); Ex. 1084 ¶¶ 16, 92–93; Ex. 1080 ¶¶ 78–83.

Patent Owner also argues that Petitioner's routine optimization arguments should fail for an additional six reasons. We address below.

Patent Owner argues that Petitioner provides no reason to optimize a cladribine dose/duration based on a patient's lymphocyte count, which is not an "efficacy" measure. PO Resp. 37–41; Ex. 2009, 121:8–18 (Dr. Miller testifying "lymphocyte suppression is a measure of cladribine's treatment response," but "is not a measure of efficacy"); Ex. 2079, 42:5–14 (same). According to Patent Owner, "the art consistently shows that lymphocyte count is a metric of safety, not therapeutic efficacy for cladribine treatment." PO Resp. 40–41 (citing, e.g., Ex. 2051 ¶ 142; Ex. 1013, 5; Ex. 1014, 1717; Ex. 1018, 1146); PO Sur-reply 12–13.

---

[31] Stelmasiak's graph also reflects "average" lymphocyte counts across a group of patients, and Stelmasiak reports a mean reduction with a standard deviation that would suggest some patients were above 1000/µL and some below. Ex. 1013, 5 ("968±229"). Stelmasiak does not indicate that patients could be sorted into responders and non-responders based on whether lymphocyte counts were above or below 1000/µL. *Id.* at 7 ("We were unable to identify any factor that would differentiate between the 'responders' and the 'non-responders.'").

We are unpersuaded that this undermines Petitioner's challenge. As argued by Petitioner, "Merck wrongly posits routine-optimization must correlate with *therapeutic efficacy*, but the doctrine applies to *any* property known to be affected by the optimized variable." Pet. Reply 2, 26–27; *E.I. DuPont De Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1009 (Fed. Cir. 2018) ("[A] recognition in the prior art that a property is affected by the variable is sufficient to find the variable result-effective."). The evidence here shows a known correlation between, for example, cladribine dose and lymphocyte levels.[32] *See, e.g.*, Ex. 1018, 1152 (analysis showing cladribine treatment associated with "dose-dependent decreases" in lymphocytes); Ex. 1084 ¶¶ 12, 81, 82; Ex. 1061, 72:5–22 (Dr. Lublin admitting MS studies used lymphocyte counts to measure cladribine's pharmacological effect and that the count can vary in a dose-dependent manner). Thus, even if lymphocyte count was understood to be primarily a safety metric in prior studies, as argued by Patent Owner (*see, e.g.*, PO Resp. 39–40), it can be applied in a result-effective variable analysis. Pet. 40–43; Pet. Reply 26–27.

Patent Owner argues there is "no guidance" on threshold lymphocyte counts that would have been sufficient to show efficacy. PO Resp. 41–42 ("Stelmasiak's data shows that a reduction in lymphocyte counts does not

---

[32] At least Beutler also points to a dose-dependent relation to both efficacy and toxicity. Ex. 1014, 1716 ("Toxicity and therapeutic response were dose-related"), 1717–1720 (describing the higher dose's stabilization of disease as "quite durable" while the lower dose "provide[s] a larger margin of safety" but "appeared to be less durable than that observed at higher doses," and noting a "dosage-response relationship"); *see also id.* at 1717 (describing "peak improvement at [about] 8 mo after treatment initiation" in the lower dose regimen); Ex. 1018 (Rice), 1151 (noting "small dose-dependent, median percent decrease in T2 lesion volume").

correlate with cladribine efficacy."). Citing Stelmasiak, Patent Owner
contends that a POSA would have believed that Bodor's dosage would be
insufficient to reduce lymphocytes below 1000 cells/μL or produce any
efficacy. *Id.* (citing Ex. 2051 ¶¶ 149–150); PO Sur-reply 14.

Patent Owner's argument does not undercut the asserted routine
optimization on this record. What is routine in prior MS clinical studies
with cladribine is that lymphocyte counts were tracked over time while
therapeutic efficacy (e.g., relapse rate, brain lesions, EDSS scores, etc.) is
monitored concurrently. *See, e.g.*, Ex. 1013; Ex. 1016; Ex. 1018; Ex. 1031;
Pet. 42 (arguing this approach was "standard practice in the field"). Rice,
for example, reported effects on lymphocyte levels at similar doses to
Bodor's, and reported that "lesions were virtually eliminated by treatment
with cladribine." Ex. 1018, 1153; Ex. 1080 ¶¶ 81–82 (showing relation
between Bodor and Rice dosing); Ex. 1002 ¶¶ 47, 91; Ex. 1084 ¶ 16 ("A
POSA would have thus expected to achieve a[t] least similar results with
Bodor's cumulative dose."). Patent Owner cites a paper by Dr. Miller where
he allegedly "disparaged" Rice's lack of treatment promise, and noted "an
enigmatic dissociation between positive effects on MRI and unconvincing
clinical benefit." PO Resp. 40 (citing Ex. 2004, 341, 350; Ex. 2009, 21:13–
23:1). It is true that Rice did not observe a "clinical" benefit (i.e., improved
EDSS scores) in its study with the more difficult-to-treat progressive MS
patients, but Rice undisputedly did observe decreased lesions across all
doses. Ex. 1061, 61:7–10 ("Progressive MS is more difficult to treat . . .
[t]han relapsing-remitting MS"). Claim 36 encompasses treating any form
of MS (including RRMS) and, even if efficacy is required, fewer lesions
would suffice. Ex. 1001, 5:54–59. Dr. Miller testifies persuasively that

reduced lesions would have been reasonably expected with Bodor's regimen. Ex. 1084 ¶ 16.

Patent Owner contends that, even if lymphocyte count were a measure of efficacy, Petitioner's theory about adjusting the "daily dose" of cladribine is flawed because lymphocytes were not measured "daily" and "daily lymphocyte count" would not provide meaningful information. PO Resp. 43–44 (citing, e.g., Ex. 1014, 1717 (describing evaluation of lymphocyte count on a "monthly" basis)).

This argument is unpersuasive. Patent Owner misconstrues Petitioner's position, which was simply using "daily dose" in the same way it is used in the '947 patent. Ex. 1001, 4:18–21 (disclosing that the total dose is determined by adding the daily doses), 20:17–22. In other words, Petitioner is referring to the dose that's administered daily, not changing the dose on a daily basis or measuring lymphocytes each day. Pet. 42 (explaining that modifying the daily dose would allow for fine-tuning the "total dose" and length of administration); Ex. 1002 ¶ 93. So, for example, Bodor's dose (10 mg tablets given 5–7 days each month) could be increased or decreased, producing an overall higher or lower total dose in the induction or maintenance periods and lymphocytes could be monitored at a periodicity routine in the art (e.g., monthly).

Patent Owner argues that Petitioner identifies no recognizable result associated with cladribine's "therapeutic effect." PO Resp. 44 (arguing lymphocyte suppression is not an "efficacy" measure). According to Patent Owner, Rice would not have led a POSA to expect success through optimization based on lymphocyte counts or MRI results. *Id.*; PO Sur-reply 2, 5 (suggesting that "coherence" across multiple outcome measures, not just MRI lesion results, is needed to confirm treatment efficacy), 14–15 (arguing

no reasonable expectation of success via optimization and that MRI outcomes do not necessarily demonstrate a treatment effect).

As we determined above, however, even if lymphocyte count is a measure of patients' level of immunosuppression and primarily a safety consideration, it can still be the "result" in a result-effective variable analysis, given that it was recognized that cladribine dose and duration are correlated with lymphocyte count. Also, inasmuch as Rice's MS treatment regimen includes a similar induction period dose and duration[33] compared to Bodor's, we agree with Dr. Miller that a POSA would have reasonably expected Bodor's regimen to reduce brain lesions—as expressly reported by Rice. Ex. 1084 ¶ 16; Ex. 1002 ¶¶ 47–49, 91.

The notion that the POSA would not have wanted to decrease lesions in the MS patient's brain or considered the same an "efficacy" measure is refuted by the patent itself and inconsistent with other evidence of record. Ex. 1001, 2:56–58 (describing Rice's results as "positive on the significant reduction on MRI-measured brain lesions"), 3:22–26 (describing, as "background" and after noting prior studies by Rice and others, that "it would be desirable to have a method for treating [MS] comprising the oral administration of Cladribine that would permit the same or improved effect on MS lesions while decreasing the occurrence and/or severity [of] adverse events"); Ex. 1061, 61:11–62:5 (testifying MRI results (reduction in number

---

[33] Rice's low-dose arm includes two courses of cladribine (0.07 mg/kg/day for five consecutive days each month (i.e., over 2-months), for a total dose of 0.7 mg/kg, which was followed by a cladribine-free period. Ex. 1018, 1146. As Dr. Pinal explains, Bodor's 1.4–2.0 mg/kg dosing, when corrected for bioavailability of Bodor's tablets (40%) is 0.6–0.8 mg/kg and, thus, is very similar to Rice's subcutaneous dose of 0.7 mg/kg. Ex. 1080 ¶¶ 81–82.

of new lesions over time) provides "proof-of-principle" for MS treatments);
*see also* Ex. 1018, 1145 ("In patients with RRMS and SPMS, there is a
correlation between the frequency and extent of lesion enhancement and
short-term disease activity."); Ex. 1014, 1720 ("The usefulness of MRI as a
measure of clinical activity and potentially as an objective means for
assessing response to therapy has recently been documented.").

Patent Owner contends that Petitioner's reliance on Rice for the points
noted above is new and untimely. PO Sur-reply 18–21. We disagree. The
Petition relied on Rice (along with Romine, Beutler, etc.) throughout as
informing the POSA's background knowledge, even if it was not expressly
asserted in combination with Bodor. *See, e.g.*, Pet. 2, 7, 15–17, 20–21, 26,
36, 41–42. We also find that Petitioner's reliance on Rice in the Reply is
fairly responsive to arguments raised by Patent Owner during trial, including
that Dr. Miller allegedly disparaged Rice's MRI and other results and that
Rice does not connect lymphocyte counts to efficacy or support a reasonable
expectation of success. *See, e.g.*, PO Resp. 40–41, 44.[34]

---

[34] Patent Owner also contends Petitioner has pivoted away from the
significance of lymphocytes as a purported sign of "efficacy" and that, at
institution, the Board understood lymphocyte count was *the* measure of
"efficacy." *See, e.g.*, PO Sur-reply 12 (characterizing as a "revised theory").
This argument overstates the Board's preliminary decision. There we
explained, for example, that it did not appear a bright-line lymphocyte level
was necessary for a therapeutic effect (e.g., EDSS score reduction) to be
seen. *See, e.g.*, Inst. Dec. 47–48 (citing, e.g., MRI and EDSS scores as
distinct from lymphocyte counts), 49 (noting reports of "efficacy" in the
literature, including Stelmasiak, Rice, and Romine, and citing lesion
reduction and the patent's broad definition of "efficacy" (n.22)). We
recognize, however, that some of the language used in our earlier decision
(and the Petition as well (e.g., Pet. 42 (suggesting measuring efficacy "based
on" changes in lymphocyte counts)) could have been more precise.

Patent Owner contends that MS is complex and involves slowly evolving disability, so it would require years to evaluate changes to a dosing regimen and corresponding "treatment benefits" and "clinical outcomes." PO Resp. 44–45. According to Patent Owner, even Dr. Miller admitted that clinical trials in even a few patients can take months to years to complete. *Id.* (citing Ex. 2009, 114:17–116:16). Thus, Patent Owner argues, routine optimization is precluded. *Id.*

The issue, however, is not whether any optimization of Bodor's dosing regimen could be completed rapidly, but whether it would have been done routinely through normal experimentation expected by skilled artisans in the field. The prior art evidences that POSAs would consider changes to dosing amount and duration as routine in this very field. *See, e.g.*, Ex. 1026, 5:20–25 (disclosing that "one can tailor the dosage and duration" of cladribine as needed for the patient being treated and MS stage); Ex. 1022, 24:1–9 (describing "fine tuning" of cladribine amounts and that "[t]herapeutically effective amounts may be easily determined," by starting lower and increasing in stepwise increments while evaluating beneficial effects). Moreover, as Petitioner explains, cladribine-dosing adjustments do not require years of clinical assessment. Pet. Reply 28; Ex. 1084 ¶ 84 (testifying "relapse rates and lesions can be assessed in as little as 6 to 12 months"). MRIs can show a treatment response within six months, changes in lymphocyte levels can be seen within a few months, and relapse rates are measured over a one-year period. *See, e.g.*, Ex. 1031, 40, Fig. 6; Ex. 1013, Fig. 1; Ex. 1061, 38:6–12 (Dr. Lublin admitting that relapse rates are measured by counting the number of relapses and dividing by time ("[t]ypically one year")).

Lastly, Patent Owner contends that there were "numerous possible combinations" for potential optimization. PO Resp. 45–48 (arguing Petitioner's position is tantamount to throwing metaphorical darts at a dartboard). But Patent Owner's contention elides the guidance already provided in the art, including Bodor's MS treatment regimen using 10 mg cladribine tablets in a 2-months on/10-months off sequence, the logic of using Bodor's induction dose/duration as a starting point for optimization in a maintenance phase, the undisputed inclusion of cladribine-free periods after dosing periods for safety reasons (as routinely seen in the art), and the positive results described in preexisting human clinical studies (decreased lesions, reduced relapses rates, improved clinical (e.g., EDSS) scores). Ex. 1002 ¶¶ 33–52; Ex. 1084 ¶¶ 51–52, 106, 122.

For all the reasons noted above, we find that Petitioner has proved by a preponderance of the evidence that a POSA would have been motivated to combine the teachings of Bodor and Stelmasiak to arrive at the subject matter of claim 36 and done so with a reasonable expectation of success.

*d) Objective Indicia of Nonobviousness*

Patent Owner argues that evidence of alleged skepticism, unexpected results, and a long-felt but unmet need are objective indicia that supports a determination that the claims are nonobvious. PO Resp. 58–65.

Objective indicia of nonobviousness are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). "The patentee bears the burden of showing that a nexus exists." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999).

Patent Owner does not assert that it is entitled to a presumption of nexus. Instead, Patent Owner argues that its evidence of alleged skepticism, etc., "bear[s] a direct nexus to the claimed invention" because "the evidence is the 'direct result of the unique characteristics of the claimed invention.'" PO Resp. 63–64 (quoting *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–74 (Fed. Cir. 2019) (explaining that, even if a presumption of nexus is inappropriate, the patentee may still prove nexus by showing that the evidence of secondary considerations is the direct result of the unique characteristics of the claimed invention). Patent Owner contends that it has shown a nexus between its evidence and at least claims 36 and 39—claims that Patent Owner contends encompass the FDA-approved method for administering MAVENCLAD and the method of cladribine administration studied in the CLARITY trial. *Id.* at 64–65 (citing, e.g., Ex. 2033 (CLARITY), 425–426; Ex. 2035 (CLARITY Extension), 1594, 1599, 1603).

We discuss nexus issues below as necessary when addressing the parties' arguments about the alleged skepticism, unexpected results, and long-felt, unmet need.

Patent Owner contends that, after reviewing the CLARITY study, the FDA "raised concerns over higher cancer risks associated with Mavenclad®." PO Resp. 59–60 (citing Ex. 2038, 1);[35] PO Sur-reply 23–24 (citing, e.g., Ex. 2079, 136:8–13 (agreeing regulators raised safety concerns about malignancies)). From this, Patent Owner contends "FDA's skepticism provides further evidence that the claimed dosing regimen was nonobvious." PO Resp. 59–60.

---

[35] Patent Owner also cites Exhibit 2039 in support of this argument, but there is no exhibit with that number submitted in this record.

Regardless of any nexus, Petitioner contends that Exhibit 2038 does not evidence skepticism. Pet. Reply 30 (citing Ex. 1084 ¶¶ 19, 99–100, 114–116). According to Petitioner, Patent Owner's evidence merely reflects the FDA's request for more information after reviewing the CLARITY study results to better understand the "safety risks and overall benefit-risk profile." *Id.* (quoting Ex. 2038, 1).

We find that Exhibit 2038 does not evidence skepticism that supports a determination of nonobviousness. Nothing in Exhibit 2038 reveals any skepticism about cladribine's "effectiveness" in treating MS, which the FDA concluded was shown through "substantial evidence" in the CLARITY study. Ex. 2038, 1. To the extent the FDA sought further information about safety, including any concerns over possible cancers, this was simply the agency attending to its normal duties. *Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013) (explaining that the FDA's request for clinical safety and efficacy data "reflects attention to the FDA's normal duties," not skepticism). Moreover, the FDA was, in all likelihood, merely responding to the data provided to the agency in relation to the CLARITY trial, which trial did report "neoplasms (including those that were found to be benign, malignant, or unspecified)" in about 1 % of patients. Ex. 2051 ¶ 228 (quoting Ex. 2033, 424). To the extent the data raised questions on the FDA's part, there is no evidence here to suggest such questions were unfounded at that time—the FDA just requested more information to appropriately weigh the risks versus the benefits.[36]

---

[36] Not only did the CLARITY study include reports of neoplasms in a few patients, the MAVENCLAD label states that treatment "may increase the risk of malignancy." Ex. 2001, 8 (citing clinical studies showing increased incidence of malignancy in treated patients versus placebo). The fact that

Patent Owner also argues that certain writings of Dr. Miller and others evidence industry skepticism. PO Resp. 58–59 (Ex. 2051 ¶¶ 195–198). Patent Owner cites a book chapter co-authored by Dr. Miller in 2000, discussing recently-completed cladribine trials and writing "[a] trial of cladribine failed to show benefit in progressive disease." *Id.* (citing Ex. 2005, 45, 67). Patent Owner also cites a 2008 review co-authored by Dr. Miller, referencing earlier studies and suggesting "it seems prudent to await the results of a prospective, randomized, blinded trial of oral cladribine before recommending its use in patients with MS." *Id.* (citing Ex. 2004, 341). Lastly, Patent Owner cites a 2005 book chapter from another specialist in this field, Dr. Noseworthy, stating: "We remain to be convinced that cladribine is useful, and do not recommend its use in the management of patients with multiple sclerosis." *Id.* (citing Ex. 2031, 753); PO Sur-reply 24–25 (arguing the authors questioned cladribine's safety and efficacy).

We find that these writings are entitled to minimal weight as evidence of skepticism. The nexus showing as to these writings is weak. The writings are principally focused on the treatment of progressive MS, yet the claims recite treating any form of MS and, thus, encompass the respectively easier-to-treat relapsing remitting form (RRMS).[37] Ex. 1061, 61:1–10, 123:6–13 (testifying Exhibit 2005 does not cite RRMS studies). Dr. Miller

the FDA may have initially flagged an increased cancer risk was not, therefore, without apparent basis and Patent Owner has not shown that its FDA-approved method avoids all such risks.

[37] Exhibit 2031 references a paper by Grieb, but it appears to be a different publication by Grieb than discussed above and, thus, it is not apparent that it relates to RRMS. *Compare* Ex. 2031, 753, 855, *with* Ex. 1001, 3:2–6. Romine, cited in Exhibit 2031, studied RRMS patients. Ex. 2031, 753.

testified that he commented only on progressive MS in Exhibits 2004 and 2005. Ex. 1084 ¶¶ 103–106 ("I expressed no skepticism about cladribine's efficacy in treating RRMS" and "a POSA would have understood cladribine to have efficacy in treating RRMS, as demonstrated by Stelmasiak and Romine"). The claims also require no specific efficacy endpoint and, even if they did, the patent defines efficacy broadly as discussed above to include, for example, *any* of the following: improved EDSS scores, reduced relapse rates, or fewer lesions. *See supra* Section III.D.4.(c). Even if Drs. Miller and Noseworthy were not yet prepared at the time of those writings to recommend cladribine's use in their patients in actual clinical practice, they expressed no skepticism about cladribine's ability to, for example, reduce the number of MRI-detected brain lesions. To the contrary, Dr. Noseworthy expressly noted the reduced lesions reported in cladribine-treated patients in both Romine and Rice. Ex. 2031, 753; *see also* Ex. 2004, 341, 350 (Miller citing the "statistically significant" reduction in lesion "number and volume" per Rice's data).

Patent Owner argues that MAVENCLAD, as illustrated by the results of the CLARITY studies, provides unexpected results. PO Resp. 60–63. More specifically, Patent Owner contends the CLARITY trials showed that giving a total dose of 3.5 or 5.25 mg/kg over two years, followed by two years of placebo, resulted in "*durable* clinical efficacy" comparable to continuing the dosing regimen over a four-year period, but with an improved safety profile. *Id.* at 60–61 (arguing that the extension phase of the study showed that the benefits of the two-year regimen were "*maintained*" in many patients who remained free from relapses or sustained disability progression. *Id.* (citing Ex. 2035, 1594, 1603; Ex. 2042, 3; Ex. 2051 ¶ 205).

Patent Owner also cites the follow-on "CLASSIC-MS study, finding 'sustained long-term mobility and disability benefits of cladribine tablets' during the median *10.9 years'* follow-up period." *Id.* at 61 (quoting Ex. 2036, 719). Thus, Patent Owner argues, the CLARITY and follow-up trials showed that the dosing method provides not only significantly reduced relapse rates, risk of disability progression, and MRI measures but also "unexpected durability" provided by a shorter-duration (two-year) dosing regimen that is more convenient for patients, especially compared to other approved MS drugs requiring continuous dosing. *Id.* at 62–63 (citing Ex. 2035, 1603; Ex. 2042, 4 (interview of clinical neurologist, stating "[t]hat convenience for them is really, really big").[38] Patent Owner also cites a paper hypothesizing that cladribine is an "immune reconstitution therapy," where reconstituted lymphocytes might become less autoreactive to CNS tissues, potentially explaining the prolonged efficacy beyond the first two treatment years. PO Resp. 62–63 (citing Ex. 2032, 1923); PO Sur-reply 25–26.

Petitioner responds that Patent Owner's nexus showing is flawed concerning the alleged unexpected results. Pet. Reply 31–32. According to Petitioner, MAVENCLAD "treats *RRMS* patients for *2 years* with cladribine *tablets*" but "the claims are broader, encompassing *any* type of MS, *any oral* cladribine dosage form, and *any regimen of ≥ 2 years*." *Id.* (citing Ex. 1084 ¶¶ 124–125; Ex. 1061, 143:13–16). Petitioner contends the evidence also does not show unexpectedly superior results because Patent Owner did not compare its results with the closest prior art—Bodor. *Id.* at

---

[38] Patent Owner also cites Exhibit 2023 in support of this argument, but there is no exhibit with that number of record.

31. And, Petitioner contends that the asserted "durable" result is not unique to Patent Owner's method compared to the prior art methods and, instead, is just inherent to cladribine. Pet. 32 (citing Ex. 1084 ¶¶ 113, 126, 130).

We give moderate weight to Patent Owner's evidence of unexpected results. As to nexus, the claims are not coextensive with the MAVENCLAD or CLARITY method for the reasons given by Petitioner, but Patent Owner persuades us they are reasonably commensurate. PO Sur-reply 26–27 (citing *Rambus, Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013); *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (explaining that an applicant need not test every embodiment within the scope of the claims to show unexpected results). Dr. Lublin provides detailed claim charts showing the correspondence between MAVENCLAD/CLARITY and claims 36 and 39, which evidence Petitioner does not rebut beyond arguing that the claims are broader. Ex. 2051 ¶¶ 223–226 (opining, also, that MAVENCLAD's safety and durable efficacy is tied to the unique features of the claims, particularly the 3.5 mg/kg cumulative two-year dosing regimen).

The weight given to Patent Owner's unexpected-results evidence is, however, discounted somewhat because, as Petitioner argues, Patent Owner provides no comparison against the Bodor regimen, which we agree is the closest prior art. *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 970 (Fed. Cir. 2006) (explaining, "when unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art"). As we explained above, Bodor's regimen using 10 mg cladribine tablets for oral administration materially overlaps with claim 36 (and claim 39, as well) in at least the induction period's dosage and

duration, and the 10-month cladribine-free period.[39]  Neither Stelmasiak nor Romine, for example, is closer than Bodor to the claims.  Petitioner has, nevertheless, argued that Rice's induction dosage/duration is similar to Bodor's, yet Rice did not report favorable results to the same extent as seen in the CLARITY trials (e.g., Rice did not see significant improvement in EDSS scores, much less report durability lasting beyond 10 years in some patients as argued by Patent Owner).[40]  *Compare* Ex. 1018, 1152–1153, *with* Ex. 1033, 420–423; Ex. 2035, 1594.  Inasmuch as Rice's results are cited by Petitioner as informing effects that would have been expected with Bodor's regimen, we are unpersuaded on this record that the long-term durability cited by Patent Owner would have been expected.  *C.f.* Ex. 1031 (Romine), 43 (citing "an estimate based on observations of cladribine in chronic progressive MS . . . would indicate that beneficial effect should eventually decline and would not be expected to last much beyond 2 years").[41]

---

[39] At the hearing, Patent Owner also was unable to identify any data or other evidence showing criticality relative to the dosages or durations recited in the claims.  Tr. 77:14–78:16 (arguing generally that the "inventors found a sweet spot").

[40] This is, however, an imperfect comparison because Rice's patients had the more difficult-to-treat progressive form of MS, as discussed above, whereas CLARITY tested patients with relapsing MS (RRMS).  Ex. 2033, 416; Ex. 2035, 1594.

[41] Petitioner's contention that long-term durability may simply arise from an inherent property or mechanism of cladribine's use is not decisive here because, as explained by the Federal Circuit, "[w]hat is important regarding properties that may be inherent, but unknown, is whether they are unexpected."  *Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. de C.V.*, 865 F.3d 1348, 1354 (Fed. Cir. 2017).

Lastly, Patent Owner argues that MAVENCLAD satisfies a long-felt
and unmet need. PO Resp. 63. According to Patent Owner, MAVENCLAD
offers MS patients a more convenient dosing regimen that requires a
relatively short-term (2 year) commitment with the possibility of offering
long-lasting relief. *Id.* (citing Ex. 2042, 1, 4; Ex. 2051 ¶¶ 209–216)
(testifying that there was a long-felt need for a safe, effective, and
convenient oral therapy for MS, compared to less convenient approved
options requiring continuous injections).

Petitioner raises the same nexus counterargument as discussed above
for the asserted unexpected results, and argues that Patent Owner's long-felt,
unmet need contentions fail because Patent Owner relies on "irrelevant ***post-
filing*** evidence." Pet. Reply 31 (citing Ex. 1084 ¶¶ 128–133).

We give moderate weight to Patent Owner's long-felt, unmet-need
evidence. The evidence is reasonably commensurate in scope with
claims 36 and 39 as noted above related to the asserted unexpected results.
Petitioner criticizes Patent Owner's reliance on "post-filing" evidence, yet
does not persuasively rebut Dr. Lublin's testimony to the effect that patients
wanted a more convenient and less-frequent regimen for treating MS.
Ex. 2051 ¶¶ 209–216. If nothing else, a desire for taking a drug
intermittently and orally versus more frequent injections seems like common
sense, whether today or in 2004, and the '947 patent suggests a desire for
methods of treating MS involving the oral administration of cladribine.
Ex. 1001, 3:22–30; *see also* Ex. 1022, 2:11–13 (disclosing oral forms
enhance compliance and decrease the discomfort of injections). The
evidence is discounted somewhat because more convenient oral forms of
cladribine were already known in the art for use in treating MS patients,
using intermittent dosing schedules, and had undergone clinical studies in

MS patients where favorable results and only "mild" side effects were reported. *See, e.g.*, Ex. 1013, 4, 7; Ex. 1022, 22–23; Ex. 1026, Abstr., 10:47–60; *In re Kao*, 639 F.3d at 1068 (explaining that objective indicia of nonobviousness must be tied to "*novel*" elements of the claim to be afforded substantial weight) (citations omitted). Moreover, even if MAVENCLAD is more convenient, Patent Owner cites no persuasive evidence to show that other approved DMTs that were available in 2004 did not already provide safe and efficacious treatments for MS.

Altogether, although we afford some weight to Patent Owner's evidence of objective indicia as discussed above, we do not find that evidence especially strong. Considering Petitioner's strong showing that Bodor's regimen teaches claim 36's steps (i) and (ii), with overlapping cladribine dosages and treatment durations, the suggestion and logic of adding a retreatment phase to Bodor's regimen given MS's chronic nature and the knowledge of cladribine retreatments in the art following cladribine-free periods, the art's teaching to "tailor" (i.e., optimize) the dose/duration according to the patients' needs, and the reporting of positive results in earlier clinical trials (e.g., reduced MS lesions, which qualifies as treatment "efficacy" per the patent), the record leans in Petitioner's favor. *Pfizer*, 480 F.3d at 1372 ("Although secondary considerations must be taken into account, they do not necessarily control the obviousness conclusion.").

### 5. *Dependent claims*

Petitioner contends that claims 38, 39, and 41–46 would also have been obvious over Bodor and Stelmasiak. Pet. 55–60. Petitioner persuades us the challenged dependent claims would have been obvious for the reasons discussed above for independent claim 36, and the further reasons given by Petitioner and Dr. Miller concerning the dependent claims, which reasons

are supported by the preponderance of the evidence of record and we adopt that reasoning as our own unless otherwise noted. *Id.*; Ex. 1002 ¶¶ 120–139; Ex. 1084 ¶¶ 97–98.

Patent Owner raises no separate argument for any of the dependent claims except for claim 39, which narrows claim 36's induction period total dose from "about 1.7 mg/kg to about 3.5 mg/kg" to "about 1.7 mg/kg." PO Resp. 57–58 (arguing that Stelmasiak disclosed use of a different dosage amounts in the induction and maintenance periods) (citing Ex. 2051 ¶¶ 189–192).

We disagree with Petitioner's contentions that the claims require an induction period dose that is higher than the maintenance period dose, as we discussed above. *See supra* Section III.C. The doses can be the same (both "about 1.7 mg/kg") as argued by Patent Owner. *Id.* And, as also discussed above, Bodor's induction dose/duration for an average weight MS patient is 1.4–2.0 mg/kg over two months, which overlaps with claim 36's range and encompasses claim 39's induction dose of about 1.7 mg/kg. *Supra* Section III.D.4.(b)-(c). We credit Dr. Miller's testimony that it would have been logical and obvious to use Bodor's induction period dose/duration as a starting point for optimization as necessary in the maintenance phase. *Id.* Patent Owner cites no evidence of criticality to the recited induction or maintenance dosage and duration and, for the reasons already discussed above, we conclude that claim 39 would have been obvious as well.

### 6.    *Conclusion*

Up considering the totality of the argument and evidence of record, and for the reasons explained above, we determine that Petitioner has proved by a preponderance of the evidence that claims 36, 38, 39, and 41–46 are unpatentable for obviousness.

## IV.   MOTIONS

Four motions to seal remain pending (Papers 19, 42, 54, and 55). Patent Owner moves to seal Exhibits 2048, 2049, and 2050 as including alleged research, development, and commercial information that Patent Owner maintains is confidential, and further requests entry of the Board's Default Protective Order.  Paper 19, 4–7.  Petitioner moves to seal its Reply and Exhibits 1059, 1060, 1063, 1080, and 1084 as including information that Merck considers confidential.  *See, e.g.*, Paper 42, 3–4.  Petitioner and Patent Owner move to seal their demonstratives.  Paper 54, 3–4 (noting, e.g., the demonstratives relate, at least in part, to Exhibits 2048–2050); Paper 55, 2–8 (explaining that the demonstratives include excerpts from, for example, Exhibits 1063, 2049, and 2050).  None of the motions is opposed.

The Board recognizes "a strong public policy for making all information filed in a quasi-judicial administrative proceeding open to the public, especially in an *inter partes* review which determines the patentability of claims in an issued patent and therefore affects the rights of the public."  *Garmin Int'l v. Cuozzo Speed Tech., LLC*, IPR2012-00001, Paper 34, 1–2 (PTAB Mar. 14, 2013).  Except as otherwise ordered by the Board, the record of an *inter partes* review shall be made available to the public.  35 U.S.C. § 316(a)(1); 37 C.F.R. § 42.14.

The standard for granting a motion to seal is "for good cause."  37 C.F.R. §§ 42.20(c), 42.54(a).  In determining whether good cause has been shown, the Board considers, among other things, whether the information sought to be sealed is truly confidential and whether the expressed interest in maintaining confidentiality outweighs the strong public interest in an open record.  *Argentum Pharm. LLC v. Alcon Rsch., Ltd.*, IPR2017-01053, Paper 27 at 2–3 (PTAB Jan. 19, 2018) (informative).

We grant Patent Owner's unopposed Motion to Seal Exhibits 2048, 2049, and 2050, and enter the Board's Default Protective Order. Patent Owner persuades us that Exhibits 2048, 2049, and 2050, include confidential research and development information.

Paper 42, Petitioner's Motion to Seal its Reply and Exhibits 1059, 1060, 1063, 1080, and 1084 is denied. Petitioner must provide minimally-redacted, public versions of its Reply and the exhibits in question (it appears that the only redacted version submitted by Petitioner is for Exhibit 1059, but the motion is denied in full to avoid piecemeal resolution). This denial is without prejudice and Petitioner may refile its motion within twenty days. If refiled, the aforementioned redacted version of the Reply and exhibits will be filed at the same time.

We grant the parties' motions (Papers 54 and 55) to seal their respective demonstratives. Although the parties did not provide redacted versions of their demonstratives, demonstratives are not evidence. Nor are the demonstratives substantively relied on herein and, thus, the absence of redacted versions does not impede the public's interest in an open and understandable record.

## V.   OBJECTIONS

Patent Owner also filed objections to a handful of Petitioner's demonstrative slides. Paper 57 (objecting to slides 41–44 and 47 in Petitioner's Demonstratives (Ex. 1092)). Patent Owner's objection is that those slides include "new argument" outside the trial record. *Id.* at 2–3.

Patent Owner's objections are overruled. Slide 41 quotes Federal Circuit precedents, with which the Board is already familiar. Slides 42 through 44 include appropriate cites to where the evidence/argument cited therein was raised in prior papers and evidence, illustrating a comparison

between what was argued throughout trial; and, to the extent Petitioner's headings constitute minimal attorney argument, they only generically relay that Petitioner disagrees with Patent Owner's Sur-reply characterizing Petitioner's argument as being "new." We similarly overrule the objection to slide 47. Although slide 47's chart includes more citations than a similar chart on page 4 of the Reply, Petitioner did rely on the other cited portions of Bodor in its papers, and the added citations are generally consistent with the argument raised by Petitioner in its analysis of whether Bodor is "by another." Pet. Reply 3–10 (arguing, e.g., that the named inventors on Bodor invented the solid cladribine dosage forms, and also described cladribine as useful for treating MS).

## VI.  CONCLUSION[42]

On this record, Petitioner has shown by a preponderance of the evidence that the challenged claims are unpatentable based on the ground advanced in the Petition.

In summary:

---

[42] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 36, 38, 39, 41–46 | 103 | Bodor, Stelmasiak | 36, 38, 39, 41–46 | |

## VII.   ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has proved by a preponderance of the evidence that claims 36, 38, 39, and 41–46 are unpatentable;

FURTHER ORDERED that the Parties' Motions to Seal (Papers 19, 54, and 55) are *Granted* as provided above;

FURTHER ORDERED that Petitioner's Motion to Seal (Paper 42) is *Denied* without prejudice as provided above;

FURTHER ORDERED that the Board's Default Protective Order is entered and controls access to confidential information in this matter;

FURTHER ORDERED that within ten (10) business days, the parties will jointly provide a minimally redacted version of this decision that is available to the public; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Eldora L. Ellison
Olga A. Partington
Chandrika Vira
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
eellison-ptab@sternekessler.com
opartington-ptab@sternekessler.com
cvira-ptab@sternekessler.com


FOR PATENT OWNER:

Emily R. Whelan
Deric Geng
Cindy Kan
WILMER CUTLER PICKERING HALE AND DORR LLP
emily.whelan@wilmerhale.com
deric.geng@wilmerhale.com
cindy.kan@wilmerhale.com

Trials@uspto.gov
571-272-7822

Paper 62
Date: September 18, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

HOPEWELL PHARMA VENTURES, INC.,
Petitioner,

v.

MERCK SERONO S.A.,
Patent Owner.

IPR2023-00481
Patent 8,377,903 B2

Before ZHENYU YANG, ROBERT A. POLLOCK, and
TIMOTHY G. MAJORS, *Administrative Patent Judges.*

MAJORS, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Granting Parties' Motions to Seal (Papers 19, 54, 55)
Denying without Prejudice Petitioner's Motion to Seal (Paper 42)
*37 C.F.R. § 42.14*

## I.     INTRODUCTION

Hopewell Pharma Ventures, Inc. ("Petitioner" or "Hopewell") filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 17, 19, 20, and 22–27 of U.S. Patent No. 8,377,903 B2 (Ex. 1001, "the '903 patent"). Pet. 1, 33.

We instituted trial on September 22, 2023.  Paper 10 ("Inst. Dec."). During trial, Merck Serono S.A. ("Patent Owner" or "Merck") filed a Patent Owner Response.  Paper 20 ("PO Resp.").  Petitioner filed a Reply (Paper 41 ("Pet. Reply")) and Patent Owner filed a Sur-reply (Paper 51 ("PO Sur-reply")).  An oral hearing was held on June 25, 2024, and a transcript is of record.  Paper 61 ("Tr.").  With authorization, Petitioner and Patent Owner also filed post-hearing supplemental briefs providing further argument about the asserted prior-art status of a reference asserted herein.  Paper 59 (PO Suppl. Br.); Paper 60 (Pet. Suppl. Br.).

