# United States Court of Appeals
# for the Federal Circuit

MERCK SERONO S.A.,

*Appellant*,

*v.*

HOPEWELL PHARMA VENTURES, INC.,
*Appellee*.

On Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in IPR2023-00480 and IPR2023-00481

## Appellee Hopewell's Response Brief

John Christopher Rozendaal
Eldora L. Ellison
Chandrika Vira
Olga A. Partington
Christina E. Dashe
Tyler C. Liu
STERNE KESSLER GOLDSTEIN & FOX PLLC
1101 K Street, NW
Floor 10
Washington, DC 20005
(202) 371-2600

*Counsel for Appellee Hopewell Pharma
Ventures, Inc.*

April 16, 2025

# PATENT CLAIMS AT ISSUE

## U.S. Patent No. 7,713,947 (the "'947 patent")

36.     A method of treating multiple sclerosis comprising the oral administration of a formulation comprising cladribine following the sequential steps below:

> (i) an induction period lasting from about 2 months to about 4 months wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

> (ii) a cladribine-free period lasting from about 8 months to about 10 months, wherein no cladribine is administered;

> (iii) a maintenance period lasting from about 2 months to about 4 months, wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg;

> (iv) a cladribine-free period wherein no cladribine is administered.

(Appx201)

39.     The method according to claim 36, wherein the total dose of cladribine reached at the end of the induction period is about 1.7 mg/kg.

(Appx201)


## U.S. Patent No. 8,377,903 (the "'903 patent")

17.     A method of treating relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis comprising the oral administration of a formulation comprising cladribine to an individual having relapsing-remitting multiple sclerosis or early secondary progressive multiple sclerosis following the sequential steps below:

> (i) an induction period lasting from about 2 months to about 4 months herein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg;

> (ii) a cladribine-free period lasting from about 8 months to about 10 months, wherein no cladribine is administered;

(iii) a maintenance period lasting from about 2 months to about 4 months, wherein said formulation is orally administered and wherein the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg; and

(iv) a cladribine-free period wherein no cladribine is administered.

(Appx213)

20.     The method according to claim 17, wherein the total dose of cladribine reached at the end of the induction period is about 1.7 mg/kg.

(Appx213)

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 25-1210

**Short Case Caption** Merck Serono S.A. v. Hopewell Pharma Ventures, Inc.

**Filing Party/Entity** Hopewell Pharma Ventures, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/05/2024

Signature: /s/ John C. Rozendaal

Name: John C. Rozendaal

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Hopewell Pharma Ventures, Inc. | Hopewell Pharma Ventures LLC | |
| | Levy SPV, LLC | |
| | GLS Capital Partners Fund I, LP | |
| | GLS Capital Partners GP, LLC | |
| | GLS Capital, LLC | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Madeleine C. Bond<br>Sterne Kessler Goldstein & Fox PLLC | | |
| Pratibha Khanduri<br>Sterne Kessler Goldstein & Fox PLLC | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)   ☐ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................................. vi

INTRODUCTION ........................................................................................... 1

COUNTERSTATEMENT OF THE ISSUES ............................................... 3

COUNTERSTATEMENT OF THE CASE ................................................... 4

    A.    The Board Held Both Patents Unpatentable as Obvious in view of
          Bodor and Stelmasiak ............................................................... 6

        1.    Bodor describes an oral dosing regimen similar to the claimed
              regimen .................................................................................... 6

        2.    Stelmasiak teaches multiple courses of treatment with
              intervening cladribine-free periods. ....................................... 7

        3.    The Board found Bodor qualifies as prior art. .......................... 7

            a.    No contribution by De Luca ............................................. 9

            b.    Contribution by Bodor and Dandiker ............................. 12

        4.    The Board concluded that retreating MS patients with
               cladribine as claimed would have been obvious in view
               of the record as a whole. ........................................................ 14

        5.    The Board declined to read the claims as requiring the dose
               to be determined based on a patient's weight. ....................... 17

SUMMARY OF THE ARGUMENT ............................................................ 18

LEGAL STANDARDS ................................................................................. 23

ARGUMENT ................................................................................................. 24

I.    BODOR IS PRIOR ART BECAUSE IT IS "BY ANOTHER." ....................................... 24

    A.    Bodor is "by another" because the relevant portions were conceived
          of by a different inventive entity than the challenged claims. ............ 24

        1.    *In re Land* established the rule that an earlier reference is
               not by another only if the relied-upon disclosure is by the
               same inventive entity as the claims being challenged. ............. 25

        2.    This Court's subsequent cases uniformly follow the rule of
               *In re Land.* ............................................................................ 30

        3.    *In re Land* is consistent with sound patent policy. .................. 34

i

B.     The Board did not violate the APA by following this Court's precedents. ........................................................................37

C.     Substantial evidence supports the Board's conclusion that De Luca did not contribute to the relied-upon portions of Bodor. ......41

    1.     Merck did not even address all of the disclosures of Bodor on which Hopewell relied. .......................................................42

    2.     De Luca did not contribute to the six-line dosing regimen on which Merck focused. ..........................................................44

D.     Substantial evidence supports the Board's finding that Drs. Bodor and Dandiker contributed to the relied-upon disclosures in Bodor. ...46

II.     THE BOARD CORRECTLY DETERMINED THAT THE PATENTS-AT-ISSUE WERE OBVIOUS IN VIEW OF BODOR AND STELMASIAK. ............................................49

A.     Substantial evidence supports the Board's findings regarding retreatment. ............................................................................50

B.     Substantial evidence supports the Board's findings regarding motivation to modify Bodor. ..............................................53

III.     THE CLAIMS DO NOT REQUIRE DETERMINING THE DOSE BASED ON THE PATIENT'S WEIGHT. .......................................................................56

CONCLUSION ....................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Applied Materials Inc. v. Gemini Research Corp.*,
  835 F.2d 279 (Fed. Cir. 1988) ..............................................................31, 32, 33

*In re Blout*,
  333 F.2d 928 (C.C.P.A. 1964) ...........................................................................28

*Consolidated Edison Co. of New York v. NLRB*,
  305 U.S. 197 (1938)...........................................................................................23

*In re Cuozzo Speed Technologies, LLC*,
  793 F.3d 1268 (Fed. Cir. 2015) .........................................................................54

*Duncan Parking Technologies, Inc. v. IPS Group, Inc.*,
  914 F.3d 1347 (Fed. Cir. 2019) ...................................................................*passim*

*E.I. DuPont De Nemours & Co. v. Synvina C.V.*,
  904 F.3d 996 (Fed. Cir. 2018) ...........................................................................56

*Elbit Systems of America, LLC v. Thales Visionix, Inc.*,
  881 F.3d 1354 (Fed. Cir. 2018) .........................................................................23

*EmeraChem Holdings, LLC v. Volkswagen Group of America, Inc.*,
  859 F.3d 1341 (Fed. Cir. 2017) ...................................................................25, 39

*In re Epstein*,
  32 F.3d 1559 (Fed. Cir. 1994) ...........................................................................60

*Ethicon LLC v. Intuitive Surgical, Inc.*,
  847 F. App'x 901 (Fed. Cir. 2021) ....................................................................43

*Google LLC v. IPA Technologies Inc.*,
  34 F.4th 1081 (Fed. Cir. 2022) ...................................................................*passim*

*In re Kaplan*,
  789 F.2d 1574 (Fed. Cir. 1986) ...................................................................31, 33

iii

*In re Katz,*
    687 F.2d 450 (C.C.P.A. 1982) ...................................................................39

*In re Land,*
    368 F.2d 866 (C.C.P.A. 1966) ..........................................................*passim*

*LSI Corp. v. Regents of University of Minnesota,*
    43 F.4th 1349 (Fed. Cir. 2022) ..............................................................43

*Meiresonne v. Google, Inc.,*
    849 F.3d 1379 (Fed. Cir. 2017) ..............................................................23

*In re Merck & Co.,*
    800 F.2d 1091 (Fed. Cir. 1986) ..............................................................52

*Molins PLC v. Textron, Inc.,*
    48 F.3d 1172 (Fed. Cir. 1995) ................................................................38

*Paice LLC v. Ford Motor Co.,*
    881 F.3d 894 (Fed. Cir. 2018) ................................................................60

*Patlex Corp. v. Mossinghoff,*
    758 F.2d 594 (Fed. Cir. 1985) ................................................................38

*Pfizer, Inc. v. Genentech, Inc.,*
    IPR2018-00373, Paper 12 (PTAB Aug. 2, 2018)....................................39

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
    566 U.S. 639 (2012)................................................................................36

*Regents of University of New Mexico v. Knight,*
    321 F.3d 1111 (Fed. Cir. 2003) ..............................................................38

*Riverwood International Corp. v. R.A. Jones & Co.,*
    324 F.3d 1346 (Fed. Cir. 2003) ................................................................8

*Roku, Inc. v. Universal Electronics, Inc.,*
    63 F.4th 1319 (Fed. Cir. 2023) ..............................................................24

*Smith & Nephew, Inc. v. Arthrex, Inc.,*
    No. IPR2016-00505, 2016 WL 5389056 (P.T.A.B. July 27, 2016)...................39

iv

*Voice Tech Corp. v. Unified Patents., LLC*,
110 F.4th 1331 (Fed. Cir. 2024) ...................................................................23

*In re Watts*,
354 F.3d 1362 (Fed. Cir. 2004) ....................................................................37

**Statutes**

35 U.S.C. § 102(c)(1)-(3) (Pub. L. No. 108-453, § 2, 118 Stat. 3596,
enacted Dec. 10, 2004) ................................................................................35

35 U.S.C. § 102(e) ..........................................................................................*passim*

35 U.S.C. § 103(c) ........................................................................................35, 36

Cooperative Research and Technology Enhancement Act of 2004
Pub. L. No. 108-453...................................................................19, 20, 35, 36

**Other Authorities**

108 Cong. Rec. H10,219 (daily ed. Nov. 20, 2004) (statement of Rep.
Sensenbrenner)...........................................................................................35

108 Cong. Rec. S2,558-59 (daily ed. Mar. 10, 2004) (statement of
Sen. Hatch).................................................................................................36

MPEP §2132.01 (9th ed., 2022)..............................................................37, 39

MPEP § 2136.04 (9th ed., 2022).................................................................37

MPEP § 2136.05(b) (9th ed., 2022) .............................................................38

## STATEMENT OF RELATED CASES

Regarding cases that may affect or be affected by this Court's decision in the pending appeal, Hopewell has nothing to add to the statement of related cases contained in Merck's opening brief.

Hopewell knows of no appeal in or from these proceedings that was previously before this Court or any other appellate court.