Unopposed motions to seal also remain pending (Papers 19, 42, 54, and 55).  We resolve those motions as set forth in Section IV below.

We have jurisdiction under 35 U.S.C. § 6(b).  After considering the full record developed through trial, we determine that Petitioner has proved by a preponderance of the evidence that the challenged claims are unpatentable.  *See* 35 U.S.C. § 316(e).  Our reasoning is explained below, and we issue this Final Written Decision under 35 U.S.C. § 318(a).

## II.     BACKGROUND

### A.     *Real Parties-in-Interest*

Petitioner identifies itself and the following entities as real parties-in-interest: Hopewell Pharma Ventures LLC; Levy SPV, LLC; GLS Capital Partners Fund I, LP; GLS Capital Partners GP, LLC; and GLS Capital, LLC.

Pet. 69–70.  Merck identifies itself along with Merck KGaA and Ares
Trading SA as the real parties-in-interest.  Paper 3, 1.

### B.    Related Matters

The parties identify the following lawsuits involving assertions of the
'903 patent: *Merck KGaA et al. v. Accord Healthcare, Inc. et al.*, 1-22-cv-
00974 (D. Del.); *Merck KGaA et al. v. Hopewell Pharma Ventures, Inc.*, 1-
22-cv-01365 (D. Del); *Merck KGaA et al v. Aurobindo Pharma USA, Inc. et
al.*, 1-23-cv-00039 (D. Del.).  Pet. 70; Paper 3, 1.

The parties also identify other related matters before the Board.
Pet. 70–71; Paper 3, 1–2.  We instituted trial in IPR2023-00480, which
matter was filed by Petitioner and challenges U.S. Patent No. 7,713,947 B2
("the '947 patent"), and we enter a final written decision in IPR2023-00480
concurrent with this Decision.  Additionally, the parties identify IPR2023-
00049 and IPR2023-00050, which were filed by a different petitioner (TWi
Pharmaceuticals, Inc. ("TWi")), challenging the '947 and '903 patents.[1]  *Id.*

### C.    The '903 Patent & Technology Background

The '903 patent, titled "Cladribine Regimen for Treating Multiple
Sclerosis," issued on February 19, 2013.  Ex. 1001, codes (45), (54).  The
application that matured into the '903 patent was filed April 23, 2010, and
claims the priority benefit of a non-provisional application that issued as the

---

[1] The Board initially denied institution on the TWi-filed petitions, but
granted institution on rehearing.  IPR2023-00049, Papers 10 and 15;
IPR2023-00050, Papers 8 and 13.  Those proceedings remain pending.

'947 patent, as well as a provisional patent application filed December 22, 2004. *Id.* at codes (22), (60), (63).[2]

According to the '903 patent, the "present invention is related to the use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis . . . wherein the preparation is to be orally administered and wherein re-treatments are possible." *Id.* at Abstr.; *see also id.* at 1:19–22 ("The present invention relates to the use of multiple doses of Cladribine for the treatment of multiple sclerosis, especially relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis.").

Cladribine is a chlorinated purine analogue, 2-chloro-2′deoxyadenosine (also known as 2-CdA). *Id.* at 2:24–27. Cladribine was known in the prior art, as were oral, i.v., and subcutaneous formulations including it. *See, e.g.*, *id.* at 6:20–25 (noting formulations for oral administration described in, for example, US Patent No. 5,506,214[3]). The '903 patent notes that cladribine has also been suggested previously in the art as useful for treating multiple sclerosis. *Id.* at 2:24–3:21 (discussing prior studies on cladribine's use in patients with multiple sclerosis); *see also* Pet. 18–20; Ex. 1002 ¶¶ 33–52 (testimony of Dr. Aaron Miller on studies by Beutler, Stelmasiak, Rice, and others).

As described in the '903 patent, "[m]ultiple sclerosis (MS) is the most known chronic inflammatory demyelinating disease of the central nervous system in humans." Ex. 1001, 1:26–28. "Over time, MS may result in the

---

[2] In this case, Petitioner assumes December 22, 2004, is the priority date. Pet. 2–4, 7–8 n.3, 13–28. Absent argument to the contrary, the Board applies December 22, 2004, as the priority date for the challenged claims.

[3] Beutler, U.S. Patent No. 5,506,214, issued April 9, 1996 (Ex. 1026).

accumulation of various neurological disabilities" and "[c]linical disability in MS is presumed to be a result of repeated inflammatory injury with subsequent loss of myelin and axons, leading to tissue atrophy." *Id.* at 1:31–35. The patent states that "MS is manifested in physical symptoms (relapses and disability progression), Central Nervous System (CNS) inflammation, brain atrophy and cognitive impairment." *Id.* at 1:36–38; Ex. 2051 ¶ 39 (testimony of Patent Owner's declarant, Dr. Fred Lublin, explaining that "multiple sclerosis," meaning "many scars," is an autoimmune disease where the immune system attacks the CNS, particularly myelin, which is an insulating substance that surrounds and protects nerve fibers/axons).

By December 2004, it was known that lymphocytes (especially T cells), which cells are part of the body's acquired immune system, play a role in the pathophysiology of MS. Ex. 1002 ¶¶ 28–29; Ex. 2051 ¶ 40 (testifying that "by 2004, MS was thought to be a lymphocyte-dependent autoimmune disease" involving autoantigen-specific T lymphocytes). According to Petitioner's declarant, Dr. Miller, "[p]atients with MS 'harbor T cells that react with CNS autoantigens'" and, "[a]lthough these T cells (a type of lymphocyte) may 'remain dormant for decades, at some point they are activated in the periphery,'" allowing the cells to "migrate through the blood-brain barrier to the brain and spinal cord." Ex. 1002 ¶¶ 28–29 (citing Ex. 1044, 1–3; Ex. 1007, 131). "Once these T cells are reactivated in the CNS . . . they 'release pro-inflammatory Th1 cytokines and orchestrate the destruction of the myelin sheath by various types of immune cells.'" *Id.* (citing Ex. 1007, 131). As Dr. Miller further explains, inflammation and resulting demyelination creates "lesions" in the affected tissues that can be detected and monitored. Ex. 1002 ¶¶ 15, 24, 27 (discussing detection of

active/enhancing lesions with MRI); Ex. 2051 ¶ 39 (explaining "lesions" reflect accumulated dead nerve cells in the brain and spinal cord).

According to the '903 patent, MS is "considered to be a multi-phasic disease and periods of clinical quiescence (remissions) occur between exacerbations. Remissions vary in length and may last several years but are infrequently permanent." Ex. 1001, 1:44–47. Moreover, the patent states, "[f]our courses of the disease are individualized: relapsing-remitting (RR), secondary progressive (SP), primary progressive (PP) and progressive relapsing (PR) multiple sclerosis." *Id.* at 1:48–50. "More than 80% of patients with MS will initially display a RR course with clinical exacerbation of neurological symptoms, followed by recovery that may or may not be complete." *Id.* at 1:51–56 (noting that disability arises from incomplete recovery from relapses). "Approximately, half of the patients with RRMS switch to a progressive course, called SPMS, 10 years after the disease[] onset." *Id.* at 1:56–62 (noting that worsening of disability in the progressive phase results from "accumulation of residual symptoms after exacerbation but also from insidious progression between exacerbations").

There is no known cure for MS. Ex. 1002 ¶ 22 (citing Ex. 1024). Because MS is a chronic disease, patients ordinarily require ongoing care and repeated treatments designed to alter or suppress the immune system. *Id.* ¶ 57 (citing Ex. 1008, 211–213). To illustrate, Dr. Miller identifies Figure 1 of Weiner (Ex. 1008), which is reproduced below.



Ex. 1008, 212, Fig. 1. Figure 1, above, is titled a "clinical course and treatment of multiple sclerosis" and shows a common MS disease course, with the horizontal axis representing time and the vertical axis the level of disability. *Id.* (capitalization omitted). The figure includes an early "attack" followed by multiple "relapses," shown by vertical bars of different heights on the left half of the figure; then, at the time represented by a vertical dashed line near the middle of the figure, the onset of a progressive phase of the disease with persistent disability steadily increasing as shown by the upwardly sloping line as one moves to the figure's right. *Id.* (including, below the horizontal axis, a treatment strategy (e.g., improve recovery from attack, etc.) for the disease stage). According to Dr. Miller, as reflected in the figure above, "different therapies are designed to treat acute attacks, prevent or decrease the number of relapses, and prevent onset of or halt the progressive phase." Ex. 1002 ¶ 57 (citing Ex. 1008, 212–213).

As Dr. Miller further explains, "[b]ecause of the role the immune system plays in the underlying pathophysiology of MS, [administering] immunosuppressive drugs was '[t]he most common therapeutic approach' for treating MS before December 2004." *Id.* ¶ 16 (citing Ex. 1013, 4;

Ex. 1007, 131); *see also id.* ¶ 30 ("Because of the role autoantigen-specific T lymphocytes were known to play in MS, suppressing these lymphocytes was a target of [prior] MS therapies"); *but see* Ex. 2051 ¶¶ 49–52 (Dr. Lublin testifying MS therapies generally involved immunosuppressive and immunomodulatory therapies, and some, though not all, involved suppressing lymphocytes (citing, e.g., increased levels of white blood cells in natalizumab-treated patients (Ex. 2019, 2)).

"Because cladribine caused 'prolonged, profound suppression of lymphocyte counts,' researchers began studying it in MS." Ex. 1002 ¶ 16 (citing Ex. 1016, 420); Ex. 2051 ¶ 64 (testifying that cladribine, originally approved for treating hairy cell leukemia, "was known for its ability to selectively reduce lymphocyte count" and, by 2004, had been investigated in several MS clinical studies). Dr. Miller testifies that "[i]n early studies, cladribine was shown to 'modulat[e] autoimmune processes involving lymphocyte abnormalities such as MS' and 'impressively decrease[]' relapse rates" in MS patients. Ex. 1002 ¶ 16 (citing Ex. 1018, 1146; Ex. 1013, 5, 7). According to Dr. Miller, "[d]uring treatment, neurologists commonly assessed the therapeutic effect of cladribine by monitoring a patient's lymphocyte count, with a sustained reduction of lymphocytes, e.g., below 1000 [cells]/µL, being characteristic of a treatment response." *Id.* (citing Ex. 1018, 1146; Ex. 1013, 5; Ex. 1014, 1717).

The '903 patent describes, in an example, a treatment regimen for patients with MS. Ex. 1001, 14:6–16:49 (Example 1). In a study on sixty patients with relapsing forms of MS, the patients were sorted into three groups: for the first year, Group 1 patients received placebo for four months followed by 8 months of no treatment; Group 2 patients received daily oral administration of cladribine (10 mg tablets) for about 5 days a month for two

months, followed by placebo for two months, and 8 months of no treatment
("total dose of about 1.75 mg/kg"); and Group 3 patients received daily oral
administration of cladribine (10 mg tablets, as above) for about 5 days a
month for 4 months followed by 8 months of no treatment ("total dose of
about 3.5 mg/kg"). *Id.* In the second year (starting month 13), the patent
discloses that all three groups received oral cladribine for about 5 days a
month for 2 months at the lower dose (i.e., total of "about 1.75 mg/kg" over
the 2 months) followed by 10 months of no treatment.[4] *Id.* (disclosing, *inter
alia*, that lymphocyte markers are monitored and that "[p]atients in Groups 2
and 3 have a decrease in brain lesions"); *see also id.* at 5:52–6:12 (disclosing
that "[e]fficacy" of cladribine for MS treatment can be measured by, for
example, relapse frequency, reduction of MRI-detectable lesions, or
improvements in clinical assessments like the "Expanded Disability Status
Scale (EDSS)" or "Scripps Neurologic Rating Scale (SNRS)" scores).

## D. *Illustrative Claims*

Claim 17, reproduced below, is the only independent claim challenged
in this proceeding. It reads:

> 17. A method of treating relapsing-remitting multiple sclerosis
> or early secondary progressive multiple sclerosis comprising the
> oral administration of a formulation comprising cladribine to an
> individual having relapsing-remitting multiple sclerosis or early
> secondary progressive multiple sclerosis following the
> sequential steps below:
>
> (i) an induction period lasting from about 2 months to
> about 4 months wherein said formulation is orally administered
> and wherein the total dose of cladribine reached at the end of the
> induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

---

[4] The '903 patent indicates that the course of treatment continues into a third
year (starting at month 25) that essentially repeats the regimen given during
the second year. Ex. 1001, 16:1–6.

(ii) a cladribine-free period lasting from about 8 months to about 10 months, wherein no cladribine is administered;

(iii) a maintenance period lasting from about 2 months to about 4 months, wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg; [and]

(iv) a cladribine-free period wherein no cladribine is administered.

Ex. 1001, 18:7–26.  Illustrating some of the challenged dependent claims, claim 20 depends from claim 17 and adds "wherein the total dose of cladribine reached at the end of the induction period is about 1.7 mg/kg," claim 22 depends from claim 17 and adds "wherein the cladribine-free period (ii) lasts about 10 months," and claim 26 depends from claim 17 and adds "wherein the formulation is orally administered at a daily dose of 10 mg cladribine." *Id.* at 18:30–32, 18:37–38, 18:45–47.

### E.    Asserted Prior Art and Ground

Petitioner asserts that claims 17, 19, 20, and 22–27 are unpatentable based on the following ground:

| Claims Challenged | 35 U.S.C. §[5] | References/Basis |
|---|---|---|
| 17, 19, 20, 22–27 | 103 | Bodor,[6] Stelmasiak[7] |

---

[5] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011), revised 35 U.S.C. §§ 102, 103 effective March 16, 2013.  The '903 patent issued from an application filed before March 16, 2013, so pre-AIA §§ 102 and 103 apply.  Ex. 1001, code (22).

[6] Bodor et al., WO 2004/087101 A2, published Oct. 14, 2004 ("Bodor" (Ex. 1022)).

[7] Zbigniew Stelmasiak, *A pilot trial of cladribine (2-chlorodeoxyadenosine) in remitting-relapsing multiple sclerosis*, 41:1 Med. Sci. Monit. (March 1, 1998) ("Stelmasiak" (Ex. 1013)).

Petitioner submits testimony from Aaron E. Miller, M.D. and Rodolfo Pinal, Ph.D. to support its challenge. Ex. 1002 (Miller Decl.); Ex. 1084 (Miller Rebuttal Decl.); Ex. 1080 (Pinal Decl.). Patent Owner responds with testimony from Fred D. Lublin, M.D. and Dr. Bernd Meibohm. Ex. 2051 (Lublin Decl.); Ex. 2052 (Meibohm Decl.). The deposition testimony of Drs. Miller, Pinal, Lublin, and Meibohm is also of record. Exs. 2009 and 2079 (Miller transcripts); Ex. 2080 (Pinal transcript); Ex. 1061 (Lublin transcript); Ex. 1062 (Meibohm transcript).

In addition to the testimony from the parties' designated experts above, the record also includes testimony from three fact witnesses: Alain Munafo, Ph.D. (Ex. 2053 (Munafo Decl.); Ex. 1063 (Munafo transcript)); Nicholas Bodor, Ph.D. (Ex. 2054 (Bodor Decl.); Ex. 1059 (Bodor transcript)); and Yogesh Dandiker, Ph.D. (Ex. 2055 (Dandiker Decl.); Ex. 1060 (Dandiker transcript)).

### III. ANALYSIS

#### A. *Legal Standards*

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3)).

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the relevant art. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed

subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) secondary considerations of nonobviousness when presented. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

Moreover, "[a]n obviousness determination requires finding both that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *CRFD Research, Inc. v. Matal*, 876 F.3d 1330, 1340 (Fed. Cir. 2017) (internal quotation marks and citation omitted).

*B.   Level of Ordinary Skill in the Art*

In determining the level of skill in the art, we consider the problems encountered in the art, the art's solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

Petitioner proposes that the person of ordinary skill in the art ("POSA") would have a "high" level of skill. Pet. 28. In more detail, Petitioner contends:

> A POSA here would have drawn upon the knowledge and experience of related disciplines of a multi-disciplinary team that might lie outside the POSA's primary training. . . . A POSA for the '903 patent would have knowledge of multiple disciplines, such as immunology, biochemistry, and human physiology and anatomy, and also typically [would] be a clinician with experience and/or training in neurology. . . . The POSA typically would be a medical doctor with a specialty in neurology, specifically in treating autoimmune disorders of the nervous system, such as multiple sclerosis, and typically at least 2 years of experience with administering treatments to patients and evaluating results of such treatments, as well as experience or knowledge in related research and development.

*Id.* at 28–29 (citing Ex. 1002 ¶¶ 20–21).

Patent Owner responds with its own definition, which Patent Owner argues is "more accurate." PO Resp. 8–9. According to Patent Owner:

> A POSA would have an M.D. with at least two years of experience treating neurological conditions, with a focus on autoimmune disorders including but not limited to multiple sclerosis, and prescribing immunotherapies to treat such neurological conditions. . . . A POSA would also be part of a team including individuals with experience in investigation of the pharmacokinetics (PK) and pharmacodynamics (PD) of drugs, pharmaceutical drug development, and clinical trial design.

*Id.* (citing Ex. 2051 ¶ 29). Regardless, Patent Owner contends, the claims are nonobvious, and its declarant (Dr. Lublin) qualifies as a POSA, under either definition. *Id.* (citing Ex. 2051 ¶¶ 30–31).

Patent Owner's definition includes aspects of pharmacology that are not explicitly recited in Petitioner's definition. We find those added aspects are consistent with the art (e.g., Ex. 1022, 40–41 (analyzing PK parameters for cladribine formulations)). We apply Patent Owner's definition in this Decision as it is somewhat more specific. In any event, neither party's analysis hinges on whether their respective POSA definition is adopted and the ultimate result here would not change under either definition.

## C. Claim Construction

In an IPR, we construe claims using the same standard used to construe claims in a civil action before the courts under 35 U.S.C. § 282(b), including construing claims in accordance with the ordinary and customary meaning as understood by the POSA and the patent's prosecution history. 37 C.F.R. § 42.100(b). We need only construe terms that are in controversy

and only as needed to resolve the matters in controversy. *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019).

Petitioner proposes constructions for the following terms: (a) "total dose of cladribine"; (b) "an induction period"; and (c) "maintenance period." Pet. 29–33. No dispute here turns on interpretation of a "total dose of cladribine," and, as noted by Petitioner, "total dose" is defined in the '903 patent. Ex. 1001, 4:19–26 (defining "total dose" as the "cumulative dose," i.e., "the total dose of Cladribine administered during the treatment, i.e. the dose reached at the end of the treatment that is calculated by adding the daily doses"). We need not further construe this term.

Regarding the term "maintenance period," Petitioner argues the maintenance period dose should be construed as being "lower" than the induction period dose. Pet. 30–33; Pet. Reply 11. And, as a corollary, Petitioner argues the induction period dose is "higher" than the maintenance period dose. Pet. 29–30. The premise of Petitioner's argument is that, during prosecution, the applicant sought to distinguish the claims over the prior art, including the asserted Bodor reference, and therein limited the claims. *Id.* at 29–33. Patent Owner disagrees and argues that, although the claims encompass regimens where the maintenance period dose is lower than the induction period dose, they also encompass a regimen where the induction and maintenance period doses are the same. PO Resp. 9 (citing the Board's Institution Decision (Paper 10, 13–17)); Inst. Dec. 17 (explaining that, based on the intrinsic evidence as a whole, the maintenance and induction doses could be the same ("about 1.7 mg/kg")).

We need not further construe and limit the claims in the manner argued by Petitioner. As Petitioner states, Patent Owner's argument and the Board's preliminary claim construction (in the Institution Decision)

"encompass" Petitioner's construction and Petitioner's "arguments apply under either." Pet. Reply 10; Tr. 24:1–9 (agreeing construction of the maintenance dose is "not an issue that [the Board] ha[s] to resolve because these claims would have been rendered obvious under either . . . our construction or Patent Owner[']s construction"). We need only construe claim terms to the extent necessary to resolve the controversy at hand. *Realtime Data*, 912 F.3d at 1375.[8]

Any remaining dispute about the meaning or application of the claims will be addressed below, where we analyze the asserted obviousness. *See infra* Section III.D.4.

### D. *Obviousness over Bodor and Stelmasiak*

Petitioner contends that claims 17, 19, 20, and 22–27 would have been obvious over the combined teachings of Bodor and Stelmasiak. Pet. 33–61.

Petitioner argues that Bodor is prior art under 35 U.S.C. § 102(a) and § 102(e). Pet. 22. The parties provide more extensive argument on the prior-art status of Bodor, which we address in Section III.D.3 below. PO Resp. 9–18 (arguing certain disclosure in Bodor is not "by another" and, thus, not prior art); PO Sur-reply 2–7 (same); Pet. Reply 3–10 (arguing Bodor's disclosure is prior art in full). Petitioner argues that Stelmasiak is prior art under § 102(b), which Patent Owner does not dispute. Pet. 24.

---

[8] In the event Petitioner should contend that an express construction of "maintenance period" and "induction period" was necessary for this Final Written Decision, we maintain and adopt our prior analysis on the issue. Inst. Dec. 13–17 (agreeing with Patent Owner that the maintenance period dose of claim 17 could be lower than the induction period dose, but it could also be the same (i.e., about 1.7 mg/kg)).

We summarize the asserted prior art below before turning to the parties' further arguments and our analysis.

*1.     Bodor (Ex. 1022)*

Bodor is an international patent application that was filed March 26, 2004, and published October 14, 2004. Ex. 1022, codes (22), (43). Bodor relates to "compositions of cladribine and cyclodextrin which are especially suited for the oral administration of cladribine." *Id.* at Abstr.

Bodor teaches that "[o]ral delivery of drugs is often preferred to parenteral delivery for a variety of reasons." *Id.* at 2:9–10. "[F]oremost," among the reasons given by Bodor, is "patient compliance." *Id.* "Patient compliance is enhanced insofar as oral dosage forms alleviate repeated health care provider visits, or the discomfort of injections or prolonged infusion times associated with some active drugs." *Id.* at 2:11–13.

"However," Bodor teaches, "to date the oral delivery of cladribine has been plagued by low bioavailability . . . and suboptimal interpatient variation." *Id.* at 2:22–25. Bodor teaches that "[i]t has now been found that amorphous cyclodextrins can be combined to form a particularly advantageous product which can be incorporated into a solid oral dosage form." *Id.* at 5:2–4. "This product is a [] cladribine-cyclodextrin complex, and solid oral dosage form containing it improves oral bioavailability and/or achieves lower interpatient and/or intrapatient variation of the drug." *Id.* at 5:4–7; *see also id.* at 11:27–12:3 (describing a cladribine and cyclodextrin complex "associated with improved cladribine absorption, as reflected by higher bioavailability and/or lower interpatient variation").

Bodor teaches cladribine has "been used as an immunosuppressive agent and as a modality for the treatment of a variety of autoimmune conditions including . . . multiple sclerosis." *Id.* at 2:1–5. Bodor discloses

that "an effective amount of the complex cladribine-cyclodextrin . . . is used (e.g., an amount affective for the treatment of multiple sclerosis[)]." *Id.* at 22:11–15. Bodor further teaches that "[t]herapeutically effective dosages described in the literature include those for . . . multiple sclerosis (from about 0.04 to about 1.0 mg/kg/day (see U.S. Patent No. 5,506,214))." *Id.* at 22:17–22 (defining "therapeutically effective amount"); *see also id.* at 22:27–23:6 (noting "various dosage amounts and dosing regimens have been reported in the literature for use in the treatment of multiple sclerosis," and listing references).[9]

Bodor discloses that, "[a]t the present time, it is envisioned that, for the treatment of multiple sclerosis, 10 mg of cladribine in the instant [] cladribine-cyclodextrin complex in the instant solid dosage form" would be given. *Id.* at 23:15–17. Further, Bodor teaches, this dosage form "would be administered once per day for a period of five to seven days in the first month, repeated for another period of five to seven days in the second month, followed by ten months of no treatment." *Id.* at 23:17–20; *see also id.* at 23:20–24 (disclosing an alternative regimen where 10 mg of cladribine is given once per day for five to seven days per month over six months, followed by eighteen months of no treatment).

Bodor teaches that the dosing regimen can be tailored to suit the needs of the patient. Specifically, Bodor teaches that "one of skill will appreciate

---

[9] Many of the references identified and incorporated-by-reference in Bodor are of record, including U.S. Patent No. 5,506,214 ("Beutler patent" (Ex. 1026)), Rice (Ex. 1018), Romine (Ex. 1031), Selby (Ex. 1047), and Tortorella (Ex. 1015). *See* Ex. 1022, 7:7–10 (incorporating-by-reference the patents, applications, and scientific literature identified in Bodor), 22:27–23:6 (incorporating Rice, Romine, etc. by reference "in their entireties").

that the therapeutically effective amount of cladribine administered herein may be lowered or increased by fine tuning and/or by administering cladribine . . . with another active ingredient." *Id.* at 24:1–6 ("The invention . . . provides a method to tailor the administration/treatment to the particular exigencies specific to a given mammal."). Furthermore, Bodor teaches that "[t]herapeutically effective amounts may be easily determined for example, empirically by starting at relatively low amounts and by step-wise increments with concurrent evaluation of beneficial effect." *Id.* at 24:6–9.

2. *Stelmasiak (Ex. 1013)*

Stelmasiak is an article about a pilot trial describing cladribine's use in patients with remitting-relapsing multiple sclerosis (RRMS), which paper published in 1998. Ex. 1013, 4–5 ("In the present study we tested clinical efficacy of cladribine in remitting-relapsing form of MS in a two-year open-label pilot clinical trial.").

In its Introduction, Stelmasiak teaches that "multiple sclerosis (MS) is an autoimmune disease in which abnormalities in immune regulation lead to the lymphocyte-dependent demyelination process in the central nervous system." *Id.* at 4. Stelmasiak teaches that "[c]ladribine . . . is a purine analog with potent and clinically useful activity against some indolent leukemias and lymphomas" and "[t]he drug displays a highly selective toxicity toward malignant lymphocytes, and normal lymphocytes are also subject to the cytotoxic effect of the drug." *Id.*

Stelmasiak teaches that, in its study, cladribine was used in a solution form for both oral and subcutaneous administrations. *Id.* at 5. "The drug was prepared as a sterile solution in isotonic saline, 1 mg/ml for oral use and 2.5 mg/ml . . . for subcutaneous injections." *Id.* Stelmasiak discloses that its

study group comprised "10 patients (eight females and two males)" with "body weight 52-75 kg (median: 66 [kg])." *Id.*

According to Stelmasiak, "[s]ix cladribine courses were given at monthly intervals, and two additional courses were given at 9 and 12 or 15 months," where "[e]ach course consisted of five doses of the drug taken once daily on consecutive days." *Id.* Six of the patients received the subcutaneous dosing (5 mg per day), and four patients received oral dosing (10 mg per day). *Id.* The patients were monitored for 24 months from the start of treatment. *Id.* at Abstr., 5–7.

Stelmasiak reports that compliance and tolerance to the therapy were "good" and "side effects were mild." *Id.* at 5. Stelmasiak teaches that, in patients with RRMS, "treatment with cladribine decreases lymphocyte counts in peripheral blood, to 1/3 of the initial values on average." *Id.* at 7. Stelmasiak teaches that the "therapy appeared to be effective in seven patients who reported very marked (almost five-fold on average) reduction in the relapse rate during the 2 years." *Id.* ("The relapse rate in some (but not all) patients is impressively decreased."). Stelmasiak discloses that, among a "responders" sub-group, the seven patients had "reported a total of 29 relapses during the two preceding years . . . and a total of 6 relapses during the two-year study period." *Id.* at 6. Stelmasiak further discloses that responding patients "showed also a somewhat more pronounced improvement in their neurological status as measured by EDSS scores." *Id.* at 7; *see also id.* at 6 ("Analysis of the data for the whole group revealed that EDSS scores were significantly reduced during the treatment compared to initial values . . . and that decreases observed at the third to fifteenth month were significant."). Stelmasiak teaches that "[a]long with clinical evaluation

in MS, the detailed pattern of cladribine-induced immunosuppression in clinical conditions deserves further study." *Id.* at 7.

The therapy given in Stelmasiak's study appeared effective in seven of the patients, but Stelmasiak reports that it "seemed ineffective in the remaining three" patients. *Id.* The Stelmasiak authors report that they "were unable to identify any factor which would differentiate between the 'responders' and the 'non-responders.'" *Id.* (reporting, for example, that "[t]here was no indication that a 'good response' is related to the actual cladribine dose per body weight").

Further, with respect to lymphocyte counts, Stelmasiak includes Figure 1, reproduced below.



**Figure 1.** Average lymphocyte counts during and after treatment with cladribine.

*Id.* at 5. Figure 1, above, is a graph of average lymphocyte counts during the 2-year treatment course, with the number of lymphocytes (1/µl) plotted on the vertical axis versus time (months) on the horizonal axis. *Id.* Stelmasiak teaches that "[l]ymphocyte counts dropped from the initial count of

2336±595 per µl (mean±S.D.) to 968±229 per µl at 6 months, and remained at approximately 1000 per µl for the next 15 months." *Id.* at 5–6 ("A tendency toward normalization of lymphocyte count became evident only at the end of the 2-year observation period.").

### 3. Status of Bodor as Prior Art

#### a) Overview

Responding to the Petition's assertion that Bodor is prior art under § 102(a) or § 102(e), Patent Owner argues that a 6-line "dosing regimen" cited in Bodor against the challenged claims is the work of the '903 patent's inventors, not the named inventors on Bodor—Drs. Nicholas Bodor and Yogesh Dandiker. PO Resp. 9–18. Thus, according to Patent Owner, that "dosing regimen" of Bodor is not "by another" under § 102(e) and cannot be used against the '903 patent's claims as prior art.[10] *Id.*

In reply, Petitioner argues, *inter alia*, that Patent Owner has not met its burden of production to come forward with sufficient, corroborated evidence to support a determination that the "dosing regimen" from Bodor is the work of all four named inventors of the '903 patent—and their work alone. Pet. Reply 2–10. Moreover, even if the '903 patent's inventors were the source of Bodor's "dosing regimen," Petitioner argues that Patent Owner misapprehends the importance of the solid cladribine dosage form for oral administration, which was undisputedly the invention of Drs. Bodor and

---

[10] Patent Owner notes, and we agree, that § 102(a)'s recitation of "by others" is equally addressed herein under the "by another" analysis. PO Resp. 10 n.5 (citing *In re Land*, 368 F.2d 866, 877–879 (CCPA 1966)). Assuming, on this record, that the priority date for the challenged claims is December 22, 2004, Bodor's publication on October 14, 2004, is not early enough to qualify Bodor as § 102(b) prior art.

Dandiker.  *Id.* at 4–5.  Petitioner argues that, because that formulation is integral to the obviousness challenge and the cited "dosing regimen," Drs. Bodor and Dandiker should, at minimum, be deemed joint inventors of all applied portions of Bodor.  *See, e.g.*, *id.* at 4–6, 10 ("Bodor and Dandiker's tablets render them co-inventors of all relied-upon disclosures."). Hence, Petitioner contends Bodor's "dosing regimen" and the '903 patent do not share the same "inventive entity," so Bodor's disclosure is "by another" and prior art in full.  *Id.* at 2–10; Pet. Suppl. Br. 1–2.

b)    *Factual Background*

There is no overlap in the listed inventors or owners of the '903 patent and the Bodor reference.  The latter names Drs. Bodor and Dandiker the inventors, and Ivax Corporation ("Ivax) as assignee.  Ex. 1022, codes (71), (75).  Conversely, the '903 patent lists Merck Serono S.A. as assignee, and names the following four inventors: Giampiero De Luca, Arnaud Ythier, Alain Munafo, and Maria Lopez-Bresnahan.  Ex. 1001, codes (73), (75). Moving forward, we may refer to these individuals by their last name and omit any titles, unless needed for clarity (e.g., we may refer to Dr. Bodor to distinguish from the "Bodor" reference).

Although Bodor and the '903 patent share no facial overlap in their inventors or assignees, the trial record shows that there was a prior contractual relationship between Ivax and an affiliate of Patent Owner. Patent Owner presents evidence that, in October 2002, Ivax entered into a confidential product development and license agreement (the "Agreement" (Ex. 2048)) with Ares Trading S.A ("Ares").  PO Resp. 13–14.  Patent Owner identifies Ares as a real party-in-interest in this proceeding (Paper 3, 1), and uses the name "Serono" to refer to itself and its affiliate, Ares, in its papers.  *See, e.g.*, PO Resp. 2 n.1.

According to Patent Owner, Serono and Ivax entered into the Agreement to jointly develop oral cladribine for treating MS. *Id.* at 13–14. Patent Owner states that, under the Agreement, "Ivax would 'develop an oral dosage formulation of [cladribine] in tablet or capsule form suitable for use in clinical trials and commercial sale,'" and "Serono agreed to 'conduct clinical trials' to determine 'the dose, safety, and/or efficacy' of IVAX's oral tablets or capsules" in furtherance of pursuing regulatory approvals and marketing the product. *Id.* (citing Ex. 2048, 2, 17–19). Patent Owner cites testimony from Munafo and Dandiker about the Agreement and discussing the delegation of responsibilities under it. Ex. 2053 ¶¶ 23–26; Ex. 2055 ¶¶ 14–15.[11]

Patent Owner submits testimony about the Serono and Ivax "teams" working under the Agreement. Munafo testifies that Serono's team included Munafo, Lopez-Bresnahan, Ythier, and De Luca, "along with many others." Ex. 2053 ¶ 18; *see also id.* ¶ 22 (testifying Serono's work led to the development of the drug MAVENCLAD, and the '947 and '903 patents, "which claim dosing regimens for treating MS"). The Ivax team included Bodor, Dandiker, "Dr. Stephen Marcus, and other team members." Ex. 2054 ¶ 14; Ex. 2055 ¶ 12.

Incident to Ivax's and Serono's collaboration, at least some of the members from each company met and communicated with each other about their work. Munafo testifies that "[c]onfidential communication between the Serono team and the IVAX team took place both at meetings (both in person and by telephone), where formal presentations were made, and by e-mail."

---

[11] Patent Owner also cites testimony from Dr. Bodor (PO Resp. 13 (citing Ex. 2054 ¶ 18)), but he admitted that he was not aware of, or familiar with, the Agreement at the relevant time. Ex. 1059, 132:19–135:3.

Ex. 2053 ¶ 27; Ex. 2055 ¶ 15 (Dandiker testifying "the IVAX and Serono teams communicated frequently and confidentially" and "I sometimes emailed directly with Dr. Munafo"); *but see* Ex. 1059 (Bodor Tr.), 31:9–10 (testifying he had not heard of Munafo), 130:2–11 (testifying he did not know, or recall meeting or communicating with, anyone from Serono; "I had no connection with Serono").

Patent Owner submits two documents related to communications and/or meetings between Ivax and Serono. First, is a document titled "Oral Cladribine for MS Project," which purports to be "Draft minutes" from a meeting on August 27, 2003, in Amsterdam. Ex. 2050 (the "Amsterdam Minutes"). The Amsterdam Minutes identify thirteen participants from Ivax and Serono as indicated in the screenshot below.



Ex. 2050, 1 (annotated). As highlighted above, the Amsterdam Minutes list Lopez-Bresnahan, Munafo, and Ythier as among the Serono participants; and Dandiker is listed among the Ivax participants. *Id.*

The second document includes a December 17, 2003, cover email from Isabelle Emery at Serono to several other people at Ivax and Serono, attaching a draft "Briefing Document" titled "Cladribine." Ex. 2049, 1–3 (email), 5–9 (briefing document) (collectively the "Briefing Document"). The Briefing Document identifies Lopez-Bresnahan, Munafo, and Dandiker, among several others, as recipients and reviewers. *Id.* at 1–3, 5 (listing, e.g., Dandiker and Serono's A. Jaber as reviewers of the "CMC [(Chemistry, Manufacturing, and Controls)] section," Munafo and Ivax's Dr. Marcus as reviewers of "PK and PD [(Pharmacokinetic and Pharmacodynamic)] human

info" in the Clinical Studies section, and Lopez-Bresnahan, Dr. Marcus, and seven others as reviewers of "All" sections).

Munafo testifies that the two documents illustrate the cladribine dosing regimen that Serono shared with Ivax. Ex. 2053 ¶¶ 29, 39–48. Munafo testifies that, as reflected in the Amsterdam Minutes, Lopez-Bresnahan presented a Phase III design including two MS treatment regimens (or "arms") using oral cladribine. *Id.* In one arm, patients would receive total cumulative doses approximating 0.7 mg/kg, and in the other arm, patients would receive about 2.1 mg/kg. *Id.* ¶¶ 35–38 (citing Ex. 2050, 4–5). According to Munafo, the 0.7 mg/kg cumulative dose would be administered over 5 days and 2 months. *Id.*; Ex. 2050, 4 ("0.7 mg/kg (.35 mg/kg x 5 days x 2 months)").[12] Because the duration of treatment is recited as "24 months," Munafo testifies this means a cladribine-free period of "22-months." Ex. 2053 ¶ 38 (citing Ex. 2050, 4). Munafo testifies the Briefing Document describes a planned study to include three treatment groups: low dose (0.7 mg/kg), high dose (2.1 mg/kg), and placebo. *Id.* ¶ 41 (citing Ex. 2049, 47–48). According to Munafo, the low-dose group would receive 10 mg oral cladribine tablets daily for 5 consecutive days in each of the first 2 months, followed by placebo in months 3–6, then no pills in months 7–12. *Id.* ¶¶ 43–46 (testifying administration of placebo and no pills in months 3–12 "would result in a 10-month 'cladribine-free' period").[13]

---

[12] According to Munafo, "this means 0.35 mg/kg per month for 2 months, delivered over 5 consecutive days each month." Ex. 2053 ¶ 37 n.4.