# INTRODUCTION

The two Merck patents at issue are directed to treating multiple sclerosis ("MS") using an oral formulation of cladribine with a specific dosing regimen. But Merck did not invent cladribine, did not invent any oral formulation of cladribine, and did not invent the idea of using oral cladribine to treat MS. Merck's ostensible invention was a cyclical dosing regimen for the oral cladribine formulation, which involved giving a total cladribine dose in a particular range during a first treatment period referred to as "an induction period," followed by a cladribine-free period, then giving a total dose of cladribine in a particular range during a subsequent treatment period referred to as "a maintenance period," followed by another cladribine-free period. Appx201(19:13-30).[1] But such cyclical regimens, with alternating treatment periods and drug-free periods, were known long before Merck applied for the patents at issue, and finding a suitable range of doses is a matter of routine optimization. Accordingly, the Patent Trial and Appeal Board found all challenged claims of both patents to be unpatentable as obvious over the combination of two prior-art references: Bodor (which discloses treating MS with oral cladribine at doses in the claimed range and with a drug-free period after

---

[1] Because the patents-at-issue share a specification and the two IPR records are substantially identical, Hopewell follows Merck's convention of citing only the '947 patent and the record in IPR2023-00480.

1

treatment), and Stelmasiak (which discloses treating MS with cladribine using cyclical dosing regimens of alternating treatment and drug-free periods).

Merck's main argument on appeal is that Bodor should not count as prior art because some of the named inventors on the Merck patents contributed to some portions of Bodor that Hopewell relied on in its IPR petitions, and thus Bodor is not an application published "by another" under pre-AIA § 102(a) and (e). That argument fails on both the law and the facts. It has long been black-letter law that in order for an earlier disclosure not to be prior art, the disclosure must be of work by the same inventive entity as the challenged patent, meaning that if just a single inventor is different, the work counts as prior art. Substantial evidence supports the Board's findings that De Luca (a named inventor on the patents-at-issue) did not contribute to the portions of Bodor that Hopewell relied upon, and that Drs. Bodor and Dandiker (the authors of Bodor) did contribute to them, thus making it doubly impossible for Merck to satisfy the same-inventive-entity requirement to disqualify Bodor as prior art.[2] Because the relevant portions of Bodor count as prior art, substantial evidence supports the factual findings that underlie that Board's conclusion that the patents-at-issue are unpatentable as obvious.

---

[2] Following Merck's convention, Hopewell uses "Bodor" to refer to the reference and "Dr. Bodor" to refer to the inventor named on the reference.

Merck also argues that "no substantial evidence" supports the findings underlying the Board's obviousness ruling. But the proceedings below involved a classic battle of the experts that Merck and its expert lost. Ample evidence in the record supports the Board's findings on obviousness. Finally, Merck argues that the claims should be interpreted to require administering a total dose of cladribine in the induction period and the maintenance period that is determined based on the patient's weight in each period. Although the claims express the total dose to be administered in units of mg/kg, the claims do not specify how the total dose is determined, nor do they require knowing the patient's weight in advance, so long as the claimed total amount is administered. The Board correctly refused to read Merck's proposed additional limitations into the claims.

Because Bodor is (devastating) prior art, and because substantial evidence supports the Board's obviousness findings, and because the claims do not require determining the patient's weight before administering the drug, this Court should affirm the Board's ruling that the challenged claims are unpatentable as obvious.

## COUNTERSTATEMENT OF THE ISSUES

1. Whether this Court should affirm the Board's determination that the Bodor reference is "by another" under pre-AIA 35 U.S.C. § 102(a) & (e), where none of the named inventors of the patents-at-issue is listed as an inventor on the reference, and Merck failed to come forward with evidence that the portions of the

3

reference that Hopewell relied on represented the work of same inventive entity as the patents-at-issue.

2.      Whether this Court should affirm the Board's determination that it would have been obvious to a skilled artisan to re-treat a patient with cladribine as claimed, given the knowledge of the skilled artisan about the chronic nature of the disease being treated, the level of skill of the artisan, and the teachings of the prior art.

3.      Whether this Court should affirm the Board's determination that the claims are not limited to administering doses based on a given patient's weight.

## COUNTERSTATEMENT OF THE CASE

Hopewell filed an Abbreviated New Drug Application with FDA seeking authorization to market a generic version of Mavenclad, Merck's oral cladribine product indicated to treat multiple sclerosis ("MS"). In response, Merck brought a Hatch-Waxman action against Hopewell in the District of Delaware, asserting the two patents at issue here. MS is a chronic autoimmune disease with no known cure. The patent claims at issue encompass methods of treating MS comprising "oral administration of a formulation comprising cladribine" following "the sequential steps" of "an induction period," "a cladribine-free period," "a maintenance period," and another "cladribine-free period." Appx201(19:13-30).

Given the autoimmune nature of MS, "the most common therapeutic approach" to MS before December 2004 was by immunosuppression. Appx1848; Appx1011(¶16). Before 2004, cladribine emerged as a useful drug "in modulating autoimmune processes involving lymphocyte abnormalities." Appx1888; Appx1011(¶16). Scientists originally developed cladribine for treatment of leukemia, but quickly repurposed it for treatment of MS due to its demonstrated ability to, e.g., "impressively decrease[]" relapse rate in MS patients.[3] Appx1849; Appx1851; Appx1011(¶16). Neurologists commonly assessed the effect of cladribine in MS patients by measuring lymphocyte count, with a sustained decrease being characteristic of a treatment response. Appx1854; Appx1011(¶16); Appx1033(¶38).

As described below, Hopewell filed IPR petitions on both of the patents-at-issue, and the Board held all challenged claims unpatentable as obvious.

---

[3] Merck's statement (at 7) that scientists were concerned about cladribine safety because "[r]epeated treatment raises long-term toxicity issues" misleadingly truncates the quotation, which talks about "toxicity issues known to occur in association with other long-term immunosuppressive treatments"—not cladribine. Appx2311.

**A.   The Board Held Both Patents Unpatentable as Obvious in view of Bodor and Stelmasiak.**

The Board issued two final written decisions—each more than 90 pages long—holding all challenged claims unpatentable as obvious based on the combination of Bodor and Stelmasiak.

**1.   Bodor describes an oral dosing regimen similar to the claimed regimen.**

The Board explained that Bodor teaches that "[o]ral delivery of drugs is often preferred to parenteral delivery for a variety of reasons," including "patient compliance"—a teaching that accords with common sense, because injections are typically painful and prolonged infusions are inconvenient. Appx16 (citing Appx1918(2:9-10)). Bodor explained that prior oral cladribine formulations suffered from problems of "low bioavailability" and "interpatient variation." *Id.* (citing Appx1918(2:22-25)). Bodor describes a cladribine tablet containing a cladribine-cyclodextrin complex that avoids these problems. *Id.* (citing Appx1921(5:2-7); Appx1927-1928(11:27-12:3)). Bodor summarizes various prior-art cladribine treatment regimens and discloses treating MS with a 10-mg oral dose of cladribine in the "cladribine-cyclodextrin complex in the instant solid dosage form," administered "once per day for a period for five to seven days in the first month, repeated for another period of five to seven days in the second month, followed by ten months of no treatment." Appx17 (citing Appx1939(23:15-20)).

The Board highlighted that "Bodor teaches that the dosing regimen can be tailored to suit the needs of the patient." *Id.* In particular, "[t]herapeutically effective amounts may be easily determined for example, empirically by starting at relatively low amounts and by step-wise increments with concurrent evaluation of beneficial effect." Appx18 (quoting Appx1940(24:6-9)).

### 2. Stelmasiak teaches multiple courses of treatment with intervening cladribine-free periods.

The Board described Stelmasiak as an article about a clinical trial of cladribine in MS patients, in which cladribine was used in a solution form for both oral and subcutaneous administrations. Appx18 (citing Appx1849). Six cladribine courses were given to trial participants at monthly intervals, and two additional courses were given at 9 and 12 or 15 months, where each course consisted of five doses taken once daily on consecutive days. *Id.* Stelmasiak reports therapeutic efficacy in reducing the relapse rate among patients in the study and improvement in neurological status as measured by standard tests. Appx19 (citing Appx1850-1851). Cladribine resulted in immunosuppression, as measured by decreased lymphocyte counts, which only started to trend back toward normal levels at the end of the two-year study period. *Id.*

### 3. The Board found Bodor qualifies as prior art.

The Board rejected Merck's argument that Bodor should not be considered prior art because a six-line dosing regimen in Bodor that was cited against the

challenged claims is supposedly the work of the named inventors of the patents-at-issue (Drs. De Luca, Ythier, Munafo, and Lopez-Bresnahan) rather than the authors of Bodor (Drs. Bodor and Dandiker). The Board held that Hopewell had made a *prima facie* case that Bodor is "by another" because there is no overlap between the named inventors on Bodor and the named inventors on the patents-at-issue. Appx30-31. The burden thus shifted to Merck to come forward with evidence that the relied-upon disclosures in Bodor were not by another. Appx31 (citing *Google LLC v. IPA Techs. Inc.*, 34 F.4th 1081, 1085-86 (Fed. Cir. 2022)).

The Board noted that when evaluating whether a prior patent or published application is "by another" and qualifies as prior art under § 102(e), what matters is "whether the portions of the reference relied on as prior art, and the subject matter of the claims in question, represent the work of a common inventive entity." Appx28 (quoting *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1356 (Fed. Cir. 2003)). The Board recognized that a common inventive entity "requires *identity* among the respective inventors." *Id.* (emphasis by Board). Hence, "'a sole applicant or patentee and joint applicants or patentees are separate or different "legal entities" and either is treated as "another"' for purposes of determining whether a reference is prior art.'" *Id.* (quoting *In re Land*, 368 F.2d 866, 878, 881 (C.C.P.A. 1966)). The Board rejected Merck's argument that "a reference's disclosure of the work of a 'subset' of named inventors is not prior art against the

invention of all of the named inventors." Appx34. The Board concluded that

Merck had cited "no case where a reference was disqualified as §§ 102(a) or (e)

prior art absent the reference (or its applied teachings) and the claims sharing the

same 'inventive entity.'" Appx36.

Applying the analytical framework of *Duncan Parking Techs., Inc. v. IPS

Grp., Inc.*, 914 F.3d 1347, 1358 (Fed. Cir. 2019), the Board identified two main

disputes between the parties regarding the contributions to the six-line passage

from Bodor that Merck focused on: *First*, whether named inventor De Luca

contributed anything to the passage; *second*, whether Drs. Bodor and Dandiker

contributed anything to the passage.

### a. No contribution by De Luca

The Board concluded that Merck had failed to come forward with "credible

and corroborated evidence that named inventor De Luca provided an inventive

contribution to the 6-line regimen that appears in Bodor." Appx31. The Board

noted that there was an October 2002 product development and license agreement

between Ivax, the employer of Drs. Bodor and Dandiker, on the one hand, and

Ares Trading S.A., one of Merck's corporate affiliates, on the other. Appx22.

Adopting Merck's terminology, the Board used the name "Serono" to refer to

Merck and its affiliate Ares. *Id.* According to Merck, Ivax and Serono entered into

the October 2002 agreement to develop oral cladribine for treating MS, with Ivax

9

developing the oral dosage form and Serono managing the clinical trials. Appx22-23.