[13] Munafo explains that the administration of placebo in months 3–6 was required to maintain the "double-blind" protocol and, thus, conceal from the patients whether they were in the high, low, or placebo group. Ex. 2053

Dandiker testifies that he attended the meeting in Amsterdam and gave a presentation on oral cladribine formulations that Ivax had developed and were investigating. Ex. 2055 ¶ 17 (citing Ex. 2050, 3–4). Dandiker also testifies that Lopez-Bresnahan presented on a Phase III study design consistent with the Amsterdam Minutes. *Id.* (citing Ex. 2050, 5–6). And, Dandiker recalls receiving a draft regulatory document in 2003, and believes the Briefing Document (Ex. 2049) is the document he received at that time. Ex. 2055 ¶ 18.

The asserted Bodor reference includes, *inter alia*, the following disclosure:

> At the present time, it is envisioned that, for the treatment of multiple sclerosis, 10 mg of cladribine in the instant complex cladribine-cyclodextrin complex in the instant solid dosage form would be administered once per day for a period of five to seven days in the first month, repeated for another period of five to seven days in the second month, followed by ten months of no treatment.

Ex. 1022, 23:15–20.[14] Unlike several other disclosures in Bodor related to treating MS with cladribine, Bodor does not attribute this 6-line disclosure to any third-party source. *See, e.g.*, *id.* at 22:17–22 (disclosing "[t]herapeutically effective dosages . . . for multiple sclerosis" in Beutler (Ex. 1026), and "various dosage amounts and dosing regimens . . . for use in the treatment of multiple sclerosis" in, e.g., Romine (Ex. 1031) and Rice (Ex. 1018)).

---

¶¶ 42–44 (noting the high-dose (2.1 mg/kg) group received active drug in each of the first six months).

[14] The parties as shorthand refer to this passage as the "6-line disclosure" or the "6-line regimen." PO Resp. 6–7; Pet. Reply 3; PO Sur-reply 3–4. We may do likewise for consistency.

Bodor includes three provisional patent applications in its priority chain. The first two provisionals were filed in 2003, and the third was filed in early 2004. Ex. 2044 ("March 2003 Provisional"); Ex. 2045 ("July 2003 Provisional"); Ex. 2046 ("February 2004 Provisional"). The 6-line disclosure quoted above does not appear in the March 2003 Provisional or the July 2003 Provisional. *See generally* Exs. 2044 and 2045. The 6-line disclosure does appear in substantial part in the February 2004 Provisional— the only difference is that the provisional uses the phrase "for one week" instead of "for a period of five to seven days." Ex. 2046, 20:6–10.

Patent Owner submits testimony from Drs. Bodor and Dandiker related to the 6-line disclosure in Bodor. Ex. 2054 ¶¶ 25–26; Ex. 2055 ¶¶ 22–23. For example, in Dr. Bodor's declaration, there is a paragraph quoting the 6-line disclosure, after which Dr. Bodor testifies:

> Neither myself nor my team, including Dr. Dandiker, developed, researched, or invented the above dosing regimen. Indeed, no one on my team at IVAX developed, researched, or invented any cladribine dosing regimen for treating MS. I do not consider this regimen to be my invention, and it was not claimed in the BODOR PCT or the corresponding U.S. patents, Nos. 8,888,328 and 8,785,415. Ex. 2069; Ex. 2029.

Ex. 2054 ¶¶ 25–26; *see also* Ex. 2055 ¶¶ 22–23 (materially the same testimony from Dandiker). Drs. Bodor and Dandiker then declare their belief that, because Serono was working on "dosing regimens" for Phase III clinical trials as part of the collaboration with Ivax, "Serono communicated the dosing regimen" described in Bodor to Ivax. Ex. 2055 ¶¶ 24–26;

Ex. 2054 ¶¶ 27–28 (testifying "it is highly likely that . . . Serono communicated the above dosing regimen" to Ivax).[15]

c)    *Analysis*

Under 35 U.S.C. §§ 102(a) or (e), an inventor's own work is not prior art that may be used against the inventor. *See Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 968 (Fed. Cir. 2014); *In re DeBaun*, 687 F.2d 459, 462 (CCPA 1982). Mere publication of an inventor's ideas in a reference patent or application of another person is not necessarily prior art "by another" against the inventor. *See In re Mathews*, 408 F.2d 1393, 1394–95 (CCPA 1969) (holding Dewey's publication of coworker Mathews's invention in Dewey patent (after Mathews had communicated that invention to Dewey) not usable as prior art against the Mathews patent).

In deciding whether a reference patent or published application is "by another" and qualifies as prior art under § 102(e), "[w]hat is significant is not merely the differences in the listed inventors, but whether the portions of the reference relied on as prior art, and the subject matter of the claims in question, represent the work of a common inventive entity." *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1356 (Fed. Cir. 2003). The "common inventive entity" inquiry, however, requires *identity* among the

---

[15] Other testimony from Dandiker and Bodor gives more context to what those witnesses mean by the phrase "dosing regimen." Dandiker testified that "dosing regimen" is "not my term," but he distinguishes a dosing regimen (how the formulation is clinically administered) from the formulation (how a dosage form is chemically designed to, e.g., give a desired release of drug). *See, e.g.*, Ex. 1060, 119:13–123:5. Dr. Bodor notes his studies used single doses of oral cladribine to compare pharmacokinetic properties and bioavailability. Ex. 2054 ¶ 17. Because he "never treated a patient using multiple doses of cladribine," Dr. Bodor testifies "we never used or studied anything that could be described as a 'dosing regimen.'" *Id.*

respective inventors. *Id.* Indeed, "a sole applicant or patentee and joint applicants or patentees are separate or different 'legal entities' and either is treated as 'another'" for purposes of determining whether a reference is prior art. *In re Land*, 368 F.2d at 878, 881 ("Land and Rogers individually [were] separate legal entities from Land and Rogers as joint inventors."). Thus, just as a reference's disclosure of the invention of A and B[16] is usable as prior art against the invention of X, Y, and Z, a reference's disclosure of the invention of X and Y is usable as prior art against the invention of X, Y, and Z. *See, e.g.*, *MaxLinear Inc. v. Cresta Tech. Corp.*, IPR2015-00594, Paper 90 at 16–24 (PTAB Aug. 15, 2016) (reference to subset of inventors determined as § 102(e) art); *Dr. Reddy's Labs., Inc. v. Horizon Pharma. USA, Inc.*, IPR2018-00272, Paper 74 at 17 (PTAB Sept. 9, 2019) (same).

The three-part test set forth in *Duncan Parking* also guides the analysis here. *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1358 (Fed. Cir. 2019); PO Resp. 10–18; Pet. Reply 3–10. According to that test, the Board must:

> (1) determine what portions of the reference patent were relied on as prior art to anticipate the claim limitations at issue, (2) evaluate the degree to which those portions were conceived "by another," and (3) decide whether that other person's contribution is significant enough, when measured against the full anticipating disclosure, to render him a joint inventor of the applied portions of the reference patent.

*Duncan Parking*, 914 F.3d at 1358. In *Google*, the Federal Circuit addressed the *Duncan Parking* test in the context of an obviousness challenge and explained that, "[t]o be a joint inventor of the [applied]

---

[16] The letters used here represent different individuals and the respective groupings (e.g., "A and B") reflect that those individuals are joint inventors of the hypothetical invention.

reference . . . , [(co-author Moran)] must have made an inventive contribution to the portions of the reference relied on and relevant to establishing obviousness." *Google, LLC v. IPA Tech. Inc.*, 34 F.4th 1081, 1086 (Fed. Cir. 2022) (analyzing whether a reference co-authored by Martin, Cheyer, and Moran was § 102(a) art to the Martin and Cheyer patent); *see also id.* at 1086 n.3 ("The portions of the reference being considered must be relied upon *and* relevant to establishing obviousness.").

Based on the parties' arguments, we see the issues as twofold. *First*, whether the evidence of record is sufficient to support a determination that the cited 6-line disclosure in the Bodor reference is the joint invention of Munafo, Lopez-Bresnahan, Ythier, and De Luca. If, for example, Bodor's 6-line disclosure did not reflect the invention of *all* the '903 patent's listed inventors, then there is no "common inventive entity" and Bodor's 6-line disclosure would be legally "by another" irrespective of whether Drs. Bodor or Dandiker contributed to it. *Second*, considering all Bodor's relied-upon teachings that are relevant to establishing the alleged obviousness of the claims (including portions that reflect the work of Drs. Bodor and Dandiker and not the '903 patent's named inventors), whether the contributions of Bodor and Dandiker are significant enough that they should be considered joint inventors of all applied portions of the reference.

> (1)     *Whether Bodor's "Dosing Regimen" and the '903 Patent Share a Common Inventive Entity that Includes De Luca*

Petitioner met its initial burden to show that Bodor is 102(a) and (e) art, "because nothing in Bodor facially 'represent[s] the work of a common inventive entity.'" Pet. Reply 2–3 (quoting *EmeraChem Holdings v. Volkswagen*, 859 F.3d 1341, 1345 (Fed. Cir. 2017)). As discussed above,

there is no facial overlap in the named inventors or assignees of Bodor and the '903 patent. Nor could Petitioner have reasonably foreseen that Patent Owner would argue Bodor (or any portion of it) represented Patent Owner's own work. As Petitioner points out, "[n]either the patent nor its file history evince a joint research agreement." *Id.* at 3. Also, despite the Examiner citing Bodor against the pending claims several times during prosecution of the '903 patent and related '947 patent (including reliance on the same 6-line disclosure discussed above), Patent Owner never argued that any of Bodor's teachings were disqualified as prior art. *See, e.g.*, Ex. 1004, 99–102 (Dec. 19, 2011, Office Action rejecting claims); Ex. 1025, 220–221 (Aug. 3, 2009, Office Action rejecting claims).

The burden thus shifted to Patent Owner to come forward with evidence sufficient to support the proposition that Bodor is not prior art. *Dr. Reddy's*, IPR2018-00272, Paper 74, at 14–19 (shifting burden to patentee to provide evidence the reference is not "by another"); *Google*, 34 F.4th at 1085–1086 (discussing shifting burdens of production in context of "by another" analysis). We agree with Patent Owner that the ultimate burden of persuasion in an IPR remains with Petitioner. PO Sur-reply 3. Yet missing from Patent Owner's produced documents and testimony is credible and corroborated evidence that named inventor De Luca provided an inventive contribution to the 6-line regimen that appears in Bodor. *Google*, 34 F.4th at 1087 (holding corroboration of alleged inventor testimony is required in the "by another" analysis).

The testimony of Drs. Bodor and Dandiker does not corroborate that De Luca made any inventive contribution to the 6-line disclosure. Dr. Bodor did not "know anybody from Serono" and "had no connection with Serono." Ex. 1059, 130:2–11. Dandiker never communicated with De Luca and could

IPR2023-00481
Patent 8,377,903 B2

not say what, if anything, he did in relation to the collaboration between Ivax and Serono. Ex. 1060, 84:2–85:19 (Q: "Do you have an understanding of whether Dr. deLuca contributed to developing the dosing regimen for treating multiple sclerosis with oral cladribine," A: "I cannot say anything on that.").

None of the three documents produced by Patent Owner suggests that De Luca made any inventive contribution to the 6-line dosing regimen. Petitioner contends that "De Luca's name appears nowhere in" the Amsterdam Minutes or the Briefing Document, and Patent Owner provides no argument to the contrary.[17] Pet. Reply 6; PO Sur-reply 5 (citing, in response, only Munafo's uncorroborated testimony that De Luca was part of the team that developed the regimen).

Patent Owner produced no testimony from three of the four named inventors on the '903 patent. The only testifying inventor, Munafo, could not recall any specific contribution made by De Luca (Serono's chief IP attorney)—declaring generically that De Luca was one of several "team" members and, in some unspecified way, helped design the subject dosing regimen. Ex. 2053 ¶¶ 18, 21, 34, 40. When pressed at deposition on what De Luca "contribute[d] intellectually to the development of the cladribine regimen in Bodor," Munafo had nothing material to add. Quite the opposite, Munafo responded simply that De Luca had worked for Serono "for a very

---

[17] ███████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████
████████████████████████████████████████████
████████████████████████

long time," but "in a department which was remote" to Munafo's, and so Munafo was "not aware of [De Luca's], how you call it, personal intellectual contribution." Ex. 1063, 94:4–95:8 ("I cannot give details on [(whether De Luca contributed to the cladribine regimen in Bodor)], besides the fact that [De Luca's] department was also represented in the project team."). Munafo's vague, uninformative, and otherwise uncorroborated testimony about De Luca's contribution to the 6-line disclosure of Bodor does not help Patent Owner meet its production burden.

That essentially leaves us with the fact that De Luca is a listed inventor on the '903 patent. Here again, however, there is no evidence of record about what De Luca specifically contributed to any of the patent's claims (e.g., De Luca could be a joint inventor of all claimed subject matter, or perhaps only of certain subject matter appearing in a dependent claim). *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998) (explaining that a joint inventor "needs to perform only a part of the task which produces the invention" and "need not make a contribution to every claim of a patent"). And, although there are similarities between the claims compared to the 6-line disclosure of Bodor, there are also some differences. Claim 17, for example, comprises oral administration of cladribine, but it does not require use of 10 mg solid tablets comprising the cladribine-cyclodextrin complex like Bodor's disclosure. Bodor's 6-line disclosure also does not expressly describe a maintenance period dose and duration or secondary cladribine-free period as claimed.[18] Patent Owner does not

---

[18] There also appear to be differences in the dosing regimen described in the Amsterdam Minutes and Briefing Document versus what is claimed. For example, the Amsterdam Minutes refer to low and high "cumulative dose[s]" of 0.7 mg/kg (delivered over 2 months) and 2.1 mg/kg (delivered

produce evidence that would show that De Luca must necessarily be a co-inventor of Bodor's 6-line disclosure simply because De Luca is named as a joint inventor on the '903 patent.

Patent Owner raises two counterarguments. Both are unavailing. First, Patent Owner contends that a reference's disclosure of the work of a "subset" of named inventors is not prior art against the invention of all named inventors. PO Suppl. Br. 1–2. Patent Owner cites *Applied Materials Inc. v. Gemini Rsch. Corp.*, 835 F.2d 279, 281 (Fed. Cir. 1988). But that case does not support Patent Owner's position. In *Applied Materials*, the Federal Circuit reversed the district court's determination that a "reference" patent naming McNeilly and Benzing was prior art to a related patent by McNeilly, Benzing, and Locke, which determination rested on the fact that the reference and patent *named* different inventors. *Id.* at 281 (explaining, "that an application has named a different inventive entity than a patent does not necessarily make that patent prior art").[19] Properly framed, the issue was

over 6 months). Ex. 2050, 4. Claim 17, however, requires a total induction dose of between about 1.7 mg/kg to 3.5 mg/kg given over about 2–4 months. Patent Owner does not explain if, and how, these regimens correspond to each other in such a way that it might suggest De Luca is necessarily a co-inventor on what is described in the minutes (and assuming De Luca is a joint inventor of claim 17). Also, if the recitation in the minutes of, for example, 0.7 mg/kg reflects an assumed total "effective" dose (meaning the dose to be delivered after reduced by a bioavailability coefficient), this would seem to implicate further the importance of Dr. Bodor's formulation work, and not that of any named inventor of the '903 patent. *See, e.g.*, Ex. 1059, 34:11–40:8 (discussing Bodor's work on bioavailability).

[19] As the court further explained, "[w]hen the joint and sole inventions are related . . ., inventor A commonly discloses the invention of A & B in the course of describing his sole invention and when he so describes the *invention* of A & B he is not disclosing 'prior art' to the A & B invention, even if he has legal status as 'another.'" *Applied Materials*, 835 F.2d at 881

whether the McNeilly/Benzing reference had disclosed the invention of McNeilly/Benzing/Locke, which the Federal Circuit answered in the affirmative. *Id.* at 280–281 (notably the reference and patent arose from a single application filed by McNeilly & Benzing, which split into multiple applications due to the PTO's restriction requirement). McNeilly and Benzing's reference disclosure of the McNeilly/Benzing/Locke invention could, therefore, not be used to invalidate that same invention in the McNeilly/Benzing/Locke patent. The court thus required the inventive entities behind the reference's applied disclosure and the patent be identical.

Patent Owner also points to *Allergan* and MPEP § 2132.01. PO Suppl. Br. 1–2 (citing *Allergan*, 754 F.3d at 966). As noted by Petitioner, *Allergan* is of no avail because the Federal Circuit held that appellant had failed to prove that the cited art "represent[s] the work of the inventors *themselves*." *Allergan*, 754 F.3d at 968–69 (emphasis added); Pet. Suppl. Br. 2. *Allergan* did *not* hold that the work of a subset of inventors was disqualified as prior art.[20] The MPEP provision cited by Patent Owner states that "[a]n inventor's or at least one joint inventor's disclosure of his or her own work within the year before the application filing date cannot be used

---

(quoting *In re Kaplan*, 789 F.2d 1574, 1576 (Fed. Cir. 1986)). Consistent with *Applied Materials's* result, this indicates the inventive entities must be identical.

[20] Patent Owner reads too much into *Allergan*, which focused on one co-inventor's (VanDenburgh's) authorship and alleged contribution to an applied reference (finding that contribution insufficient). *Allergan*, 754 F.3d at 968–70. We are unpersuaded that *Allergan* stands for the proposition that appellant would have prevailed and excluded the asserted art irrespective to whether co-inventor (Woodward) contributed to it, which the court did not substantively discuss, much less decide.

against the application as prior art" under § 102(a). Manual of Patent Examining Procedure (MPEP) § 2132.01 (9th ed. 2022). The authority behind this MPEP provision, however, does not support a conclusion that the "common inventive entity" inquiry requires something less than identity. To the contrary, the MPEP relies on *In re Katz*, which explained that a paper authored by Katz, Chiorazzi, and Eshar would only be excluded as prior art against the Katz patent if Katz *alone* invented the relied-upon disclosures in the paper. *In re Katz*, 687 F.2d 450, 455 (CCPA 1982) (explaining "co-authors may not be presumed to be coinventors merely from the fact of co-authorship").

In short, Patent Owner cites no authority holding that a reference's disclosure of the invention of a *subset* of inventors is disqualified as prior art against the invention of *all* the inventors. Patent Owner cites no case where a reference was disqualified as §§ 102(a) or (e) prior art absent the reference (or its applied teachings) and the claims sharing the same "inventive entity."

Second, Patent Owner argues that, under a "rule of reason," its evidence is sufficiently corroborated. PO Sur-reply 5–6; PO Suppl. Br. 2. It is true that whether an inventor's testimony is corroborated is evaluated under a "rule of reason" analysis, and that "[c]orroborating evidence may take many forms." *Ethicon*, 135 F.3d at 1461. But, as it concerns De Luca's alleged contribution to the 6-line disclosure, the testimonies of Bodor and Dandiker and the few internal documents produced by Patent Owner are silent. Munafo's vague assertion that De Luca had "discussions" with "various team members" that helped to develop the proposed regimen (Ex. 2053 ¶ 21) are undermined by Munafo's concession that he was "not aware of" and "cannot give details" about any contribution from De Luca (Ex. 1063, 95:3–8). And, this record is especially wanting for independent

corroboration about De Luca's role vis-à-vis the Bodor regimen because the events in question took place over twenty-years ago.[21]  Even considering the '903 patent, there is no sufficient evidence here from which we can conclude that a specific contribution from De Luca to the claimed subject matter found its way into Bodor's 6-line disclosure.

Altogether, we conclude that Patent Owner cannot exclude Bodor's 6-line disclosure as prior art unless that disclosure was invented by the *same* "inventive entity" as the '903 patent's challenged claims.  And, on this record, we determine that Patent Owner has not provided sufficient evidence to support the conclusion that De Luca is an inventor of the subject matter in Bodor being applied against the '903 patent.  Bodor is, thus, "by another" and available as prior art.

(2)  *Bodor's and Dandiker's Contribution to the "Dosing Regimen"*

Even if the four named inventors of the '903 patent made an inventive contribution to Bodor's 6-line disclosure, Petitioner argues that those contributors were not alone and that Patent Owner is ignoring the importance of Bodor's and Dandiker's cladribine tablet formulation.  Pet. Reply 3–10.

According to Petitioner, under *Duncan Parking* step 1, Petitioner relies on additional Bodor disclosures relevant to establishing obviousness. *Id.* at 3–4.  Petitioner cites Bodor's stated benefits of its oral cladribine formulation (e.g., bioavailability), MS cladribine dosages achieving therapeutic results, fine-tuning cladribine's dose and treatment duration, and

_____

[21] As noted above, Patent Owner never sought to disqualify Bodor during prosecution of the '903 and '947 patents when rejections based on Bodor were raised much closer in time to Ivax's and Serono's collaboration.

37
**Appx131**

Bodor's examples (e.g., making of Bodor's 3 mg and 10 mg tablets, and testing of tablets in patients with MS). *Id.* (citing Ex. 1022, 2, 22:17–19, 24:1–9, Examples 1–4). Patent Owner neither argues nor presents evidence that the '903 patent's named inventors are responsible for these other disclosures in Bodor, and we agree with Petitioner that at least some of these additional disclosures are highly relevant to Petitioner's obviousness challenge. For example, Petitioner's citation to Bodor's teaching of lower interpatient variation with Bodor's solid tablets provides a reason to use that dosage form (Pet. 35); and Petitioner's citation to Bodor's disclosure about "fine tuning" the cladribine dose and length of treatment is relevant to Petitioner's position that a POSA would have regarded those variables as "result-effective" and optimizable to arrive at an obvious maintenance period dose and duration (*id.* at 42–43). Those disclosures are thus, under *Google*, both relied-upon by Petitioner and relevant to establishing the alleged obviousness of the claims. *Google*, 34 F.4th at 1086. Although we agree that Bodor's 6-line disclosure plays a central role in Petitioner's obviousness challenge, we disagree with Patent Owner's suggestion that it is the only disclosure that counts in the *Duncan Parking* analysis. PO Sur-reply 3–4.

Petitioner also argues, under *Duncan Parking* step 2, that Bodor and Dandiker undisputedly invented the solid cladribine dosage form that is described and used in the so-called 6-line regimen. Pet. Reply 4–5 (citing, e.g., Ex. 1059, 25:13–26:2 ("That's my invention and Dr. Dandiker's invention"), Ex. 1060, 48:15–49:13 ("What we were trying to do was to make the first oral tablet . . . for cladribine so that it would help people, it would help patients. Multiple Sclerosis is a devastating disease. . . . And oral, I think, is just better for the patient."). Petitioner argues Drs. Bodor and

Dandiker recognized the tablets' importance to MS treatments, as they are the sole inventors of MS treatment methods using those tablets, as claimed in two patents with priority to Bodor. *Id.* (citing Ex. 1022, claims 22, 27, 28; Ex. 2029, claims 54, 56, 61, and 75). And, even as it pertains to the disclosure of "10 mg" tablets in Bodor's 6-line regimen, Munafo could not say that the '903 patent's inventors alone were responsible for that dose. Ex. 1063, 135:4–14 (testifying "it was a joint team effort"). Indeed, evidence suggests they were not alone. Ex. 2050 (Amsterdam Minutes), 3–4

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████ The teaching of the 10 mg cladribine tablets in Bodor's 6-line disclosure is not only relevant to the obviousness challenge, it is key to Petitioner's showing about how the claimed induction period's total dose limitation is met. *See* Pet. 50–51 (Ex. 1002 ¶ 83 (calculating (10 mg x 14 days = 140 mg; 140 mg ÷ 70 kg (average-weight patient) = 2 mg/kg (within range of 1.7–3.5 mg/kg)).

Patent Owner argues that Petitioner does not explain how Bodor's and Dandiker's involvement in a formulation renders them co-inventors of the regimen. PO Sur-reply 6–7 (arguing, *inter alia*, that Bodor also describes using the formulation to treat diseases in addition to MS, and never claimed the regimen involving administration for a specific number of days/months). That, however, is not accurate. As Petitioner points out, Bodor and Dandiker testified that their tablets exhibited properties important to Bodor's regimen, including improved absorption, reduced interpatient variation, and increased patient convenience/compliance. Pet. Reply 5 (citing, e.g.,

Ex. 1059, 34:11–40:8; Ex. 1060, 121:21–123:7, 124:11–125:6). Patent Owner's clinical pharmacology expert, Dr. Meibohm, agrees that such properties would have been considered when developing a dosing regimen. Ex. 2052 ¶ 2; Ex. 1062, 42:1–47:16, 48:7–57:21 (testifying interpatient variability, dosage form/route, patient compliance/adherence, and stability would "all have been considerations in developing a dosing regimen as of the 2004 time frame").

Even Munafo agreed that "the formulation is part of the elements that you consider in designing a dosing regimen . . . and it [(Ivax's formulation)] became an element that we were considering when designing this dosing regimen." Ex. 1063, 79:8–14. Patent Owner argues that Munafo was only referring to "hypothetical" effects a formulation could have on the regimen; and, according to Patent Owner, there is no evidence the regimen actually changed based on the formulation. PO Sur-reply 7 (citing Ex. 1063, 78:5–80:4). Thus, according to Patent Owner, the formulation bears only an "incidental relation" to the regimen. We disagree. If we somehow excised the recitation of "10 mg of cladribine in the instant complex cladribine-cyclodextrin complex in the instant solid dosage form" from the remainder of the 6-line disclosure, it is unclear what dosage form is used or even how much of the drug would be given. *See* Pet. Reply 4 (annotating Bodor's 6-line disclosure; green highlighting reflecting subject matter not attributable only to named inventors on the '903 patent). The disclosure is intertwined and, on this record, we find that the tablets bear more than an incidental relation to the frequency and duration of administering those tablets.

Accordingly, upon considering all Bodor's relied-upon disclosures as discussed above and the significance of those disclosures to the obviousness challenge presented here, along with the contributions of Drs. Bodor and

Dandiker to the cladribine tablets underlying those disclosures, we conclude that *Duncan Parking* step 3 is met. On the record here, the 6-line disclosure is not solely the invention of the '903 patent's named inventors, Drs. Bodor and Dandiker are at least co-inventors of all applied portions, and the Bodor reference is "by another" and available in full as prior art.

### 4. Obviousness of Claim 17

#### a) Overview

Petitioner contends that claim 17 would have been obvious over the teachings of Bodor and Stelmasiak. Pet. 33–56; Ex. 1002 ¶¶ 77–119. Petitioner contends that Bodor and Stelmasiak teach methods of treating RRMS comprising administering oral formulations of cladribine and that both treatments include induction and cladribine-free periods. Pet. 46–52 (citing, e.g., Ex. 1022, Abstr., 22, 23:15–20; Ex. 1013, Abstr.). Indeed, Petitioner contends the induction period dosing in Bodor overlaps with the claimed induction period dosing, and is followed by a 10-month, cladribine-free period. *Id.* at 50–52 (arguing, e.g., that an average-weight patient would receive about 1.4 mg/kg to about 2.0 mg/kg, overlapping with claim 17's range of about 1.7–3.5 mg/kg); Ex 1002 ¶¶ 83, 84, 105.

According to Petitioner, Bodor at least suggests a retreatment period after the cladribine-free period, especially in view of the fact that MS is a chronic disease and many MS patients do require retreatment. *Id.* at 52–54 (citing Ex. 1022, 23:15–24; Ex. 1002 ¶¶ 86–87; Ex. 1009, 263). Petitioner notes that Stelmasiak teaches a cyclical treatment regimen that includes cladribine retreatments and intermittent cladribine-free periods. *Id.* at 54–55 (citing Ex. 1013, Abstr., 5; Ex. 1002 ¶¶ 88–89). Further, Petitioner contends, it would have been routine to optimize the total dose and length of cladribine administration in a maintenance phase. *Id.* at 40–44 (citing, e.g.,

Ex. 1022, 2, 11–12, 23, 24:6–9 (teaching therapeutically effective amounts can be "easily determined [] empirically by starting at relatively low amounts and by step-wise increments with concurrent evaluation of benefits"), 55–56; Ex. 1002 ¶¶ 102–104 (testifying it would be logical and within the POSA's ordinary skill to use Bodor's two-month treatment period as a starting point for optimization in a maintenance phase).

Petitioner argues it would have been obvious to optimize the total dose and duration of Bodor's regimen as appropriate for treating MS. Pet. 42–43. Petitioner contends the POSA would have, as was standard practice in the field, regularly measured patients' lymphocyte counts while assessing therapeutic efficacy. *Id.* (citing, e.g., Exs. 1013, 5; Ex. 1014, 1717; Ex. 1018, 1146); *see also id.* at 37 (citing Ex. 1002 ¶¶ 103, 105–106 (testifying that a POSA would have been motivated to intersperse drug-treatment periods with drug-free periods to manage hematological toxicity)). And, Petitioner contends, a POSA would have reasonably expected success in view of various clinical studies reporting on the efficacy of cladribine in MS patients, including patients with RRMS. *Id.* at 44–46 (citing, e.g., Ex. 1013, 7; Ex. 1023, Abstr.; Ex. 1022, 22; Ex. 1031, Abstr.; Ex. 1002 ¶¶ 35–50).

In response, Patent Owner argues that claim 17 would not have been obvious for three principal reasons. *First*, Patent Owner contends that neither Bodor nor Stelmasiak teaches the claimed induction and maintenance period dosing. PO Resp. 19–35. According to Patent Owner, Bodor and Stelmasiak do not disclose "weight-based" dosing, and neither reference discloses the same maintenance period as claimed. *Id.* at 19–24. *Second*, Patent Owner contends there is no reason to combine Bodor's and Stelmasiak's teachings or reasonable expectation of success in doing so to

arrive at the claimed method. *Id.* at 35–57 (arguing, *inter alia*, Petitioner's optimization arguments should fail because of alleged dissociation between suppressed lymphocyte counts and therapeutic efficacy). *Third*, Patent Owner argues that objective indicia support a conclusion of nonobviousness. *Id.* at 58–65 (asserting, e.g., alleged skepticism).

We address the parties' arguments and evidence in more detail below in the analysis that follows.

> b) *Whether the Prior Art Teaches or Suggests All Limitations, Including the Claimed Induction and Maintenance Periods*

According to Petitioner, Bodor teaches treating MS, including RRMS, by orally administering cladribine and satisfies claim 17's preamble. Pet. 45, 49 (citing, e.g., Ex. 1022, 22, 23:15–20). Petitioner identifies Bodor's incorporation-by-reference of Romine's (Ex. 1031) cladribine trial involving treatment of RRMS patients, which Bodor cites before describing its 10 mg tablet oral MS treatment regimen; so, Petitioner contends, Bodor "thus expressly teach[es] treatment of RRMS with Bodor'[s] oral dosage form." Pet. 49; Ex. 1002 ¶ 78. Petitioner contends that Stelmasiak similarly teaches treating RRMS using an oral formulation of cladribine. Pet. 46–47, 49–50 (citing Ex. 1013, Abstr.). For the reasons given by Petitioner, we find that Bodor and Stelmasiak disclose claim 17's preamble, whether that language is limiting or not. Patent Owner provides no argument to the contrary.

Petitioner argues that Bodor and Stelmasiak teach induction periods, and that Bodor teaches an induction period dosage and duration that overlaps with claim 17's recitation in step (i) that the total cladribine dose reached at the end of the induction period is about 1.7 mg/kg to about 3.5 mg/kg. *Id.* at 50–51 (citing Ex. 1022, 23; Ex. 1013, Abstr., 5). Specifically, Petitioner

contends, Bodor teaches an induction period spanning two months wherein 10 mg of cladribine is administered once daily for five to seven days in the first month and repeated for five to seven days in the second month. Ex. 1022, 23. As Dr. Miller explains, that regimen would provide a total cladribine dose of 100–140 mg (e.g., 7 days x 10 mg x 2 months = 140 mg) at the end of the induction period and, for a patient of average weight, mathematically corresponds to a range of about 1.4 mg/kg to 2 mg/kg (e.g., 140 mg ÷ 70 kg = 2 mg/kg). Pet. 51; Ex. 1002 ¶ 83 (citing Exhibit 1050 for an average adult weight and showing the respective calculations).

Petitioner contends that Bodor further teaches a cladribine-free period that satisfies claim 17's step (ii). Pet. 51–52. Petitioner cites Bodor's teaching that the induction period discussed above is "followed by ten months of no treatment." *Id.*; *see also id.* at 47–48 (citing Ex. 1022, 23:15–20). According to Petitioner, Bodor's cladribine-free period is within the scope of the claimed "cladribine-free period lasting from about 8 months to about 10 months." *Id.* at 51–52; Ex. 1002 ¶¶ 84, 105.

Furthermore, Dr. Miller opines that a POSA would have understood that Bodor suggests a retreatment period after the cladribine-free period. Ex. 1002 ¶¶ 84–87 (discussing Bodor's alternative regimen with a 6-month induction period, and an 18-month cladribine-free period (Ex. 1022, 23:15–24) and testifying that a POSA would understand Bodor to suggest a subsequent retreatment phase "otherwise, the specified length of time of the cladribine-free period is meaningless"). Dr. Miller testifies that a POSA would have known that MS is a disease without a cure that typically needs ongoing treatment and, reading Bodor in that context, would have "thought to re-administer cladribine again after the specified cladribine-free period." *Id.* ¶ 87 (testifying that "MS patients typically receive more than one course

of drug therapy to treat active relapses, prevent relapses, and/or prevent or slow further progression of the disease"); *see also id.* ¶¶ 57–63.

Accordingly, Petitioner contends that a POSA would have understood Bodor as teaching a cladribine dosing regimen for the treatment of MS as shown in the schematic below.



Pet. 51–52 (citing Ex. 1002 ¶ 84). The image above is a schematic/timeline that shows an induction period (months one and two), a subsequent "No treatment" period of ten months, and then a "Retreatment" or "Maintenance" phase starting in the thirteenth month. Ex. 1002 ¶ 84. The schematic also shows daily and monthly cladribine doses in each of the first two months (~ 0.7–1 mg/kg for each month based on the average-weight patient). *Id.*

Petitioner argues that Stelmasiak teaches a cyclical cladribine regimen with "induction" and retreatment or "maintenance" periods. Pet. 54–55. Petitioner contends that Stelmasiak teaches a regimen ("Regimen 2") involving administration of oral cladribine for the first six months, a no-treatment period in months seven and eight, a retreatment at month nine, followed by another no-treatment period between months ten to fourteen, then another cladribine retreatment at month fifteen, which is again followed by a no-treatment period that spans months sixteen to twenty-four. *Id.*;

Ex. 1013, Abstr., 5. Dr. Miller's schematic illustrating this dosing regimen from Stelmasiak is reproduced below.



Ex. 1002 ¶ 89. The schematic above shows the periods in which cladribine is administered (with dosing amounts in green font) occurring in months one through six, and at months nine and fifteen; following each of the periods in which cladribine is administered are "No treatment" periods (red font) lasting a certain number of months. Dr. Miller opines that a POSA would have understood the first six months as being an induction period and that the retreatments at month nine and fifteen would be understood as "Maintenance" treatments. *Id.* ¶¶ 88–89.

We find that Petitioner has shown by a preponderance of the evidence that Bodor teaches or suggests the induction period recited in claim 17's step (i) and subsequent cladribine-free period recited in claim 17's step (ii). We credit Dr. Miller's testimony, discussed above, explaining how those claim limitations would have been obvious from at least Bodor's teachings. Patent Owner's counterargument, discussed below, is unavailing.

Patent Owner contends that "flat and weight-based dosing are fundamentally different." PO Resp. 19 (asserting "in flat dosing all patients, regardless of weight, receive the same amount of a drug") (citing Ex. 2051 ¶¶ 91–93; Ex. 2052 ¶ 35). According to Patent Owner, Bodor considered

"weight-based dosing in the art but still chose flat dosing" for its 2-months on, 10-months off regimen. *Id.* at 20; *see also* PO Sur-reply 8–10 ("In contrast to the challenged claims' weight-based dosing, Bodor and Stelmasiak only disclose ***flat*** dosing.").