The Board considered Merck's argument that testimony from Drs. Bodor and Dandiker (named inventors of Bodor), and Dr. Munafo (named inventor on Merck's patents) supposedly showed that the six lines in Bodor of interest to Merck reflect the work of Serono rather than Ivax. Appx24-35. To corroborate that testimony, Merck relied on two documents: (1) "Draft minutes" from an August 27, 2003 meeting in Amsterdam, and (2) a December 27, 2003 email from someone at Serono to several people at Ivax and Serono with an attached draft "Briefing Document" entitled "Cladribine." Appx24 (citing Appx7197-7204 and Appx7138-7196). Notably, Dr. De Luca, who had served as Merck's Chief IP Counsel, did not testify during the proceedings. None of the three witnesses Merck put forward could say what contribution, if any, De Luca had made to Bodor. And neither of the documents Merck relied on to corroborate the named inventors' contributions even mentions De Luca.[4] Appx31-32. Nor, the Board concluded,

---

[4] Merck says that "the Amsterdam Minutes mentioned Dr. De Luca." Br.17 (citing Appx32 n.17). But the supposed reference to De Luca in the meeting minutes actually mentions a "J.P. deLuca" and so does not appear to refer to named inventor G. De Luca. Appx7200. Even if it did refer to the correct De Luca, however, that fleeting reference in a portion of the meeting dealing with Dandiker's formulation work (which neither side cited in its papers below) says nothing about any contribution by De Luca to the pertinent portions of Bodor.

does the mere fact that De Luca was named as an inventor on the patents-at-issue indicate that he contributed anything to Bodor. Appx33-34.

The Board rejected Merck's argument that the evidence of De Luca's contribution to Bodor was sufficient under a "rule of reason" analysis. The Board pointed out that "as it concerns De Luca's alleged contribution to the 6-line disclosure, the testimonies of Bodor and Dandiker and the few internal documents produced by Patent Owner are silent." Appx36. And Munafo's "vague assertion that De Luca had 'discussions' with 'various team members'" was undermined by Munafo's concession that he "was 'not aware of' and 'cannot give details' about any contribution from De Luca." *Id*. The Board observed that the record concerning De Luca's contribution was "especially wanting" because the events took place more than 20 years ago. *Id.* The Board also noted that Merck never sought to disqualify Bodor as prior art during the prosecution of the patents-at-issue even though the examiner had made rejections based on Bodor "much closer in time to Ivax's and Serono's collaboration." *Id* at n.21.

Because Merck failed to provide "sufficient evidence to support the conclusion that De Luca is an inventor of the subject matter in Bodor being applied" against the patents-at issue, the Board ruled that Bodor is "'by another' and available as prior art." Appx37.

### b.    Contribution by Bodor and Dandiker

As an independent basis for its conclusion that Bodor was "by another," the Board found that Drs. Bodor and Dandiker (who are not named as inventors on the patents-at-issue) contributed materially to portions of Bodor on which Hopewell relied. These include the higher bioavailability and other benefits of the formulation that Bodor discloses; cladribine dosages achieving therapeutic results in MS patients; fine-tuning of cladribine dose and treatment duration; and Bodor's examples (e.g. testing of tablets in MS patients). Appx37(citing Appx1916; Appx1938(22:17-19); Appx1940(24:1-9); Appx1942-1952(Examples 1-4).) The Board found that "at least some of these additional disclosures are highly relevant" to Hopewell's obviousness challenge. Appx37-38. For example, Bodor's teaching of lower interpatient variation with Bodor's tablet provides a reason to use that dosage form, and Bodor's disclosure about fine-tuning the dosage and treatment length supports Hopewell's position that a skilled artisan would have regarded those variables as result-effective and optimizable. *Id.* Significantly, the Board noted that Merck "neither argues nor presents evidence that the [patents-at-issue's] named inventors are responsible for these other disclosures in Bodor." Appx37.

The Board also found that Drs. Bodor and Dandiker contributed to the six-line disclosure on which Merck chose to focus. That disclosure calls for administration of "10 mg of cladribine in the instant complex cladribine-

cyclodextrin complex in the instant solid dosage form" for "five to seven days" in the first two months, followed by a 10-month cladribine-free period. Appx1939(23:15-20). The Board found that Drs. Bodor and Dandiker invented the 10-mg cladribine-cyclodextrin dosage form and that the dosage form "is not only relevant to the obviousness challenge, it is key to Petitioner's showing about how the claimed induction period's total dose limitation is met." Appx39 (citing Appx11063). The Board relied on testimony from Drs. Bodor and Dandiker that their tablets "exhibited properties important to Bodor's regimen, including improved absorption, reduced interpatient variation and increased patient convenience/compliance." Appx39 (citing Appx3995-4001(34:11-40:8); Appx4259-4261(121:21-123:7); Appx4262-4263(124:11-125:6)). The Board also noted testimony from Merck's formulation expert Dr. Meibohm and inventor Munafo about the importance of the formulation in designing a dosing regimen. Appx39-40. Finally, the Board observed that if it "somehow excised the recitation of '10 mg of cladribine in the instant complex cladribine-cyclodextrin complex in the instant solid dosage form' from the remainder of the 6-line disclosure," it would be "unclear what dosage form is used or even how much of the drug would be given." Appx40. The Board concluded its analysis thus: "On the record here, the 6-line disclosure is not solely the invention of the [patents-at-issue's] named

inventors, Drs. Bodor and Dandiker are at least co-inventors of all applied portions, and the Bodor reference is 'by another' and available in full as prior art." *Id*.

### 4. The Board concluded that retreating MS patients with cladribine as claimed would have been obvious in view of the record as a whole.

The Board concluded that Bodor teaches an induction period dosage and duration that overlaps with the claimed total cladribine dose reached at the end of the induction period in the range of about 1.7 mg/kg to about 3/5 mg/kg. Appx 43 (citing Appx1939; Appx1848; Appx1849). Bodor's disclosed regimen would provide a total cladribine dose of 100-140 mg at the end of the induction period, which, for patient of average weight, corresponds to a range of about 1.4 mg/kg to 2 mg/kg. *Id.* (citing Appx1058-1059(¶83) & Appx2440 for average adult weight). And Bodor's ten months of no cladribine treatment is within the claimed cladribine-free period of about 8 months to about 10 months. Appx44.

Although Bodor does not state expressly that there should be additional cladribine treatment after the cladribine-free period, the Board credited the testimony of Hopewell's expert Dr. Miller that a skilled artisan would have understood Bodor to suggest such retreatment because "otherwise the specified length of time of the cladribine-free period is meaningless." Appx44 (citing Appx1939(23:15-24)); Appx53 (same). The Board also credited his explanation that a skilled artisan would have understood that MS is a chronic disease without a

14

cure that typically needs ongoing treatment. In particular, MS patients typically receive more than one course of drug therapy to treat active relapses, prevent relapses, and/or prevent or slow further progression of the disease. Appx44 (citing Appx1061(¶87) & Appx1041-1045(¶¶53-59)).

Similarly, the Board recognized that Stelmasiak teaches a cyclical cladribine regimen with an induction period, a cladribine-free period, and maintenance periods. Appx46 (citing Appx1061-1063(¶¶88-89)). The Board acknowledged that the timing and dosing of Stelmasiak's retreatments are not the same as what is claimed but found that Bodor's treatment regimen (not Stelmasiak's) would be optimized for retreatments: "retreatment (and routine optimization thereof as necessary) at the end of Bodor's 10-month cladribine-free period would have resulted in the claimed maintenance period and dose." Appx58.

The Board credited Dr. Miller's testimony that it would have been logical and feasible for a skilled artisan to use Bodor's two-month treatment period and cladribine dose as the starting point for optimization in a maintenance phase, as Bodor itself teaches that such variables are optimizable. Appx54. The Board likewise concluded that it would be obvious to include a cladribine-free period after the initial treatment and each retreatment period, as expressly shown in Stelmasiak, to help control potential drug toxicity and side effects. Appx55.

The Board rejected Merck's argument that safety concerns relating to immunosuppression would have prevented a skilled artisan from retreating with cladribine. The evidence showed that skilled artisans continued to use cladribine to treat MS patients and considered the drug to have an acceptable safety profile given the drug's promise in treating MS. Appx56-57 (summarizing evidence). The cladribine prior art expressly taught MS-treatment regimens involving cladribine-free periods and retreatment as needed. Appx57. In particular, retreatment was recommended given cladribine's temporary lymphocyte suppression and MS's chronic nature. Appx57-58. The Board credited Dr. Miller's "literature-backed testimony" that "[b]ecause lymphocytes rebound," the "'lengthy but impermanent duration of effect of cladribine means that retreatment will be necessary if cladribine is to become a practical long-term therapy for MS.'" Appx58 (quoting Appx5492-5493(¶71) (quoting Appx2310)).

Ultimately, the Board concluded that a skilled artisan would have been motivated to combine the teachings of Bodor and Stelmasiak to arrive at the subject matter of the challenged claims with a reasonable expectation of success. Appx79.

**5. The Board declined to read the claims as requiring the dose to be determined based on a patient's weight.**

Although in its Patent Owner Response Merck did not propose any claim construction relating to how the cladribine dosage should be determined, and addressed the issue in only a cursory manner in its sur-reply, the Board nevertheless considered Merck's argument that the claims should be interpreted to exclude administering doses to patients that fall within the recited range but were not determined based on the patient's weight. The Board could "see no adequate basis for limiting the claims" as Merck requested. Appx47. The Board declined "to import into the claims any express patient-weighing step or to construe the claims to require preexisting knowledge of a patient's weight." *Id.* The Board correctly stated that "the claims include no active steps of determining a patient's weight or performing *a priori* calculations to arrive at any alleged 'weight-based' dosing before cladribine is taken or administered." Appx47-48. The Board also noted that "the total dose in [exemplary] claim 36 is only recited passively in a wherein clause—'wherein the total dose of cladribine *reached at* the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg." Appx48 (citing Appx201(19:17-21)) (emphasis by Board).

Furthermore, the Board found it obvious to convert so-called flat expressions of the dose to weight-based expressions because "in this field, those expressions

are often used interchangeably to describe cladribine doses for treating MS." Appx48. The Board also noted that when, during prosecution, the Examiner cited Bodor's alleged flat dose against the claims, Merck did not argue the distinction between flat and weight-based expressions of the dose. Appx49 n.23. In response to Merck's argument that Bodor does not expressly disclose patient weights, the Board concluded that "reading Bodor's disclosure such that the regimen would not apply to at least averaged-weighted patients is unsupported and illogical." Appx50. The Board also noted that "[g]iving 140 mg to any patient weighing between about 50-80 kg (110-176 pounds) would result in an induction dosage within the bounds" of the claimed range. Appx50-51. The Board also rejected Merck's argument that Stelmasiak taught away from weight-based dosing. Appx52-53.

After considering all of the evidence, the Board held the challenged claims unpatentable. This appeal followed.