Insofar as Patent Owner is urging that claim 17 should be interpreted to *exclude* administering so-called "flat" doses (i.e., 100–140 mg) to patients of average weight where the total cladribine dose would fall within claim 17's recited range of about 1.7 mg/kg to 3.5 mg/kg, we reject that interpretation. Patent Owner did not propose any express "weight-based" claim construction in its Patent Owner Response and, in its Sur-reply, the only support cited by Patent Owner for its apparent limiting interpretation is an example in the patent (where patients receive a different number of tablets depending on their weight), and the prescribing information/label for the approved drug MAVENCLAD (and testimony about that drug's label). PO Sur-reply 8–9 (citing Ex. 1001, 14:41–44, Tables 3 & 4 (disclosing, e.g., that patients weighing between 60–69.9 kg receive ten 10 mg pills over the first two months; patients weighing 70–89.9 kg receive twelve to fourteen 10 mg pills over the first two months); Ex. 2001, 5).[22]

We see no adequate basis for limiting the claims in the manner suggested by Patent Owner based on the cited example and the extrinsic evidence about MAVENCLAD. We decline to import into the claims any

---

[22] Patent Owner also cites the Specification's disclosure that dosage administered to an individual "will vary depending on a variety of factors," listing pharmacokinetic properties, patient sex, age, weight, health, symptoms, frequency of treatments, and effect desired, among other factors. Ex. 1001, 5:30–35. We do not agree that this non-specific disclosure justifies limiting the claims as written in the manner urged by Patent Owner.

express patient-weighing step or to construe the claims to require preexisting knowledge of a patient's weight. As we noted at institution, the claims include no active steps of determining a patient's weight or performing *a priori* calculations to arrive at any alleged "weight-based" dosing before cladribine is taken or administered. Inst. Dec. 36 n.18. Indeed, the total dose in claim 17 is only recited passively in a wherein clause—"wherein the total dose of cladribine *reached at* the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg." Ex. 1001, 18:17–21 (emphasis added). We, thus, agree with Petitioner; Patent Owner "does not identify any term justifying limiting the claims to weight-based dosing." Pet. Reply 12; Ex. 1084 ¶ 32 (testifying "none of [the] claims . . . require an active step of determining a patient's weight before administering cladribine," and "the claims do not recite administering specific amounts of cladribine to patients of a specific weight").

In any event, the evidence points to the obviousness of converting so-called flat and weight-based expressions of the dose. And, in this field, those expressions are often used interchangeably to describe cladribine doses for treating MS. Bodor, for example, describes a regimen using 10 mg tablets administered over 5–7 days per month for 2 months, which Patent Owner argues is "flat." Ex. 1022, 23:15–20. Elsewhere, however, Bodor defines the "therapeutically effective amount" for treating MS with cladribine in view of the technical literature's reporting of values between "about 0.04 to about 1.0 mg/kg/day." *Id.* at 22:17–22 (citing Beutler (Ex. 1026)). Consistent with Dr. Miller's calculations of the total amount of cladribine given (on a mg/kg basis) with Bodor's regimen using 10 mg tablets, that total amount is well within Bodor's broader definition of known therapeutic amounts. Ex. 1002 ¶ 83. Contrary to Patent Owner's argument,

Bodor does not suggest it was going in any new or nonobvious direction by expressing "flat" dosages in its regimen. PO Resp. 20.

Even the '903 patent makes the obvious conversion between flat and by-weight dose expressions when describing the *background* prior art. The patent describes a study by "Grieb" wherein "Cladribine has been orally administered during 6 monthly courses of 5 days at a total dose of about 4–5.7 mg/kg (patients of about 52 and about 75 kilos, respectively)." Ex. 1001, 3:3–21 (describing Grieb and citing Stelmasiak). Nowhere, however, does Grieb explicitly report a total dosage of 4–5.7 mg/kg. *See generally* Ex. 1023. The patent simply makes the basic mathematical conversion from Grieb's express disclosure (much like Bodor's cited regimen) of giving a certain dosing (e.g., 10 mg/day) over a specified timeframe. Ex. 1023, 324. Patent Owner suggests this description of Grieb should be discounted because the patent's inventors were more prescient than the ordinarily skilled artisan. PO Resp. 24. Yet that argument is undermined because that description appears in the "Background of the Invention," where the patent was plainly summarizing what was already known in the prior art. Ex. 1001, 1:23–3:21 (describing prior studies by Beutler, Grieb, and others). Moreover, although the alleged differences between "flat" and "by-weight" dosing has been a focus of Patent Owner's argument throughout this proceeding, the patent itself never highlights such distinctions, much less suggests any criticality to them.[23]

---

[23] Patent Owner does not identify any prosecution history that would support the alleged distinction between "flat" and "by-weight" dosing. We are aware of none. Indeed, the Examiner cited Bodor's alleged "flat" dose against the claims, which claims included similar "mg/kg" recitations. *See,*

Patent Owner argues that Bodor's dosing does not vary depending on the patient's weight. PO Resp. 20–21. We credit, however, Dr. Miller's testimony that, if Bodor's recited regimen using 10 mg cladribine tablets were given to patients of average weight, there would be material overlap with the induction period's total dose as claimed. *See, e.g.*, Ex. 1002 ¶¶ 83, 107; Ex. 1084 ¶¶ 9–10 (opining that it would have been obvious to administer Bodor's tablets to a patient of average weight (e.g., 70 kg), and in doing so, a POSA would have arrived at the claimed induction dose" and noting "Dr. Lublin did not disagree . . . that treating a MS patient of average weight would have been obvious")). *E.I. du Pont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1008 (Fed. Cir. 2018) ("The point of our overlapping range cases is that, in the absence of evidence indicating that there is something special or critical about the claimed range, an overlap suffices to show that the claimed range was disclosed in—and therefore obvious in light of—the prior art.").

Patent Owner argues that Dr. Miller arrives at the overlap in doses only through hindsight because Bodor does not expressly disclose patient weights. PO Resp. 21–23; Ex. 2051 ¶¶ 89–90 (agreeing with Dr. Miller's calculations but asserting it is hindsight to choose "one very particular-weight patient"). But reading Bodor's disclosure such that the regimen would not apply to at least average-weight patients is unsupported and illogical. *Fleming v. Cirrus Design Corp.*, 28 F.4th 1214, 1223 (Fed. Cir. 2022) ("Since *KSR*, we have explained that it is appropriate to consider the knowledge, creativity, and common sense of a skilled artisan in an

---

*e.g.*, Ex. 1004, 52, 100–102. And the applicant did not argue the alleged distinction Patent Owner raises now. *Id.* at 120–122.

obviousness determination."). The overlap also exists well beyond giving Bodor's regimen to a single patient weighing precisely 70 kg/154 pounds. Giving 140 mg to any patient weighing between about 50–80 kg (110–176 pounds) would result in an induction dosage within the bounds of claim 17's range.[24] And, as Petitioner points out, the art supports applying Bodor's dosing to average-weight patients. Pet. Reply 19 (citing Stelmasiak's cohort of patients weighing 52–75 kg (Ex. 1013, 5)); *see also* Ex. 1084 ¶¶ 65–66 (testifying it would have been obvious to treat patients of average weight and providing mg/kg calculations (n.2) for patients of various weights to further illustrate the overlap with the claims). Petitioner need not show that administering every dose to every hypothetical patient falls within the claim. *Hewlett-Packard Co. v. Mustek Sys.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003) (explaining that prior art that "sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention").

Patent Owner argues that we should disregard Dr. Miller's opinions about the obviousness of the claimed induction period dosing because, outside of this IPR, he described MAVENCLAD's "weight-based" dosing as "rather unique." PO Resp. 21–22 (citing, e.g., 2007 (2019 video for National MS Society), 3:53–4:12; Ex. 2008 (transcript), 4:17–5:1). We credit Dr. Miller's responsive testimony, however, which explains that his comments were "made in the context of [FDA] *approved* MS drugs, not *all* drugs or dosing regimens being investigated in the prior art." Ex. 1084 ¶ 67.

---

[24] Notably, the '903 patent also treats such bounds rather loosely. *See, e.g.*, Ex. 1001, 15 (Table 3 (target dose of "1.75 mg/kg"): suggesting, e.g., a patient receiving 14 tablets (each with 10 mg cladribine) and weighing between 85–89.9 kg would fit the criteria, which conversion produces a total dose range of about 1.56–1.65 mg/kg).

What may be "unique" in terms of FDA approval does not equate with being nonobvious over the relevant art. Considering the prior art and preexisting clinical studies generally, it is clear that administering "weight-based" cladribine dosing is not unique. *See, e.g.*, Ex. 1018 (Rice), Abstr. (describing placebo-controlled clinical trials in MS patients receiving subcutaneous induction dose of 0.7 mg/kg (over 2 months) or 2.1 mg/kg (over 6 months)); Ex. 1002 ¶ 47 (discussing Rice's study).

Patent Owner argues that Stelmasiak does not remedy Bodor's deficiencies because it too allegedly teaches "flat" dosing, not "weight-based" dosing. PO Resp. 23. Also, Patent Owner contends, "Stelmasiak teaches away from" weight-based dosing. *Id.*; PO Sur-reply 10.

Bodor is not deficient for the reasons explained above. Pet. Reply 19 (noting Petitioner relies on Bodor's induction dosing, not Stelmasiak's). We also disagree that Stelmasiak teaches away from weight-based dosing.[25] Stelmasiak discloses that "there was no indication that a 'good response' is related to the actual cladribine dose per body weight." Ex. 1013, 6–7; Ex. 1084 ¶ 68 (testifying "a POSA would have understood that to simply mean that 'responders' in the study had different body weights"). This is not a teaching away. Stelmasiak sought to explain the variance in lymphocyte counts among its patients, and to identify "any factor" that might have differentiated between patients that were responders versus the non-responders. Ex. 1013, 6–7. Stelmasiak was "unable" to identify such a factor. But Stelmasiak nowhere teaches that expressing dosages in mg/kg

---

[25] Because Patent Owner admits that Stelmasiak and Grieb have substantially the same disclosures (PO Resp. 24), the '903 patent's concession about what was known from Grieb undercuts Patent Owner's argument that Stelmasiak also discloses only "flat" dosing.

and administering those dosages would result in an ineffective MS treatment. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) (explaining the art's disclosure of alternatives is not a teaching away where the disclosure does not "criticize, discredit, or otherwise discourage the solution claimed"). To the contrary, at most, Stelmasiak suggests doing so would not have changed its results. Ex. 1084 ¶ 68 (testifying "Dr. Lublin provides no evidence that weight-based cladribine dosing was superior or not 'equivalent' to flat, fixed dosing").

Considering the totality of the record, we also find that it would have been obvious to follow Bodor's 2-month induction period and 10-month cladribine-free period with a retreatment or maintenance phase. Bodor teaches two "alternative" regimens—one noted immediately above, and another where the drug is administered for six months (giving a higher overall dose) with a longer 18-month drug free period. Ex. 1022, 23:15–24. We find persuasive Dr. Miller's testimony that Bodor's recitation of specific durations for the drug-free periods logically suggests a retreatment period. *See, e.g.*, Ex. 1002 ¶¶ 84–86 ("otherwise, the specified length of time of the cladribine-free period is meaningless"); *see also* Ex. 1084 ¶ 70 (noting Patent Owner's declarant "Dr. Lublin does not provide another explanation of why Bodor specifies the length of time of the cladribine-free period").[26] Indeed, Dr. Miller testifies, "[t]he most logical reading of Bodor would have

---

[26] At the hearing, when asked about why Bodor would specify the length of the cladribine-free period, Patent Owner's counsel stated that "it's a period in which the person should not be treated with cladribine" and is required for safety. Tr. 62:11–63:22. But this seems to reinforce Petitioner's point that, by specifying the number of months of the cladribine-free period, Bodor is suggesting one could safely retreat the patient as needed when that specified period elapsed—or at least the POSA would consider doing so.

included a re-treatment period, especially because such re-treatments were consistent with prior clinical studies where patients relapsed during or after cladribine therapy." Ex. 1084 ¶ 70 (citing Ex. 1013, Abstr.; Ex. 1031, 43); Pet. 36–37 (citing, e.g., Ex. 1002 ¶¶ 100–101, 113; Ex. 1018, Abstr.).

We also find persuasive Petitioner's position and Dr. Miller's supporting testimony that it would have been logical and well within the POSA's skill to use Bodor's 2-month treatment period and cladribine dose as a "starting point" for optimization in a maintenance phase.[27] Pet. 42–43; Ex. 1002 ¶¶ 102–104; Ex. 1084 ¶ 88. Petitioner argues, it would have been routine and well within the ordinary capabilities of the POSA to "fine tune" the total dose and length of cladribine administration, including during a maintenance period. Pet. 42–43; Ex. 1002 ¶ 93. The prior art supports that POSAs regarded such variables as optimizable. Bodor teaches that:

> [O]ne of skill will appreciate that the therapeutically effective amount of cladribine administered here may be lowered or increased by fine-tuning and/or by administering cladribine according to the invention with another active ingredient. The invention therefore provides a method to tailor the administration/treatment to the particular exigencies specific to a given mammal. Therapeutically effective amounts may be easily determined, for example, empirically by starting at relatively low amounts and by step-wise increments with concurrent evaluation of beneficial effect.

---

[27] For the same reasons discussed above, if the POSA repeated Bodor's dosage of 100–140 mg over two months in a maintenance phase for an average-weight patient (range of about 1.4–2.0 mg/kg), the dose and duration would overlap with the recitations in claim 17's step (iii) (total dose of about 1.7 mg/kg in a period lasting about 2–4 months).

Ex. 1022, 24:1–9; *see also* Ex. 1026, 5:20–25 (teaching that "one can tailor the dosage and duration" of cladribine administration "to the stage of the [MS] disease and the condition of the patient being treated").

Petitioner's position that it would have been obvious to use Bodor's induction dose/duration as a logical "starting point" in a maintenance phase is also more consistent with a concession made by Patent Owner during prosecution of the '903 patent. There, it was argued that, if Bodor were understood to "imply" a retreatment (as the Examiner had found), "the teachings of the reference would suggest that the *same dosing regimen* be applied to the patient (10 mg of cladribine administered for 5-7 days each month for two consecutive months followed by another 10 month period of time in which the patient receives no treatment)." Ex. 1004, 100–101, 151 (arguing "[t]his would have resulted in the *same* total dose of cladribine being administered to the patient in *both* the induction phase and the maintenance phase") (emphasis added).

Petitioner also argues, and we agree, it would have been obvious to include a cladribine-free period after delivering treatment during a maintenance period. Pet. 54. As Dr. Miller explains, this is shown expressly in Stelmasiak, which followed the initial treatment and each retreatment period with cladribine-free periods. *Id.* (citing Ex. 1002 ¶ 88). Moreover, we credit Dr. Miller's testimony that a POSA would have incorporated cladribine-free periods to help control potential drug toxicity and side effects. *Id.* at 37 (citing Ex. 1002 ¶¶ 103–105 ("[A] POSA would have known that suppressing a patient's immune system would put them at increased risk of infection."); Ex. 1013, 5 (teaching "hematological toxicity of the drug (bone marrow suppression) raised some concern"); Ex. 1084 ¶ 87 (testifying "a POSA would have had the skill to monitor a patient's

lymphocyte count and side effects associated with lymphocyte and myelosuppression and optimize the length of time of the second cladribine-free period to mitigate side effects while maximizing lymphocyte suppression").

Patent Owner argues that Bodor and Stelmasiak do not disclose the maintenance period as claimed. PO Resp. 24–35 (citing, e.g., Ex. 2051 ¶¶ 98–124). Patent Owner contends that "safety concerns" stemming from prolonged immunosuppression would have suggested against retreating with cladribine. *Id.* at 25–27. Patent Owner contends that dosing of other FDA-approved MS disease-modifying agents (DMAs) were dosed continuously, not cyclically. *Id.* at 27–30 (arguing that Dr. Miller's citation to drugs like corticosteroids as evidence of cyclical retreatment is uninformative). And, Patent Owner contends, "most MS clinical trials studying cladribine" used only a single course of drug administration without any retreatment. *Id.* at 30–33. We address these arguments in turn below.

Because cladribine was known to be a strong immunosuppressive agent, there were some safety concerns with its use reflected in the art. *See, e.g.*, Ex. 1015, 1752 ("The primary toxicity caused by the drug is myelosuppression, which is a dose-limiting factor."); Ex. 1016, 430 ("[C]aution is recommended when the drug is administered before, after or with other drugs that may cause myelosuppression or immunosuppression.").

On the whole, however, the evidence shows that POSAs continued to use cladribine to treat MS patients in human clinical studies and considered cladribine to have an acceptable safety profile for such uses—especially balanced against the drug's promise. Stelmasiak reported no "clinically significant hematological side effects," and only "mild" side effects over its

two-year study, even with an induction dose higher than Bodor's 2-month total dosing and giving multiple cladribine retreatments. Ex. 1013, 7. Romine reported a mild infection in a few cladribine patients and one placebo patient but "[o]therwise, there were no side effects or adverse events." Ex. 1031, 35; *see also* Ex. 1018, 1153 (Rice reporting "no serious adverse events could be attributed to cladribine in this study."); Ex. 1047, Abstr. (Selby noting cladribine "was remarkably well tolerated"). Although Romine states that "[r]epeated treatment raises long-term toxicity issues . . . known to occur with *other* long-term immunosuppressive treatments," Romine, nevertheless, describes *retreating* twenty-four patients with cladribine. Ex. 1031, 43–44 (noting those patients were retreated for disease worsening, and reporting "no instances of marrow suppression or thrombocytopenia" but some increase (4% to 25%) in infection frequency versus the initial phase) (emphasis added); *see, e.g.*, Ex. 1084 ¶¶ 51–57 (reviewing cladribine's efficacy and safety profile as reported in the literature and testifying, "a POSA would have understood that cladribine continued to be administered to MS patients before 2004, despite the 'safety concerns' Dr. Lublin claims existed"). On balance, we disagree that a POSA would have considered a cladribine retreatment unacceptably unsafe following Bodor's 10-month cladribine-free period.

Patent Owner's argument about other FDA-approved MS drugs being dosed continuously without interruption fares no better in rebutting Petitioner's challenge. PO Resp. 27–30; Ex. 2051 ¶¶ 54–58, 102–103. The art's teachings are not limited to FDA-approved drugs. The prior art here *specific to cladribine* expressly teaches MS-treatment regimens that include cladribine-free periods and suggests retreating patients with cladribine as needed. Ex. 1022, 23:15–24; Ex. 1013, Abstr.; Ex. 1018, 1146; Ex. 1031,

43–44; Ex. 1002 ¶¶ 35–49; Ex. 1084 ¶¶ 69–70, 75. As persuasively argued by Petitioner, "[r]etreatment was recommended given cladribine's temporary lymphocyte suppression and MS's chronic nature." Pet. Reply 21–22 (citing e.g., Ex. 1084 ¶¶ 71–73, 95–96). We credit Dr. Miller's literature-backed testimony that a POSA would have understood that, "[b]ecause lymphocytes rebound, the art recognized that the 'lengthy but impermanent duration of effect of cladribine means that retreatment will be necessary if cladribine is to become a practical long-term therapy for MS.'" Ex. 1084 ¶ 71 (quoting Ex. 1031, 43); *see also* Ex. 1046, 392 ("Since the beneficial effect of a single course of cladribine in CPMS patients is not permanent, a current study of the safety and efficacy of retreatment with cladribine will be especially important.").

Patent Owner's argument that "most" clinical trials did not retreat with cladribine is equally unavailing. PO Resp. 30–33. The fact is, some studies did expressly retreat with cladribine—including at least Stelmasiak (retreatment at, e.g., months 9 and 15), Romine (retreatment if recurrence of disease worsening), and Rice (retreatment 12-months after last dose if evidence of disease progression). Ex. 1013, Abstr., 2; Ex. 1018, 1146; Ex. 1031, 43.

Patent Owner argues that the specific timing and dosing of Stelmasiak's retreatments are not the same as what is claimed. PO Resp. 33–34. That is true but inapposite because the challenge is obviousness based on the art's combined teachings. *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1050 (Fed. Cir. 2019) ("A finding of obviousness . . . cannot be overcome by attacking references individually where the rejection is based upon the teachings of a combination of references.") (internal quotation marks omitted). We find retreatment (and routine optimization thereof as

necessary) at the end of Bodor's 10-month cladribine-free period would have resulted in the claimed maintenance period and dose. Patent Owner also dismisses the retreatments described in Rice and Romine because they were not "automatic" but depended on conditions like worsening of the patient's disease or hematological criteria.[28] PO Resp. 30–32. But we fail to see how this undermines Petitioner's theory, which did not presuppose "automatic" retreatment either. *See, e.g.*, Ex. 1002 ¶¶ 100–101 (testifying that at least some patients would be expected to exhibit signs of disease relapse during or after Bodor's initial treatment, motivating retreatment for the relapsing patient after the 10-month cladribine-free period).

Patent Owner's arguments about a lack of "consensus" around *when* retreatment should occur and the possibility that drugs other than cladribine might be used in a retreatment phase are unpersuasive. PO Resp. 32–33. As discussed above, Stelmasiak teaches retreatment at about two and eight months after the 6-month induction dosing period ended; according to Dr. Miller, Bodor logically suggests a retreatment after a 10-month cladribine-free period lapses; and Rice and Romine teach a retreatment as needed by the patient and at twelve months after the initial treatment ended. Even if there was no "consensus" to give a maintenance dose after expiry of a cladribine-free period lasting about 8–10 months as claimed, where, as here, retreatment with cladribine following a drug-free period was well-known in the art, it is not inventive to discover optimum or workable ranges by routine experimentation. *In re Aller*, 220 F.2d 454, 456 (CCPA 1955).

---

[28] Rice, for example, teaches that the hematologic criteria were based on patient's complete blood count (CBC). Ex. 1018, 1146, 1154 (listing criteria including platelet, neutrophil, and hemoglobin counts above a threshold).

Moreover, that some clinicians may have considered switching drugs in retreatment does not mean that a POSA would not have considered continuing treatment with cladribine. Ex. 1084 ¶ 73. Both scenarios could be true and, based on the record here, we find retreatments with cladribine were known and would have been considered.

For the above reasons, we are persuaded that claim 17's recited maintenance period and secondary cladribine-free period (in steps (iii) and (iv)) would have been obvious over the asserted art. We further address the parties' arguments about routine optimization of result-effective variables (e.g., cladribine dose and duration) in Section III.D.4.(c) below. *See, e.g.*, Pet. 40–43; PO Resp. 37–47 (addressing routine optimization in relation to argument about motivation and reasonable expectation of success).

*c)*     *Motivation to Combine and Reasonable
Expectation of Success*

According to Petitioner, a POSA would have been motivated to use Bodor's oral cladribine solid dosage form to treat MS. Pet. 33–34 (citing preference for oral drug delivery, increased bioavailability, and lowered interpatient variation with Bodor's oral dosage form as reasons to use Bodor's tablets to treat MS). *Id.* at 34–35 (citing, e.g., Ex. 1022, 2, 11–12, 23; Ex. 1002 ¶ 79); *see also* Ex. 1002 ¶¶ 96–98 (reviewing benefits of Bodor's oral tablets, such as convenience of injections, as reason to use). Further, Petitioner contends, a POSA would have expected at least some patients treated with Bodor's "two months on/ten months off" cycle to experience breakthrough disease or relapse that would require additional, maintenance treatment. *Id.* at 35–37 (citing Ex. 1002 ¶ 100 (testifying, with citation to supporting literature, that cladribine treatment is disease modifying but not permanent and that it was recognized that retreatment

60

would be important)).  As explained by Petitioner with Dr. Miller's supporting testimony, signs or symptoms of relapse may include, e.g., worsening neurologic function on physical examination of the patient or inflammatory demyelination (i.e., new lesion formation) on MRI scan.  *Id.* (citing Ex. 1002 ¶ 100; Ex. 1016, 420; Ex. 1013, 6–7).

Because a POSA would have expected signs of relapse in at least some patients, Petitioner contends a POSA had reasons to retreat with cladribine, such as taught in Stelmasiak.  *Id.* at 36–37 (citing Stelmasiak's reporting of a reduction in relapse rate, and improvements in patient EDSS scores).  As discussed above, Petitioner contends that Bodor suggests retreatment too and that it would have been logical to use Bodor's induction dosing protocol in a retreatment phase.  *Id.* at 42–43, 52–53; Ex. 1002 ¶¶ 86–87, 102.  Petitioner contends a POSA, thus, would have had reasons to continue treating patients with cladribine after the induction and cladribine-free periods of Bodor.  Pet. 35–37; Ex. 1002 ¶ 101.  Indeed, Petitioner contends, retreatment, including with cladribine, was seen in various MS therapies described in the art.  *Id.* (citing Ex. 1026, 11:5–7, Ex. 1022, 23; Ex. 1013, Abstr.; Ex. 1018, Abstr.; Ex. 1002 ¶¶ 101, 113).  Petitioner also contends a POSA had reasons to consider using lower maintenance-period doses or the same induction-period dose in the maintenance phase.  *Id.* at 38–39; *id.* at 38 n.10; Ex. 1002 ¶¶ 89, 108–109.

Petitioner argues the claimed dose of cladribine reached at the end of the induction and maintenance periods would have been prima facie obvious over the prior art's teachings.  Pet. 40–44.  Petitioner cites an overlapping range with Bodor's 1.4 mg/kg to 2.0 mg/kg induction dosing compared to the range of "about 1.7 mg/kg to about 3.5 mg/kg" as claimed.  *Id.* at 40–41 (citing Ex. 1002 ¶ 107).  Petitioner contends that duration of treatment and

dosage amount were known variables subject to routine optimization. *Id.* at 41–43 (citing Ex. 1002 ¶¶ 91–93, 110, 117; Ex. 1022, 2, 11–12, 23, 24); *see also id.* at 42 (citing Bodor's definition (Ex. 1022, 22) for "therapeutically effective amount"). Petitioner cites the art's teaching that "one of skill will appreciate that the therapeutically effective amount of cladribine administered . . . may be *lowered or increased* by fine tuning" and that "one can *tailor the dosage and duration* for which [cladribine] is administered to the stage of the disease and the condition of the patient being treated." *Id.* (quoting Ex. 1022, 24:1–3; Ex. 1026, 5:22–25) (emphasis added by Petitioner). Thus, Petitioner argues, cladribine's dose and length of administration are result-effective variables that can be modified to achieve a recognizable result (e.g., change in a patient's lymphocyte count). *Id.* at 42 ("Rice uses two different cladribine doses, 0.7 mg/kg and 2.1 mg/kg, with the higher dose having a higher suppression of lymphocyte counts.") (citing Ex. 1018, Fig. 4).

Accordingly, Petitioner argues, it would have been routine and within the POSA's capabilities to "fine tune" the total dose and length of cladribine administration. *Id.* at 42–43; Ex. 1002 ¶ 93. Dr. Miller opines that "it would have been logical for a POSA to have used Bodor's 2-month treatment period as a starting point, knowing that it could be routinely optimized." Ex. 1002 ¶ 102. Petitioner cites Bodor's teaching that "[t]herapeutically effective amounts may be easily determined, for example, empirically by starting at relatively low amounts and by step-wise increments with concurrent evaluation of beneficial effect." Ex. 1022, 24:6–9; Pet. 43. And, Petitioner contends, a POSA would have arrived at suitable doses and durations of cladribine administration by routinely measuring the patients' lymphocyte counts and monitoring for therapeutic efficacy. Pet. 43 (arguing

"[t]his was standard practice in the field, as demonstrated by at least Stelmasiak, Rice, and Beutler") (citing Ex. 1013, 5, Ex. 1014, 1717; Ex. 1018, 1146; Ex. 1002 ¶¶ 31–32)); *see also id.* at 43–44 (arguing no evidence of "criticality" to the dosage/duration for the maintenance period of claim 17).

Petitioner contends a POSA would have followed a retreatment period with another cladribine-free period. Pet. 37. According to Petitioner, a POSA would have been motivated to do so to manage possible adverse effects (e.g., hematological toxicity). *Id.*; Ex. 1013, 5; Ex. 1002 ¶¶ 103, 105–106 (testifying the drug-free periods would have been seen as a desirable aspect of the regimen to mitigate toxicity and infections arising from the immunosuppressive effects of cladribine).

Lastly, Petitioner contends a POSA would have had a reasonable expectation of success in arriving at the subject matter of claim 17. Pet. 44–46 (citing Ex. 1002 ¶¶ 35–50; 111–119). Petitioner contends the POSA would have "followed the instructions in Bodor to orally administer the dosage forms following the dosage regimen" disclosed as suitable for treatment of MS. *Id.* at 44–45. Petitioner contends a POSA would have included a maintenance and secondary cladribine-free period "because it was standard practice in the field to retreat MS patients over the course of the disease," and optimized the duration and dosing of such maintenance period as appropriate. *Id.* (citing Ex. 1013, Abstr.; Ex. 1002 ¶¶ 113–114). And, Petitioner contends, a POSA would have reasonably expected that the claimed cladribine regimen would be effective because it was known that cladribine can cause a "prolonged, profound suppression of lymphocyte counts," and researchers, including at least Stelmasiak and Romine, had described favorable effects including significantly reduced relapse rates and

MRI findings (i.e., reduced lesions) in clinical studies with RRMS patients. *Id.* at 45–46 (citing Ex. 1013, 4, 7; Ex. 1022, 1–2, 22–23 (incorporating Romine); Ex. 1031, Abstr.; Ex. 1016, 420, Ex. 1002 ¶¶ 35–50, 52, 114–116).

We find the POSA would have had sufficient motivation for modifying and optimizing Bodor's teachings to arrive at the subject matter of claim 17, and have had a reasonable expectation of success in doing so. We explain our findings below and then turn to Patent Owner's arguments to explain why they are unavailing.

We find that Petitioner has proved by a preponderance of the evidence that a POSA would be motivated to use Bodor's solid oral 10 mg tablets and the recited 2-months on/10-months off regimen for treating MS patients. This requires little more than the POSA following Bodor's express guidance, and Bodor states that its dosage formulation has advantages (e.g., patient compliance with oral delivery; lower interpatient variability). Ex. 1022, 2, 12, 23; *see also* Ex. 1080 ¶ 16 (testimony of Dr. Pinal about the general preference for oral tablets and remarking on other attributes of Bodor's tablets making them desirable to use in an MS treatment regimen). Using Bodor's tablets and following the above-noted regimen would result in overlap with claim 17's induction period in step (i), as well as overlap with the claim's cladribine-free period recited in step (ii) as discussed above.

We find persuasive Dr. Miller's testimony that a POSA would have been motivated to retreat with cladribine at least those patients who showed signs of relapse—and done so after Bodor's 10-month cladribine-free period expires. Ex. 1002 ¶¶ 100–102 (citing, e.g., Ex. 1016, 420; Ex. 1013, 6–7; Ex. 1037, 908). We also agree that it would have been logical to use Bodor's initial treatment dose/duration as a starting point for optimization in a retreatment (maintenance) phase. *Id.* The prior art supports our finding

that a POSA would have understood that cladribine dose and duration were known optimizable variables. *See, e.g.*, Ex. 1022, 24:1–9; Ex. 1026, 5:20–22; Ex. 1002 ¶¶ 18, 117–118 (testifying patient-specific dose optimization is a common practice in the clinic). Moreover, the known correlation between cladribine dose/duration (variables) and level of lymphocyte suppression (a result) supports our determination that the variables are "result-effective." *See, e.g.*, Ex. 1002 ¶¶ 91–92 (testifying "[i]t was also general knowledge in the art that a direct correlation exists between the dose and length of administration of cladribine and level of lymphocyte suppression"), 117–118; Ex. 1018 (Rice), 1152, Fig. 4 (describing "dose-dependent decreases" in lymphocyte levels at 0.7 mg/kg and 2.1 mg/kg); *see also id.* at 1151 (reporting a "small, dose-dependent, median percent decrease in T2 lesion volume"); Ex. 1047 (Selby), 297 (describing less rapid decrease and faster rebound in lymphocyte levels with cladribine at lower versus higher doses (2.1 mg/kg and 2.8 mg/kg)). Thus, we find that a POSA would have optimized Bodor's cladribine dose/duration in a maintenance phase as appropriate for the relapsing patient, and also included a secondary cladribine-free period (for safety and to mitigate toxicity) and, in doing so, would have predictably arrived at claim 17's steps (iii) and (iv).

We also find that a POSA would have reasonably expected success in arriving at the claimed subject matter. In addressing this issue, we conclude that "the claims are not limited to any efficacy degree or metric." Pet. Reply 10 (citing Ex. 1061 (Lublin Tr.), 139:15–19 (Q: "Do the claims of the '903 patent require any particular degree of efficacy in its methods of

treating multiple sclerosis?" A. "Not that I see")).[29] *C.f. Janssen Pharm., Inc. v. Teva Pharm. USA, Inc.*, 97 F.4th 915, 928–929 (Fed. Cir. 2024) (holding that, "[w]hatever role safety and efficacy data may play in assessing the strength of a motivation or lack of motivation to combine, . . . [the absence of safety and efficacy data in certain art] cannot justify simply discarding that prior art particularly where, as here, the claims do not have any safety and efficacy requirement.").

But even if the claims did require a specific treatment "efficacy," the patent's definition of the term is broad. It indicates that efficacy can be measured by, for example, "frequency of relapses" or "presence or absence of new lesions" as detected by MRI. Ex. 1001, 5:52–6:9 (describing reduction in MRI $T_1$ lesions as a "primary efficacy variable" and "[s]econdary efficacy variables" as including, for example, lesion volume, frequency of exacerbations, and EDSS or SNRS scores); *see also id.* at 16:7–49 (example, using MRI-detected lesions as the efficacy metric; remarking that the treatment is "efficient in decreasing brain lesions and no severe adverse effect is observed").

With that context about what the claims require (or rather, don't) as to specific therapeutic efficacy, we consider the preexisting technical literature about cladribine's positive effects when treating MS patients, which Petitioner has identified. *See, e.g.*, Pet. 19–21 (summarizing studies by

---

[29] The patent also indicates that the "beneficial effect" of the invention, including any attenuation, decrease, reduction, or diminishing of pathological development of disease may be seen at *any stage* of the treatment course (e.g., after the induction treatment, during a cladribine-free period, etc.). Ex. 1001, 5:19–24.

Beutler, Stelmasiak, Romine, and Rice, which we highlight below in order
of their publication (from roughly 1996 through 2000)).

> Beutler: in a 2-year, placebo-controlled, double-blind, crossover
> study, noted improvement in EDSS and SNRS scores in patients
> receiving cladribine, and "highly statistically significant
> changes" in brain lesions. Ex. 1014, 1717–19 ("Our studies
> clearly show that cladribine retards the progression of neurologic
> impairment of patients with chronic progressive MS" and "[i]n
> our studies we observed marked improvement in the appearance
> and disappearance of lesions" in patients receiving both the high
> and low doses (2.8 mg/kg and 1.4 mg/kg).); *see also id.* at 1716
> ("Analysis of the results revealed a favorable influence on
> neurological performance scores . . . and on MRI findings on
> patients treated with cladribine.").

> Stelmasiak: in a 2-year pilot study of cladribine's use in RRMS
> patients, reported "EDSS scores were significantly reduced [(a
> positive outcome)] during the treatment compared to the initial
> values" and the "number of relapses . . . was markedly reduced
> (almost five times on average)" in seven of the ten patients.
> Ex. 1013, 4, 6–7 ("The relapse rate in some (but not all) patients
> is impressively decreased" while side effects are "mild").

> Romine: in an 18-month, placebo-controlled, double-blind study
> on patients with RRMS, reported "significant favorable effect of
> cladribine on the joint frequency and severity of relapses" and
> "MRI-enhancing lesions were completely suppressed in the
> cladribine patients." Ex. 1031, 35 (subcutaneous injection of
> total 2.1 mg/kg over six months). Romine, thus, "conclude[d]
> that cladribine shows promise as a treatment for relapsing-
> remitting multiple sclerosis." *Id.* (noting, with the exception of
> "mild" infection in a few patients, "there were no side effects or
> adverse events").

> Rice: in a multi-year, placebo-controlled clinical trial[30] of
> progressive MS patients, concluded that, although "[n]o

---

[30] Rice included a 12-month double-blind phase, which was followed by a
long-term extension phase for some patients. Ex. 1018, 1146.

significant treatment effects were found for cladribine in terms of changes in EDSS or SNRS scores[,] [b]oth doses [(0.7 mg/kg and 2.1 mg/kg)] of cladribine produced and sustained significant reductions in the presence, number, and volume of gadolinium-enhanced T1 brain lesions on MRI." Ex. 1018, 1145 (describing the drug as "generally safe and well tolerated"), 1153 ("MRI findings . . . were more compelling" (compared to the results for clinical efficacy as measured by EDSS/SNRS scores), noting "T1 lesions represent areas of breakdown of the blood-brain barrier and are generally believed to be sites of new inflammation that probably precede symptoms and other MRI signs in MS," and those "lesions were virtually eliminated by treatment with cladribine").

These preexisting studies reasonably demonstrate cladribine's safety and efficacy—at least comparable to what is reported in the '903 patent and encompassed by the patent's definition of "efficacy." The expectation of success need be only reasonable, not absolute. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). Moreover, the test for obviousness does not require "actual success" in the prior art. *See Endo Pharm. Inc. v. Actavis LLC*, 922 F.3d 1365, 1379 (Fed. Cir. 2019) (Stoll, J., dissenting) (citing *PAR Pharm. Inc. v. TWi Pharm., Inc.*, 773 F.3d 1186, 1198 (Fed. Cir. 2014)). But here, the art does report actually significant and positive results in the treatment of MS as discussed above, including fewer lesions and a reduction in relapses. *See* Pet. 43–46 (citing studies); Pet. Reply 13–14 (citing studies); Ex. 1084 ¶ 89 (testifying a POSA would have reasonably expected Bodor's oral cladribine tablets and regimen of administering them "to effectively suppress lymphocytes and treat MS by reducing relapse rates and/or brain lesions as detected by MRI"). Bodor fully incorporates-by-reference many preexisting MS cladribine studies, including those from Romine and Rice (summarized above) immediately before disclosing its 2-months on, 10-months off regimen. Ex. 1022, 22:27–23:6. Even if Bodor

did not itself report clinical results of that regimen, we find a POSA would have reasonably expected success in treating MS patients with it (optimized to include a suitable maintenance dose and secondary cladribine-free period, as discussed above).