## SUMMARY OF THE ARGUMENT

**I.**     The C.C.P.A.'s *In re Land* decision established the rule that, in evaluating whether a reference counts as prior art under 102(e), what matters is who the inventors are of the particular disclosures from the earlier reference that are relied upon to establish invalidity. If the *same inventive entity* is responsible for the relied-upon disclosure and the challenged patent, then the disclosure cannot be relied upon as prior art. The logic underlying the rule, is that a patent to one set of

inventors should not be invalidated by the earlier disclosure of their own work, even if that disclosure occurs in an application by a different set of inventors. Part I.A.1., *infra.*

This Court has consistently applied that same analysis when evaluating whether an earlier reference is "by another" for purposes of § 102(e). The Board correctly applied that analysis in finding that the relied-upon portions of Bodor are by another. Merck has no case-law support for its proposed contrary rule that a reference should not count as "by another' if any subset of the named inventors is responsible for the disclosure in the earlier reference. Merck's argument repeatedly elides the distinction between the inventors of what is claimed in the earlier reference (who are named on that reference and may well be a subset of the inventors on the challenged patent), and the inventors responsible for the relied-upon disclosure in the earlier reference (who may not be named on the reference and who need to be the same as those of the challenged claims in order for the disclosure not to be "by another" for § 102(e) purposes). Part I.A.2, *infra*.

Merck's argument that this Court should interpret the prior-art provisions of the Patent Act to encourage collaboration is unpersuasive, especially because Congress already addressed the issue in the CREATE Act, which provides a pathway for the work done pursuant to a joint research agreement not to be counted as prior art against a challenged patent under appropriate circumstances.

Merck has never argued that the CREATE Act applies to the present case. Part I.A.3., *infra*.

Merck's argument that the Board violated the Administrative Procedure Act by following this Court's binding precedent rather than applying an unsupported statement in the Manual of Patent Examining Procedure ("MPEP") as its rule of decision is both forfeited and meritless. Even though the parties engaged in post-hearing briefing on the "by another" issue, Merck never asked the Board for an opportunity to supplement the record with additional evidence of De Luca's contribution to Bodor. The Board did not err by failing to grant relief that Merck never requested. Furthermore, it is well settled that the MPEP lacks the force of law and is not an appropriate authority to rely on for substantive legal questions about the meaning and requirements of the Patent Act—especially when doing so would upend 60 years of precedent from this Court and its predecessor. The Court should have no illusions as to why Merck is seeking a remand for further proceedings into De Luca's contribution to the claimed invention: these patents are set to expire in May and October of 2026, respectively. Merck is playing for a remand to run out the clock on Hopewell: A remand—even one destined to again result in a decision that the patents are invalid—will take time and thus delay the onset of generic competition until the patents expire. Part I.B, *infra*.

Substantial evidence supports the Board's findings that Merck failed to come forward with evidence of De Luca's contribution to the relied-upon portions of Bodor. De Luca did not testify in this case, and none of the witnesses could recall De Luca's contribution. Neither of the putatively corroborating documents mentions a contribution by De Luca. Hence, the Board was right to conclude that Bodor counts as 102(e) prior art. Part I.C., *infra*.

Bodor is 102(e) prior art for the additional, independent reason that substantial evidence supports the Board's findings that Drs. Bodor and Dandiker (who are named as inventors of Bodor) contributed to the relied-upon portions of Bodor, which include more than just the six-line passage on which Merck chose to focus. The tablet that they invented is an integral part of Bodor's disclosure not only of the recommended dosing regimen but also of other aspects of Bodor's teachings, such as the advantages of oral dosage forms and the status of dosage and treatment length as optimizable result-effective variables. Part I.D, *infra.*

**II.** Substantial evidence supports the factual findings underpinning the Board's obviousness conclusion. The proceedings below involved a battle of the experts that Merck lost. In its brief, Merck repeatedly cites arguments and testimony from its own expert that the Board found unpersuasive while ignoring the contrary evidence and testimony from Hopewell's expert. Merck harps on the fact that Bodor does not expressly describe retreatment, while ignoring that MS is

a chronic disease and that cladribine's effects are temporary, so that retreatment is a logical expedient for treating the illness. The Board credited testimony that skilled artisans would have understood Bodor as contemplating retreatment after the end of its 10-month cladribine-free period. In any event, Stelmasiak expressly teaches retreatment after a cladribine-free period. The Board credited evidence that, using Bodor's dosing regimen as a starting point, a skilled artisan would arrive at the claimed maintenance regimen through routine optimization with a reasonable expectation of success. Given the highly deferential standard of review for agency fact-finding, the Court should affirm the conclusion of obviousness. Part II, *infra.*

**III.** The Board correctly rejected Merck's invitation to import into the claims a requirement that the dose of cladribine actually be calculated using a patient's weight. As written the claims simply require that the "total dose of cladribine reached" at the end of a treatment period fall into a particular range, which is expressed in mg/kg. As long as a total dose falling into the claimed range is administered, it does not matter how that dose is determined or whether the patient's weight is known before the dose is administered. On their face, the claims encompass both weight-based and flat dosing. Moreover, when summarizing prior art involving *flat* dosing, the patents-at-issue simply convert the figures from mg to mg/kg format without comment. Similarly, when arguing that the *flat* dosing

22

regimen in Bodor reflects the work of the named inventors of the patents-at-issue, Merck cites documents that use only mg/kg units. These and other examples confirm that merely expressing doses in mg/kg does not mean that the claimed doses must be chosen based on prior knowledge of the patient's weight. Part III, *infra.*

## LEGAL STANDARDS

This Court "review[s] the Board's ultimate obviousness determinations de novo and its underlying factual findings for substantial evidence*." Voice Tech Corp. v. Unified Pats., LLC*, 110 F.4th 1331, 1342 (Fed. Cir. 2024) (cleaned up). "Motivation to combine is one of those underlying factual issues." *Id.*; *see also Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017).

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938). "If two inconsistent conclusions may reasonably be drawn from the evidence in record, [the Board's] decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1356 (Fed. Cir. 2018) (cleaned up). Thus, even if this Court concludes it might "have decided the factual dispute

at hand differently than the Board did, it is not the province of this court to do so."

*Roku, Inc. v. Universal Elecs., Inc.*, 63 F.4th 1319, 1326 (Fed. Cir. 2023).

Whether a reference is "by another" for prior-art purposes is "a question of law based on underlying facts." *Google LLC v. IPA Techs. Inc.,* 34 F.4th 1081, 1085 (Fed. Cir. 2022). Although the petitioner in an *inter partes* review has the ultimate burden of proving unpatentability, once the petitioner makes a *prima facie* case that a reference is by another, the burden of production shifts to the patent owner to go forward with evidence that the relied-upon portions are by the same inventive entity as the challenged patent. *Id.* at 1085-86.

## ARGUMENT

### I. BODOR IS PRIOR ART BECAUSE IT IS "BY ANOTHER."

### A. Bodor is "by another" because the relevant portions were conceived of by a different inventive entity than the challenged claims.

Pre-AIA section 102(e) provides that a person shall be entitled to a patent unless "the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent ...."[5] As this Court has explained, "the statute's reference to 'by another' means that an application issued to the same inventive entity cannot qualify as

---

[5] The parties agree that § 102(a)'s recitation of "by others" is equally addressed herein under the "by another" analysis of § 102(e). Br. 27 n.10.

§ 102(e) prior art." *EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*, 859 F.3d 1341, 1345 (Fed. Cir. 2017). Hence, notwithstanding Merck's protestations to the contrary, the Board correctly applied settled law when it ruled that a prior art reference is "by another" if the relevant portions are by a different inventive entity—that is, a different set of inventors—than the challenged patent.

1. ***In re Land*** **established the rule that an earlier reference is not by another only if the relied-upon disclosure is by the same inventive entity as the claims being challenged.**

*In re Land* is instructive on this issue. In that case, this Court's predecessor addressed a joint application by Land and Rogers that had been rejected on the basis of an earlier application by Land alone and an earlier application by Rogers alone. 368 F.2d at 880. The Court, in an opinion by Judge Rich, acknowledged that if the rejection had been based on "another joint Land and Rogers application, instead of two individual applications, the rule would apply that an applicant's copending applications or publications are not prior art to him." *Id.*

The Court explained that the mere fact that the earlier references named, on their face, different inventive entities than the challenged patent did not, by itself, resolve the question whether the earlier references were "by another": "The question here is not merely whether A or B, individually, is or is not 'another' to A & B jointly on a theory of 'different legal entities.' Of course they are different 'entities' in the sense that an invention made jointly by A & B cannot be the sole

25

invention or A or B and vice versa ...." *Id.* at 879. The key question, the Court explained, is not who authored the earlier references but rather whether the portions of the earlier references disclosed the work of Land and Rogers jointly, rather than their individual work: "When the joint and sole inventions are related, as they are here, inventor A commonly discloses the invention of A & B in the course of describing his sole invention and when he so describes the invention of A & B he is not disclosing 'prior art' to the A & B invention, even if he has legal status as 'another.'" *Id.* In other words, *if the disclosure in the prior art reveals the work of the same inventive entity as the challenged patent*, then the work is not "by another," no matter who is listed as the author or inventor on the earlier reference.

The *Land* Court went on to observe that, to qualify as prior art under section 102(e), an earlier patent application needs to have been filed "before the invention … by the applicant" on the challenged patent. *Id.* This condition cannot be satisfied, however, if "the 102(e) reference patentee got knowledge of the applicant's invention from him … or …had knowledge of the joint applicants' invention by being one of them, and thereafter describes it." *Id.* In those circumstances, the 102(e) reference patentee "necessarily files that application after the applicant's invention date and the patent as a 'reference' does not evidence that the invention, when made, was already known to others." *Id.*

Applying that legal analysis to the facts before it, the Court concluded that the earlier patents to Land and to Rogers individually did not disclose their joint invention; therefore, the earlier references were "by another" and "should be regarded as prior art." *Id.* at 881. That is because there was "no indication that the portions of the references relied on disclose anything that they did jointly," nor was there "any showing that what they did jointly was done before the filing of the reference patent applications." *Id.* Applying that same analysis to the facts of the present case leads to the same conclusion: there is no indication that the portions of Bodor relied upon disclose anything that all four named inventors of the patents-at-issue did jointly. And the only thing the record shows the inventors doing jointly—namely, filing the applications for the patents-at issue—was done only after the filing of the Bodor application. Hence, the disclosure in Bodor is "by another" and should be regarded as prior art.