Patent Owner argues that Petitioner fails to establish a motivation for changing Bodor's "flat" cladribine-dosing method to a "weight-based" method. PO Resp. 35–36 (arguing no overlap between Bodor's "flat" dosing and the claims), 48–49 (citing Ex. 2051 ¶¶ 85–97, 132, 164–166). Patent Owner presumes that the claims exclude giving allegedly "flat" dosing of between 100–140 mg to a range of patients (including those of average weight, e.g., 70 kg) that would otherwise result in mg/kg dose expression that overlaps with the claims. We reject this argument for reasons already explained above. *See supra* Section III.D.4.(b). Bodor's method need not be *changed* in the manner urged by Patent Owner.

Patent Owner argues that a POSA would not have been motivated to retreat MS patients after Bodor's 10-month cladribine-free period, or done so with a reasonable expectation of success. PO Resp. 53–55. According to Patent Owner, there was no general, cyclical immunosuppression framework and FDA-approved MS drugs were dosed continuously. *Id.* at 53–54. Patent Owner contends Petitioner is citing Stelmasiak's cyclical regimen in hindsight because, even with its retreatments, EDSS scores eventually returned to baseline. *Id.* at 54–55. And, PO argues, if retreatment was needed, a POSA could have looked at other available MS drugs. *Id.* at 55.

We reject this argument for reasons already explained above, including our crediting of Dr. Miller's testimony that it would be logical to retreat relapsing patients following Bodor's 10-month cladribine-free period, and in view of multiple studies that did retreat with cladribine (e.g., Rice,

Romine, and Stelmasiak). Patent Owner contends that, as to Rice and Romine, the art did not teach repeated treatment absent a pharmacological rationale and patient need. *Id.* at 54 (citing Ex. 2051 ¶¶ 180–181). This does not undermine Petitioner's showing because, as already explained, Dr. Miller testifies that retreatment would have been considered appropriate for patients showing signs of continued need (e.g., disease worsening, relapses during or after the cladribine-free period). Ex. 1002 ¶¶ 51, 52, 91, 99–102. Petitioner's theory also does not suggest that retreatment would have occurred without concomitant considerations of safety (e.g., lymphocyte counts). Ex. 1084 ¶¶ 11, 69–72 (noting, e.g., mean lymphocyte counts in Rice had rebounded to a level above $1.0 \times 10^9$/L by the tenth month following the last cladribine dose). Regarding Stelmasiak, it at least *maintained* EDSS scores during its full two-year study—a positive result showing the disease did not worsen. *Id.* ¶¶ 52 ("EDSS scores at 24 months were the same as they were at baseline indicates a lack of overall disability worsening."), 94–95; Ex. 1061 (Lublin Tr.), 57:3–4 (admitting "[t]here also could be decreased worsening of the EDSS," and "if your agent slows that worsening, then that's a therapeutic effect").

Patent Owner argues that a POSA would not have been motivated to combine Bodor and Stelmasiak to arrive at the claimed induction or maintenance doses. PO Resp. 49–53, 55–57. According to Patent Owner, the bioavailability of Stelmasiak's oral cladribine/saline solution is higher than Bodor's tablets, so a POSA would not have been motivated to "start" with Bodor over Stelmasiak. *Id.* at 50–53 (arguing "Bodor lacks efficacy data for its dosing regimen"). Patent Owner also contends a POSA would have expected Bodor's lower induction dose (total dose (140 mg) with less bioavailability) would have been less effective than Stelmasiak's induction

dose (300 mg) and unable to suppress lymphocytes to the same degree as Stelmasiak. *Id.*; *see also id.* at 55–57 (arguing that Stelmasiak's lower maintenance doses are given earlier (after a 2- or 5-month drug-free period), following Stelmasiak's higher induction dose compared to Bodor, and thus provide no reason to lower a maintenance dose in Bodor or wait ten months to give it).

We disagree with Patent Owner's argument. Even assuming Stelmasiak's formulation has a higher bioavailability (allegedly 50% versus about 39% in Bodor), there are other reasons for the POSA to have selected Bodor's regimen. Ex. 2009, 61:13–18 (Miller agreeing the reported bioavailability for Bodor's 10 mg tablets is 39.1–39.4%). Bodor describes other desirable features with its tablets, including lower interpatient variability and patient convenience. Pet. 33–35; Ex. 1022, 2, 11–12. The premise of Patent Owner's argument—that the POSA needs to have chosen to start with Bodor over Stelmasiak—is also flawed. The law "does not require that a particular combination must be the preferred, or the most desirable." *Novartis Pharma. Corp. v. West-Ward Pharma Int'l Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019); *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. 2021) ("[It is] not necessary to show that a combination is the best option, only that it be a suitable option.") (internal quotation marks omitted). Bodor's induction dosing and duration need not be modified by Stelmasiak to arrive at the induction period as claimed. And adding a maintenance phase to Bodor is a logical extension of its disclosures, which would have been further obvious in view of cladribine retreatments already known in the art and routine optimization. Pet. Reply 22 (noting Petitioner cited Stelmasiak for suggesting a cyclical regimen, but

"did not argue modifying Bodor's method to incorporate *Stelmasiak's* cladribine-free period and lower-dose maintenance periods").

Insofar as it concerns an expectation of efficacy with Bodor's regimen and Petitioner's reliance on Stelmasiak, we agree with Petitioner, "there is no fixed lymphocyte-reduction 'bright-line threshold'" that guarantees efficacy. Pet. Reply 22 (citing, e.g., Ex. 1084 ¶ 14 (testifying "lymphocytes do not need to be suppressed to below 1000 cells/µL to achieve a therapeutic effect—1000 cells/µL is merely exemplary")). Stelmasiak, for example, discloses that a "significant" improvement (i.e., reduction) in EDSS scores was seen within three months of the start of treatment when lymphocyte counts were well above 1000/µL. Ex. 1013, 6; PO Resp. 52 (annotation to Stelmasiak's Figure 1 where, at three months, lymphocyte count was ~ 1350 cells/µL, and only about "150 mg" of cladribine was given at that stage).[31] Moreover, the reasonable expectation of success is shown by the record as a whole (see discussion of Rice, Romine, Beutler, and Stelmasiak above); *see, e.g.*, Pet. Reply 26 ("Rice reported that cladribine doses similar to Bodor's suppressed lymphocytes to ≤ about 1000 cells/µL" and "reported lowered brain lesions and volumes")); Ex. 1084 ¶¶ 16, 92–93; Ex. 1080 ¶¶ 78–83.

Patent Owner also argues that Petitioner's routine optimization arguments should fail for an additional six reasons. We address below.

---

[31] Stelmasiak's graph also reflects "average" lymphocyte counts across a group of patients, and Stelmasiak reports a mean reduction with a standard deviation that would suggest some patients were above 1000/µL and some below. Ex. 1013, 5 ("968±229"). Stelmasiak does not indicate that patients could be sorted into responders and non-responders based on whether lymphocyte counts were above or below 1000/µL. *Id.* at 7 ("We were unable to identify any factor that would differentiate between the 'responders' and the 'non-responders.'").

Patent Owner argues that Petitioner provides no reason to optimize a cladribine dose/duration based on a patient's lymphocyte count, which is not an "efficacy" measure. PO Resp. 37–41; Ex. 2009, 121:8–18 (Dr. Miller testifying "lymphocyte suppression is a measure of cladribine's treatment response," but "is not a measure of efficacy"); Ex. 2079, 42:5–14 (same). According to Patent Owner, "the art consistently shows that lymphocyte count is a metric of safety, not therapeutic efficacy for cladribine treatment." PO Resp. 40–41 (citing, e.g., Ex. 2051 ¶ 142; Ex. 1013, 5; Ex. 1014, 1717; Ex. 1018, 1146); PO Sur-reply 12–13.

We are unpersuaded that this undermines Petitioner's challenge. As argued by Petitioner, "Merck wrongly posits routine-optimization must correlate with **therapeutic efficacy**, but the doctrine applies to **any** property known to be affected by the optimized variable." Pet. Reply 2, 26–27; *E.I. DuPont De Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1009 (Fed. Cir. 2018) ("[A] recognition in the prior art that a property is affected by the variable is sufficient to find the variable result-effective."). The evidence here shows a known correlation between, for example, cladribine dose and lymphocyte levels.[32] *See, e.g.*, Ex. 1018, 1152 (analysis showing cladribine treatment associated with "dose-dependent decreases" in lymphocytes);

---

[32] At least Beutler also points to a dose-dependent relation to both efficacy and toxicity. Ex. 1014, 1716 ("Toxicity and therapeutic response were dose-related"), 1717–1720 (describing the higher dose's stabilization of disease as "quite durable" while the lower dose "provide[s] a larger margin of safety" but "appeared to be less durable than that observed at higher doses," and noting a "dosage-response relationship"); *see also id.* at 1717 (describing "peak improvement at [about] 8 mo after treatment initiation" in the lower dose regimen); Ex. 1018 (Rice), 1151 (noting "small dose-dependent, median percent decrease in T2 lesion volume").

Ex. 1084 ¶¶ 12, 81, 82; Ex. 1061, 72:5–22 (Dr. Lublin admitting MS studies used lymphocyte counts to measure cladribine's pharmacological effect and that the count can vary in a dose-dependent manner). Thus, even if lymphocyte count was understood to be primarily a safety metric in prior studies, as argued by Patent Owner (*see, e.g.*, PO Resp. 40–41), it can be applied in a result-effective variable analysis. Pet. 41–44; Pet. Reply 26–27.

Patent Owner argues there is "no guidance" on threshold lymphocyte counts that would have been sufficient to show efficacy. PO Resp. 41–42 ("Stelmasiak's data shows that a reduction in lymphocyte counts does not correlate with cladribine efficacy."). Citing Stelmasiak, Patent Owner contends that a POSA would have believed that Bodor's dosage would be insufficient to reduce lymphocytes below 1000 cells/µL or produce any efficacy. *Id.* (citing Ex. 2051 ¶¶ 149–150); PO Sur-reply 14.

Patent Owner's argument does not undercut the asserted routine optimization on this record. What is routine in prior MS clinical studies with cladribine is that lymphocyte counts were tracked over time while therapeutic efficacy (e.g., relapse rate, brain lesions, EDSS scores, etc.) is monitored concurrently. *See, e.g.*, Ex. 1013; Ex. 1016; Ex. 1018; Ex. 1031. Pet. 42 (arguing this approach was "standard practice in the field"). Rice, for example, reported effects on lymphocyte levels at similar doses to Bodor's, and reported that "lesions were virtually eliminated by treatment with cladribine." Ex. 1018, 1153; Ex. 1080 ¶¶ 81–82 (showing relation between Bodor and Rice dosing); Ex. 1002 ¶¶ 47–49, 91; Ex. 1084 ¶ 16 ("A POSA would have thus expected to achieve a[t] least similar results with Bodor's cumulative dose."). Patent Owner cites a paper by Dr. Miller where he allegedly "disparaged" Rice's lack of treatment promise, and noted "an enigmatic dissociation between positive effects on MRI and unconvincing

clinical benefit." PO Resp. 40–41 (citing Ex. 2004, 341, 350; Ex. 2009, 21:13–23:1). It is true that Rice did not observe a "clinical" benefit (i.e., improved EDSS scores) in its study with the more difficult-to-treat progressive MS patients, but Rice undisputedly did observe decreased lesions across all doses. Ex. 1061, 61:7–10 ("Progressive MS is more difficult to treat . . . [t]han relapsing-remitting MS"). Claim 17 encompasses treating RRMS and, even if efficacy is required, fewer lesions would suffice. Ex. 1001, 5:54–59. Dr. Miller testifies persuasively that reduced lesions would have been reasonably expected with Bodor's regimen. Ex. 1084 ¶ 16.

Patent Owner contends that, even if lymphocyte count were a measure of efficacy, Petitioner's theory about adjusting the "daily dose" of cladribine is flawed because lymphocytes were not measured "daily" and "daily lymphocyte count" would not provide meaningful information. PO Resp. 43–44 (citing, e.g., Ex. 1014, 1717 (describing evaluation of lymphocyte count on a "monthly" basis)).

This argument is unpersuasive. Patent Owner misconstrues Petitioner's position, which was simply using "daily dose" in the same way it is used in the '903 patent. Ex. 1001, 4:19–22 (disclosing that the total dose is determined by adding the daily doses), 18:43–45. In other words, Petitioner is referring to the dose that's administered daily, not changing the dose on a daily basis or measuring lymphocytes each day. Pet. 42 (explaining that modifying the daily dose would allow for fine-tuning the "total dose" and length of administration); Ex. 1002 ¶ 93. So, for example, Bodor's dose (10 mg tablets given 5–7 days each month) could be increased or decreased, producing an overall higher or lower total dose in the induction or maintenance periods and lymphocytes could be monitored at a periodicity routine in the art (e.g., monthly).

Patent Owner argues that Petitioner identifies no recognizable result associated with cladribine's "therapeutic effect." PO Resp. 44 (arguing lymphocyte suppression is not an "efficacy" measure). According to Patent Owner, Rice would not have led a POSA to expect success through optimization based on lymphocyte counts or MRI results. *Id.*; PO Sur-reply 2, 5 (suggesting that "coherence" across multiple outcome measures, not just MRI lesion results, is needed to confirm treatment efficacy), 14–15 (arguing no reasonable expectation of success via optimization and that MRI outcomes do not necessarily demonstrate a treatment effect).

As we determined above, however, even if lymphocyte count is a measure of patients' level of immunosuppression and primarily a safety consideration, it can still be the "result" in a result-effective variable analysis, given that it was recognized that cladribine dose and duration are correlated with lymphocyte count. Also, inasmuch as Rice's MS treatment regimen includes a similar induction period dose and duration[33] compared to Bodor's, we agree with Dr. Miller that a POSA would have reasonably expected Bodor's regimen to reduce brain lesions—as expressly reported by Rice. Ex. 1084 ¶ 16; Ex. 1002 ¶¶ 47–49, 91.

The notion that the POSA would not have wanted to decrease lesions in the MS patient's brain or considered the same an "efficacy" measure is refuted by the patent itself and inconsistent with other evidence of record.

---

[33] Rice's low-dose arm includes two courses of cladribine (0.07 mg/kg/day for five consecutive days each month (i.e., over 2-months), for a total dose of 0.7 mg/kg, which was followed by a cladribine-free period. Ex. 1018, 1146. As Dr. Pinal explains, Bodor's 1.4–2.0 mg/kg dosing, when corrected for bioavailability of Bodor's tablets (~ 40%) is 0.6–0.8 mg/kg and, thus, is very similar to Rice's subcutaneous dose of 0.7 mg/kg. Ex. 1080 ¶¶ 81–82.

Ex. 1001, 2:56–58 (describing Rice's results as "positive on the significant reduction on MRI-measured brain lesions"), 3:22–26 (describing, as "background" and after noting prior studies by Rice and others, that "it would be desirable to have a method for treating [MS] comprising the oral administration of Cladribine that would permit the same or improved effect on MS lesions while decreasing the occurrence and/or severity [of] adverse events"); Ex. 1061, 61:11–62:5 (testifying MRI results (reduction in number of new lesions over time) provides "proof-of-principle" for MS treatments); *see also* Ex. 1018, 1145 ("In patients with RRMS and SPMS, there is a correlation between the frequency and extent of lesion enhancement and short-term disease activity."); Ex. 1014, 1720 ("The usefulness of MRI as a measure of clinical activity and potentially as an objective means for assessing response to therapy has recently been documented.").

Patent Owner contends that Petitioner's reliance on Rice for the points noted above is new and untimely. PO Sur-reply 18–21. We disagree. The Petition relied on Rice (along with Romine, Beutler, etc.) throughout as informing the POSA's background knowledge, even if it was not expressly asserted in combination with Bodor. *See, e.g.*, Pet. 2, 7, 15–17, 20–21, 26, 37, 42–43. We also find that Petitioner's reliance on Rice in the Reply is fairly responsive to arguments raised by Patent Owner during trial, including that Dr. Miller allegedly disparaged Rice's MRI and other results and that Rice does not connect lymphocyte counts to efficacy or support a reasonable expectation of success. *See, e.g.*, PO Resp. 40–41, 44.[34]

---

[34] Patent Owner also contends Petitioner has pivoted away from the significance of lymphocytes as a purported sign of "efficacy" and that, at institution, the Board understood lymphocyte count was *the* measure of "efficacy." *See, e.g.*, PO Sur-reply 12–13 (characterizing as a "revised

Patent Owner contends that MS is complex and involves slowly evolving disability, so it would require years to evaluate changes to a dosing regimen and corresponding "treatment benefits" and "clinical outcomes." PO Resp. 44–45. According to Patent Owner, even Dr. Miller admitted that clinical trials in even a few patients can take months to years to complete. *Id.* (citing Ex. 2009, 114:17–116:16). Thus, Patent Owner argues, routine optimization is precluded. *Id.*

The issue, however, is not whether any optimization of Bodor's dosing regimen could be completed rapidly, but whether it would have been done routinely through normal experimentation expected by skilled artisans in the field. The prior art evidences that POSAs would consider changes to dosing amount and duration as routine in this very field. *See, e.g.*, Ex. 1026, 5:20–25 (disclosing that "one can tailor the dosage and duration" of cladribine as needed for the patient being treated and MS stage); Ex. 1022, 24:1–9 (describing "fine tuning" of cladribine amounts and that "[t]herapeutically effective amounts may be easily determined," by starting lower and increasing in stepwise increments while evaluating beneficial effects). Moreover, as Petitioner explains, cladribine-dosing adjustments do not require years of clinical assessment. Pet. Reply 28; Ex. 1084 ¶ 84

theory"). This argument overstates the Board's preliminary decision. There we explained, for example, that it did not appear a bright-line lymphocyte level was necessary for a therapeutic effect (e.g., EDSS score reduction) to be seen. *See, e.g.*, Inst. Dec. 47–48 (citing, e.g., MRI and EDSS scores as distinct from lymphocyte counts), 49–50 (noting reports of "efficacy" in the literature, including Stelmasiak, Rice, and Romine, and citing lesion reduction and the patent's broad definition of "efficacy" (n.23)). We recognize, however, that some of the language used in our earlier decision (and the Petition as well (e.g., Pet. 43 (suggesting measuring efficacy "based on" changes in lymphocyte counts)) could have been more precise.

(testifying "relapse rates and lesions can be assessed in as little as 6 to 12 months"). MRIs can show a treatment response within six months, changes in lymphocyte levels can be seen within a few months, and relapse rates are measured over a one-year period. *See, e.g.*, Ex. 1031, 40, Fig. 6; Ex. 1013, Fig. 1; Ex. 1061, 38:6–12 (Dr. Lublin admitting that relapse rates are measured by counting the number of relapses and dividing by time ("[t]ypically one year")).

Lastly, Patent Owner contends that there were "numerous possible combinations" for potential optimization. PO Resp. 45–48 (arguing Petitioner's position is tantamount to throwing metaphorical darts at a dartboard). But Patent Owner's contention elides the guidance already provided in the art, including Bodor's MS treatment regimen using 10 mg cladribine tablets in a 2-months on/10-months off sequence, the logic of using Bodor's induction dose/duration as a starting point for optimization in a maintenance phase, the undisputed inclusion of cladribine-free periods after dosing periods for safety reasons (as routinely seen in the art), and the positive results described in preexisting human clinical studies (decreased lesions, reduced relapses rates, improved clinical (e.g., EDSS) scores). Ex. 1002 ¶¶ 33–52; Ex. 1084 ¶¶ 51–52, 106, 122.

For all the reasons noted above, we find that Petitioner has proved by a preponderance of the evidence that a POSA would have been motivated to combine the teachings of Bodor and Stelmasiak to arrive at the subject matter of claim 17 and done so with a reasonable expectation of success.

### d) *Objective Indicia of Nonobviousness*

Patent Owner argues that evidence of alleged skepticism, unexpected results, and a long-felt but unmet need are objective indicia that supports a determination that the claims are nonobvious. PO Resp. 58–65.

Objective indicia of nonobviousness are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). "The patentee bears the burden of showing that a nexus exists." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999).

Patent Owner does not assert that it is entitled to a presumption of nexus. Instead, Patent Owner argues that its evidence of alleged skepticism, etc., "bear[s] a direct nexus to the claimed invention" because "the evidence is the 'direct result of the unique characteristics of the claimed invention.'" PO Resp. 63–64 (quoting *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–74 (Fed. Cir. 2019) (explaining that, even if a presumption of nexus is inappropriate, the patentee may still prove nexus by showing that the evidence of secondary considerations is the direct result of the unique characteristics of the claimed invention). Patent Owner contends that it has shown a nexus between its evidence and at least claims 17 and 20—claims that Patent Owner contends encompass the FDA-approved method for administering MAVENCLAD and the method of cladribine administration studied in the CLARITY trial. *Id.* at 64–65 (citing, e.g., Ex. 2033 (CLARITY), 425–26; Ex. 2035 (CLARITY Extension), 1594, 1599, 1603).

We discuss nexus issues below as necessary when addressing the parties' arguments about the alleged skepticism, unexpected results, and long-felt, unmet need.

Patent Owner contends that, after reviewing the CLARITY study, the FDA "raised concerns over higher cancer risks associated with

Mavenclad®." PO Resp. 59–60 (citing Ex. 2038, 1);[35] PO Sur-reply 23–25 (citing, e.g., Ex. 2079, 136:8–13 (agreeing regulators raised safety concerns about malignancies)). From this, Patent Owner contends "FDA's skepticism provides further evidence that the claimed dosing regimen was nonobvious." PO Resp. 59–60.

Regardless of any nexus, Petitioner contends that Exhibit 2038 does not evidence skepticism. Pet. Reply 30 (citing Ex. 1084 ¶¶ 19, 99–100, 114–116). According to Petitioner, Patent Owner's evidence merely reflects the FDA's request for more information after reviewing the CLARITY study results to better understand the "safety risks and overall benefit-risk profile." *Id.* (quoting Ex. 2038, 1).

We find that Exhibit 2038 does not evidence skepticism that supports a determination of nonobviousness. Nothing in Exhibit 2038 reveals any skepticism about cladribine's "effectiveness" in treating MS, which the FDA concluded was shown through "substantial evidence" in the CLARITY study. Ex. 2038, 1. To the extent the FDA sought further information about safety, including any concerns over possible cancers, this was simply the agency attending to its normal duties. *Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013) (explaining that the FDA's request for clinical safety and efficacy data "reflects attention to the FDA's normal duties," not skepticism). Moreover, the FDA was, in all likelihood, merely responding to the data provided to the agency in relation to the CLARITY trial, which trial did report "neoplasms (including those that were found to be benign, malignant, or unspecified)" in about 1 % of

---

[35] Patent Owner also cites Exhibit 2039 in support of this argument, but there is no exhibit with that number submitted in this record.

patients. Ex. 2051 ¶ 228 (quoting Ex. 2033, 424). To the extent the data raised questions on the FDA's part, there is no evidence here to suggest such questions were unfounded at that time—the FDA just requested more information to appropriately weigh the risks versus the benefits.[36]

Patent Owner also argues that certain writings of Dr. Miller and others evidence industry skepticism. PO Resp. 58–59 (Ex. 2051 ¶¶ 195–198). Patent Owner cites a book chapter co-authored by Dr. Miller in 2000, discussing recently-completed cladribine trials and writing "[a] trial of cladribine failed to show benefit in progressive disease." *Id.* (citing Ex. 2005, 45, 67). Patent Owner also cites a 2008 review co-authored by Dr. Miller, referencing earlier studies and suggesting "it seems prudent to await the results of a prospective, randomized, blinded trial of oral cladribine before recommending its use in patients with MS." *Id.* (citing Ex. 2004, 341). Lastly, Patent Owner cites a 2005 book chapter from another specialist in this field, Dr. Noseworthy, stating: "We remain to be convinced that cladribine is useful, and do not recommend its use in the management of patients with multiple sclerosis." *Id.* (citing Ex. 2031, 753); PO Sur-reply 24–25 (arguing the authors questioned cladribine's safety and efficacy).

We find that these writings are entitled to minimal weight as evidence of skepticism. The nexus showing as to these writings is weak. The writings are principally focused on treatment of progressive MS, yet the

---

[36] Not only did the CLARITY study include reports of neoplasms in a few patients, the MAVENCLAD label states that treatment "may increase the risk of malignancy." Ex. 2001, 8 (citing clinical studies showing increased incidence of malignancy in treated patients versus placebo). The fact that the FDA may have initially flagged an increased cancer risk was not, therefore, without apparent basis and Patent Owner has not shown that its FDA-approved method avoids all such risks.

claims recite and encompass treating relapsing-remitting MS (RRMS), which easier to treat than progressive forms of the disease.[37] Ex. 1061, 61:1–10, 123:6–13 (testifying Exhibit 2005 does not cite RRMS studies). Dr. Miller testified that he commented only on progressive MS in Exhibits 2004 and 2005. Ex. 1084 ¶¶ 103–106 ("I expressed no skepticism about cladribine's efficacy in treating RRMS" and "a POSA would have understood cladribine to have efficacy in treating RRMS, as demonstrated by Stelmasiak and Romine"). The claims also require no specific efficacy endpoint and, even if they did, the patent defines efficacy broadly as discussed above to include, for example, *any* of the following: improved EDSS scores, reduced relapse rates, or fewer lesions. *See supra* Section III.D.4.(c). Even if Drs. Miller and Noseworthy were not yet prepared at the time of those writings to recommend cladribine's use in their patients in actual clinical practice, they expressed no skepticism about cladribine's ability to, for example, reduce the number of MRI-detected brain lesions. To the contrary, Dr. Noseworthy expressly noted the reduced lesions reported in cladribine-treated patients in both Romine and Rice. Ex. 2031, 753; *see also* Ex. 2004, 341, 350 (Miller citing the "statistically significant" reduction in lesion "number and volume" per Rice's data).

Patent Owner argues that MAVENCLAD, as illustrated by the results of the CLARITY studies, provides unexpected results. PO Resp. 60–63; PO Sur-reply 25–26. More specifically, Patent Owner contends the CLARITY trials showed that giving a total dose of 3.5 or 5.25 mg/kg over two years,

---

[37] Exhibit 2031 references a paper by Grieb, but it appears to be a different publication by Grieb than discussed above and, thus, it is not apparent that it relates to RRMS. *Compare* Ex. 2031, 753, 855, *with* Ex. 1001, 3:2–6. Romine, cited in Exhibit 2031, studied RRMS patients. Ex. 2031, 753.

followed by two years of placebo, resulted in "***durable*** clinical efficacy" comparable to continuing the dosing regimen over a four-year period, but with an improved safety profile. PO Resp. 60–61 (arguing that the extension phase of the study showed that the benefits of the two-year regimen were "***maintained***" in many patients who remained free from relapses or sustained disability progression. *Id.* (citing Ex. 2035, 1594, 1603; Ex. 2042, 3; Ex. 2051 ¶ 205).

Patent Owner also cites the follow-on "CLASSIC-MS study, finding 'sustained long-term mobility and disability benefits of cladribine tablets' during the median ***10.9 years'*** follow-up period." *Id.* at 61 (quoting Ex. 2036, 719). Thus, Patent Owner argues, the CLARITY and follow-up trials showed that the dosing method provides not only significantly reduced relapse rates, risk of disability progression, and MRI measures but also "unexpected durability" provided by a shorter-duration (two-year) dosing regimen that is more convenient for patients, especially compared to other approved MS drugs requiring continuous dosing. *Id.* at 62–63 (citing Ex. 2035, 1603; Ex. 2042, 4 (interview of clinical neurologist, stating "[t]hat convenience for them is really, really big").[38] Patent Owner also cites a paper hypothesizing that cladribine is an "immune reconstitution therapy," where reconstituted lymphocytes might become less autoreactive to CNS tissues, potentially explaining the prolonged efficacy beyond the first two treatment years. *Id.* (citing Ex. 2032, 1923); PO Sur-reply 25–26.

Petitioner responds that Patent Owner's nexus showing is flawed concerning the alleged unexpected results. Pet. Reply 31–32. According to

---

[38] Patent Owner also cites Exhibit 2023 in support of this argument, but there is no exhibit with that number of record.

Petitioner, MAVENCLAD "treats **RRMS** patients for **2 years** with cladribine **tablets**" but "the claims are directed to **RRMS and early SPMS**, **any oral** cladribine dosage form, and **any regimen of ≥ 2 years**." *Id.* (citing Ex. 1084 ¶¶ 124–125; Ex. 1061, 143:5–9). Petitioner contends that the evidence also does not show unexpectedly superior results because Patent Owner did not compare its results with the closest prior art—Bodor. *Id.* at 31. And, Petitioner contends that the asserted "durable" result is not unique to Patent Owner's method compared to the prior art methods and, instead, is just inherent to cladribine. Pet. 32 (citing Ex. 1084 ¶¶ 113, 126, 130).

We give moderate weight to Patent Owner's evidence of unexpected results. As to nexus, the claims are not coextensive with the MAVENCLAD or CLARITY method for the reasons given by Petitioner, but Patent Owner persuades us they are reasonably commensurate. PO Sur-reply 26–27 (citing *Rambus, Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013); *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (explaining that an applicant need not test every embodiment within the scope of the claims to show unexpected results). Dr. Lublin provides detailed claim charts showing the correspondence between MAVENCLAD/CLARITY and claims 17 and 20, which evidence Petitioner does not rebut beyond arguing that the claims are broader. Ex. 2051 ¶¶ 223–226 (opining, also, that MAVENCLAD's safety and durable efficacy is tied to the unique features of the claims, particularly the 3.5 mg/kg cumulative two-year dosing regimen).

The weight given to Patent Owner's unexpected-results evidence is, however, discounted somewhat because, as Petitioner argues, Patent Owner provides no comparison against the Bodor regimen, which we agree is the closest prior art. *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 970 (Fed. Cir. 2006) (explaining, "when unexpected results are used as evidence of

nonobviousness, the results must be shown to be unexpected compared with the closest prior art"). As we explained above, Bodor's regimen using 10 mg cladribine tablets for oral administration materially overlaps with claim 17 (and claim 20, as well) in at least the induction period's dosage and duration, and the 10-month cladribine-free period.[39] Neither Stelmasiak nor Romine, for example, is closer than Bodor to the claims. Petitioner has, nevertheless, argued that Rice's induction dosage/duration is similar to Bodor's, yet Rice did not report favorable results to the same extent as seen in the CLARITY trials (e.g., Rice did not see significant improvement in EDSS scores, much less report durability lasting beyond 10 years in some patients).[40] *Compare* Ex. 1018, 1152–53, *with* Ex. 1033, 420–23; Ex. 2035, 1594. Inasmuch as Rice's results are cited by Petitioner as informing effects that would have been expected with Bodor's regimen, we are unpersuaded on this record that the long-term durability cited by Patent Owner would have been expected. *C.f.* Ex. 1031 (Romine), 43 (citing "an estimate based on observations of cladribine in chronic progressive MS . . . would indicate that beneficial effect should eventually decline and would not be expected to last much beyond 2 years").[41]

---

[39] At the hearing, Patent Owner also was unable to identify any data or other evidence showing criticality relative to the dosages or durations recited in the claims. Tr. 77:14–78:16 (arguing generally that the "inventors found a sweet spot").

[40] This is, however, an imperfect comparison because Rice's patients had the more difficult-to-treat progressive form of MS, as discussed above, whereas CLARITY tested patients with relapsing MS (RRMS). Ex. 2033, 416; Ex. 2035, 1594.

[41] Petitioner's contention that long-term durability may simply arise from an inherent property or mechanism of cladribine's use is not decisive here because, as explained by the Federal Circuit, "[w]hat is important regarding

Lastly, Patent Owner argues that MAVENCLAD satisfies a long-felt and unmet need. PO Resp. 63. According to Patent Owner, MAVENCLAD offers MS patients a more convenient dosing regimen that requires a relatively short-term (2 year) commitment with the possibility of offering long-lasting relief. *Id.* (citing Ex. 2042, 1, 4; Ex. 2051 ¶¶ 209–216) (testifying that there was a long-felt need for a safe, effective, and convenient oral therapy for MS, compared to less convenient approved options requiring continuous injections).

Petitioner raises the same nexus counterargument as discussed above for the asserted unexpected results, and argues that Patent Owner's long-felt, unmet need contentions fail because Patent Owner relies on "irrelevant *post-filing* evidence." Pet. Reply 31 (citing Ex. 1084 ¶¶ 128–133).

We give moderate weight to Patent Owner's long-felt, unmet-need evidence. The evidence is reasonably commensurate in scope with claims 17 and 20 as noted above related to the asserted unexpected results. Petitioner criticizes Patent Owner's reliance on "post-filing" evidence, yet does not persuasively rebut Dr. Lublin's testimony to the effect that patients wanted a more convenient and less-frequent regimen for treating MS. Ex. 2051 ¶¶ 209–216. If nothing else, a desire for taking a drug intermittently and orally versus more frequent injections seems like common sense, whether today or in 2004, and the '903 patent suggests a desire for methods of treating MS involving the oral administration of cladribine. Ex. 1001, 3:22–30; *see also* Ex. 1022, 2:11–13 (disclosing oral forms

---

properties that may be inherent, but unknown, is whether they are unexpected." *Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. de C.V.*, 865 F.3d 1348, 1354 (Fed. Cir. 2017).

enhance compliance and decrease the discomfort of injections). The evidence is discounted somewhat because more convenient oral forms of cladribine were already known in the art for use in treating MS patients, using intermittent dosing schedules, and had undergone clinical studies in MS patients where favorable results and only "mild" side effects were reported. *See, e.g.*, Ex. 1013, 4, 7; Ex. 1022, 22–23; Ex. 1026, Abstr., 10:47–60; *In re Kao*, 639 F.3d at 1068 (explaining that objective indicia of nonobviousness must be tied to "*novel*" elements of the claim to be afforded substantial weight) (citations omitted). Moreover, even if MAVENCLAD is more convenient, Patent Owner cites no persuasive evidence to show that other approved DMTs that were available in 2004 did not already provide safe and efficacious treatments for MS.

Altogether, although we afford some weight to Patent Owner's evidence of objective indicia as discussed above, we do not find that evidence especially strong. Considering Petitioner's strong showing that Bodor's regimen teaches claim 17's steps (i) and (ii), with overlapping cladribine dosages and treatment durations, the suggestion and logic of adding a retreatment phase to Bodor's regimen given MS's chronic nature and the knowledge of cladribine retreatments in the art following cladribine-free periods, the art's teaching to "tailor" (i.e., optimize) the dose/duration according to the patients' needs, and the reporting of positive results in earlier clinical trials (e.g., reduced MS lesions, which qualifies as treatment "efficacy" per the patent), the record leans in Petitioner's favor. *Pfizer*, 480 F.3d at 1372 ("Although secondary considerations must be taken into account, they do not necessarily control the obviousness conclusion.").

### 5.    Dependent claims

Petitioner contends that claims 19, 20, and 22–27 would also have been obvious over Bodor and Stelmasiak. Pet. 57–62. Petitioner persuades us the challenged dependent claims would have been obvious for the reasons discussed above for independent claim 17, and the further reasons given by Petitioner and Dr. Miller concerning the dependent claims, which reasons are supported by the preponderance of the evidence of record and we adopt that reasoning as our own unless otherwise noted. *Id.*; Ex. 1002 ¶¶ 120–139; Ex. 1084 ¶¶ 97–98.

Patent Owner raises no separate argument for any of the dependent claims except for claim 20, which narrows claim 17's induction period total dose from "about 1.7 mg/kg to about 3.5 mg/kg" to "about 1.7 mg/kg." PO Resp. 57–58 (arguing that Stelmasiak disclosed use of a different dosage amounts in the induction and maintenance periods) (citing Ex. 2051 ¶¶ 189–192).

We disagree with Petitioner's contentions that the claims require an induction period dose that is higher than the maintenance period dose, as we discussed above. *See supra* Section III.C. The doses can be the same (both "about 1.7 mg/kg") as argued by Patent Owner. *Id.* And, as also discussed above, Bodor's induction dose/duration for an average weight MS patient is 1.4–2.0 mg/kg over two months, which overlaps with claim 17's range and encompasses claim 20's induction dose of about 1.7 mg/kg. *Supra* Section III.D.4.(b)–(c). We credit Dr. Miller's testimony that it would have been logical and obvious to use Bodor's induction period dose/duration as a starting point for optimization as necessary in the maintenance phase. *Id.* Patent Owner cites no evidence of criticality to the recited induction or

maintenance dosage and duration and, for the reasons already discussed above, we conclude that claim 20 would have been obvious as well.

### 6. Conclusion

Up considering the totality of the argument and evidence of record, and for the reasons explained above, we determine that Petitioner has proved by a preponderance of the evidence that claims 17, 19, 20, and 22–27 are unpatentable for obviousness.

### IV. MOTIONS

Four motions to seal remain pending (Papers 19, 42, 54, and 55). Patent Owner moves to exclude Exhibits 2048, 2049, and 2050 as including alleged research, development, and commercial information that Patent Owner maintains is confidential, and further requests entry of the Board's Default Protective Order. Paper 19, 4–7. Petitioner moves to seal its Reply and Exhibits 1059, 1060, 1063, 1080, and 1084 as including information that Merck considers confidential. *See, e.g.*, Paper 42, 3–4. Petitioner and Patent Owner move to seal their demonstratives. Paper 54, 3–4 (noting, e.g., the demonstratives relate, at least in part, to Exhibits 2048–2050); Paper 55, 2–8 (explaining that the demonstratives include excerpts from, for example, Exhibits 1063, 2049, and 2050). None of the motions is opposed.