Merck cites *Land* only twice in its brief, and its cursory treatment of this important case is revealing. The first time (at 28), Merck cites *Land* for the proposition that "an earlier disclosure by A & B is potentially a disclosure 'by another' with respect to a subsequent patent application by A alone." But that gets the facts of *Land* precisely backwards: *Land* involved a disclosure by A alone—a *subset* of the joint inventors—and held that the disclosure was prior art to the joint application of A & B. That holding cannot be squared with the rule for which

27

Merck advocates on appeal, namely, that a disclosure by a subset of the joint inventors cannot be "by another" and so cannot be prior art.[6] Merck argues in its brief that "[w]hen A initially discloses an invention, and then *later* collaborates within the grace period with B," A's earlier disclosure should not count as prior art to a patent naming A & B as coinventors because doing so "would only punish A for collaborating with, and *sharing* credit with, B." Br. 29 (emphasis in original). Yet, *Land* holds the contrary: Land's earlier disclosure was prior art to the patent naming Land and his collaborator Rogers as coinventors. *See Land*, 368 F.2d at 881.

The second time Merck cites *Land* (at 29), it takes a sentence from the opinion out of context and overreads it. As noted above, the *Land* Court did say that the analysis is not just a matter of asking "merely whether A or B, individually, is or is not 'another' to A & B jointly on a theory of 'different legal entities.'" *Land*, 368 F.2d at 879. When the sentence is taken in context, it is apparent that what the Court meant was that the mere fact that the earlier

---

[6] Notably, in the earlier case of *In re Blout*, 333 F.2d 928, 931 (C.C.P.A. 1964), the Court had remarked that "Rogers is not 'another' to Blout and Rogers"—essentially the position that Merck currently espouses. But in *Land*, the Court called that phrasing "unfortunate" and explained that the "true basis" for the *Blout* decision was that "the alleged anticipatory disclosure in the Rogers patent was a description of the Blout and Rogers joint invention, not the invention of another." *Land*, 368 F.2d at 879 n.10.

references name, on their face, different inventive entities than the challenged patent did not, by itself, require the conclusion that the earlier references were "by another." In other words, the fact that the earlier references named different inventors was the start of the analysis rather than the end of it. And that is because, as Judge Rich explained, "inventor A commonly discloses the invention of A & B in the course of describing his sole invention and when he so describes the invention of A & B he is not disclosing 'prior art' to the A & B invention, even if he has the legal status as 'another.'" *Id.* This point is immensely important: what matters it *not* whether the inventive entity *named on the earlier reference* is different from that named on the challenged patent; rather, what matters is whether the inventive entity *responsible for the relied-upon disclosure* is different from that of the challenged claims.

In its argument on appeal, Merck attempts to elide this distinction by taking the quoted sentence from *Land* out of context. Specifically, Merck wants to read that sentence to mean that the disclosure of work by one inventive entity might not be "by another" when asserted as prior art against later patent claims by a different inventive entity. But *Land* actually holds the opposite. If a patent to A & B is being challenged, then in order for the earlier reference not to count as prior art, the portion of the reference relied upon needs to be the disclosure of work by A & B— not by any other inventive entity.

## 2. This Court's subsequent cases uniformly follow the rule of *In re Land.*

The Board was correct when it observed that Merck "cites no authority holding that a reference's disclosure of the invention of a *subset* of inventors is disqualified as prior art against the invention of *all* the inventors." Appx36 (emphasis in original). In fact, this Court and its predecessor have, for nearly 60 years, consistently followed the analytical framework of *Land* under which the Court looks to see whether the portions of the reference patent relied on as prior art were invented by same inventive entity as the challenged claims. In *Duncan Parking* this Court restated the pertinent analytical framework as a three-part test:

> (1) determine what portions of the reference patent were relied on as prior art to anticipate the claim limitations at issue, (2) evaluate the degree to which those portions were conceived "by another," and (3) decide whether that other person's contribution is significant enough, when measured against the full anticipating disclosure, to render him a joint inventor of the applied portions of the reference patent.

*Duncan Parking*, 914 F.3d at 1358. If, after this analysis is done, the inventive entity responsible for the relied-upon portion of the earlier reference is different from the inventive entity on the challenged claims, then the earlier reference is section-102(e) prior art, as the holding in *Duncan Parking* demonstrates. There, the Court held that a later patent to King was invalidated by an earlier patent to King because the portion of the earlier patent relied upon disclosed the joint work of King and Schwarz: "the anticipating embodiment was the joint invention of King

and Schwarz, an inventive entity different from that of the [later] patent, and the [earlier] patent is prior art under 35 U.S.C. § 102(e)." *Id.*at 1359. In *Duncan Parking*, as in *Land*, the decisive fact was the relied-upon portion of the earlier reference was by a *different inventive entity* than the challenged claims.

The other side of the same coin is *In re Kaplan*, 789 F.2d 1574 (Fed. Cir. 1986), where this Court held that an earlier patent to Kaplan was not prior art to a later patent to Kaplan and Walker because the portion of the earlier patent relied upon disclosed the joint work of the Kaplan and Walker—*the same inventive entity* as in the challenged patent. *Id.* at 1575-76; *see also id* at 1580 (calling it "impermissible" to use as prior art "a disclosure of appellants' own joint invention which had been incorporated into the Kaplan sole disclosure").

*Applied Materials Inc. v. Gemini Rsch. Corp.*, 835 F.2d 279 (Fed. Cir. 1988) follows the same logic. There, the district court had erroneously invalidated a patent to McNeilly, Benzing, and Locke based on an earlier patent to McNeilly and Benzing, on the basis that the named inventors on the two patents were different and so constituted different inventive entities. *Id.* at 281. This Court reversed, citing and quoting *Kaplan* and *Land* for the proposition when inventor A, in the course of applying for a patent, discloses the joint invention of A & B, then "he is not disclosing 'prior art' to the A & B invention, even if he has legal status as 'another.'" *Id.* Again, the reference was not prior art because the relied-upon

portion of the earlier reference disclosed work by the inventors of the challenged claims (even though the set of named inventors on the earlier reference was different).

Just as its predecessor had done in *Land*, this Court went on to consider the timing of the disclosure vis-à-vis the date of the invention. The Court observed that the applications at issue in *Applied Materials* grew from the same original application: "Accordingly, if the invention claimed in the [later] patent is fully disclosed in the [earlier] patent, this invention had to be invented before the filing date of the [earlier] patent and cannot be 102(e) prior art to the [later] patent." *Id.* That is because when the 102(e) reference patentee "had knowledge of the joint applicants' invention" by "being one of them," and "thereafter describes it, he necessarily filed the application after the applicant's invention date." *Id.* (quoting *Land*, 368 F.2d at 879).

In addressing *Applied Materials*, Merck again attempts to elide the distinction between the inventors of what is *claimed* in a 102(e) reference (who are named as inventors on the reference) and the inventors of what is *disclosed* in the portions of the reference relied upon as prior art. Br.29-33. The *Applied Materials* Court recognized that the invention claimed in the earlier patent to McNeilly and Benzing was conceived by a different inventive entity than the invention claimed in the later patent to McNeilly, Benzing, and Locke (and the district court in

*Applied Materials* erred in thinking that that difference was enough to make the earlier patent "by another."). But the earlier patent did not qualify as a 102(e) reference because although it claimed only the invention of McNeilly and Benzing, it disclosed the invention of McNeilly, Benzing, and Locke. We know this because the ground of the rejection was *anticipation*, meaning that all of the elements claimed in the later patent to McNeilly, Benzing, and Locke were disclosed in the earlier one to McNeilly and Benzing. *Applied Materials*, 835 F.2d at 281. And the disclosure in the earlier patent necessarily happened only *after* the invention of the McNeilly-Benzing-Locke invention because, as discussed above, both inventions claimed priority to the same prior application, and the invention must have occurred before that application was filed. *Id.*

Merck is therefore wrong when it describes *Applied Materials* as holding that the earlier application "was not disclosure 'by another,' because McNeilly and Benzing were common to both applications." Br.31. If having two out of the three joint inventors on the earlier patent were enough to make the earlier patent not by another, then there would have been no need for this Court to reprise the whole analysis of *Land* and *Kaplan*. The lesson of *Applied Materials* is not, as Merck would have it, that "the addition of Locke as a co-inventor did not deprive McNeilly and Benzing of their right to patent what they invented." Br. 31. Rather, it is that the disclosure by McNeilly and Benzing of the later-claimed invention by

33

McNeilly, Benzing, and Locke did not deprive the latter set of three inventors of their right to patent what they invented.

### 3. *In re Land* is consistent with sound patent policy.

Merck argues that requiring the relied-upon portions of the 102(e) prior art reference to reflect the work of the same inventive entity as the challenged patent has "a chilling effect on collaboration between original inventors and additional inventors during the one-year grace period." Br. 3. This supposed chilling effect is dubious, not least because the same-inventive-entity requirement has been the law for nearly 60 years without having noticeably chilled collaboration or innovation in the United States.

In the present case, three of the named inventors of the patents-at-issue arguably contributed to Bodor, but De Luca did not. If those three inventors wanted a patent on what they disclosed, then they could have filed a patent application on it without De Luca. If they had done so (and if they had been able to show that Drs. Bodor and Dandiker did not contribute to the relevant portions of Bodor), then Bodor would not count as prior art against their later-filed patent.

But the relevant question is not whether the three inventors' contributions should count as prior art against *them*; rather, the question is whether their prior work should count as prior art against *De Luca.* There is no reason in law or logic why Bodor should not count as prior art against De Luca, when the relevant

34

portions of Bodor reflect no contribution by him. The principle that one's own work should not count as prior art has no applicability to De Luca on the current record—the relevant portion of Bodor is simply not De Luca's "own work."

Moreover, Congress has considered the issue that innovation often involves collaboration among different inventors, and it has addressed that issue in the Cooperative Research and Technology Enhancement Act of 2004 Pub. L. No. 108-453 ("The CREATE Act"). The CREATE Act amended pre-AIA 35 U.S.C. § 103(c) to provide that patentability is not precluded on the basis of obviousness where subject matter that qualified as prior art is developed by a person different from the person claiming the invention, if (1) "a joint research agreement was in effect on or before the date" of the claimed invention; (2) "the claimed invention was made as a result of activities undertaken within the scope of the joint research agreement;" and (3) "the application for patent for the claimed invention discloses or is amended to disclose the names of the parties to the joint research agreement." Pre-AIA 35 U.S.C. § 102(c)(1)-(3) (Pub. L. No. 108-453, § 2, 118 Stat. 3596, enacted Dec. 10, 2004).

The CREATE Act was enacted to "spur the development of new technologies by making it easier for collaborative inventors who represent more than one organization to obtain the protection of the U.S. patent system for their inventions." 108 Cong. Rec. H10,219 (daily ed. Nov. 20, 2004) (statement of Rep.

Sensenbrenner). The Act was meant to allow collaborative teams to share non-public information without having that information qualify as prior art. *See* 108 Cong. Rec. S2,558-59 (daily ed. Mar. 10, 2004) (statement of Sen. Hatch). These are precisely the policy issues that Merck professes to be concerned about. Yet Merck did not even attempt to meet the requirements of the CREATE Act, which demands more than merely alleging, some 20 years after the fact, that prior art was subject to a joint research agreement. Merck did not articulate how the patents-at-issue resulted from "the activities taken within the scope of the" Ivax-Serono agreement, nor did Merck disclose the "the names of the parties to the joint research agreement" in the patent applications, as required by pre-AIA 35 U.S.C. § 103(c)(2)(C).