The Board recognizes "a strong public policy for making all information filed in a quasi-judicial administrative proceeding open to the public, especially in an *inter partes* review which determines the patentability of claims in an issued patent and therefore affects the rights of the public." *Garmin Int'l v. Cuozzo Speed Tech., LLC*, IPR2012-00001, Paper 34 at 1–2 (PTAB Mar. 14, 2013). Except as otherwise ordered by the Board, the record of an *inter partes* review shall be made available to the public. 35 U.S.C. § 316(a)(1); 37 C.F.R. § 42.14.

The standard for granting a motion to seal is "for good cause." 37 C.F.R. §§ 42.20(c), 42.54(a). In determining whether good cause has been shown, the Board considers, among other things, whether the information sought to be sealed is truly confidential and whether the expressed interest in maintaining confidentiality outweighs the strong public interest in an open record. *Argentum Pharm. LLC v. Alcon Rsch., Ltd.*, IPR2017-01053, Paper 27 at 2–3 (PTAB Jan. 19, 2018) (informative).

We grant Patent Owner's unopposed Motion to Seal Exhibits 2048, 2049, and 2050, and enter the Board's Default Protective Order. Paper 19. Patent Owner persuades us that Exhibits 2048, 2049, and 2050, include confidential research and development information.

Paper 42, Petitioner's Motion to Seal its Reply and Exhibits 1059, 1060, 1063, 1080, and 1084 is denied. Petitioner must provide minimally-redacted, public versions of its Reply and the exhibits in question (it appears that the only redacted version submitted by Petitioner is for Exhibit 1059, but the motion is denied in full to avoid piecemeal resolution). This denial is without prejudice and Petitioner may refile its motion within twenty (20) days. If refiled, the aforementioned redacted version of the Reply and exhibits will be filed at the same time.

We grant the parties' motions (Papers 54 and 55) to seal their respective demonstratives. Although the parties did not provide redacted versions of their demonstratives, demonstratives are not evidence. Nor are the demonstratives substantively relied on herein and, thus, the absence of redacted versions does not impede the public's interest in an open and understandable record.

## V.    OBJECTIONS

Patent Owner also filed objections to a handful of Petitioner's demonstrative slides.  Paper 57 (objecting to slides 41–44 and 47 in Petitioner's Demonstratives (Ex. 1092)).  Patent Owner's objection is that those slides include "new argument" outside the trial record.  *Id.* at 2–3.

Patent Owner's objections are overruled.  Slide 41 quotes Federal Circuit precedents, with which the Board is already familiar.  Slides 42 through 44 include appropriate cites to where the evidence/argument cited therein was raised in prior papers and evidence, illustrating a comparison between what was argued throughout trial; and, to the extent Petitioner's headings constitute minimal attorney argument, they only generically relay that Petitioner disagrees with Patent Owner's Sur-reply characterizing Petitioner's argument as being "new."  We similarly overrule the objection to slide 47.  Although slide 47's chart includes more citations than a similar chart on page 4 of the Reply, Petitioner did rely on the other cited portions of Bodor in its papers, and the added citations are generally consistent with the argument raised by Petitioner in its analysis of whether Bodor is "by another."  Pet. Reply 3–10 (arguing, e.g., that the named inventors on Bodor invented the solid cladribine dosage forms, and also described cladribine as useful for treating MS).

## VI.    CONCLUSION[42]

On this record, Petitioner has shown by a preponderance of the evidence that the challenged claims are unpatentable based on the ground advanced in the Petition.

---

[42] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice*

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 17, 19, 20, 22–27 | 103 | Bodor, Stelmasiak | 17, 19, 20, 22–27 | |

## VII.  ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has proved by a preponderance of the evidence that claims 17, 19, 20, and 22–27 are unpatentable;

FURTHER ORDERED that the Parties' Motions to Seal (Papers 19, 54, and 55) are *Granted* as provided above;

FURTHER ORDERED that Petitioner's Motion to Seal (Paper 42) is *Denied* without prejudice as provided above;

FURTHER ORDERED that the Board's Default Protective Order is entered and controls access to confidential information in this matter;

FURTHER ORDERED that within ten (10) business days, the parties will jointly provide a minimally redacted version of this decision that is available to the public; and

---

*Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*.  *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Eldora L. Ellison
Olga A. Partington
Chandrika Vira
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
eellison-ptab@sternekessler.com
opartington-ptab@sternekessler.com
cvira-ptab@sternekessler.com


FOR PATENT OWNER:

Emily R. Whelan
Deric Geng
Cindy Kan
WILMER CUTLER PICKERING HALE AND DORR LLP
emily.whelan@wilmerhale.com
deric.geng@wilmerhale.com
cindy.kan@wilmerhale.com



US007713947B2

(12) **United States Patent**
De Luca et al.

(10) Patent No.: **US 7,713,947 B2**
(45) Date of Patent: **May 11, 2010**

(54) **CLADRIBINE REGIMEN FOR TREATING MULTIPLE SCLEROSIS**

(75) Inventors: **Giampiero De Luca**, Conches/Geneva (CH); **Arnaud Ythier**, Collex-Bossy (CH); **Alain Munafo**, Tartegnin (CH); **Maria Lopez-Bresnahan**, Lincoln, MA (US)

(73) Assignee: **Merck Serono S.A.**, Coinsins, Vaud (CH)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 300 days.

(21) Appl. No.: **11/722,018**

(22) PCT Filed: **Dec. 20, 2005**

(86) PCT No.: **PCT/EP2005/056954**

§ 371 (c)(1),
(2), (4) Date: **Jun. 18, 2007**

(87) PCT Pub. No.: **WO2006/067141**

PCT Pub. Date: **Jun. 29, 2006**

(65) **Prior Publication Data**

US 2009/0081163 A1     Mar. 26, 2009

**Related U.S. Application Data**

(60) Provisional application No. 60/638,669, filed on Dec. 22, 2004.

(30) **Foreign Application Priority Data**

Dec. 22, 2004     (EP) ................................. 04106909

(51) **Int. Cl.**
*A61K 31/52*     (2006.01)
*A61K 31/7076*     (2006.01)
*A61K 38/21*     (2006.01)
*A61K 9/00*     (2006.01)

(52) **U.S. Cl.** ...................................... **514/46**; 424/85.6

(58) **Field of Classification Search** ...................... None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,964,848 A * 10/1990 Bloom ....................... 604/6.03
5,506,214 A * 4/1996 Beutler ....................... 514/46

2010/0021429 A1* 1/2010 Brentzel et al. ............ 424/85.6

FOREIGN PATENT DOCUMENTS

EP       0 626 853 B1     4/2000
WO     WO 2004/087101 A2     10/2004

OTHER PUBLICATIONS

Beutler, E. et al. "Marrow Suppression Produced by Repeated Doses of Cladribine", *Acta Haematol*, 1994, pp. 10-15, vol. 91.
Beutler, E. et al. "Treatment of Multiple Sclerosis and Other Autoimmune Diseases With Cladribine", *Seminars in Hematology*, Jan. 1, 1996, pp. 45-52, vol. 33, No. 1, Supplement 1.
Beutler, E. et al. "The treatment of chronic progressive multiple sclerosis with cladribine", *Proc. Natl. Acad. Sci. USA*, Feb. 1996, pp. 1716-1720, vol. 93.
Ellison, G. et al. "Oral Cladribine for Multiple Sclerosis", *Neurology*, Mar. 1997, P03.070, pp. A174-A175, vol. 48, No. 3, XP008047069.
Grieb, P. et al. "Effect of Repeated Treatments with Cladribine (2-Chlorodeoxyadenosine) on Blood Counts in Multiple Sclerosis Patients", *Archivum Immunologiae et Therapiae Experimentalis*, 1995, pp. 323-327, vol. 43, No. 5-6.
Kazimierczuk, Z. et al. "Synthesis of 2'-Deoxytubercidin, 2'-Deoxyadenosine, and Related 2'-Deoxynucleosides via a Novel Direct Stereospecific Sodium Salt Glycosylation Procedure", *J. Am. Chem. Soc.*, 1984, pp. 6379-6382, vol. 106, No. 21.
Kurtzke, J. "Rating neurologic impairment in multiple sclerosis: An expanded disability status scale (EDSS)", *Neurology*, Nov. 1983, pp. 1444-1452, vol. 33.
Langtry, H. et al. "Cladribine: A Review of its Use in Multiple Sclerosis", *Biodrugs*, May 1998, pp. 419-433, vol. 9, No. 3.
Lassmann, H. "Heterogeneity of multiple sclerosis pathogenesis: implications for diagnosis and therapy", *TRENDS in Molecular Medicine*, Mar. 2001, pp. 115-121, vol. 7, No. 3.
Lublin, F. et al. "Defining the clinical course of multiple sclerosis: Results of an international survey", *Neurology*, Apr. 1996, pp. 907-911, vol. 46.
Lucchinetti, C. et al. "Multiple sclerosis: recent developments in neuropathology, pathogenesis, magnetic resonance imaging studies and treatment", *Current Opinion in Neurology*, 2001, pp. 259-269, vol. 14.

(Continued)

*Primary Examiner*—Elizabeth C. Kemmerer
*Assistant Examiner*—Kimberly A. Ballard
(74) *Attorney, Agent, or Firm*—Saliwanchik, Lloyd & Saliwanchik

(57) **ABSTRACT**

The present invention is related to the use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis, especially relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis, wherein the preparation is to be orally administered and wherein re-treatments are possible.

**48 Claims, No Drawings**

OTHER PUBLICATIONS

Mattson, D. "Update on the diagnosis of multiple sclerosis", *Expert Review of Neurotherapeutics*, May 2002, pp. 319-327, vol. 2, No. 3.

McDonald, W. et al. "Recommended Diagnostic Criteria for Multiple Sclerosis: Guidlines from the International Panel on the Diagnosis of Multiple Sclerosis", *Annals of Neurology*, Jul. 2001, pp. 121-127, vol. 50, No. 1.

Miller, R. et al. "Therapeutic advances in ALS", *Neurology*, 1996, pp. S217, vol. 47, Suppl. 4.

Noseworthy, J. et al. "Multiple Sclerosis", *The New England Journal of Medicine*, Sep. 28, 2000, pp. 938-952, vol. 343, No. 13.

Poser, C. et al. "New Diagnostic Criteria for Multiple Sclerosis: Guidelines for Research Protocols", *Annals of Neurology*, Mar. 1983, pp. 227-231, vol. 13, No. 3.

Rice, G. et al. "Cladribine and progressive MS: Clinical and MRI outcomes of a multicenter controlled trial", *Neurology*, Mar. 2000, pp. 1145-1155, vol. 54.

Romine, J. et al. "A Double-Blind, Placebo-Controlled, Randomized Trial of Cladribine in Relapsing-Remitting Multiple Sclerosis", *Proceedings of the Association of American Physicians*, Jan./Feb. 1999, pp. 35-44, vol. 111, No. 1.

Schumacher, G. et al. "Problems of Experimental Trials of Therapy in Multiple Sclerosis: Report by the Panel on the Evaluation of Experimental Trials of Therapy in Multiple Sclerosis", *Annals New York Academy of Sciences*, Mar. 31, 1965, pp. 552-568, vol. 122.

Selby, R. et al. "Safety and Tolerability of Subcutaneous Cladribine Therapy in Progressive Multiple Sclerosis", *Can. J. Neurol. Sci.*, 1998, pp. 295-299, vol. 25.

Sipe, J. et al. "A neurologic rating scale (NRS) for use in multiple sclerosis", *Neurology*, Oct. 1984, pp. 1368-1372, vol. 34.

Stelmasiak, Z. et al. "A pilot trial of cladribine (2-chlorodeoxyadenosine) in remitting-relapsing multiple sclerosis", *Med. Sci Monit.*, 1998, pp. 4-8, vol. 4, No. 1.

* cited by examiner

1

# CLADRIBINE REGIMEN FOR TREATING MULTIPLE SCLEROSIS

## CROSS-REFERENCE TO RELATED APPLICATION

This application is the U.S. national stage application of International Patent Application No. PCT/EP2005/056954, filed Dec. 20, 2005, which claims the benefit of U.S. Provisional Patent Application No. 60/638,669, filed Dec. 22, 2004, the disclosures of which are hereby incorporated by reference in their entireties, including all figures, tables and amino acid or nucleic acid sequences.

## FIELD OF THE INVENTION

The present invention relates to the use of multiple doses of Cladribine for the treatment of multiple sclerosis, especially relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis.

## BACKGROUND OF THE INVENTION

Multiple sclerosis (MS) is the most known chronic inflammatory demyelinating disease of the central nervous system in humans. The onset of the disease typically occurs during ages 20 to 40. Women are affected approximately twice as often as men.

Over time, MS may result in the accumulation of various neurological disabilities. Clinical is disability in MS is presumed to be a result of repeated inflammatory injury with subsequent loss of myelin and axons, leading to tissue atrophy.

MS is manifested in physical symptoms (relapses and disability progression), Central Nervous System (CNS) inflammation, brain atrophy and cognitive impairment. Presenting symptoms include focal sensory deficits, focal weakness, visual problems, imbalance and fatigue. Sexual impairment and sphincter dysfunction may occur. Approximately half of the patients with MS may experience cognitive impairment or depression.

MS is now considered to be a multi-phasic disease and periods of clinical quiescence (remissions) occur between exacerbations. Remissions vary in length and may last several years but are infrequently permanent.

Four courses of the disease are individualized: relapsing-remitting (RR), secondary progressive (SP), primary progressive (PP) and progressive relapsing (PR) multiple sclerosis.

More than 80% of patients with MS will initially display a RR course with clinical exacerbation of neurological symptoms, followed by a recovery that may or may not be complete (Lublin and Reingold, *Neurology,* 1996, 46:907-911).

During RRMS, accumulation of disability results from incomplete recovery from relapses. Approximately, half of the patients with RRMS switch to a progressive course, called SPMS, 10 years after the diseased onset. During the SP phase, worsening of disability results from the accumulation of residual symptoms after exacerbation but also from insidious progression between exacerbations (Lublin and Reingold above). 10% of MS patients have PPMS which is characterized by insidious progression of the symptoms from the disease onset. Less than 5% of patients have PRMS and are often considered to have the same prognosis as PPMS. It is suggested that distinct pathogenic mechanisms may be involved in different patient sub-groups and have wide-ranging impli-

2

cations for disease classification (Lassmann et al., 2001, *Trends Mol. Med.,* 7, 115-121; Lucchinetti et al., *Curr. Opin. Neurol.,* 2001, 14, 259-269).

MS onset is defined by the occurrence of the first neurological symptoms of CNS dysfunction. Advances in cerebrospinal fluid (CSF) analysis and magnetic resonance imaging (MRI) have simplified the diagnostic process and facilitated early diagnostic (Noseworthy et al., *The New England Journal of Medicine,* 2000, 343, 13, 938-952). The International Panel on the Diagnosis of MS issued revised criteria facilitating the diagnosis of MS and including MRI together with clinical and para-clinical diagnostic methods (Mc Donald et al., 2001, *Ann. Neurol.,* 50:121-127).

Current medications for MS which are disease modifying treatments, i.e. modifying the course of MS, modulate or suppress the immune system. There are four FDA approved immunomodulating agents for RRMS: three beta interferons (Betaseron®, Berlex; Avonex®, Biogen; Rebif®, Serono) and Glatimarer Acetate (Copaxone®, Amgen). There is also one FDA approved immunosuppressing drug for worsening MS, Mitoxantrone (Novantrone®, Amgen). Several other immunosuppressive agents are used, although not FDA approved.

Among them, Cladribine, a chlorinated purine analogue 2-chloro-2'deoxyadenosine analogue (2-CdA), has been suggested to be useful in the treatment of MS (EP 626853B1 and U.S. Pat. No. 5,506,214).

Several clinical studies with Cladribine in patients with multiple sclerosis have investigated the use of i.v. and s.c. Cladribine in MS.

Two double-blind, placebo controlled Phase II studies were conducted respectively in the treatment of Chronic Progressive MS (Selby et al., 1998, *Can. J. Neurol. Sci.,* 25:295-299) and Relapsing-Remitting MS respectively (Romine et al., 1999, *Proceedings of the Association of American Physicians,* 111, 1, 35-44).

In the first trial, the Cladribine dose used was 0.1 mg/kg/day for 7 days by continuous i.v. infusion. The treatment for repeated for 4 consecutive months.

In the second clinical trial, the Cladribine dose used was 0.07 mg/kg/day for 5 days by subcutaneous injection. The treatment was repeated for 6 consecutive months.

In addition, placebo controlled Phase III study was conducted in patients with primary progressive (PP) or secondary progressive (SP) multiple sclerosis (Rice at al., 2000, *Neurology,* 54, 5, 1145-1155). In this study, both patient groups received Cladribine by subcutaneous injection at a dose of 0.07 mg/kg/day. The treatment was repeated for either 2 months or 6 months.

The Phase II clinical studies provided evidence for the positive effects of Cladribine in patients with MS in terms of Kutzke Extended Disability Status Scale (EDSS), Scripps Neurologic rating Scale (SNRS) scores and Magnetic Resonance Imaging (MRI) findings (Beutler et al., 1996, *Proc. Nat. Acad. Sci. USA,* 93, 1716-1720; Romine et al., 1999 above). Phase II study results, were positive on the significant reduction of MRI-measured brain lesions (Rice at al., 2000, above).

Some adverse effects (AEs), such as increased incidence of infections related to compromised immune function or myelosuppression, were observed with the highest doses (Selby et al., 1998, above; Beutler et al., 1994, *Acta hematol,* 91:10-15). Due to the narrow margin of safety between the efficacy dose and the dose of occurrence of AEs, to date, all clinical trials for Cladribine in multiple sclerosis have been conducted using either i.v. or s.c. administration. As a result, Beutler et al. (Beutler et al., 1996, *Seminars in Hematology,*

3

33, 1(S1), 45-52) excluded the oral route for the treatment of multiple sclerosis with Cladribine.

Grieb et al. reported a small trial in 11 patients with remitting-relapsing multiple sclerosis (Grieb et al., 1995, *Archivum Immunologiae et Therapiae Experimentalis,* 43 (5-6), 323-327) wherein Cladribine has been orally administered during 6 monthly courses of 5 days at a total dose of about 4-5.7 mg/kg (patients of about 52 and about 75 kilos, respectively) i.e. a total effective dose of 2-2.85 mg/kg. For some patients, a single re-treatment of 5 days was performed at a cumulative dose of 0.4-0.66 mg/kg after a cladribine free-period of 3 or 6 months. The side effects observed with the regimen above were said to be less severe than the ones observed in the study on patients suffering from chronic progressive multiple sclerosis treated by i.v. infusion of Cladribine (Sipe et al., 1994, *Lancet,* 344, 9-13) but were still present. In addition, the therapeutic efficacy of the oral regimen above versus the i.v. infusion therapy was questioned (Grieb et al., 1995, above) and a group of "non-responders" has been identified (Stelmasiak et al., 1998, *Laboratory Investigations,* 4(1), 4-8).

Therefore, it would be desirable to have a method for treating multiple sclerosis comprising the oral administration of Cladribine that would permit the same or improved effect on MS lesions while decreasing the occurrence and/or severity adverse events. In addition, as MS is a chronic disease, it would be desirable to decrease the occurrence and/or severity adverse events in such a way that re-treatments are possible. A sustained benefit of Cladribine treatment between the treatment periods is also desirable.

SUMMARY OF THE INVENTION

The present invention is directed towards a use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis, wherein the preparation is to be orally administered. Particularly, the invention is directed towards a use of Cladribine for the preparation of a medicament for the treatment of relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis and wherein re-treatments are possible.

An embodiment of the invention provides an improved dosing regimen for Cladribine in the treatment of multiple sclerosis.

An additional embodiment of the invention provides a use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis wherein adverse effects are reduced, allowing further use of Cladribine.

In one embodiment, the invention provides a use of Cladribine for the preparation of a pharmaceutical formulation wherein the formulation is to be orally administered following the sequential steps below:

(i) An induction period wherein the Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the maintenance period is lower than the total dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered.

In another embodiment, the invention provides a method for the treatment of multiple sclerosis, comprising the oral

4

administration of Cladribine or of a formulation thereof in a patient in need thereof comprising the following steps:

(i) An induction treatment wherein the total dose of Cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance treatment wherein the total dose of Cladribine reached at the end of the maintenance period is lower than the total dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered.

DETAILED DESCRIPTION OF THE INVENTION

Definitions

The "total dose" or "cumulative dose" refers to the total dose of Cladribine administered during the treatment, i.e. the dose reached at the end of the treatment that is calculated by adding the daily doses. For example, the total dose of Cladribine corresponding to a treatment of 0.7 mg/kg Cladribine per day during 5 days is 3.5 mg/kg or the total dose of Cladribine corresponding to a treatment of 0.35 mg/kg Cladribine per day during 5 days is 1.7 mg/kg.

"The total effective dose" or "cumulative effective dose" refers to the bioavailable dose of Cladribine after a given administration period, i.e. the bioavailable dose reached at the end of the treatment that is calculated by adding the daily doses reduced by the bioavailability coefficient. For example, the total effective dose of Cladribine corresponding to a treatment of 0.7 mg/kg Cladribine per day during 5 days wherein the bioavailability of Cladribine is of about 40% is 1.4 mg/kg or the total effective dose of Cladribine corresponding to a treatment of 0.35 mg/kg Cladribine per day during 5 days wherein the bioavailability of Cladribine is of about 40% is 0.7 mg/kg.

Typically, the bioavailability of Cladribine or of a Cladribine formulation used in the context of this invention is from about 30% to about 90%, preferably from about 40% to about 60%, such as about 50%.

"A week" refers to a period of time of or about 5, about 6 or about 7 days.

"A month" refers to a period of time of or about 28, 29, about 30 or about 31 days.

"Treatment" comprises the sequential succession of an "induction treatment" and at least a "maintenance treatment". Typically, a treatment according the invention comprises an "induction treatment" and about one or about two or about three maintenance treatments. Typically, a treatment according to the invention is of about 2 years (about 24 months) or about 3 years (about 36 months) or about 4 years (about 48 months).

An "Induction Treatment" consists in the sequential succession of (i) an induction period wherein the Cladribine or the Cladribine pharmaceutical preparation of the invention is orally administered and (ii) a Cladribine-free period. An induction period lasts up to about 4 months or up to about 3 month or up to about 2 months. For example, an induction period lasts for about 2 to about 4 months. An induction period consists in the oral administration of Cladribine or a pharmaceutical preparation thereof during about 1 to about 7 days each month.

A "Cladribine-free period" is a period wherein no Cladribine is administered to the patient. During a Cladribine-free period, the patient can be free of any administration or be

dosed with a placebo-pill or another drug except. A Cladribine-free period lasts up to about 10 months or up to 9 months or up to about 8 months. For example, a Cladribine-free period lasts from about 8 to about 10 months, typically at least of about 8 months.

A "Maintenance Treatment" consists in the sequential succession of (i) a maintenance period wherein the Cladribine or the Cladribine pharmaceutical preparation of the invention is orally administered at a lower dose than the Cladribine dose orally administered during the induction treatment and (ii) a Cladribine-free period. A maintenance period lasts for up to about 4 months, or up to about 3 months, or up to about 2 months, preferably up to about 2 months. For example, a maintenance period lasts for about 2 to about 4 months, preferably for about 2 months. A maintenance period consists in the oral administration of Cladribine or of a pharmaceutical preparation thereof during about 1 to about 7 days each month.

Within the context of this invention, the beneficial effect, including but not limited to an attenuation, reduction, decrease or diminishing of the pathological development after onset of the disease, may be seen after one or more a "treatments", after an "induction treatment", after a "maintenance treatment" or during a Cladribine-free period.

"Daily dose" refers to the total dose of Cladribine orally administered to the patient each day of administration. The daily dose can be reached through a single or several administrations per day, such as for example once a day, twice a day or three times a day.

The dosage administered, as single or multiple doses, to an individual will vary depending upon a variety of factors, including pharmacokinetic properties, patient conditions and characteristics (sex, age, body weight, health, size), extent of symptoms, concurrent treatments, frequency of treatment and the effect desired.

Patients suffering from MS can be defined for example as having clinically definite or laboratory-definite MS according to Schumacher or Poser criteria (Schumacher et al., 1965, *Ann. NY Acad. Sci.* 1965; 122:552-568; Poser et al., 1983, *Ann. Neurol.* 13(3): 227-31).

"Relapses" involve neurologic problems that occur over a short period, typically days but sometimes as short as hours or even minutes. These attacks most often involve motor, sensory, visual or coordination problems early in the disease. Later, bladder, bowel, sexual and cognitive problems may be shown. Sometimes the attack onset occurs over several weeks. Typical MS relapse involves a period of worsening, with development of neurological deficits, then a plateau, in which the patient is not getting any better but also not getting any worse followed by a recovery period. Recovery usually begins within a few weeks.

"Efficacy" of a treatment according to the invention can be measured based on changes in the course of disease in response to a use according to the invention. For example, treatment of MS efficacy can be measured by the frequency of relapses in RRMS and the presence or absence of new lesions in the CNS as detected using methods such as MRI technique (Miller et al., 1996, *Neurology,* 47(Suppl 4): S217; Evans et al., 1997, *Ann. Neurology,* 41:125-132).

The observation of the reduction and/or suppression of MRI T$_1$ gadolinium-enhanced lesions (thought to represent areas of active inflammation) gives a primary efficacy variable.

Secondary efficacy variables include MRI T$_1$ enhanced brain lesion volume, MRI T$_1$ enhanced lesion number, MRI T$_2$ lesion volume (thought to represent total disease burden, i.e. demyelination, gliosis, inflammation and axon loss), MRI

T$_1$ enhanced hypointense lesion volume (thought to represent primarily demyelination and axon loss), time-to-progression of MS, frequency and severity of exacerbations and time-to-exacerbation, Expanded Disability Status Scale score and Scripps Neurologic Rating Scale (SNRS) score (Sipe et al., 1984, *Neurology,* 34, 1368-1372). Methods of early and accurate diagnosis of multiple sclerosis and of following the disease progression are described in Mattson, 2002, *Expert Rev. Neurotherapeutics,* 319-328.

Degree of disability of MS patients can be for example measured by Kurtzke Expanded Disability Status Scale (EDSS) score (Kurtzke, 1983, *Neurology,* 33, 1444-1452). Typically a decrease in EDSS score corresponds to an improvement in the disease and conversely, an increase in EDSS score corresponds to a worsening of the disease.

Cladribine (2-CdA)

2-CdA and its pharmacologically acceptable salts may be used in the practice of this invention.

Cladribine can be formulated in any pharmaceutical preparation suitable for oral administration. Representative oral formulations of 2-CdA are described in (WO 96/19230; WO 96/19229; U.S. Pat. Nos. 6,194,395; 5,506,214; WO 2004/087100; WO 2004/087101), the contents of which are incorporated herein by reference. Examples of ingredients for oral formulations are given below.

Processes for preparing 2-CdA are well known in the art. For example, the preparation of 2-CdA is described in (EP 173,059; WO 04/028462; WO 04/028462; U.S. Pat. No. 5,208,327; WO 00/64918) and Robins et al., *J. Am. Chem. Soc.,* 1984, 106: 6379. Alternatively, pharmaceutical preparations of 2-CdA may be purchased from Bedford Laboratories, Bedford, Ohio.

Oral administration of Cladribine may be in capsule, tablet, oral suspension, or syrup form. The tablet or capsules may contain from about 3 to 500 mg of Cladribine. Preferably they may contain about 3 to about 10 mg of Cladribine, more preferably about 3, about 5 or about 10 mg of Cladribine. The capsules may be gelatin capsules and may contain, in addition to Cladribine in the quantity indicated above, a small quantity, for example less than 5% by weight, magnesium stearate or other excipient. Tablets may contain the foregoing amount of the compound and a binder, which may be a gelatin solution, a starch paste in water, polyvinyl alcohol in water, etc. with a typical sugar coating.

Compositions

Compositions of this invention may further comprise one or more pharmaceutically acceptable additional ingredient(s) such as alum, stabilizers, antimicrobial agents, buffers, coloring agents, flavoring agents, adjuvants, and the like.

Compositions of this invention may be in the form of tablets or lozenges formulated in a conventional manner. For example, tablets and capsules for oral administration may contain conventional excipients including, but not limited to, binding agents, fillers, lubricants, disintegrants and wetting agents. Binding agents include, but are not limited to, syrup, accacia, gelatin, sorbitol, tragacanth, mucilage of starch and polyvinylpyrrolidone. Fillers include, but are not limited to, lactose, sugar, microcrystalline cellulose, maizestarch, calcium phosphate, and sorbitol. Lubricants include, but are not limited to, magnesium stearate, stearic acid, talc, polyethylene glycol, and silica. Disintegrants include, but are not limited to, potato starch and sodium starch glycollate. Wetting agents include, but are not limited to, sodium lauryl sulfate). Tablets may be coated according to methods well known in the art.

7

Compositions of this invention may also be liquid formulations including, but not limited to, aqueous or oily suspensions, solutions, emulsions, syrups, and elixirs. The compositions may also be formulated as a dry product for constitution with water or other suitable vehicle before use. Such liquid preparations may contain additives including, but not limited to, suspending agents, emulsifying agents, nonaqueous vehicles and preservatives. Suspending agent include, but are not limited to, sorbitol syrup, methyl cellulose, glucose/sugar syrup, gelatin, hydroxyethylcellulose, carboxymethyl cellulose, aluminum stearate gel, and hydrogenated edible fats. Emulsifying agents include, but are not limited to, lecithin, sorbitan monooleate, and acacia. Nonaqueous vehicles include, but are not limited to, edible oils, almond oil, fractionated coconut oil, oily esters, propylene glycol, and ethyl alcohol. Preservatives include, but are not limited to, methyl or propyl p-hydroxybenzoate and sorbic acid.

Combination

According to the invention, Cladribine can be administered alone or in combination with IFN-beta, prophylactically or therapeutically to an individual prior to, simultaneously or sequentially with other therapeutic regimens or agents (e.g. multiple drug regimens), in a therapeutically effective amount, especially therapeutic agents for the treatment of multiple sclerosis. Active agents that are administered simultaneously with other therapeutic agents can be administered in the same or different compositions and in the same or different routes of administration.

In one embodiment, when Cladribine is administered in combination with WFN-beta, WFN-beta is administered during the Cladribine-free period.

In another embodiment, when Cladribine is administered in combination with IFN-beta, IFN-beta is administered after the "treatment" according to the invention.

The term "interferon-beta (IFN-β)", as used herein, is intended to include fibroblast interferon in particular of human origin, as obtained by isolation from biological fluids or as obtained by DNA recombinant techniques from prokaryotic or eukaryotic host cells, as well as its salts, functional derivatives, variants, analogs and active fragments.

IFN-β suitable in accordance with the present invention is commercially available e.g. as Rebif® (Serono), Avonex® (Biogen) or Betaferon® (Schering). The use of interferons of human origin is also preferred in accordance with the present invention. The term interferon, as used herein, is intended to encompass salts, functional derivatives, variants, analogs and active fragments thereof.

Rebif® (recombinant human interferon-β) is the latest development in interferon therapy for multiple sclerosis (MS) and represents a significant advance in treatment. Rebi® is interferon (IFN)-beta 1a, produced from mammalian cell lines. It was established that interferon beta-1a given subcutaneously three times per week is efficacious in the treatment of Relapsing-Remitting Multiple Sclerosis (RRMS). Interferon beta-1a can have a positive effect on the long-term course of MS by reducing number and severity of relapses and reducing the burden of the disease and disease activity as measured by MRI.

The dosing of IFN-β in the treatment of relapsing-remitting MS according to the invention depends on the type of IFN-β used.

In accordance with the present invention, where IFN is recombinant IFN-β1b produced in *E. Coli*, commercially available under the trademark Betaseron®, it may preferably

8

be administered sub-cutaneously every second day at a dosage of about of 250 to 300 µg or 8 MIU to 9.6 MIU per person.

In accordance with the present invention, where IFN is recombinant IFN-β1a, produced in Chinese Hamster Ovary cells (CHO cells), commercially available under the trademark Avonex®, it may preferably be administered intramuscularly once a week at a dosage of about of 30 µg to 33 µg or 6 MIU to 6.6 MIU per person.

In accordance with the present invention, when IFN is recombinant IFN-β1a, produced in Chinese Hamster Ovary cells (CHO cells), commercially available under the trademark Rebif®, it may preferably be administered sub-cutaneously three times a week (TIW) at a dosage of 22 to 44 µg or 6 MIU to 12 MIU per person.

Patients

Patients according to the invention are patients suffering from multiple sclerosis, preferably RRMS or early SPMS.

In an embodiment of the invention, patients are selected from human males or females between 18 and 55 years age.

In another embodiment of the invention, patients had at least one relapse within the prior 12 months of the treatment.

Use According to the Invention

In one embodiment, the invention provides a use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis wherein the formulation is to be orally administered following the sequential steps below:

(i) An induction period wherein Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the maintenance period is lower than the total dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered.

In a further embodiment, the invention provides a use according to the invention wherein the induction period lasts up to about 4 months or up to about 3 months or up to about 2 months.

In a further embodiment, the invention provides a use according to the invention wherein the induction period lasts up to about 2 months.

In a further embodiment, the invention provides a use according to the invention wherein the induction period lasts up to about 4 months.

In a further embodiment, the invention provides a use according to the invention wherein the total dose of Cladribine reached at the end of the induction period is about 1.7 mg/kg.

In a further embodiment, the invention provides a use according to the invention wherein the total dose of Cladribine reached at the end of the induction period is about 3.5 mg/kg.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free period lasts up to about 10 months, or up to about 9 months or up to about 8 months.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free (ii) period lasts up to about 8 months.

9

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free (ii) period lasts at least about 8 months.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free period (ii) lasts up to about 10 months.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free (iv) period lasts up to about 10 months.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free (iv) period lasts at least about 8 months.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free periods (ii) and/or (iv) last between about 8 and about 10 months.

In another further embodiment, the invention provides a use according to the invention wherein a placebo-pill is administered during the Cladribine-free period.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free period is free of any administration.

In another further embodiment, the invention provides a use according to the invention wherein the maintenance period lasts up to about 4 months, or up to about 3 months, or up to about 2 months, preferably up to about 2 months.

In another further embodiment, the invention provides a use according to the invention wherein the total dose of Cladribine reached at the end of the maintenance period (iii) is about 1.7 mg/kg.

In another further embodiment, the invention provides a use according to the invention wherein the steps (iii) to (iv) are repeated at least one or two times.

In a preferred embodiment, the invention provides a use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis wherein the formulation is to be orally administered following the sequential steps below:

(i) An induction period wherein Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the maintenance period is lower than the total dose of Cladribine reached at the end of the induction period (i)

(iv) A Cladribine-free period wherein no Cladribine is administered;

wherein the induction period last up to about 4 months, or up to about 3 months, or up to about 2 months; the Cladribine-free period (ii) lasts up to about 10 months, or up to about 9 months, or up to about 8 months; the maintenance period (iii) lasts up to about 2 months; the Cladribine-free period (iv) lasts up to about 10 months; the total dose of Cladribine reached at the end of the maintenance period is about 1.7 mg/kg and steps (iii) to (iv) are repeated performed one, two or three times.

In another embodiment, the invention provides a use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis wherein the formulation is to be orally administered following the sequential steps below:

10

(i) An induction period wherein Cladribine pharmaceutical formulation is administered and wherein the total effective dose of Cladribine reached at the end of the induction period is from about 0.7 mg/kg to about 1.4 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine pharmaceutical formulation is administered and wherein the total effective dose of Cladribine reached at the end of the maintenance period (iii) is lower than the total effective dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered.

In a further embodiment, the invention provides a use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis wherein the formulation is to be orally administered following the sequential steps below:

(i) An induction period wherein Cladribine pharmaceutical formulation is administered and wherein the total effective dose of Cladribine reached at the end of the induction period is from about 0.7 mg/kg to about 1.4 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine pharmaceutical formulation is administered and wherein the total effective dose of Cladribine reached at the end of the maintenance period is lower than the total effective dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered;

wherein the induction period lasts up to about 4 months, or up to about 3 months, or up to about 2 months; the Cladribine-free period (ii) lasts up to about 10 months, or up to about 9 months, or up to about 8 months; the maintenance period (iii) lasts up to about 2 months; the Cladribine-free period (ii) lasts up to about 10 months; the total effective dose of Cladribine reached at the end of the maintenance period is about 0.7 mg/kg and steps (iii) to (iv) are repeated performed one, two or three times.

In a preferred embodiment, the invention provides Cladribine for use as a medicament for the treatment of multiple sclerosis wherein the medicament is to be orally administered following the sequential steps below:

(i) An induction period wherein Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the maintenance period is lower than the total dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered;

wherein the induction period last up to about 4 months, or up to about 3 months, or up to about 2 months; the Cladribine-free period (ii) lasts up to about 10 months, or up to about 9 months, or up to about 8 months; the maintenance period (iii) lasts up to about 2 months; the Cladribine-free period (iv) lasts up to about 10 months; the total dose of Cladribine

reached at the end of the maintenance period is about 1.7 mg/kg and steps (iii) to (iv) are repeated performed one, two or three times.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered at a daily dose of Cladribine about 3 to 30 mg Cladribine, preferably 5 to 20 mg Cladribine, most preferably 10 mg Cladribine.