This Court should not distort the Patent Act to address Merck's proffered policy concerns when Congress has already addressed them specifically in the CREATE Act. *Cf. RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general," especially where Congress has "deliberately targeted specific problems with specific solutions.").

**B. The Board did not violate the APA by following this Court's precedents.**

Merck argues that the Board violated the Administrative Procedure Act ("APA") by following this Court's precedents described above because in doing so the Board deviated from MPEP §2132.01 (9th ed., 2022), which states that "at least one joint inventor's disclosure of his or her own work within the year before the application filing date cannot be used against the application as prior art." Merck feigns surprise that it needed to demonstrate that De Luca contributed to the relied-upon portions of Bodor and claims that if it had been told that it needed to come forward with evidence of a contribution by De Luca, it "could have proceeded differently—such as by providing more evidence of Dr. De Luca's specific contributions to the disclosure in Bodor." Br.37.

As an initial matter, Merck never asked the Board for an opportunity to provide more evidence of De Luca's contributions (even though the Board took post-hearing briefing on the 102(e) issue) and thus forfeited that argument. It is too late to ask for that relief for the first time on appeal. *In re Watts*, 354 F.3d 1362, 1367 (Fed. Cir. 2004) (emphasizing that appellant "not be permitted to raise arguments on appeal that were not presented to the Board.").

Next, Merck's argument fails on its own terms because it takes its cherry-picked sentence from the MPEP out of context. For example, MPEP § 2136.04 states

that an earlier reference "by a different inventive entity, whether or not the application shares some inventors in common with the patent, is *prima facie* evidence that the invention was made 'by another'" as set forth in § 102(e)—a position irreconcilable with Merck's arguments on appeal. MPEP § 2136.05(b) is even more explicit in embracing *In re Land* and rejecting Merck's position:

> In the situation where one application is first filed naming sole inventor X and then a later application is filed naming joint inventors X & Y, it must be proven that the joint invention was made first, was thereafter described in the sole inventor's patent, or [patent application publication], and then the joint application was filed.

MPEP § 2136.05(b) (citing *In re Land*, 368 F.2d 866 (C.C.P.A. 1966). Hence, the MPEP itself refutes Merck's argument that it did not need to provide evidence of De Luca's contribution to Bodor.

In any event, the Board was correct to follow this Court's cases rather than some loose language in the MPEP, which "does not have the force of law." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 n.10 (Fed. Cir. 1995); *see also Regents of Univ. of New Mexico v. Knight*, 321 F.3d 1111, 1121 (Fed. Cir. 2003) ("The MPEP sets forth PTO procedures; it is not a statement of law"). In the context of patent examination, the MPEP describes Patent Office procedures "on which the public can rely." *Patlex Corp. v. Mossinghoff,* 758 F.2d 594, 606 (Fed. Cir. 1985). But there is no question of Patent Office procedure at issue in this case. Rather, at issue is the substantive legal question of what 35 U.S.C. § 102(e) requires—a topic on

which the MPEP is entitled to no weight. *See EmeraChem Holding, LLC v. Volkswagen Grp. of Am., Inc.*, 859 F.3d 1341, 1348 (Fed. Cir. 2017) ("To the extent the MPEP describes our case law differently … that interpretation does not control."). Moreover, the Board has stated that, even regarding procedural matters, "[t]he MPEP is not binding authority in *inter partes* reviews" because it is "a manual for *patent examiners* during *examination*," and "*inter partes* review is not examination." *Smith & Nephew, Inc. v. Arthrex, Inc.*, No. IPR2016-00505, 2016 WL 5389056 (P.T.A.B. July 27, 2016) (emphasis in original).[7]

As the Board observed, the only authority cited in MPEP § 2132.01—*In re Katz*, 687 F.2d 450 (C.C.P.A. 1982)—does not support the proposition that the "common inventive entity" inquiry requires anything less than identity. Appx35. Katz was the sole named inventor on the challenged patent and the sole inventive contributor to the pertinent portions of the prior-art reference; the other named authors were students working under Katz's direction and control. *Katz*, 687 F.2d at 455. Hence, the disclosure was of the inventive contribution of Katz alone—the

_____

[7] Merck's citations in footnote 11 (at 34-35) of patent examiners apparently accepting deficient inventorship declarations during prosecution is unpersuasive. The only non-prosecution citation is to a discretionary denial of IPR institution on multiple grounds that did not squarely address the requirements for 102(e) prior art. *Pfizer, Inc. v. Genentech, Inc.*, IPR2018-00373, Paper 12 (PTAB Aug. 2, 2018).

*same* inventive entity on the challenged patent. Merck has not cited, and Hopewell had not found, any case from the Court in which only a subset of the named inventors made a disclosure of their work that was *not* deemed prior art to a patent issued to a different inventive entity.

The Court should have no illusions as to why Merck is seeking a remand for further proceedings into De Luca's contribution to the claimed invention: these patents are set to expire in May and October of 2026, respectively. Merck has sought to delay this appeal at every possible opportunity—for example, by waiting until the last possible moment to file a notice of appeal and then seeking an extension of the deadline to file its opening brief so that it would have more than 120 days from the time of its notice of appeal and more than six months from the adverse Board decisions to file its brief. Even though there is no reason to think that that De Luca, who was Merck's Chief IP counsel (Appx7580(¶21)), contributed in any way to Bodor, Merck is playing for a remand to run out the clock on Hopewell in this Hatch-Waxman case. A remand—even one destined to again result in a decision that the patents are invalid—will take time and thus delay the final FDA approval of Hopewell's generic cladribine product and delay the onset of competition to Merck until the patents expire.

### C. Substantial evidence supports the Board's conclusion that De Luca did not contribute to the relied-upon portions of Bodor.

With the legal premise to Merck's "by another" challenge foreclosed by long-standing precedent, Merck is left with a run-of-the-mill challenge to the Board's factual findings that Dr. De Luca did not contribute to the relevant portions of Bodor, and that both Drs. Bodor and Dandiker did contribute. But those findings are entitled to deference under the substantial-evidence standard of review.

Bodor, on its face, lists Drs. Bodor and Dandiker as inventors and Ivax Corporation as assignee. Appx1915. In contrast, the patents-at-issue name Drs. De Luca, Ythier, Munafo, and Lopez-Bresnahan as inventors and Merck Serono S.A. as assignee. Appx190, Appx203. The difference in named inventors constitutes *prima facie* evidence that Bodor is by another. The burden thus shifted to Merck to come forward with evidence that the relied-upon portions of Bodor were invented by the named inventors of the patents-at-issue. *See Google*, 34 F.4th at 1085–1086. Merck asserts (at 42) that the Board improperly shifted the burden of persuasion on unpatentability to Merck, but the Board did no such thing. Rather, the Board simply found that Merck failed to come forward with evidence sufficient to overcome the *prima face* case that Bodor is by another. Appx30-37.

41

## 1. Merck did not even address all of the disclosures of Bodor on which Hopewell relied.

In an obviousness case, Step 1 of the *Duncan Parking* analysis requires

Merck to identify which portions of Bodor were "relied upon and relevant to

establishing obviousness." *Google*, 34 F.4th at 1086. Merck chose to focus only on

a six-line passage from Bodor, but the Board correctly found that that passage was

not the only relevant passage that Hopewell relied upon. Appx37-38. The table

below summarizes other relevant passages from Bodor on which Hopewell relied:

| Relied-Upon Disclosures | Bodor | Petition |
|---|---|---|
| Benefits of oral cladribine | Appx1918(2:9-13) | Appx11017 |
| MS treatment dosages achieving therapeutic results | Appx1938(22:17-19) | Appx11055 |
| Fine-tuning cladribine's dose/length of treatment | Appx1940(24:1-9) | Appx11055-Appx11056 |
| Cladribine tablets for treating MS | Appx1942-Appx1952(Examples 1-4) | Appx11047, Appx11057-Appx11059 |

Merck argues (at 43-45) that the Board erred in considering passages other

than its preferred six lines. But Merck's attempt artificially to limit the analysis

only to its preferred six-line passage is unmoored from the case law and illogical to

boot. As this Court has explained:

> The portions of the reference being considered must be relied upon *and* relevant to establishing obviousness. Otherwise, a party challenging a patent could artificially alter the inventive entity for comparison by citing extraneous portions of a multi-inventor prior art reference, thereby making it "by others" even if the portions of the reference necessary for

42

establishing obviousness had the same inventive entity status as the challenged patent.

*Google*, 34 F.4th at 1086 n.3 (emphasis in original). Hence, the Board correctly considered *all* of the portions of Bodor that were relied upon and relevant to establishing obviousness.

Merck's reliance on *LSI Corp. v. Regents of Univ. of Minn.*, 43 F.4th 1349, 1356 (Fed. Cir. 2022) and *Ethicon LLC v. Intuitive Surgical, Inc.*, 847 F. App'x 901, 909 (Fed. Cir. 2021) for its narrower reading of *Duncan Parking* is inapposite because those cases (like *Duncan Parking* itself) were about *anticipation*, not obviousness, so it is not surprising that they focused on passages relevant to anticipation. Neither case holds or implies that, *in an obviousness case*, portions of a reference relevant to motivation to combine or reasonable expectation of success should not be considered when evaluating whether prior art is "by another."

The Board correctly recognized that the additional relied-upon disclosures were relevant to such matters as why a skilled artisan would choose a solid tablet dosage form and whether a skilled artisan would regard the cladribine dose and length of treatment as optimizable result-effective variables. Appx38. Merck's utter failure even to attempt to show that these passages are attributable solely to the named inventive entity of the patents-at-issue confirms that they are by another and can be relied upon as prior art.

### 2. De Luca did not contribute to the six-line dosing regimen on which Merck focused.

Regarding the six-line disclosure on which Merck did present argument, Merck failed to come forward with credible, corroborated evidence of any contribution to the disclosure in Bodor by patent lawyer De Luca. *Google*, 34 F.3d at 1087 (requiring corroboration of testimony "that an individual is an inventor of a potentially invalidating prior art reference").

As an initial matter, De Luca did not even testify in this case. Munafo—the only inventor who testified—was unable to identify what contribution De Luca made to the disclosures in Bodor. As the Board observed, Munafo's declaration stated "generically that De Luca was one of several 'team' members and, in some unspecified way, helped design the subject dosing regimen." Appx32 (citing Appx7579(¶18), Appx7580(¶21)). It is not clear who at Serono worked on the dosing regimen, as Munafo stated that his Serono team included his co-inventors "along with many others." Appx7579(¶18). Munafo testified that De Luca worked "in a department which was remote" to Munafo's, so Munafo was "not aware of" De Luca's "personal intellectual contribution." Appx4884-4885(94:4-95:8). Indeed, the only information that Munafo had about De Luca was that De Luca's "department was also represented in the project team." *Id.* Hence, Merck is wrong when it suggests (at 41) that Munafo's testimony showed that De Luca contributed

to the relevant disclosures in Bodor. Nor do the Amsterdam Minutes or the Briefing Document that Merck relies on to corroborate Munafo's testimony supply the missing information about De Luca, as neither document mentions him.. Appx7197; Appx7138.[8] Neither Dr. Bodor nor Dr. Dandiker had any knowledge about a contribution by De Luca. Bodor had "no connection with Serono." Appx4091(130:2-11). When asked whether he had "an understanding of whether Dr. De Luca contributed to developing the dosing regimen for treating multiple sclerosis with oral cladribine," Dandiker responded: "I cannot say anything on that." Appx4222-4223(84:2-85:19).