In another further embodiment, the invention provides a use according to the invention wherein the total dose of Cladribine reached at the end of the induction period is about 3.5 mg/kg and the total dose of Cladribine reached at the end of the maintenance period is about 1.7 mg/kg.

In another further embodiment, the invention provides a use according to the invention wherein the total effective dose of Cladribine reached at the end of the induction period is about 1.4 mg/kg and the total effective dose of Cladribine reached at the end of the maintenance period is about 0.7 mg/kg.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered once a day during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered several times a day administered once a day during the induction period, preferably twice or three times a day, more preferably twice a day.

In another embodiment, the invention provides a use of Cladribine according to the invention whereby the pharmaceutical formulation is orally administered about 1 to about 7 days per month, preferably from about 5 to about 7 days per month during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention whereby the pharmaceutical formulation is orally administered about 0.02 days/kg to about 0.08 days/kg per month during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention whereby the pharmaceutical formulation is orally administered about 0.02 days/kg to about 0.08 days/kg per month during the maintenance period.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered at a daily dose of about 10 mg Cladribine from day 1 to about day 2 each month during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered at a daily dose of about 10 mg Cladribine from day 1 to about day 3 each month during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered at a daily dose of about 10 mg Cladribine from day 1 to about day 4 each month during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered at a daily dose of about 10 mg Cladribine from day 1 to about day 5 each month during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered at a daily

dose of about 10 mg Cladribine from day 1 to about day 6 each month during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered at a daily dose of about 10 mg Cladribine from day 1 to about day 4 each month during the induction period and wherein the pharmaceutical formulation is a pharmaceutical formulation described in WO 2004/087101 or in WO 2004/087100.

In another embodiment, the invention provides a use of Cladribine according to any of the preceding claims wherein the pharmaceutical formulation is to be administered in combination with interferon-beta.

In a preferred embodiment, the invention provides a method for the treatment of multiple sclerosis, comprising the oral administration of Cladribine or of a pharmaceutical formulation thereof in a patient in need thereof comprising the following steps:

(i) An induction period wherein Cladribine or a pharmaceutical formulation thereof is administered and wherein the total dose of Cladribine reached at the end of the induction period is from about 1.5 mg/kg to about 3.5 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine or a pharmaceutical formulation thereof is administered and wherein the total dose of Cladribine reached at the end of the maintenance period is lower than the total dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered.

In a preferred embodiment, the invention provides a method for the treatment of multiple sclerosis, comprising the oral administration of Cladribine or of a pharmaceutical formulation thereof in a patient in need thereof comprising the following steps:

(i) An induction period wherein Cladribine or a pharmaceutical formulation thereof is administered and wherein the total effective dose of Cladribine reached at the end of the induction period is from about 0.7 mg/kg to about 1.4 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine pharmaceutical formulation is administered and wherein the total effective dose of Cladribine reached at the end of the maintenance period is lower than the total effective dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered.

In another further embodiment, the invention provides a method according to the invention wherein the steps (iii) to (iv) are repeated at least one or two times.

In a preferred embodiment, the invention provides a method of treating multiple sclerosis with Cladribine, wherein Cladribine is orally administered following the sequential steps below:

(i) Administering Cladribine, such that the total dose of Cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) Administering no Cladribine during a Cladribine free period;

13

(iii) Administering Cladribine such that the total dose of Cladribine reached at the end of a maintenance period is lower than the total dose of Cladribine reached at the end of the induction period (i);

(iv) And optionally, a Cladribine-free period wherein no Cladribine is administered.

In a further preferred embodiment, the invention provides a method wherein the induction period lasts up to about 4 months, or up to about 3 months, or up to about 2 months.

In a further preferred embodiment, the invention provides a method wherein the total dose of Cladribine reached at the end of the induction period is about 1.7 mg/kg.

In a further preferred embodiment, the invention provides a method wherein the total dose of Cladribine reached at the end of the induction period is about 3.5 mg/kg.

In a further preferred embodiment, the invention provides a method wherein the total effective dose of Cladribine reached at the end of the induction period is about 1.4 mg/kg.

In a further preferred embodiment, the invention provides a method wherein the Cladribine-free period lasts up to about 10 months, or up to about 9 months, or up to about 8 months.

In a further preferred embodiment, the invention provides a method wherein the maintenance period lasts up to about 4 months, or up to about 3 months up to about 2 months.

In a further preferred embodiment, the invention provides a method wherein the total dose of Cladribine reached at the end of the maintenance period is about 1.7 mg/kg.

In a further preferred embodiment, the invention provides a method wherein the total effective dose of Cladribine reached at the end of the maintenance period is about 0.7 mg/kg.

In a further preferred embodiment, the invention provides a method wherein the maintenance period is followed by a Cladribine-free period.

In another embodiment, the invention provides a method according to the invention wherein the total dose of Cladribine reached at the end of the induction period is about 3.5 mg/kg and the total dose of Cladribine reached at the end of the maintenance period is about 1.7 mg/kg.

In another further embodiment, the invention provides a method according to the invention wherein the total effective dose of Cladribine reached at the end of the induction period is about 1.4 mg/kg and the total effective dose of Cladribine reached at the end of the maintenance period is about 0.7 mg/kg.

In another further embodiment, the invention provides a method according to the invention wherein Cladribine is to be orally administered at a daily dose of about 3 to about 30 mg.

In another further embodiment, the invention provides a method according to the invention wherein Cladribine is to be orally administered at a daily dose of about 10 mg.

In another further embodiment, the invention provides a method according to the invention wherein Cladribine is orally administered about 1 to about 7 days per month during the induction period.

In another further embodiment, the invention provides a method according to the invention wherein the steps (iii) are repeated at least one or two times.

In another further embodiment, the invention provides a method according to the invention wherein Cladribine is to be administered in combination with interferon-beta.

## EXAMPLES

The following abbreviations refer respectively to the definitions below:

kg (kilogram), μg (microgram), mg (milligram), AEs (Adverse effects), CNS (Cnetral nervous system), CSF (Cerebrospinal fluid), EDSS (Expanded Disability Status Scale, SNRS (Scripps Neurologic Rating Scale), IFN (interferon), i.v. (intra-veinous), MIU (Million International units), MS (multiple sclerosis), MRI (Magnetic resonance imaging), p.o. (per os), PPMS (Primary progressive multiple sclerosis), PRMS (Progressive relapsing multiple sclerosis), RRMS (Relapsing-remitting multiple sclerosis), SPMS (Secondary progressive multiple sclerosis), s.c. (subcutaneous), TIW (Three times a week), 2-CdA (2-chloro-2'deoxyadenosine or Cladribine), UI; (International unit).

The efficacy and safety of oral Cladribine administration, eventually multi-dose administration, according to the invention can be assessed for example following the protocol below:

### Example 1

### Oral Cladribine in the Treatment of Relapsing Forms of MS

A study of sixty patients with relapsing forms of clinically definite multiple sclerosis is undertaken. Each patient is first examined for normal hepatic, renal, and bone marrow functioning to establish baseline values.

Patients are selected from Male or Female, between 18 and 55 years of age who had one or more relapses within the prior 12 months. Female patients are non-pregnant female. Patients are randomly assigned to one of the treatment groups listed in Table 1 below:

TABLE 1

| Group | 2-CdA |
|---|---|
| 1 | — |
| 2 | 1.75 mg/kg |
| 3 | 3.5 mg/kg |

Each of the patients in Groups 2 and 3 receives 3 mg or 10 mg 2-CdA (1, 2 or 3 administration(s) a day depending on the patient's weight) combined in cyclodextrin formulation as described in WO 2004/087101, Example 3. The Compositions of the Cladribine formulations in 3 mg or 10 mg 2-CdA tablets containing hydroxypropyl-beta-cyclodextrin are listed in Table 2 below:

TABLE 2

| Name of ingredients | Formula mg/tablet | Formula mg/tablet |
|---|---|---|
| Cladribine-2-hydroxypropyl-β-cyclodextrin- complex* | 153.75 equivalent to 10 mg 2-CdA | 30.60 equivalent to 3 mg 2-CdA |
| Sorbitol powder | 44.25 | 68.4 |
| Magnesium Stearate (vegetable grade) | 2.0 | 1.00 |
| Total | 200.0 | 100 |

*Cladribine is complexed and lyophilised with 2-hydroxypropyl-β-cyclodextrin as a separate process as described in WO 2004/087101.

Examples of administration schemes for the induction period depending on the patient's weight are given below in Tables 3 and 4 for the target doses of 1.75 mg/kg and 3.5 mg/kg respectively. For the maintenance period, the example of administration scheme of Table 3 is applicable.

TABLE 3

| Patient weight ranges (kg) | | | Total target dose (kg) equivalent | | Number of pills (10 mg)/induction period | | |
|---|---|---|---|---|---|---|---|
| | Mid | | to 1.75 mg/kg | | Month | Month | |
| Min | range | Max | Min | Max | 1 | 2 | Total |
| 40 | 42.5 | 44.9 | 28 | 31.4 | 4 | 3 | 7 |
| 45 | 47.5 | 49.9 | 31.5 | 34.9 | 4 | 4 | 8 |
| 50 | 52.5 | 54.9 | 35 | 38.4 | 5 | 4 | 9 |
| 55 | 57.5 | 59.9 | 38.5 | 41.9 | 5 | 5 | 10 |
| 60 | 62.5 | 64.9 | 42 | 45.4 | 5 | 5 | 10 |
| 65 | 67.5 | 69.9 | 45.5 | 48.9 | 6 | 5 | 11 |
| 70 | 72.5 | 74.9 | 49 | 52.4 | 6 | 6 | 12 |
| 75 | 77.5 | 79.9 | 52.5 | 55.9 | 7 | 6 | 13 |
| 80 | 82.5 | 84.9 | 56 | 59.4 | 7 | 6 | 13 |
| 85 | 87.5 | 89.9 | 59.5 | 62.9 | 7 | 7 | 14 |
| 90 | 92.5 | 94.9 | 63 | 66.4 | 8 | 7 | 15 |
| 95 | 97.5 | 99.9 | 66.5 | 69.9 | 8 | 8 | 16 |
| 100 | 102.5 | 104.9 | 70 | 73.4 | 9 | 8 | 17 |
| 105 | 107.5 | 109.9 | 73.5 | 76.9 | 9 | 9 | 18 |
| 110 | 112.5 | 114.9 | 77 | 80.4 | 9 | 9 | 18 |
| 115 | 117.5 | 119.9 | 80.5 | 83.9 | 10 | 9 | 19 |

TABLE 4

| Patient weight ranges (kg) | | | Total target dose (kg) equivalent | | Number of pills (10 mg)/induction period | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Mid | | to 3.5 mg/kg | | Month | Month | Month | Month | |
| Min | range | Max | Min | Max | 1 | 2 | 3 | 4 | Total |
| 40 | 42.5 | 44.9 | 56 | 62.9 | 4 | 4 | 3 | 3 | 14 |
| 45 | 47.5 | 49.9 | 63 | 69.9 | 4 | 4 | 4 | 4 | 16 |
| 50 | 52.5 | 54.9 | 70 | 76.9 | 5 | 4 | 4 | 4 | 17 |
| 55 | 57.5 | 59.9 | 77 | 83.9 | 5 | 5 | 5 | 4 | 19 |
| 60 | 62.5 | 64.9 | 84 | 90.9 | 6 | 5 | 5 | 5 | 21 |
| 65 | 67.5 | 69.9 | 91 | 97.9 | 6 | 6 | 5 | 5 | 22 |
| 70 | 72.5 | 74.9 | 98 | 104.9 | 6 | 6 | 6 | 6 | 24 |
| 75 | 77.5 | 79.9 | 105 | 111.9 | 7 | 7 | 6 | 6 | 26 |
| 80 | 82.5 | 84.9 | 112 | 118.9 | 7 | 7 | 7 | 6 | 27 |
| 85 | 87.5 | 89.9 | 119 | 125.9 | 7 | 7 | 7 | 7 | 28 |
| 90 | 92.5 | 94.9 | 126 | 132.9 | 8 | 8 | 7 | 7 | 30 |
| 95 | 97.5 | 99.9 | 133 | 139.9 | 8 | 8 | 8 | 8 | 32 |
| 100 | 102.5 | 104.9 | 140 | 146.9 | 9 | 8 | 8 | 8 | 33 |
| 105 | 107.5 | 109.9 | 147 | 153.9 | 9 | 9 | 9 | 8 | 35 |
| 110 | 112.5 | 114.9 | 154 | 160.9 | 10 | 9 | 9 | 9 | 37 |
| 115 | 117.5 | 119.9 | 161 | 167.9 | 10 | 10 | 9 | 9 | 38 |

In Group 1 patients receive a placebo (saline) for 4 months followed by 8 months of no treatment.

In Group 2 patients receive a daily oral administration of Cladribine for about 5 days a month during 2 months (induction period) of 2-CdA cyclodextrin formulation such as the total effective dose administered at the end of the first 2 months approximates about 0.7 mg/kg (total dose of about 1.75 mg/kg for a bioavailability of about 40%); followed by administration of placebo for 2 months; followed by 8 months of no treatment.

In Group 3 patients receive a daily oral administration of Cladribine for about 5 days a month during 4 months (induction period) of 2-CdA cyclodextrin formulation such as the total effective dose administered at the end of the first 4 months approximates about 1.4 mg/kg (total dose of about 3.5 mg/kg for a bioavailability of about 40%); followed by 8 months of no treatment.

Beginning at month 13, all 3 patient groups receive re-treatment with Cladribine cyclodextrin formulation for about 5 days a month for 2 months (maintenance period) with the

lower dose (such as the total effective dose administered at the end of the first 2 months approximates about 0.7 mg/kg) followed by 10 months of no treatment.

Finally, beginning at month 25, all patient groups receive re-treatment with Cladribine cyclodextrin formulation for about 5 days a month for 2 months (maintenance period) with the lower dose (such as the total effective dose administered at the end of the first 2 months approximates about 0.7 mg/kg) followed by 10 more months of no treatment.

Patients are monitored to determine whether there is any progression or improvement of brain lesions associated with progression of MS through MRI scans and neurological examination as described in Miller et al., 1996, above; Evans et al., 1997, above; Sipe et al., 1984, above; and Mattson, 2002, above. All patients have a baseline and MRI study (brain or spinal cord, according to localization of the lesions) at month 12.

The patient's disability progression and the time for having a first relapse are monitored as well as the proportion of relapse-fee patients at 24 months.

Lymphocyte markers and monocyte counts are monitored in the patients.

Patients in Groups 2 and 3 have a decrease in brain lesions.

The data show that the 2-CdA regimen consisting in the succession of an induction treatment and maintenance treatments is efficient in decreasing brain lesions and no severe adverse effect is observed.

The invention claimed is:

1. A method of treating multiple sclerosis comprising oral administration of a formulation comprising cladribine, wherein the formulation is to be orally administered following the sequential steps below:

(i) an induction period wherein said cladribine formulation is administered and wherein the total dose of cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) a cladribine-free period of between about 8 and about 10 months wherein no cladribine formulation is administered;

(iii) a maintenance period wherein said cladribine formulation is administered and wherein the total dose of cladribine reached at the end of the maintenance period

is lower than the total dose of cladribine reached at the end of the induction period (i); and

(iv) a cladribine-free period wherein no cladribine formulation is administered.

**2.** The method according to claim **1**, wherein the induction period lasts up to about 4 months.

**3.** The method according to claim **2**, wherein the induction period lasts about 2 months.

**4.** The method according to claim **2**, wherein the induction period lasts about 3 months.

**5.** The method according to claim **2**, wherein the induction period lasts about 4 months.

**6.** The method according to claim **2**, wherein the induction period lasts up to about 3 months.

**7.** The method according to claim **1**, wherein the total dose of cladribine reached at the end of the induction period is about 1.7 mg/kg.

**8.** The method according to claim **1**, wherein the total dose of cladribine reached at the end of the induction period is about 3.5 mg/kg.

**9.** The method according to claim **1**, wherein the cladribine-free (iv) period lasts about 10 months.

**10.** The method according to claim **1**, wherein the maintenance period lasts about 4 months.

**11.** The method according to claim **1**, wherein the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg.

**12.** The method according to claim **1**, wherein the formulation is to be orally administered following the sequential steps below:

(i) an induction period wherein said cladribine formulation is orally administered and wherein the total dose of cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) a cladribine-free period of between about 8 and about 10 months wherein no cladribine formulation is administered;

(iii) a maintenance period wherein said cladribine formulation is administered and wherein the total dose of cladribine reached at the end of the maintenance period is lower than the total dose of cladribine reached at the end of the induction period (i); and

(iv) a cladribine-free period wherein no cladribine formulation is administered;

wherein the induction period lasts up to 4 months; the cladribine-free period (ii) lasts up to 10 months; the maintenance period (iii) lasts up to 2 months; the cladribine-free period (iv) lasts up to 10 months; the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg and steps (iii) to (iv) are repeated one, two or three times.

**13.** The method according to claim **12**, wherein the total dose of cladribine reached at the end of the induction period is about 3.5 mg/kg and the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg.

**14.** The method according to claim **12**, wherein the formulation is to be orally administered at a daily dose of 3 to 30 mg cladribine.

**15.** The method according to claim **14**, wherein the formulation is to be orally administered at a daily dose of 10 mg cladribine.

**16.** The method according to claim **1**, wherein the formulation is orally administered 1 to 7 days per month during the induction period.

**17.** The method according to claim **1**, wherein the steps (iii) to (iv) are repeated at least one or two times.

**18.** The method according to claim **1**, wherein said cladribine formulation is to be administered in combination with interferon-beta.

**19.** The method according to claim **12**, wherein said cladribine formulation is to be administered in combination with interferon-beta.

**20.** A method of treating multiple sclerosis comprising the oral administration of a formulation comprising cladribine following the sequential steps below:

(i) an induction period lasting from about 2 months to about 4 months wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) a cladribine-free period lasting from about 8 months to about 10 months, wherein no cladribine is administered;

(iii) a maintenance period lasting from about 2 months to about 4 months, wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the maintenance period is lower than the total dose of cladribine reached at the end of the induction period (i);

(iv) a cladribine-free period wherein no cladribine is administered.

**21.** The method according to claim **20**, wherein the induction period lasts about 4 months.

**22.** The method according to claim **20**, wherein the induction period lasts about 2 months.

**23.** The method according to claim **20**, wherein the total dose of cladribine reached at the end of the induction period is about 1.7 mg/kg.

**24.** The method according to claim **20**, where the total dose of cladribine reached at the end of the induction period is about 3.5 mg/kg.

**25.** The method according to claim **20**, wherein the cladribine-free period (ii) lasts about 10 months.

**26.** The method according to claim **20**, wherein the cladribine-free period (iv) period lasts 10 months.

**27.** The method according to claim **20**, wherein the maintenance period lasts about 2 months.

**28.** The method according to claim **20**, wherein the formulation is orally administered following the sequential steps below:

(i) an induction period wherein said formulation is administered orally and wherein the total dose of cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) a cladribine-free period wherein no cladribine is administered;

(iii) a maintenance period wherein said formulation is administered orally and wherein the total dose of cladribine reached at the end of the maintenance period is lower than the total dose of cladribine reached at the end of the induction period (i); (iv) a cladribine-free period wherein no cladribine is administered;

wherein the maintenance period (iii) lasts about 2 months; the cladribine-free period (iv) lasts about 10 months; the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg and steps (iii) to (iv) are repeatedly performed one, two or three times.

**29.** The method according to claim **20**, wherein the total dose of cladribine reached at the end of the induction period is about 3.5 mg/kg and the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg.

**30.** The method according to claim **20**, wherein the formulation is orally administered at a daily dose of 3 to 30 mg cladribine.

**31**. The method according to claim **20**, wherein the formulation is orally administered at a daily dose of 10 mg cladribine.

**32**. The method according to claim **20**, wherein the formulation is orally administered 1 to 7 days per month during the induction period.

**33**. The method according to claim **20**, wherein the steps (iii) to (iv) are repeated at least one time.

**34**. The method according to claim **20**, wherein the steps (iii) to (iv) are repeated at least two times.

**35**. The method according to claim **20**, wherein the formulation is administered in combination with interferon-beta.

**36**. A method of treating multiple sclerosis comprising the oral administration of a formulation comprising cladribine following the sequential steps below:

    (i) an induction period lasting from about 2 months to about 4 months wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

    (ii) a cladribine-free period lasting from about 8 months to about 10 months, wherein no cladribine is administered;

    (iii) a maintenance period lasting from about 2 months to about 4 months, wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg;

    (iv) a cladribine-free period wherein no cladribine is administered.

**37**. The method according to claim **36**, wherein the induction period lasts about 4 months.

**38**. The method according to claim **36**, wherein the induction period lasts about 2 months.

**39**. The method according to claim **36**, wherein the total dose of cladribine reached at the end of the induction period is about 1.7 mg/kg.

**40**. The method according to claim **36**, where the total dose of cladribine reached at the end of the induction period is about 3.5 mg/kg.

**41**. The method according to claim **36**, wherein the cladribine-free period (ii) lasts about 10 months.

**42**. The method according to claim **36**, wherein the cladribine-free (iv) period lasts 10 months.

**43**. The method according to claim **36**, wherein the maintenance period lasts about 2 months.

**44**. The method according to claim **36**, wherein the formulation is orally administered at a daily dose of 3 to 30 mg cladribine.

**45**. The method according to claim **36**, wherein the formulation is orally administered at a daily dose of 10 mg cladribine.

**46**. The method according to claim **36**, wherein the formulation is orally administered 1 to 7 days per month during the induction period.

**47**. The method according to claim **36**, wherein the steps (iii) to (iv) are repeated at least one or two times.

**48**. The method according to claim **36**, wherein the formulation is administered in combination with interferon-beta.

\*   \*   \*   \*   \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,713,947 B2
APPLICATION NO. : 11/722018
DATED              : May 11, 2010
INVENTOR(S)     : Giampiero De Luca et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 1,
Line 31, "Clinical is disability" should read --Clinical disability--.

Column 7,
Line 32, "WFN-beta, WFN-beta" should read --IFN-beta, IFN-beta--.

Column 14,
Line 12, "UI; (International unit)" should read --UI (International unit)--.

Signed and Sealed this

Fifteenth Day of June, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*


## (12) United States Patent
### De Luca et al.

(10) **Patent No.:** **US 8,377,903 B2**

(45) **Date of Patent:** **\*Feb. 19, 2013**

(54) **CLADRIBINE REGIMEN FOR TREATING MULTIPLE SCLEROSIS**

(75) Inventors: **Giampiero De Luca**, Conches/Geneva (CH); **Arnaud Ythier**, Collex-Bossy (CH); **Alain Munafo**, Tartegnin (CH); **Maria Lopez-Bresnahan**, Lincoln, MA (US)

(73) Assignee: **Merck Serono SA**, Coinsins, Vaud (CH)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 162 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/766,173**

(22) Filed: **Apr. 23, 2010**

(65) **Prior Publication Data**

US 2010/0203017 A1    Aug. 12, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/722,018, filed as application No. PCT/EP2005/056954 on Dec. 20, 2005, now Pat. No. 7,713,947.

(60) Provisional application No. 60/638,669, filed on Dec. 22, 2004.

(30) **Foreign Application Priority Data**

Dec. 22, 2004    (EP) ..................................... 04106909

(51) **Int. Cl.**
*A61K 31/52*    (2006.01)
*A61K 31/7076*    (2006.01)
*A61K 38/21*    (2006.01)
*A61K 9/00*    (2006.01)

(52) **U.S. Cl.** ........................................ **514/46**; 424/85.6

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,964,848 A | 10/1990 | Bloom | |
| 5,506,214 A | 4/1996 | Beutler | |
| 2010/0021429 A1 | 1/2010 | Brentzel et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 626 853 B1 | 4/2000 |
| WO | WO 2004/087101 A2 | 10/2004 |

OTHER PUBLICATIONS

Beutler, E. et al. "Marrow Suppression Produced by Repeated Doses of Cladribine", *Acta Haematol*, 1994, pp. 10-15, vol. 91.
Beutler, E. et al. "Treatment of Multiple Sclerosis and Other Autoimmune Diseases With Cladribine", *Seminars in Hematology*, Jan. 1, 1996, pp. 45-52, vol. 33, No. 1, Supplement 1.
Beutler, E. et al. "The treatment of chronic progressive multiple sclerosis with cladribine", *Proc. Natl. Acad. Sci. USA*, Feb. 1996, pp. 1716-1720, vol. 93.

Ellison, G. et al. "Oral Cladribine for Multiple Sclerosis", *Neurology*, Mar. 1997, P03.070, pp. A174-A175, vol. 48, No. 3, XP008047069.
Grieb, P. et al. "Effect of Repeated Treatments with Cladribine (2-Chlorodeoxyadenosine) on Blood Counts in Multiple Sclerosis Patients", *Archivum Immunologiae et Therapiae Experimentalis*, 1995, pp. 323-327, vol. 43, No. 5-6.
Kazimierczuk, Z. et al. "Synthesis of 2'-Deoxytubercidin, 2'-Deoxyadenosine, and Related 2'-Deoxynucleosides via a Novel Direct Stereospecific Sodium Salt Glycosylation Procedure", *J. Am. Chem. Soc.*, 1984, pp. 6379-6382, vol. 106, No. 21.
Kurtzke, J. "Rating neurologic impairment in multiple sclerosis: An expanded disability status scale (EDSS)", *Neurology*, Nov. 1983, pp. 1444-1452, vol. 33.
Langtry, H. et al. "Cladribine: A Review of its Use in Multiple Sclerosis", *Biodrugs*, May 1998, pp. 419-433, vol. 9, No. 3.
Lassmann, H. et al. "Heterogeneity of multiple sclerosis pathogenesis: implications for diagnosis and therapy", *TRENDS in Molecular Medicine*, Mar. 2001, pp. 115-121, vol. 7, No. 3.
Lublin, F. et al. "Defining the clinical course of multiple sclerosis: Results of an international survey", *Neurology*, Apr. 1996, pp. 907-911, vol. 46.
Lucchinetti, C. et al. "Multiple sclerosis: recent developments in neuropathology, pathogenesis, magnetic resonance imaging studies and treatment", *Current Opinion in Neurology*, 2001, pp. 259-269, vol. 14.
Mattson, D. "Update on the diagnosis of multiple sclerosis", *Expert Review of Neurotherapeutics*, May 2002, pp. 319-327, vol. 2, No. 3.
McDonald, W. et al. "Recommended Diagnostic Criteria for Multiple Sclerosis: Guidlines from the International Panel on the Diagnosis of Multiple Sclerosis", *Annals of Neurology*, Jul. 2001, pp. 121-127, vol. 50, No. 1.
Miller, R. et al. "Therapeutic advances in ALS", *Neurology*, 1996, pp. S217, vol. 47, Suppl. 4.
Noseworthy, J. et al. "Multiple Sclerosis", *The New England Journal of Medicine*, Sep. 28, 2000, pp. 938-952, vol. 343, No. 13.
Poser, C. et al. "New Diagnostic Criteria for Multiple Sclerosis: Guidelines for Research Protocols", *Annals of Neurology*, Mar. 1983, pp. 227-231, vol. 13, No. 3.
Rice, G. et al. "Cladribine and progressive MS: Clinical and MRI outcomes of a multicenter controlled trial", *Neurology*, Mar. 2000, pp. 1145-1155, vol. 54.
Romine, J. et al. "A Double-Blind, Placebo-Controlled, Randomized Trial of Cladribine in Relapsing-Remitting Multiple Sclerosis", *Proceedings of the Association of American Physicians*, Jan./Feb. 1999, pp. 35-44, vol. 111, No. 1.
Schumacher, G. et al. "Problems of Experimental Trials of Therapy in Multiple Sclerosis: Report by the Panel on the Evaluation of Experimental Trials of Therapy in Multiple Sclerosis", *Annals New York Academy of Sciences*, Mar. 31, 1965, pp. 552-568, vol. 122.

(Continued)

*Primary Examiner* — Elizabeth C Kemmerer
*Assistant Examiner* — Kimberly A Ballard
(74) *Attorney, Agent, or Firm* — Saliwanchik, Lloyd & Eisenschenk

(57) **ABSTRACT**

The present invention is related to the use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis, especially relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis, wherein the preparation is to be orally administered and wherein re-treatments are possible.

**29 Claims, No Drawings**

OTHER PUBLICATIONS

Selby, R. et al. "Safety and Tolerability of Subcutaneous Cladribine Therapy in Progressive Multiple Sclerosis", *Can. J. Neurol. Sci.*, 1998, pp. 295-299, vol. 25.

Sipe, J. et al. "A neurologic rating scale (NRS) for use in multiple sclerosis", *Neurology*, Oct. 1984, pp. 1368-1372, vol. 34.

Stelmasiak, Z. et al. "A pilot trial of cladribine (2-chlorodeoxyadenosine) in remitting-relapsing multiple sclerosis", *Med. Sci Monit.*, 1998, pp. 4-8, vol. 4, No. 1.

# CLADRIBINE REGIMEN FOR TREATING MULTIPLE SCLEROSIS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. Ser. No. 11/722,018, filed Jun. 18, 2007, which is the U.S. national stage application of International Patent Application No. PCT/EP2005/056954, filed Dec. 20, 2005, which claims the benefit of U.S. Provisional Patent Application No. 60/638,669, filed Dec. 22, 2004, the disclosures of which are hereby incorporated by reference in their entireties, including all figures, tables and amino acid or nucleic acid sequences.

## FIELD OF THE INVENTION

The present invention relates to the use of multiple doses of Cladribine for the treatment of multiple sclerosis, especially relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis.

## BACKGROUND OF THE INVENTION

Multiple sclerosis (MS) is the most known chronic inflammatory demyelinating disease of the central nervous system in humans. The onset of the disease typically occurs during ages 20 to 40. Women are affected approximately twice as often as men.

Over time, MS may result in the accumulation of various neurological disabilities. Clinical disability in MS is presumed to be a result of repeated inflammatory injury with subsequent loss of myelin and axons, leading to tissue atrophy.

MS is manifested in physical symptoms (relapses and disability progression), Central Nervous System (CNS) inflammation, brain atrophy and cognitive impairment. Presenting symptoms include focal sensory deficits, focal weakness, visual problems, imbalance and fatigue. Sexual impairment and sphincter dysfunction may occur. Approximately half of the patients with MS may experience cognitive impairment or depression.

MS is now considered to be a multi-phasic disease and periods of clinical quiescence (remissions) occur between exacerbations. Remissions vary in length and may last several years but are infrequently permanent.

Four courses of the disease are individualized: relapsing-remitting (RR), secondary progressive (SP), primary progressive (PP) and progressive relapsing (PR) multiple sclerosis.

More than 80% of patients with MS will initially display a RR course with clinical exacerbation of neurological symptoms, followed by a recovery that may or may not be complete (Lublin and Reingold, *Neurology*, 1996, 46:907-911).

During RRMS, accumulation of disability results from incomplete recovery from relapses. Approximately, half of the patients with RRMS switch to a progressive course, called SPMS, 10 years after the diseased onset. During the SP phase, worsening of disability results from the accumulation of residual symptoms after exacerbation but also from insidious progression between exacerbations (Lublin and Reingold above). 10% of MS patients have PPMS which is characterized by insidious progression of the symptoms from the disease onset. Less than 5% of patients have PRMS and are often considered to have the same prognosis as PPMS. It is suggested that distinct pathogenic mechanisms may be involved in different patient sub-groups and have wide-ranging impli-

cations for disease classification (Lassmann et al., 2001, *Trends Mol. Med.,* 7, 115-121; Lucchinetti et al., *Curr. Opin. Neurol.,* 2001, 14, 259-269).

MS onset is defined by the occurrence of the first neurological symptoms of CNS dysfunction. Advances in cerebrospinal fluid (CSF) analysis and magnetic resonance imaging (MRI) have simplified the diagnostic process and facilitated early diagnostic (Noseworthy et al., *The New England Journal of Medicine,* 2000, 343, 13, 938-952). The International Panel on the Diagnosis of MS issued revised criteria facilitating the diagnosis of MS and including MRI together with clinical and para-clinical diagnostic methods (Mc Donald et al., 2001, *Ann. Neurol.,* 50:121-127).

Current medications for MS which are disease modifying treatments, i.e. modifying the course of MS, modulate or suppress the immune system. There are four FDA approved immunomodulating agents for RRMS: three beta interferons (Betaseron®, Berlex; Avonex®, Biogen; Rebif®, Serono) and Glatimarer Acetate (Copaxone®, Amgen). There is also one FDA approved immunosuppressing drug for worsening MS, Mitoxantrone (Novantrone®, Amgen). Several other immunosuppressive agents are used, although not FDA approved.

Among them, Cladribine, a chlorinated purine analogue 2-chloro-2' deoxyadenosine analogue (2-CdA), has been suggested to be useful in the treatment of MS (EP 626853B1 and U.S. Pat. No. 5,506,214).

Several clinical studies with Cladribine in patients with multiple sclerosis have investigated the use of i.v. and s.c. Cladribine in MS.

Two double-blind, placebo controlled Phase II studies were conducted respectively in the treatment of Chronic Progressive MS (Selby et al., 1998, *Can. J. Neurol. Sci.,* 25:295-299) and Relapsing-Remitting MS respectively (Romine et al., 1999, *Proceedings of the Association of American Physicians,* 111, 1, 35-44).

In the first trial, the Cladribine dose used was 0.1 mg/kg/day for 7 days by continuous i.v. infusion. The treatment for repeated for 4 consecutive months.

In the second clinical trial, the Cladribine dose used was 0.07 mg/kg/day for 5 days by subcutaneous injection. The treatment was repeated for 6 consecutive months.

In addition, placebo controlled Phase III study was conducted in patients with primary progressive (PP) or secondary progressive (SP) multiple sclerosis (Rice et al., 2000, *Neurology,* 54, 5, 1145-1155). In this study, both patient groups received Cladribine by subcutaneous injection at a dose of 0.07 mg/kg/day. The treatment was repeated for either 2 months or 6 months.

The Phase II clinical studies provided evidence for the positive effects of Cladribine in patients with MS in terms of Kutzke Extended Disability Status Scale (EDSS), Scripps Neurologic rating Scale (SNRS) scores and Magnetic Resonance Imaging (MRI) findings (Beutler et al., 1996, *Proc. Nat. Acad. Sci. USA,* 93, 1716-1720; Romine et al., 1999 above). Phase III study results, were positive on the significant reduction of MRI-measured brain lesions (*Rice et al.,* 2000, above).

Some adverse effects (AEs), such as increased incidence of infections related to compromised immune function or myelosuppression, were observed with the highest doses (Selby et al., 1998, above; Beutler et al., 1994, *Acta hematol.,* 91:10-15). Due to the narrow margin of safety between the efficacy dose and the dose of occurrence of AEs, to date, all clinical trials for Cladribine in multiple sclerosis have been conducted using either i.v. or s.c. administration. As a result, Beutler et al. (Beutler et al., 1996, *Seminars in Hematology,*

33, 1(S1), 45-52) excluded the oral route for the treatment of multiple sclerosis with Cladribine.

Grieb et al. reported a small trial in 11 patients with remitting-relapsing multiple sclerosis (Grieb et al., 1995, *Archivum Immunologiae et Therapiae Experimentalis,* 43 (5-6), 323-327) wherein Cladribine has been orally administered during 6 monthly courses of 5 days at a total dose of about 4-5.7 mg/kg (patients of about 52 and about 75 kilos, respectively) i.e. a total effective dose of 2-2.85 mg/kg. For some patients, a single re-treatment of 5 days was performed at a cumulative dose of 0.4-0.66 mg/kg after a cladribine free-period of 3 or 6 months. The side effects observed with the regimen above were said to be less severe than the ones observed in the study on patients suffering from chronic progressive multiple sclerosis treated by i.v. infusion of Cladribine (Sipe et al., 1994, *Lancet,* 344, 9-13) but were still present. In addition, the therapeutic efficacy of the oral regimen above versus the i.v. infusion therapy was questioned (Grieb et al., 1995, above) and a group of "non-responders" has been identified (Stelmasiak et al., 1998, *Laboratory Investigations,* 4(1), 4-8).

Therefore, it would be desirable to have a method for treating multiple sclerosis comprising the oral administration of Cladribine that would permit the same or improved effect on MS lesions while decreasing the occurrence and/or severity adverse events. In addition, as MS is a chronic disease, it would be desirable to decrease the occurrence and/or severity adverse events in such a way that re-treatments are possible. A sustained benefit of Cladribine treatment between the treatment periods is also desirable.

## SUMMARY OF THE INVENTION

The present invention is directed towards a use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis, wherein the preparation is to be orally administered. Particularly, the invention is directed towards a use of Cladribine for the preparation of a medicament for the treatment of relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis and wherein re-treatments are possible.

An embodiment of the invention provides an improved dosing regimen for Cladribine in the treatment of multiple sclerosis.

An additional embodiment of the invention provides a use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis wherein adverse effects are reduced, allowing further use of Cladribine.

In one embodiment, the invention provides a use of Cladribine for the preparation of a pharmaceutical formulation wherein the formulation is to be orally administered following the sequential steps below:

(i) An induction period wherein the Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the maintenance period is lower than the total dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered.

In another embodiment, the invention provides a method for the treatment of multiple sclerosis, comprising the oral administration of Cladribine or of a formulation thereof in a patient in need thereof comprising the following steps:

(i) An induction treatment wherein the total dose of Cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance treatment wherein the total dose of Cladribine reached at the end of the maintenance period is lower than the total dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered.