Reliance on the so-called rule of reason does not help Merck in overcoming the *prima facie* case that Bodor is by another. The Board considered evaluated whether the record indicated that De Luca had contributed to the relevant passages in Bodor. Appx28-34; Appx36-37. The problem for Merck is not that the Board imposed too high a corroboration requirement, as Merck suggests (at 40). Rather, the problem is that *no one knows* what, if anything, De Luca contributed to the dosing regimen disclosed in Bodor, and none of the documents that Merck relied

---

[8] Merck never argued before the Board that the mention of J.P. de Luca in the Amsterdam Minutes referred to named inventor G. De Luca. Even if the reference were to the relevant inventor, that passing mention would not illuminate how, if at all, De Luca contributed to Bodor. *See supra* note 4; Appx 32 n.17.

upon indicates any such contribution. Although Merck relies on the uncorroborated declaration of Munafo, he ultimately admitted that he is "not aware of" and "cannot give details": about De Luca's contribution. Appx4885(95:3-8). The record amply supports the Board's conclusion that Merck did not come forward with sufficient evidence to overcome the *prima facie* case that Bodor is by another. Appx37.

### D. Substantial evidence supports the Board's finding that Drs. Bodor and Dandiker contributed to the relied-upon disclosures in Bodor.

Regardless of whether De Luca is deemed an inventor of the relevant portions of Bodor, that reference is by another for the additional, independent reason that Drs. Bodor and Dandiker made inventive contributions to those portions, as discussed below. Substantial evidence supports the Board's finding in this regard, which provides another, independent basis for affirmance.

The six lines in Bodor that Merck focuses on disclose treating MS with "10 mg of cladribine in the instant complex cladribine-cyclodextrin complex in the instant solid dosage form" for "five to seven days" in the first two months, followed by a 10-month cladribine-free period. Appx1939(23:15-20). The record before the Board generally showed that large teams from Ivax and Serono worked on developing an oral cladribine product to treat MS. But knowledge of who contributed what to the project more than 20 years ago has largely been lost due to

the passage of time, and the two documents that Merck relies on to corroborate inventor Munafo's story do not corroborate contributions of the named inventors, as distinct from contributions by Drs. Bodor and Dandiker.

For example, neither of those documents mentions a 10 mg tablet, let alone indicates whose idea it was to develop at 10 mg tablet—Munafo testified "it was a joint team agreement." Appx4925(135:9-14). The use of a 10-mg tablet first appears in the '247 provisional application, to which Bodor claims priority and on which Dr. Bodor is the only named inventor. Appx7045. Hence, the record does not show that the named inventors on the patents-at-issue invented the 10 mg dose for use in the regimen. Similarly, while the regimen disclosed in Bodor involves administering cladribine for five to seven days, Merck's documents disclose only five days. Appx7200-7201; Appx7184-7188. Munafo's assertion that his team at Serono considered "6 or 7 days per month" is entirely uncorroborated. Appx7592-7593(¶¶47-48). The first time a regimen longer than five days is mentioned is in the '247 provisional application by Dr. Bodor. Appx7066(20:6-10). Munafo admitted that "[f]requency of administration" is "an integral part of" a regimen; Merck has not shown that the named inventors of the patents-at-issue invented the claimed dosing frequency. Appx4853-4854(63:17-64:14).

Drs. Bodor and Dandiker invented Bodor's "instant solid dosage form." Appx3986-3987(25:13-26:2); Appx4225-4227(87:15-89:2). Munafo admitted that

Bodor's tablets "became an element that" Munafo and his Serono team "were considering when designing this dosing regimen." Appx4869-4870(79:8-80:4). Drs. Bodor and Dandiker recognized the tablets' usefulness in treating MS, as they are the sole inventors of MS treatment methods using those tablets, claimed in U.S. Patent Nos. 7,888,328 and 8,785,415. They each testified that their tablets exhibited properties critical in Bodor's disclosed dosing regimen: increased absorption, bioavailability, reduced interpatient variation, and increased patient convenience and compliance. Appx3995-4005(34:11-44:8); Appx4020-4021(59:9-60:14); Appx4186-4187(48:15-49:13); Appx4259-4263(121:21-125:6); Appx4658-4673(42:1-57:21). The tablets are also integral to the additional relied-upon disclosures for Hopewell's arguments, which Merck never argued were attributable to the named inventors of the patents-at-issue. *Supra* Part I.C.1. Accordingly, the contributions of Drs. Bodor and Dandiker are significant enough to make them co-inventors of all relied-upon disclosures.

In sum, substantial evidence supports the Board's finding that Drs. Bodor and Dandiker are at least co-inventors of all relied-upon portions of Bodor; therefore, the Bodor reference is by another and available in full as prior art. Appx40. This provides yet another basis for affirmance.

## II. THE BOARD CORRECTLY DETERMINED THAT THE PATENTS-AT-ISSUE WERE OBVIOUS IN VIEW OF BODOR AND STELMASIAK.

As often happens in obviousness cases, there was a battle of the experts before the Board, and Merck lost. Time after time in its brief, Merck cites its own expert's opinion, ignores the competing evidence that Hopewell put before the Board, and then wrongly asserts that no substantial evidence supports the Board's findings. But the Board's opinions addressed in detail and rejected Merck's many arguments against obviousness while crediting the testimony of Hopewell's medical expert Dr. Miller, whose testimony is in accord with common sense.

On appeal, Merck focuses mainly on whether the retreating with cladribine in the claimed maintenance period would have been obvious. Merck consistently ignores the basic fact that MS is a chronic autoimmune disorder, yet the effects of cladribine are temporary, making retreatment a logical expedient in managing the disease. Arguing by analogy, Merck says (at 51) that if a dentist tells a patient not to have X-rays for three months, the expiration of the three-month period does not mean that the patient should immediately undergo an X-ray. But Merck's premise is wrong—dental X-rays are not used to treat a chronic degenerative disease that is incurable and has an unpredictable progression, so the motivation to undergo follow-up X-rays is not analogous to the motivation to re-treat a chronically ill MS patient.

## A. Substantial evidence supports the Board's findings regarding retreatment.

Merck's repeatedly says that Bodor does not *expressly* describe re-treating MS patients with cladribine after the 10-month cladribine-free period. That might be a problem if Hopewell had argued *anticipation* by Bodor, but it does not diminish the force of Hopewell's actual argument—obviousness.

The Board credited testimony from Hopewell's expert Dr. Miller that because MS is a disease without a cure that typically needs ongoing treatment, a skilled artisan would have "thought to re-administer cladribine again after the specified cladribine-free period." Appx44 (citing Appx1061(¶87). The Board also credited Dr. Miller's statement that "the specified length of time of the cladribine-free period is meaningless" unless some retreatment is contemplated. Appx53 (citing Appx1059-1061(¶¶84-86); Appx1033-1039(¶¶39–49)). The Board likewise credited his testimony that "[t]he most logical reading of Bodor would have included a re-treatment period, especially because such re-treatments were consistent with prior clinical studies where patients relapsed during or after cladribine therapy." Appx53-54 (citing Appx5491(¶70)). Furthermore, the Board observed that Merck's expert Dr. Lublin did "not provide another explanation of why Bodor specifies the length of time of the cladribine-free period." *Id.* The Board's findings on this score are thus amply supported by the record evidence.

In any event, although Bodor does not expressly teach retreatment after the cladribine-free period, Stelmasiak does. Merck notes (at Appx53) that Stelmasiak's maintenance dose is different from the claimed maintenance does. That is true but inconsequential, since the evidence showed, and the Board found, that a skilled artisan would use *Bodor's* treatment regimen (not Stelmasiak's) as a starting point for the maintenance dose and then apply routine optimization to arrive at the claimed maintenance dose. Appx54 (citing Appx1074-1076(¶¶102-104); Appx5504-5505(¶88)). The use of Bodor as the starting point for optimizing the maintenance dose is consistent with Merck's own statements during prosecution of the '903 patent-at-issue. There, Merck had conceded that if Bodor were understood to imply a re-treatment (as the examiner had found), then "the teachings of the reference would suggest that the *same* dosing regimen be applied to the patient (10 mg of cladribine administered 5-7 days each month for two consecutive months followed by another 10 month period of time in which the patient received no treatment." Appx55(quoting Appx2132).

Hopewell did not argue, and the Board did not find, that either Bodor or Stelmasiak taught *precisely* the claimed retreatment protocol. Rather "the challenge is obviousness based on the art's combined teachings." Appx58. As this Court has stated, "[n]on-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of

references." *In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986). The Board found that "retreatment (and routine optimization thereof as necessary) at the end of Bodor's 10-month cladribine-free period would have resulted in the claimed maintenance period and dose, and substantial evidence supports that conclusion. Appx58, Appx61-62 (citing Appx1080-1081(¶¶109-110)).

The Board rejected Merck's argument (at 51) that the prior art contemplated retreatment only when certain criteria were met. The Board found that "[t]he prior art here *specific to cladribine* expressly teaches MS-treatment regimens that include cladribine-free periods and suggests retreating patients with cladribine as needed." Appx57 (citing Appx1939(23:15–24); Appx1848; Appx1888; Appx2310-2311; Appx1033-1039(¶¶38–49)). The Board also credited the "literature-backed" testimony of Hopewell's expert that a skilled artisan "would have understood that, '[b]ecause lymphocytes rebound, the art recognized that the "lengthy but impermanent duration of effect of cladribine means that retreatment will be necessary if cladribine is to become a practical long-term therapy for MS." Appx58 (citing Appx5492-5493(¶71) (quoting Appx2310).

Merck's quibble (at 52) with the Board's statement that a skilled artisan "would consider" retreatment is also inapposite. The Board made that statement in a footnote pointing out the tension between Merck's argument that cladribine was such a dangerous drug that a skilled artisan would not retreat with cladribine *at all*

with Merck's counsel's statement at oral argument that Bodor specified a 10-month cladribine-free period "for safety." Appx53 (citing Appx11870-11871(62:11-63:22)). The Board noted that Merck's counsel's statement was consistent with the proposition that, "by specifying the number of months of the cladribine-free period, Bodor is suggesting one could safely retreat the patient as needed when that specified period elapsed—or at least the POSA would consider doing so." Appx53 n.26. The Board's obviousness conclusion does not rest on that passing remark in a footnote about the implications of Merck's counsel's own statements; rather, the obviousness determination rests on a painstaking examination of the totality of the record, including examples of cladribine retreatment in the prior art. Appx 57-58 (citing Appx1033-1039(¶¶38–49)).