## DETAILED DESCRIPTION OF THE INVENTION

### Definitions

The "total dose" or "cumulative dose" refers to the total dose of Cladribine administered during the treatment, i.e. the dose reached at the end of the treatment that is calculated by adding the daily doses. For example, the total dose of Cladribine corresponding to a treatment of 0.7 mg/kg Cladribine per day during 5 days is 3.5 mg/kg or the total dose of Cladribine corresponding to a treatment of 0.35 mg/kg Cladribine per day during 5 days is 1.7 mg/kg.

"The total effective dose" or "cumulative effective dose" refers to the bioavailable dose of Cladribine after a given administration period, i.e. the bioavailable dose reached at the end of the treatment that is calculated by adding the daily doses reduced by the bioavailability coefficient. For example, the total effective dose of Cladribine corresponding to a treatment of 0.7 mg/kg Cladribine per day during 5 days wherein the bioavailability of Cladribine is of about 40% is 1.4 mg/kg or the total effective dose of Cladribine corresponding to a treatment of 0.35 mg/kg Cladribine per day during 5 days wherein the bioavailability of Cladribine is of about 40% is 0.7 mg/kg.

Typically, the bioavailability of Cladribine or of a Cladribine formulation used in the context of this invention is from about 30% to about 90%, preferably from about 40% to about 60%, such as about 50%.

"A week" refers to a period of time of or about 5, about 6 or about 7 days.

"A month" refers to a period of time of or about 28, about 29, about 30 or about 31 days.

"Treatment" comprises the sequential succession of an "induction treatment" and at least a "maintenance treatment". Typically, a treatment according to the invention comprises an "induction treatment" and about one or about two or about three maintenance treatments.

Typically, a treatment according to the invention is of about 2 years (about 24 months) or about 3 years (about 36 months) or about 4 years (about 48 months).

An "Induction Treatment" consists in the sequential succession of (i) an induction period wherein the Cladribine or the Cladribine pharmaceutical preparation of the invention is orally administered and (ii) a Cladribine-free period. An induction period lasts up to about 4 months or up to about 3 month or up to about 2 months. For example, an induction period lasts for about 2 to about 4 months. An induction period consists in the oral administration of Cladribine or a pharmaceutical preparation thereof during about 1 to about 7 days each month.

A "Cladribine-free period" is a period wherein no Cladribine is administered to the patient. During a Cladribine-free period, the patient can be free of any administration or be

5

dosed with a placebo-pill or another drug except. A Cladribine-free period lasts up to about 10 months or up to 9 months or up to about 8 months. For example, a Cladribine-free period lasts from about 8 to about 10 months, typically at least of about 8 months.

A "Maintenance Treatment" consists in the sequential succession of (i) a maintenance period wherein the Cladribine or the Cladribine pharmaceutical preparation of the invention is orally administered at a lower dose than the Cladribine dose orally administered during the induction treatment and (ii) a Cladribine-free period. A maintenance period lasts for up to about 4 months, or up to about 3 months, or up to about 2 months, preferably up to about 2 months. For example, a maintenance period lasts for about 2 to about 4 months, preferably for about 2 months. A maintenance period consists in the oral administration of Cladribine or of a pharmaceutical preparation thereof during about 1 to about 7 days each month.

Within the context of this invention, the beneficial effect, including but not limited to an attenuation, reduction, decrease or diminishing of the pathological development after onset of the disease, may be seen after one or more a "treatments", after an "induction treatment", after a "maintenance treatment" or during a Cladribine-free period.

"Daily dose" refers to the total dose of Cladribine orally administered to the patient each day of administration. The daily dose can be reached through a single or several administrations per day, such as for example once a day, twice a day or three times a day.

The dosage administered, as single or multiple doses, to an individual will vary depending upon a variety of factors, including pharmacokinetic properties, patient conditions and characteristics (sex, age, body weight, health, size), extent of symptoms, concurrent treatments, frequency of treatment and the effect desired.

Patients suffering from MS can be defined for example as having clinically definite or laboratory-definite MS according to Schumacher or Poser criteria (Schumacher et al., 1965, *Ann. NY Acad. Sci.* 1965; 122:552-568; Poser et al., 1983, *Ann. Neurol.* 13(3): 227-31).

"Relapses" involve neurologic problems that occur over a short period, typically days but sometimes as short as hours or even minutes. These attacks most often involve motor, sensory, visual or coordination problems early in the disease. Later, bladder, bowel, sexual and cognitive problems may be shown. Sometimes the attack onset occurs over several weeks. Typical MS relapse involves a period of worsening, with development of neurological deficits, then a plateau, in which the patient is not getting any better but also not getting any worse followed by a recovery period. Recovery usually begins within a few weeks.

"Efficacy" of a treatment according to the invention can be measured based on changes in the course of disease in response to a use according to the invention. For example, treatment of MS efficacy can be measured by the frequency of relapses in RRMS and the presence or absence of new lesions in the CNS as detected using methods such as MRI technique (Miller et al., 1996, *Neurology,* 47(Suppl 4): 5217; Evans et al., 1997, *Ann. Neurology,* 41:125-132).

The observation of the reduction and/or suppression of MRI $T_1$ gadolinium-enhanced lesions (thought to represent areas of active inflammation) gives a primary efficacy variable.

Secondary efficacy variables include MRI $T_1$ enhanced brain lesion volume, MRI $T_1$ enhanced lesion number, MRI $T_2$ lesion volume (thought to represent total disease burden, i.e. demyelination, gliosis, inflammation and axon loss), MRI

6

$T_1$ enhanced hypointense lesion volume (thought to represent primarily demyelination and axon loss), time-to-progression of MS, frequency and severity of exacerbations and time-to-exacerbation, Expanded Disability Status Scale score and Scripps Neurologic Rating Scale (SNRS) score (Sipe et al., 1984, *Neurology,* 34, 1368-1372). Methods of early and accurate diagnosis of multiple sclerosis and of following the disease progression are described in Mattson, 2002, *Expert Rev. Neurotherapeutics,* 319-328.

Degree of disability of MS patients can be for example measured by Kurtzke Expanded Disability Status Scale (EDSS) score (Kurtzke, 1983, *Neurology,* 33, 1444-1452). Typically a decrease in EDSS score corresponds to an improvement in the disease and conversely, an increase in EDSS score corresponds to a worsening of the disease.

Cladribine (2-CdA)

2-CdA and its pharmacologically acceptable salts may be used in the practice of this invention.

Cladribine can be formulated in any pharmaceutical preparation suitable for oral administration. Representative oral formulations of 2-CdA are described in (WO 96/19230; WO 96/19229; U.S. Pat. No. 6,194,395; U.S. Pat. No. 5,506,214; WO 2004/087100; WO 2004/087101), the contents of which are incorporated herein by reference. Examples of ingredients for oral formulations are given below.

Processes for preparing 2-CdA are well known in the art. For example, the preparation of 2-CdA is described in (EP 173,059; WO 04/028462; WO 04/028462; U.S. Pat. No. 5,208,327; WO 00/64918) and Robins et al., *J. Am. Chem. Soc.,* 1984, 106: 6379. Alternatively, pharmaceutical preparations of 2-CdA may be purchased from Bedford Laboratories, Bedford, Ohio.

Oral administration of Cladribine may be in capsule, tablet, oral suspension, or syrup form. The tablet or capsules may contain from about 3 to 500 mg of Cladribine. Preferably they may contain about 3 to about 10 mg of Cladribine, more preferably about 3, about 5 or about 10 mg of Cladribine. The capsules may be gelatin capsules and may contain, in addition to Cladribine in the quantity indicated above, a small quantity, for example less than 5% by weight, magnesium stearate or other excipient. Tablets may contain the foregoing amount of the compound and a binder, which may be a gelatin solution, a starch paste in water, polyvinyl alcohol in water, etc. with a typical sugar coating.

Compositions

Compositions of this invention may further comprise one or more pharmaceutically acceptable additional ingredient(s) such as alum, stabilizers, antimicrobial agents, buffers, coloring agents, flavoring agents, adjuvants, and the like.

Compositions of this invention may be in the form of tablets or lozenges formulated in a conventional manner. For example, tablets and capsules for oral administration may contain conventional excipients including, but not limited to, binding agents, fillers, fillers, lubricants, disintegrants and wetting agents. Binding agents include, but are not limited to, syrup, accacia, gelatin, sorbitol, tragacanth, mucilage of starch and polyvinylpyrrolidone. Fillers include, but are not limited to, lactose, sugar, microcrystalline cellulose, maize starch, calcium phosphate, and sorbitol. Lubricants include, but are not limited to, magnesium stearate, stearic acid, talc, polyethylene glycol, and silica. Disintegrants include, but are not limited to, potato starch and sodium starch glycollate. Wetting agents include, but are not limited to, sodium lauryl sulfate. Tablets may be coated according to methods well known in the art.

Compositions of this invention may also be liquid formulations including, but not limited to, aqueous or oily suspen-

sions, solutions, emulsions, syrups, and elixirs. The compositions may also be formulated as a dry product for constitution with water or other suitable vehicle before use. Such liquid preparations may contain additives including, but not limited to, suspending agents, emulsifying agents, non-aqueous vehicles and preservatives. Suspending agent include, but are not limited to, sorbitol syrup, methyl cellulose, glucose/sugar syrup, gelatin, hydroxyethylcellulose, carboxymethyl cellulose, aluminum stearate gel, and hydrogenated edible fats. Emulsifying agents include, but are not limited to, lecithin, sorbitan monooleate, and acacia. Non-aqueous vehicles include, but are not limited to, edible oils, almond oil, fractionated coconut oil, oily esters, propylene glycol, and ethyl alcohol. Preservatives include, but are not limited to, methyl or propyl p-hydroxybenzoate and sorbic acid.

Combination

According to the invention, Cladribine can be administered alone or in combination with IFN-beta, prophylactically or therapeutically to an individual prior to, simultaneously or sequentially with other therapeutic regimens or agents (e.g. multiple drug regimens), in a therapeutically effective amount, especially therapeutic agents for the treatment of multiple sclerosis. Active agents that are administered simultaneously with other therapeutic agents can be administered in the same or different compositions and in the same or different routes of administration.

In one embodiment, when Cladribine is administered in combination with IFN-beta, IFN-beta is administered during the Cladribine-free period.

In another embodiment, when Cladribine is administered in combination with IFN-beta, IFN-beta is administered after the "treatment" according to the invention.

The term "interferon-beta (IFN-β)", as used herein, is intended to include fibroblast interferon in particular of human origin, as obtained by isolation from biological fluids or as obtained by DNA recombinant techniques from prokaryotic or eukaryotic host cells, as well as its salts, functional derivatives, variants, analogs and active fragments.

IFN-β suitable in accordance with the present invention is commercially available e.g. as Rebif® (Serono), Avonex® (Biogen) or Betaferon® (Schering). The use of interferons of human origin is also preferred in accordance with the present invention. The term interferon, as used herein, is intended to encompass salts, functional derivatives, variants, analogs and active fragments thereof.

Rebif® (recombinant human interferon-β) is the latest development in interferon therapy for multiple sclerosis (MS) and represents a significant advance in treatment. Rebif® is interferon (IFN)-beta 1a, produced from mammalian cell lines. It was established that interferon beta-1a given subcutaneously three times per week is efficacious in the treatment of Relapsing-Remitting Multiple Sclerosis (RRMS). Interferon beta-1a can have a positive effect on the long-term course of MS by reducing number and severity of relapses and reducing the burden of the disease and disease activity as measured by MRI.

The dosing of IFN-β in the treatment of relapsing-remitting MS according to the invention depends on the type of IFN-β used.

In accordance with the present invention, where IFN is recombinant IFN-β1b produced in E. Coli, commercially available under the trademark Betaseron®, it may preferably be administered sub-cutaneously every second day at a dosage of about of 250 to 300 μg or 8 MIU to 9.6 MIU per person.

In accordance with the present invention, where IFN is recombinant IFN-β1a, produced in Chinese Hamster Ovary

cells (CHO cells), commercially available under the trademark Avonex®, it may preferably be administered intra-muscularly once a week at a dosage of about of 30 μg to 33 μg or 6 MIU to 6.6 MIU per person.

In accordance with the present invention, when IFN is recombinant IFN-β1a, produced in Chinese Hamster Ovary cells (CHO cells), commercially available under the trademark Rebif®, it may preferably be administered sub-cutaneously three times a week (TIW) at a dosage of 22 to 44 μg or 6 MIU to 12 MIU per person.

Patients

Patients according to the invention are patients suffering from multiple sclerosis, preferably RRMS or early SPMS.

In an embodiment of the invention, patients are selected from human males or females between 18 and 55 years age.

In another embodiment of the invention, patients had at least one relapse within the prior 12 months of the treatment.

Use According to the Invention

In one embodiment, the invention provides a use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis wherein the formulation is to be orally administered following the sequential steps below:

(i) An induction period wherein Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the maintenance period is lower than the total dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered.

In a further embodiment, the invention provides a use according to the invention wherein the induction period lasts up to about 4 months or up to about 3 months or up to about 2 months.

In a further embodiment, the invention provides a use according to the invention wherein the induction period lasts up to about 2 months.

In a further embodiment, the invention provides a use according to the invention wherein the induction period lasts up to about 4 months.

In a further embodiment, the invention provides a use according to the invention wherein the total dose of Cladribine reached at the end of the induction period is about 1.7 mg/kg.

In a further embodiment, the invention provides a use according to the invention wherein the total dose of Cladribine reached at the end of the induction period is about 3.5 mg/kg.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free period lasts up to about 10 months, or up to about 9 months or up to about 8 months.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free (ii) period lasts up to about 8 months.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free (ii) period lasts at least about 8 months.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free period (ii) lasts up to about 10 months.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free (iv) period lasts up to about 10 months.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free (iv) period lasts at least about 8 months.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free periods (ii) and/or (iv) last between about 8 and about 10 months.

In another further embodiment, the invention provides a use according to the invention wherein a placebo-pill is administered during the Cladribine-free period.

In another further embodiment, the invention provides a use according to the invention wherein the Cladribine-free period is free of any administration.

In another further embodiment, the invention provides a use according to the invention wherein the maintenance period lasts up to about 4 months, or up to about 3 months, or up to about 2 months, preferably up to about 2 months.

In another further embodiment, the invention provides a use according to the invention wherein the total dose of Cladribine reached at the end of the maintenance period (iii) is about 1.7 mg/kg.

In another further embodiment, the invention provides a use according to the invention wherein the steps (iii) to (iv) are repeated at least one or two times.

In a preferred embodiment, the invention provides a use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis wherein the formulation is to be orally administered following the sequential steps below:

(i) An induction period wherein Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the maintenance period is lower than the total dose of Cladribine reached at the end of the induction period (i)

(iv) A Cladribine-free period wherein no Cladribine is administered;

wherein the induction period last up to about 4 months, or up to about 3 months, or up to about 2 months; the Cladribine-free period (ii) lasts up to about 10 months, or up to about 9 months, or up to about 8 months; the maintenance period (iii) lasts up to about 2 months; the Cladribine-free period (iv) lasts up to about 10 months; the total dose of Cladribine reached at the end of the maintenance period is about 1.7 mg/kg and steps (iii) to (iv) are repeated performed one, two or three times.

In another embodiment, the invention provides a use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis wherein the formulation is to be orally administered following the sequential steps below:

(i) An induction period wherein Cladribine pharmaceutical formulation is administered and wherein the total effective dose of Cladribine reached at the end of the induction period is from about 0.7 mg/kg to about 1.4 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine pharmaceutical formulation is administered and wherein the total

effective dose of Cladribine reached at the end of the maintenance period (iii) is lower than the total effective dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered.

In a further embodiment, the invention provides a use of Cladribine for the preparation of a pharmaceutical formulation for the treatment of multiple sclerosis wherein the formulation is to be orally administered following the sequential steps below:

(i) An induction period wherein Cladribine pharmaceutical formulation is administered and wherein the total effective dose of Cladribine reached at the end of the induction period is from about 0.7 mg/kg to about 1.4 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine pharmaceutical formulation is administered and wherein the total effective dose of Cladribine reached at the end of the maintenance period is lower than the total effective dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered;

wherein the induction period lasts up to about 4 months, or up to about 3 months, or up to about 2 months; the Cladribine-free period (ii) lasts up to about 10 months, or up to about 9 months, or up to about 8 months; the maintenance period (iii) lasts up to about 2 months; the Cladribine-free period (ii) lasts up to about 10 months; the total effective dose of Cladribine reached at the end of the maintenance period is about 0.7 mg/kg and steps (iii) to (iv) are repeated performed one, two or three times.

In a preferred embodiment, the invention provides Cladribine for use as a medicament for the treatment of multiple sclerosis wherein the medicament is to be orally administered following the sequential steps below:

(i) An induction period wherein Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine pharmaceutical formulation is administered and wherein the total dose of Cladribine reached at the end of the maintenance period is lower than the total dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered;

wherein the induction period last up to about 4 months, or up to about 3 months, or up to about 2 months; the Cladribine-free period (ii) lasts up to about 10 months, or up to about 9 months, or up to about 8 months; the maintenance period (iii) lasts up to about 2 months; the Cladribine-free period (iv) lasts up to about 10 months; the total dose of Cladribine reached at the end of the maintenance period is about 1.7 mg/kg and steps (iii) to (iv) are repeated performed one, two or three times.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered at a daily dose of Cladribine about 3 to 30 mg Cladribine, preferably 5 to 20 mg Cladribine, most preferably 10 mg Cladribine.

In another further embodiment, the invention provides a use according to the invention wherein the total dose of

Cladribine reached at the end of the induction period is about 3.5 mg/kg and the total dose of Cladribine reached at the end of the maintenance period is about 1.7 mg/kg.

In another further embodiment, the invention provides a use according to the invention wherein the total effective dose of Cladribine reached at the end of the induction period is about 1.4 mg/kg and the total effective dose of Cladribine reached at the end of the maintenance period is about 0.7 mg/kg.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered once a day during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered several times a day administered once a day during the induction period, preferably twice or three times a day, more preferably twice a day.

In another embodiment, the invention provides a use of Cladribine according to the invention whereby the pharmaceutical formulation is orally administered about 1 to about 7 days per month, preferably from about 5 to about 7 days per month during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention whereby the pharmaceutical formulation is orally administered about 0.02 days/kg to about 0.08 days/kg per month during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention whereby the pharmaceutical formulation is orally administered about 0.02 days/kg to about 0.08 days/kg per month during the maintenance period.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered at a daily dose of about 10 mg Cladribine from day 1 to about day 2 each month during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered at a daily dose of about 10 mg Cladribine from day 1 to about day 3 each month during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered at a daily dose of about 10 mg Cladribine from day 1 to about day 4 each month during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered at a daily dose of about 10 mg Cladribine from day 1 to about day 5 each month during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered at a daily dose of about 10 mg Cladribine from day 1 to about day 6 each month during the induction period.

In another embodiment, the invention provides a use of Cladribine according to the invention wherein the pharmaceutical formulation is to be orally administered at a daily dose of about 10 mg Cladribine from day 1 to about day 4 each month during the induction period and wherein the pharmaceutical formulation is a pharmaceutical formulation described in WO 2004/087101 or in WO 2004/087100.

In another embodiment, the invention provides a use of Cladribine according to any of the preceding claims wherein the pharmaceutical formulation is to be administered in combination with interferon-beta.

In a preferred embodiment, the invention provides a method for the treatment of multiple sclerosis, comprising the oral administration of Cladribine or of a pharmaceutical formulation thereof in a patient in need thereof comprising the following steps:

(i) An induction period wherein Cladribine or a pharmaceutical formulation thereof is administered and wherein the total dose of Cladribine reached at the end of the induction period is from about 1.5 mg/kg to about 3.5 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine or a pharmaceutical formulation thereof is administered and wherein the total dose of Cladribine reached at the end of the maintenance period is lower than the total dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered.

In a preferred embodiment, the invention provides a method for the treatment of multiple sclerosis, comprising the oral administration of Cladribine or of a pharmaceutical formulation thereof in a patient in need thereof comprising the following steps:

(i) An induction period wherein Cladribine or a pharmaceutical formulation thereof is administered and wherein the total effective dose of Cladribine reached at the end of the induction period is from about 0.7 mg/kg to about 1.4 mg/kg;

(ii) A Cladribine-free period wherein no Cladribine is administered;

(iii) A maintenance period wherein Cladribine pharmaceutical formulation is administered and wherein the total effective dose of Cladribine reached at the end of the maintenance period is lower than the total effective dose of Cladribine reached at the end of the induction period (i);

(iv) A Cladribine-free period wherein no Cladribine is administered.

In another further embodiment, the invention provides a method according to the invention wherein the steps (iii) to (iv) are repeated at least one or two times.

In a preferred embodiment, the invention provides a method of treating multiple sclerosis with Cladribine, wherein Cladribine is orally administered following the sequential steps below:

(i) Administering Cladribine, such that the total dose of Cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) Administering no Cladribine during a Cladribine free period;

(iii) Administering Cladribine such that the total dose of Cladribine reached at the end of a maintenance period is lower than the total dose of Cladribine reached at the end of the induction period (i);

(iv) And optionally, a Cladribine-free period wherein no Cladribine is administered.

In a further preferred embodiment, the invention provides a method wherein the induction period lasts up to about 4 months, or up to about 3 months, or up to about 2 months.

In a further preferred embodiment, the invention provides a method wherein the total dose of Cladribine reached at the end of the induction period is about 1.7 mg/kg.

In a further preferred embodiment, the invention provides a method wherein the total dose of Cladribine reached at the end of the induction period is about 3.5 mg/kg.

In a further preferred embodiment, the invention provides a method wherein the total effective dose of Cladribine reached at the end of the induction period is about 1.4 mg/kg.

In a further preferred embodiment, the invention provides a method wherein the Cladribine-free period lasts up to about 10 months, or up to about 9 months, or up to about 8 months.

In a further preferred embodiment, the invention provides a method wherein the maintenance period lasts up to about 4 months, or up to about 3 months or up to about 2 months.

In a further preferred embodiment, the invention provides a method wherein the total dose of Cladribine reached at the end of the maintenance period is about 1.7 mg/kg.

In a further preferred embodiment, the invention provides a method wherein the total effective dose of Cladribine reached at the end of the maintenance period is about 0.7 mg/kg.

In a further preferred embodiment, the invention provides a method wherein the maintenance period is followed by a Cladribine-free period.

In another further embodiment, the invention provides a method according to the invention wherein the total dose of Cladribine reached at the end of the induction period is about 3.5 mg/kg and the total dose of Cladribine reached at the end of the maintenance period is about 1.7 mg/kg.

In another further embodiment, the invention provides a method according to the invention wherein the total effective dose of Cladribine reached at the end of the induction period is about 1.4 mg/kg and the total effective dose of Cladribine reached at the end of the maintenance period is about 0.7 mg/kg.

In another further embodiment, the invention provides a method according to the invention wherein Cladribine is to be orally administered at a daily dose of about 3 to about 30 mg.

In another further embodiment, the invention provides a method according to the invention wherein Cladribine is to be orally administered at a daily dose of about 10 mg.

In another further embodiment, the invention provides a method according to the invention wherein Cladribine is orally administered about 1 to about 7 days per month during the induction period.

In another further embodiment, the invention provides a method according to the invention wherein the steps (iii) are repeated at least one or two times.

In another further embodiment, the invention provides a method according to the invention wherein Cladribine is to be administered in combination with interferon-beta.

## EXAMPLES

The following abbreviations refer respectively to the definitions below:

kg (kilogram), μg (microgram), mg (milligram), AEs (Adverse effects), CNS (Cnetral nervous system), CSF (Cerebrospinal fluid), EDSS (Expanded Disability Status Scale, SNRS (Scripps Neurologic Rating Scale), IFN (interferon), i.v. (intra-veinous), MIU (Million International units), MS (multiple sclerosis), MRI (Magnetic resonance imaging), p.o. (per os), PPMS (Primary progressive multiple sclerosis), PRMS (Progressive relapsing multiple sclerosis), RRMS (Relapsing-remitting multiple sclerosis), SPMS (Secondary progressive multiple sclerosis), s.c. (subcutaneous), TIW (Three times a week), 2-CdA (2-chloro-2' deoxyadenosine or Cladribine), UI (International unit).

The efficacy and safety of oral Cladribine administration, eventually multi-dose administration, according to the invention can be assessed for example following the protocol below:

### Example 1

Oral Cladribine in the Treatment of Relapsing Forms of MS

A study of sixty patients with relapsing forms of clinically definite multiple sclerosis is undertaken. Each patient is first examined for normal hepatic, renal, and bone marrow functioning to establish baseline values.

Patients are selected from Male or Female, between 18 and 55 years of age who had one or more relapses within the prior 12 months. Female patients are non-pregnant female. Patients are randomly assigned to one of the treatment groups listed in Table 1 below:

TABLE 1

| Group | 2-CdA |
|---|---|
| 1 | — |
| 2 | 1.75 mg/kg |
| 3 | 3.5 mg/kg |

Each of the patients in Groups 2 and 3 receives 3 mg or 10 mg 2-CdA (1, 2 or 3 administration(s) a day depending on the patient's weight) combined in cyclodextrin formulation as described in WO 2004/087101, Example 3. The Compositions of the Cladribine formulations in 3 mg or 10 mg 2-CdA tablets containing hydroxypropyl-beta-cyclodextrin are listed in Table 2 below:

TABLE 2

| Name of ingredients | Formula mg/tablet | Formula mg/tablet |
|---|---|---|
| Cladribine-2-hydroxypropyl-β-cyclodextrin-complex* | 153.75 equivalent to 10 mg 2-CdA | 30.60 equivalent to 3 mg 2-CdA |
| Sorbitol powder | 44.25 | 68.4 |
| Magnesium Stearate (vegetable grade) | 2.0 | 1.00 |
| Total | 200.0 | 100 |

*Cladribine is complexed and lyophilised with 2-hydroxypropyl-β-cyclodextrin as a separate process as described in WO 2004/087101.

Examples of administration schemes for the induction period depending on the patient's weight are given below in Tables 3 and 4 for the target doses of 1.75 mg/kg and 3.5 mg/kg respectively. For the maintenance period, the example of administration scheme of Table 3 is applicable.

TABLE 3

| Patient weight ranges (kg) | | | Total target dose (kg) equivalent for 1.75 mg/kg | | Number of pills (10 mg)/induction period | | |
|---|---|---|---|---|---|---|---|
| Min | Mid range | Max | Min | Max | Month 1 | Month 2 | Total |
| 40 | 42.5 | 44.9 | 28 | 31.4 | 4 | 3 | 7 |
| 45 | 47.5 | 49.9 | 31.5 | 34.9 | 4 | 4 | 8 |
| 50 | 52.5 | 54.9 | 35 | 38.4 | 5 | 4 | 9 |
| 55 | 57.5 | 59.9 | 38.5 | 41.9 | 5 | 5 | 10 |

15

## TABLE 3-continued

| Patient weight ranges (kg) | | | Total target dose (kg) equivalent to 1.75 mg/kg | | Number of pills (10 mg)/induction period | | |
|---|---|---|---|---|---|---|---|
| Min | Mid range | Max | Min | Max | Month 1 | Month 2 | Total |
| 60 | 62.5 | 64.9 | 42 | 45.4 | 5 | 5 | 10 |
| 65 | 67.5 | 69.9 | 45.5 | 48.9 | 6 | 5 | 11 |
| 70 | 72.5 | 74.9 | 49 | 52.4 | 6 | 6 | 12 |
| 75 | 77.5 | 79.9 | 52.5 | 55.9 | 7 | 6 | 13 |
| 80 | 82.5 | 84.9 | 56 | 59.4 | 7 | 6 | 13 |
| 85 | 87.5 | 89.9 | 59.5 | 62.9 | 7 | 7 | 14 |
| 90 | 92.5 | 94.9 | 63 | 66.4 | 8 | 7 | 15 |
| 95 | 97.5 | 99.9 | 66.5 | 69.9 | 8 | 8 | 16 |
| 100 | 102.5 | 104.9 | 70 | 73.4 | 9 | 8 | 17 |
| 105 | 107.5 | 109.9 | 73.5 | 76.9 | 9 | 9 | 18 |
| 110 | 112.5 | 114.9 | 77 | 80.4 | 9 | 9 | 18 |
| 115 | 117.5 | 119.9 | 80.5 | 83.9 | 10 | 9 | 19 |

## TABLE 4

| Patient weight ranges (kg) | | | Total target dose (kg) equivalent to 3.5 mg/kg | | Number of pills (10 mg)/induction period | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Min | Mid range | Max | Min | Max | Month 1 | Month 2 | Month 3 | Month 4 | Total |
| 40 | 42.5 | 44.9 | 56 | 62.9 | 4 | 4 | 3 | 3 | 14 |
| 45 | 47.5 | 49.9 | 63 | 69.9 | 4 | 4 | 4 | 4 | 16 |
| 50 | 52.5 | 54.9 | 70 | 76.9 | 5 | 4 | 4 | 4 | 17 |
| 55 | 57.5 | 59.9 | 77 | 83.9 | 5 | 5 | 5 | 4 | 19 |
| 60 | 62.5 | 64.9 | 84 | 90.9 | 6 | 5 | 5 | 5 | 21 |
| 65 | 67.5 | 69.9 | 91 | 97.9 | 6 | 6 | 5 | 5 | 22 |
| 70 | 72.5 | 74.9 | 98 | 104.9 | 6 | 6 | 6 | 6 | 24 |
| 75 | 77.5 | 79.9 | 105 | 111.9 | 7 | 7 | 6 | 6 | 26 |
| 80 | 82.5 | 84.9 | 112 | 118.9 | 7 | 7 | 7 | 6 | 27 |
| 85 | 87.5 | 89.9 | 119 | 125.9 | 7 | 7 | 7 | 7 | 28 |
| 90 | 92.5 | 94.9 | 126 | 132.9 | 8 | 8 | 7 | 7 | 30 |
| 95 | 97.5 | 99.9 | 133 | 139.9 | 8 | 8 | 8 | 8 | 32 |
| 100 | 102.5 | 104.9 | 140 | 146.9 | 9 | 8 | 8 | 8 | 33 |
| 105 | 107.5 | 109.9 | 147 | 153.9 | 9 | 9 | 9 | 8 | 35 |
| 110 | 112.5 | 114.9 | 154 | 160.9 | 10 | 9 | 9 | 9 | 37 |
| 115 | 117.5 | 119.9 | 161 | 167.9 | 10 | 10 | 9 | 9 | 38 |

In Group 1 patients receive a placebo (saline) for 4 months followed by 8 months of no treatment.

In Group 2 patients receive a daily oral administration of Cladribine for about 5 days a month during 2 months (induction period) of 2-CdA cyclodextrin formulation such that the total effective dose administered at the end of the first 2 months approximates about 0.7 mg/kg (total dose of about 1.75 mg/kg for a bioavailability of about 40%); followed by administration of placebo for 2 months; followed by 8 months of no treatment.

In Group 3 patients receive a daily oral administration of Cladribine for about 5 days a month during 4 months (induction period) of 2-CdA cyclodextrin formulation such that the total effective dose administered at the end of the first 4 months approximates about 1.4 mg/kg (total dose of about 3.5 mg/kg for a bioavailability of about 40%); followed by 8 months of no treatment.

Beginning at month 13, all 3 patient groups receive re-treatment with Cladribine cyclodextrin formulation for about 5 days a month for 2 months (maintenance period) with the lower dose (such as the total effective dose administered at the end of the first 2 months approximates about 0.7 mg/kg) followed by 10 months of no treatment.

16

Finally, beginning at month 25, all patient groups receive re-treatment with Cladribine cyclodextrin formulation for about 5 days a month for 2 months (maintenance period) with the lower dose (such as the total effective dose administered at the end of the first 2 months approximates about 0.7 mg/kg) followed by 10 more months of no treatment.

Patients are monitored to determine whether there is any progression or improvement of brain lesions associated with progression of MS through MRI scans and neurological examination as described in Miller et al., 1996, above; Evans et al., 1997, above; Sipe et al., 1984, above; and Mattson, 2002, above. All patients have a baseline and MRI study (brain or spinal cord, according to localization of the lesions) at month 12.

The patient's disability progression and the time for having a first relapse are monitored as well as the proportion of relapse-fee patients at 24 months.

Lymphocyte markers and monocyte counts are monitored in the patients.

Patients in Groups 2 and 3 have a decrease in brain lesions. The data show that the 2-CdA regimen consisting in the succession of an induction treatment and maintenance treatments is efficient in decreasing brain lesions and no severe adverse effect is observed.

We claim:

1. A method of treating relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis comprising the oral administration of a formulation comprising cladribine to an individual having relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis following the sequential steps below:

(i) an induction period lasting from about 2 months to about 4 months wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) a cladribine-free period lasting from about 8 months to about 10 months, wherein no cladribine is administered;

(iii) a maintenance period lasting from about 2 months to about 4 months, wherein said formulation is orally administered and wherein the total dose of cladribine

reached at the end of the maintenance period is lower than the total dose of cladribine reached at the end of the induction period (i);

(iv) a cladribine-free period wherein no cladribine is administered.

**2**. The method according to claim **1**, wherein the induction period lasts about 4 months.

**3**. The method according to claim **1**, wherein the induction period lasts about 2 months.

**4**. The method according to claim **1**, wherein the total dose of cladribine reached at the end of the induction period is about 1.7 mg/kg.

**5**. The method according to claim **1**, where the total dose of cladribine reached at the end of the induction period is about 3.5 mg/kg.

**6**. The method according to claim **1**, wherein the cladribine-free period (ii) lasts about 10 months.

**7**. The method according to claim **1**, wherein the cladribine-free (iv) period lasts 10 months.

**8**. The method according to claim **1**, wherein the maintenance period lasts about 2 months.

**9**. The method according to claim **1**, wherein the formulation is orally administered following the sequential steps below:

(i) an induction period wherein said formulation is administered orally and wherein the total dose of cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) a cladribine-free period wherein no cladribine is administered;

(iii) a maintenance period wherein said formulation is administered orally and wherein the total dose of cladribine reached at the end of the maintenance period is lower than the total dose of cladribine reached at the end of the induction period (i); and

(iv) a cladribine-free period wherein no cladribine is administered;

wherein the maintenance period (iii) lasts about 2 months; the cladribine-free period (iv) lasts about 10 months; the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg and steps (iii) to (iv) are repeatedly performed one, two or three times.

**10**. The method according to claim **1**, wherein the total dose of cladribine reached at the end of the induction period is about 3.5 mg/kg and the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg.

**11**. The method according to claim **1**, wherein the formulation is orally administered at a daily dose of 3 to 30 mg cladribine.

**12**. The method according to claim **1**, wherein the formulation is orally administered at a daily dose of 10 mg cladribine.

**13**. The method according to claim **1**, wherein the formulation is orally administered 1 to 7 days per month during the induction period.

**14**. The method according to claim **1**, wherein the steps (iii) to (iv) are repeated at least one time.

**15**. The method according to claim **1**, wherein the steps (iii) to (iv) are repeated at least two times.

**16**. The method according to claim **1**, wherein the formulation is administered in combination with interferon-beta.

**17**. A method of treating relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis comprising the oral administration of a formulation comprising cladribine to an individual having relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis following the sequential steps below:

(i) an induction period lasting from about 2 months to about 4 months wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

(ii) a cladribine-free period lasting from about 8 months to about 10 months, wherein no cladribine is administered;

(iii) a maintenance period lasting from about 2 months to about 4 months, wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg; and

(iv) a cladribine-free period wherein no cladribine is administered.

**18**. The method according to claim **17**, wherein the induction period lasts about 4 months.

**19**. The method according to claim **17**, wherein the induction period lasts about 2 months.

**20**. The method according to claim **17**, wherein the total dose of cladribine reached at the end of the induction period is about 1.7 mg/kg.

**21**. The method according to claim **17**, where the total dose of cladribine reached at the end of the induction period is about 3.5 mg/kg.

**22**. The method according to claim **17**, wherein the cladribine-free period (ii) lasts about 10 months.

**23**. The method according to claim **17**, wherein the cladribine-free (iv) period lasts 10 months.

**24**. The method according to claim **17**, wherein the maintenance period lasts about 2 months.

**25**. The method according to claim **17**, wherein the formulation is orally administered at a daily dose of 3 to 30 mg cladribine.

**26**. The method according to claim **17**, wherein the formulation is orally administered at a daily dose of 10 mg cladribine.

**27**. The method according to claim **17**, wherein the formulation is orally administered 1 to 7 days per month during the induction period.

**28**. The method according to claim **17**, wherein the steps (iii) to (iv) are repeated at least one or two times.

**29**. The method according to claim **17**, wherein the formulation is administered in combination with interferon-beta.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 8,377,903 B2                                    Page 1 of 1
APPLICATION NO.   : 12/766173
DATED             : February 19, 2013
INVENTOR(S)       : Giampiero De Luca et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

Column 5,
Line 58, "5217" should read --S217--.

Signed and Sealed this
Twenty-sixth Day of November, 2013

*Margaret A. Focarino*

Margaret A. Focarino
*Commissioner for Patents of the United States Patent and Trademark Office*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 7th day of March, 2025, I filed the Non-Confidential Brief for Appellant Merck Serono S.A. with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ David B. Bassett
DAVID B. BASSETT
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.     The filing has been prepared using a proportionally spaced typeface and includes 13,978 words.

2.     The filing has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ David B. Bassett
DAVID B. BASSETT
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

March 7, 2025