## B. Substantial evidence supports the Board's findings regarding motivation to modify Bodor.

Merck is wrong when it says (at 52) that Dr. Miller did not testify "that a skilled artisan would have been *motivated* to re-treat." (emphasis by Merck). He stated expressly that a skilled artisan "would have been motivated to retreat" relapsing patients with cladribine after "ten months of no treatment." Appx1011-1013(¶17); *see also* Appx1071-1074(¶¶99-102); Appx5498-5500(¶¶79-82). Nor did the Board err by focusing on testimony that a skilled artisan would have been motivated to re-treat patients who showed signs of relapse. *Contra* Br. 54. As

written, the claims cover re-treating both relapsing patients and non-relapsing patients. That it would be obvious to re-treat relapsing patients in the claimed manner suffices to make the claim invalid as obvious, in view of the "long-established rule that 'claims which are broad enough to read on obvious subject matter are unpatentable even though they also read on nonobvious subject matter.'" *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1281 (Fed. Cir. 2015); *see* Appx64 (citing Appx1072-1075(¶¶100-102)). Whether it would *also* be obvious to retreat non-relapsing patients is irrelevant.

Merck is similarly wrong when it argues (at 56) that Dr. Miller disparaged cladribine in an earlier paper and that the Board failed to address his ostensible change of position. Dr. Miller's previous comments were directed to a different cladribine product in a reference by Rice, which Dr. Miller said showed "positive effects" in medical imaging scans but "unconvincing clinical benefit" in a group of patient with a more-difficult-to-treat progressive form of MS. Appx5069; Appx6172-6174(21:13-23:1)). The Board considered those prior comments and noted that the claims at issue encompass treating all forms of MS, not just the hard-to-treat progressive form. Indeed, the clinical data in the patents-in-suit involves the easier-to-treat relapsing-remitting form of the disease; there is no evidence that the claimed treatment would clinically benefit the hard-to-treat progressive MS patients. That the drug may not work well for the hardest-to-treat type of MS does

not make it any less obvious to use it to treat other types of MS. Furthermore, to the extent the claims require efficacy, Rice reported decreased lesions on the affected nerves across all doses, which is one measure of efficacy. Appx74-75, Appx1038-1039(¶¶47-49) (citing Appx1887; Appx1895)). And the Board found "persuasive[]" Dr. Miller's testimony "that reduced lesions would have been reasonably expected with Bodor's regimen." *Id.* (citing Appx5451(¶16)). Simply put, Dr. Miller did not alter his position on cladribine.

Finally, Merck argues that the Board erred by treating lymphocyte level as a result-effective variable to be optimized. According to Merck (at 58), the Board's analysis "makes no sense" because "*safety* is not a result that could allow one to optimize *efficacy* of an MS regimen." (emphasis by Merck). Merck is wrong about therapeutic efficacy being the only relevant result.

Although, as the Board noted, there is no fixed lymphocyte-reduction "bright-line threshold," Cladribine's effect was commonly assessed by monitoring lymphocytes, with a sustained reduction reflecting a treatment response. Appx71; Appx1029(¶32); Appx1034-1035(¶40); Appx1063-1065(¶90); Appx5450-5451(¶14); Appx5505-5506(¶90). Indeed, Merck's own expert conceded that one can "confirm the pharmacological effect of cladribine by measuring lymphocyte count" and that this effect "can be dependent on the dose of cladribine administered." Appx4475(72:5–13); Appx4477(74:15-21).

55

As the Board recognized, "Merck wrongly posits routine-optimization must correlate with *therapeutic efficacy*, but the doctrine applies to *any* property known to be affected by the optimized variable." Appx73 (emphasis in original) (citing *E.I. DuPont De Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1009 (Fed. Cir. 2018). One can, for example, optimize the dose and duration of cladribine treatment to ensure that lymphocyte counts remain at a safe level. The Board correctly concluded that "even if lymphocyte count is a measure of patients' level of immunosuppression and primarily a safety consideration, it can still be the 'result' in a result-effective variable analysis, given that it was recognized that cladribine dose and duration are correlated with lymphocyte count." Appx76.

Merck set itself a difficult task on appeal by arguing that "[n]o substantial evidence supports the Board's [obviousness] conclusion." Br.48. In fact, as discussed above, ample evidence in the record supports the factual findings underlying the Board's obviousness conclusion. Given the exceedingly deferential standard of review for agency fact-finding, this Court should affirm.

## III. THE CLAIMS DO NOT REQUIRE DETERMINING THE DOSE BASED ON THE PATIENT'S WEIGHT.

The Board correctly rejected Merck's argument that because the claims express cladribine amounts in units of mg/kg, they should be construed to require

56

administering a dose based on the patient's weight. Merck's claim construction is incorrect.

The parties agree that exemplary claim 36 of the '947 patent requires not only that "the total dose of cladribine reached at the end of the induction period is from about 1.7 mg/kg to about 3.5 mg/kg" but also that "the total dose of cladribine reached at the end of the maintenance period is about 1.7 mg/kg."Appx201(19:14-30). On its face, the claim requires that the *total dose* administered to the patient by the end of each treatment period be in the claimed range, which is expressed in mg/kg. Merck argues that to practice the claim, one must administer a cladribine dose that is "determined based on the patient's weight (measured in kilograms) during the induction and maintenance periods." Br.59. But plain text of the claim contains no step of weighing the patient or determining the dose based on the patient's weight. Given the absence of any such step, the claim is practiced by administering the correct total dose of cladribine, *regardless* of how that dose is determined, and *regardless* of whether the patient's weight is known.

Although Merck says (at 62) that it is not arguing for adding to the claims a patient-weighing step or a requirement of preexisting knowledge of the patient's weight, that is sleight of hand. For, *in the very next sentence* Merck concedes that, under its construction, "to practice the claims as written" someone "will know the

patient's weight and use it to determine the correct dosage." *Id.* Regardless of

whether one labels it as adding limitations to the claims or something else, Merck's

limiting construction is not supported by the text of the claims or the intrinsic

record. Rather, as long as a total amount of cladribine is administered to a patient

that, when expressed in mg/kg, falls within the claimed range, the claim element is

satisfied.

A patient of average weight (e.g., 70 kg) treated with Bodor's dosing

regimen would reach a total dose of 1.4-2 mg/kg at the end of the induction period.

If, as Merck suggests (at 60) a 100 kg patient were given 170 mg of cladribine in

total during a treatment period, the patient would reach 1.7 mg/kg. Similarly, a 70

kg patient given 120 mg of cladribine in total according to Bodor's treatment

regimen would also reach 1.7 mg/kg, regardless of whether the person

administering the drug knew the patient's weight. Thus, applying Bodor's regimen

to patients of various weights results in dosages within the range claimed in the

patents-at-issue.

To try to heighten the distinction between weight-based and flat dosing,

Merck argued that Stelmasiak teaches away from weight-based dosing, but the

Board correctly rejected that argument. Appx52. Stelmasiak says that "there was

no indication that a 'good response' is related to the actual cladribine dose per

body weight." Seen in context, this simply means that body weight did not

distinguish responders from nonresponders. Appx1850-1851; Appx5490(¶68). But Stelmasiak nowhere disparages expressing dosages in mg/kg units. Nor does it suggest that expressing dosages in mg/kg and administering those doses would result in an ineffective MS treatment. Appx52. To the contrary, as the Board observed, "Stelmasiak suggests doing so would not have changed its results." Appx53. Merck's expert Dr. Lublin likewise provided "no evidence that weight-based cladribine dosing was superior or not 'equivalent' to flat, fixed dosing." Appx53 (citing Appx5490(¶68)).

The usage of various units in the prior art undermines Merck's argument that because the dose is expressed in mg/kg, the claims require administration of amounts based on prior knowledge of the patient's weight. For example, according to Merck, Bodor "articulates a flat-dosing regimen." Br.13. Yet Bodor expresses cladribine doses in both mg format and mg/kg format. For example, Merck's favorite six-line passage from Bodor describes administration of "10 mg of cladribine" once a day for "five to seven days." Appx1939. Yet Bodor describes therapeutically effective dosages for MS in the literature as ranging "from about 0.04 to about 1.0 mg/kg/day." Appx1938. Bodor's use of both dose formats is consistent with the Board's observations that "the evidence points to the obviousness of converting so-called flat and weight-based expressions of the dose"

and that "in this field, those expressions are often used interchangeably to describe cladribine doses for treating MS." Appx48.

As the Board noted, the patents-at-issue never highlight any distinction between flat dosing and weight-based dosing. Appx49. In fact, when summarizing prior art, such as the Grieb reference, which discloses flat dosing, the "Background of the Invention" section of the patents-at-issue simply converts the figures to mg/kg format without comment. Appx193(3:3-12); Appx1972. Merck errs in holding Bodor to a higher disclosure standard than Merck's own patents. *See Paice LLC v. Ford Motor Co*., 881 F.3d 894, 902 (Fed. Cir. 2018) (agreeing that a patent owner cannot hold a prior art reference "to a different standard than it holds the claimed invention" (cleaned up)); *see also In re Epstein*, 32 F.3d 1559, 1568 (Fed. Cir. 1994) ("that [an] appellant did not provide the type of detail in his specification that he now argues is necessary in prior art references supports" finding that "one skilled in the art would have known how to implement the features").

Tellingly, when arguing that the *flat* dosing regimen in Bodor reflects the work of the named inventors of the patents-at-issue, Merck cites documents that show only *weight-based* units. Br.12-13 (citing Appx7200; Appx7188-7189). That Merck relies upon a regimen expressed in mg/kg to try to corroborate the inventorship of Bodor's disclosure of a regimen expressed in mg confirms that

merely expressing doses in mg/kg does not limit the claims to doses chosen based on prior knowledge of the patient's weight.

Whether a treatment regimen meets the claims ultimately depends on the number of milligrams of cladribine administered at the end of the treatment period. The Board thus correctly rejected Merck's proposed claim construction.

## CONCLUSION

The Board's decisions should be affirmed.

April 16, 2025

Respectfully submitted,

 /s/ John Christopher Rozendaal

John Christopher Rozendaal
Eldora L. Ellison
Chandrika Vira
Olga A. Partington
Christina E. Dashe
Tyler C. Liu
STERNE KESSLER GOLDSTEIN &
 FOX PLLC
1101 K Street, NW
Floor 10
Washington, DC 20005
(202) 371-2600

*Counsel for Appellee Hopewell
Pharma Ventures, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 25-1210, -1211

**Short Case Caption:** Merck Serono S.A. v. Hopewell Pharma Ventures, Inc.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,998 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/16/2025

Signature: /s/ John Christopher Rozendaal

Name: John Christopher Rozendaal

Save for Filing